**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LEZMOND CHARLES MITCHELL              :
Register Number 48685-008             :
U.S. Penitentiary Terre Haute         :
Terre Haute, IN 47802                 :
                                      :
                Plaintiff,            :
                                      :
            v.                        :       Civil Action No. _____
                                      :
WILLIAM P. BARR                       :       **CAPITAL CASE**
Attorney General                      :
U.S. Department of Justice            :       **EXECUTION SCHEDULED FOR**
950 Pennsylvania Avenue, NW           :       **AUGUST 26, 2020**
Washington, DC 20530                  :
                                      :       **Time: 6:00 p.m. EST**
JEFFREY A. ROSEN                      :
Deputy Attorney General               :
U.S. Department of Justice            :
950 Pennsylvania Avenue, NW           :
Washington, DC 20530                  :
                                      :
ROSALIND SARGENT-BURNS                :
Acting Pardon Attorney                :
Office of the Pardon Attorney         :
950 Pennsylvania Avenue, NW           :
Washington, DC 20530                  :
                                      :
MICHAEL CARVAJAL                      :
Director                              :
Federal Bureau of Prisons             :
U.S. Department of Justice            :
320 First Street, NW                  :
Washington, DC 20534                  :
                                      :
JEFFREY E. KRUEGER                    :
Regional Director                     :
Federal Bureau of Prisons             :
North Central Region                  :
U.S. Department of Justice            :
400 State Avenue, Suite 800           :
Kansas City, KS 66101                 :
                                      :
and                                   :
                                      :

1

T.J. WATSON                              :
Complex Warden                           :
U.S. Penitentiary Terre Haute            :
4700 Bureau Road South                   :
Terre Haute, IN 47802                    :
                                         :
In their official capacities; and,       :
                                         :
U.S. DEPARTMENT OF JUSTICE               :
950 Pennsylvania Avenue, NW              :
Washington, DC 20530                     :
                                         :
FEDERAL BUREAU OF PRISONS                :
U.S. Department of Justice               :
320 First Street, NW                     :
Washington, DC 20534                     :
                                         :
OFFICE OF THE PARDON ATTORNEY            :
950 Pennsylvania Avenue, NW              :
Washington, DC 20530                     :
                                         :
                        Defendants.      :

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
FOR VIOLATIONS OF THE FIFTH AND EIGHTH
AMENDMENTS TO THE
UNITED STATES CONSTITUTION**

## I.    NATURE OF ACTION

1.    Plaintiff Lezmond Charles Mitchell ("Mitchell") brings this action for injunctive

and declaratory relief for violations of his rights under the United States Constitution,

specifically his Fifth Amendment Rights to due process and equal protection, and his Eighth

Amendment right against arbitrary imposition of the death penalty, which have arisen in the

course of his attempt to make use of promulgated procedures created for individuals under a

federal death sentence seeking executive clemency.

//

//

2

## II.    PARTIES

2.      Plaintiff Mitchell is a U.S. citizen and a member of the Navajo Nation. He is incarcerated at the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute"). He is a death-sentenced prisoner under the control and supervision of the Federal Bureau of Prisons ("BOP"), an agency within the U.S. Department of Justice ("DOJ"). He is scheduled for execution by lethal injection at USP Terre Haute on August 26, 2020.

3.      Defendant William P. Barr ("Attorney General Barr") is the Attorney General of the United States. Mitchell was remanded to Attorney General Barr's custody upon Mitchell's convictions and death sentence. Under the Federal Death Penalty Act ("FDPA"), Attorney General Barr is the executive responsible for carrying out sentences of death against federal prisoners. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

4.      Defendant Jeffrey A. Rosen is the Deputy Attorney General of the United States. Under the supervision of the Attorney General, he oversees the day-to-day operations of the BOP and the Office of the Pardon Attorney ("OPA"). He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

5.      Defendant Rosalind Sargent-Burns is the Acting Pardon Attorney. She is charged with managing the day-to-day operations of the OPA, including oversight of the review and investigation of clemency petitions and making recommendations on petitions, pursuant to the clemency process, to the Deputy Attorney General and Attorney General. She is sued here in her official capacity for the purpose of obtaining declaratory and injunctive relief.

6.      Michael Carvajal is the director of the BOP. He oversees the operations of BOP facilities, staff, and individuals in BOP custody, and serves the Deputy Attorney General and

Attorney General. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

7.      Defendant Jeffrey E. Kreuger is the Regional Director of the North Central Region of the BOP. As such, he is responsible for USP Terre Haute, and he plays a critical role in the oversight of the operations of that prison, including policy implementation. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

8.      Defendant T.J. Watson is the Complex Warden of USP Terre Haute, which is where Mitchell is confined. In that position, he is charged with management of USP Terre Haute and the oversight and implementation of operations and policies there. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

9.      Defendant DOJ is a cabinet-level department of the federal government responsible for enforcement of the laws of the United States, for oversight and implementation of procedures relating to executive clemency, and for oversight of the BOP and implementation of BOP policies.

10.      Defendant OPA is an office within the DOJ responsible for reviewing, investigating, and making favorable or unfavorable recommendations regarding petitions for executive clemency.

11.      Defendant BOP is a sub-agency of the DOJ responsible for the care, custody and control of individuals incarcerated by the federal government.

12.      John Does I-X are employed or retained by the BOP to consult with, prepare for, and/or carry out Mitchell's execution. Mitchell does not know, and the Attorney General and the BOP Defendants have not revealed, their identities or positions. They are sued here in their official capacities for the purpose of obtaining declaratory and injunctive relief.

//

13.     Defendants are acting, and each of them at all times relevant hereto were acting, in their respective official capacities with respect to all acts described herein, and were in each instance acting under the color and authority of federal law in violating Mitchell's constitutional rights. Upon information and belief, unless preliminarily and permanently enjoined, each of the Defendants intends to act in his or her official capacity and under the authority of federal law in violating Mitchell's constitutional rights.

### III.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 2201 in that the claim for injunctive relief arises under the United States Constitution and federal statutes, including 28 U.S.C.A § 2201, in that an actual controversy exists between Defendants and Mitchell involving actions taken by Defendants and policies applied by Defendants to Mitchell in violation of rights guaranteed by the United States Constitution. Defendants have obstructed Mitchell's ability to avail himself of the established procedures available to death-sentenced individuals for meaningful review of his petition for executive clemency.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) because the DOJ, Office of the Pardon Attorney, and BOP headquarters are in this district; because a substantial part of the events giving rise to Mitchell's claims, including Defendants' actions pertaining to the executive clemency process in Mitchell's case, took place and continue to take place in this District; and because Defendants, the majority of whom reside in this District, were acting in their official capacities in violating Mitchell's constitutional rights.

//

//

## IV.   FACTUAL BACKGROUND

### A.   Mitchell's First Notice of Execution (2019)

16.     On July 25, 2019, Mitchell was served with a letter from the Warden of the United States Penitentiary at Terre Haute informing Mitchell that his execution had been scheduled for December 11, 2019 and further advising that:

> Under Title 28, Code of Federal Regulations, Sections 1.1 and 1.10, if you wish to seek commutation of sentence or reprieve from the President, petitions may be emailed directly to the DOJ Pardon Attorney at USPARDON.Attorney@usdoj.gov. If email is not available, petitions may be mailed to with the Office of the Pardon Attorney, U.S. Department of Justice, 950 Pennsylvania Avenue, RFK Main Justice Building, Washington, D.C 20530. The Office of the Pardon Attorney is responsible for receiving and processing on behalf of the President all requests for clemency. If you wish to apply for commutation of sentence your petition must be filed within 30 days of the date you receive this notice.

(Ex. 1 at 001.)

17.     On July 31, 2019, Mitchell was served with an amended notice ("July 31 Notice"), which corrected a minor error in the July 25 Notice and acknowledged that error. In all other ways, the July 31 Notice was identical to the July 25 Notice, and included, word-for-word, the above quoted paragraph about clemency proceedings. (Ex. 2 at 002.) With this amended notice, Mitchell's clemency application was due by August 30, 2019, leaving OPA, DOJ, and the President almost three-and-a-half months to complete the clemency process.

18.     On August 30, 2019, in accordance with 28 C.F.R. § 1.1, 1.10(b) and the July 31 Notice, Mitchell timely filed a formal petition for commutation of his death sentence with the Office of the Pardon Attorney ("OPA"). OPA acknowledged receipt on September 4, 2019, and informed counsel that they would accept supplemental materials submitted on or before September 19, 2019. (Ex. 3 at 003 (citing 28 CFR § 1.10(b).) Mitchell timely filed supplemental materials in support of his clemency petition on September 19, 2019. On October 2, 2019, OPA

6

granted Mitchell's request to make a live presentation in support of his clemency petition, and undersigned counsel arranged to meet with OPA on October 22, 2019 for a 90-minute live presentation. (Ex. 3 at 007.)

19.    On October 4, 2019, the United States Court of Appeals for the Ninth Circuit stayed Mitchell's execution pending the outcome of a preexisting appeal. *Mitchell v. United States*, No. 18-17031 (9th Cir., October 4, 2019), Dkt. 26. On October 7, 2019, OPA informed counsel for Mitchell that, in light of the Ninth Circuit's order staying Mitchell's execution, OPA would be cancelling Mitchell's live presentation and administratively closing Mitchell's clemency petition without prejudice. (Ex. 3 at 008.) A subsequent email from OPA clarified that if the stay were lifted and the original execution date reinstated, the clemency process could be restored with the petition submitted on August 30. (Ex. 3 at 009.) However, "[s]hould the originally imposed execution date pass and a new notification of execution be given from the Bureau of Prisons at some point in the future, then the process would have to begin again." (Ex. 3 at 009.)

**B.    Mitchell's Second Notice of Execution (2020)**

20.    Mitchell's execution was stayed through the completion of his Ninth Circuit Appeal. On April 30, 2020, the Ninth Circuit issued its decision in *Mitchell v. United States*, 958 F.3d 775 (9th Cir. 2020) ("*Mitchell III*"). Mitchell timely filed a petition for rehearing/rehearing en banc, which was denied. *Mitchell v. United States*, No. 18-17031, Dkt. 39 (9th Cir. July 8, 2020). On July 15, 2020, Mitchell's motion to stay the mandate in order to petition the Supreme Court for further review was denied. *Id.* at Dkt. 45. On July 20, 2020, Mitchell filed a petition for rehearing/rehearing en banc challenging the denial of his motion to stay of the mandate. *Id.* at Dkt. 46.

//

21.     On July 29, 2020, Defendant Watson served Mitchell with a letter ("2020 Notice") which informed Mitchell that his execution had been rescheduled for August 26, 2020. (Ex. 4 at 010.) Although the first and final paragraph tracked almost exactly the language from the previous two notices, conspicuously absent was the paragraph advising Mitchell about his ability to seek clemency.

22.     Later in the day on July 29, the Government filed a letter with the Clerk of the Ninth Circuit, notifying the court that it set Mitchell's execution date for August 26, 2020. *Mitchell v. United States*, No. 18-17031. Dkt. 47 (9th Cir., July 29, 2020).

23.     Given OPA's rules against adjudicating clemency petitions when the petitioner is involved in active litigation concerning his convictions or sentencing, it was unclear whether OPA would accept Mitchell's clemency petition when the Government rescheduled Mitchell's execution while litigation was still pending in the Ninth Circuit. *See also* 28 C.F.R. § 1.10(b) ("No petition for reprieve or commutation of a death sentence should be filed before proceedings on the petitioner's direct appeal of the judgment of conviction and first petition under 28 U.S.C. 2255 have terminated.").

24.     Nevertheless, because he was given less than 30 days' notice of his execution date, on July 31, 2020, Mitchell filed a petition for executive clemency with OPA. (Ex. 5 at 011-273, Clemency Petition and Attachments.) OPA scheduled an oral presentation in support of clemency from undersigned counsel on August 11, 2020. (Ex. 6 at 282.)

25.     At the oral presentation, counsel for Mitchell inquired about the review process and whether Mitchell would receive a decision about a grant or a denial of clemency before the execution date. (Ex. 13 ¶ 4.) Kira Gillespie, Senior Attorney Advisor at OPA, could not say whether it would be possible to ensure a clemency decision one way or the other before Mitchell's scheduled execution date. (Ex. 13 ¶ 5.)

26.     Also on August 11, 2020, the Ninth Circuit denied Mitchell's petition for rehearing/rehearing en banc, and the mandate issued on August 18, 2020. *Mitchell v. United States*, No. 18-17031, Dkts. 52, 55. With the mandate issued, Mitchell's stay of execution was lifted. *Id.* at Dkt. 26.

27.     The primary thrust of Mitchell's clemency petition is that his death sentence is an affront to the sovereignty of the Navajo Nation. Mitchell is Navajo, and the victims in his case were also Navajo, and the crime took place on the Navajo reservation. In the FDPA, Congress included a provision called the "tribal option," which gave Native American tribes the authority to determine whether they wanted the death penalty to apply in cases of intra-Indian crimes occurring on tribal land where federal jurisdiction was predicated on Indian country. 18 U.S.C. § 3598. Despite the Navajo Nation's opposition to the death penalty generally, and to its imposition for Mitchell specifically, DOJ exploited a legal loophole and capitally prosecuted Mitchell for the general applicability crime of carjacking resulting in death. Three Ninth Circuit Judges have strongly urged that the executive seriously consider granting clemency in this case. *Mitchell v. United States*, 790 F.3d 881, 897 (9th Cir. 2015) ("*Mitchell II*") (Reinhardt, J. dissenting); *Mitchell v. United States*, 958 F.3d 775, 793 (9th Cir. 2020) (Christen, J. concurring) and 794 (Hurwitz, J. concurring) ("I respectfully suggest that the current Executive should take a fresh look at the wisdom of imposing the death penalty. . . . I hope that the Executive will carefully consider whether the death penalty is appropriate in this unusual case.").

28.     Mitchell's request for clemency is joined by Navajo Nation President Jonathan Nez and Vice President Myron Lizer, who have made the Navajo Nation's position clear: a commutation of the death sentence and imposition of a life sentence "honors our religious and traditional beliefs, the Navajo Nation's long-standing position on the death penalty for Native Americans, and our respect for the decision of the victim's family." (Ex. 7 at 283.) The Navajo

Nation "strongly hold[s]" that "life is sacred" and believes a grant of clemency "is appropriate to begin to restore harmony and balance to the affected families and to the inherent sovereignty of the Navajo Nation." (Ex. 7 at 284.) President Nez and Vice President Lizer also emphasized what an affront Mitchell's capital prosecution was to tribal sovereignty, and asked President Trump to grant clemency so the two nations could "move forward" and "continue to work on the importance of protecting [the Navajo] people." (Ex. 7 at 284.) President Nez also participated in Mitchell's oral presentation in support of clemency, to reiterate the Navajo Nation's request for a life sentence for Mitchell.

29.     The Navajo Nation Council has also petitioned President Trump for executive clemency. (Ex. 7 at 285-86.) In a letter from Speaker Seth Damon, the Council reiterated its "opposition to the death penalty and its application to Lezmond Mitchell." (Ex. 7 at 286.) Because "[t]ime is of the essence" in light of the impending execution date, the Council urged President Trump to recognize the sovereign-to-sovereign relationship of Indian tribes and the Federal Government and "exercise mercy for our tribal member, Lezmond Mitchell." (Ex. 7 at 286.) Additionally, Native American rights organizations, including the National Congress of American Indians, the Native American Rights Fund, and the Native American Bar Association of Arizona, have also petitioned for executive clemency for Mitchell. (Ex. 7 at 287-91; Ex. 12 at 301-02.)

30.     United States Senator Tom Udall of New Mexico, whose constituency includes portions of the Navajo Nation, has also personally written to President Trump, requesting that clemency be granted in this case. (Ex. 11 at 299-300.)

31.     As of the date of filing, Mitchell's clemency petition remains pending. On August 21, 2020, counsel for Mitchell inquired of OPA as to when a decision might be forthcoming, and were told that OPA was not permitted to provide any information about whether a decision

would be made before the execution. (Ex. 13 ¶ 7.) Mitchell's execution is currently set to take place in less than two days.

32.     On August 24, 2020, counsel for Mitchell emailed Assistant United States Attorney Krissa Lanham, of the United States Attorney's Office for the District of Arizona, who represents the Government in the criminal and post-conviction proceedings concerning Mitchell's criminal convictions and sentences. Counsel informed AUSA Lanham of the nature of this lawsuit, inquired as to who would be representing the Government in this matter, and to schedule a meet and confer concerning the motion for a temporary restraining order and injunction. (Ex. 13 ¶ 8.) AUSA Lanham and Mitchell's counsel spoke at approximately 4:15 p.m. E.S.T., and at that time she read a prepared statement as follows: "Having received both written and oral submissions from Mr. Mitchell, the Office of the Pardon Attorney has completed its investigation and the department has made its recommendation to the President. *See* 28 CFR 1.6 and 1.10. Accordingly, no additional time is needed to complete the executive clemency process." (Ex. 13 ¶ 8.)

## C.     The commutation process for individuals under death sentence.

33.     The procedures for a person under a federal death sentence to petition the President of the United States for commutation are set forth in the Code of Federal Regulations, 28 C.F.R. § 1.1-1.10, with § 1.10 specifically governing the process petitioners must follow in capital cases. 28 C.F.R. § 1.10 was promulgated on August 2, 2000, in advance of what were then the first executions to be carried out by the federal government since the U.S. Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972). The procedures applicable to persons under a sentence of death, among other requirements, set a strict deadline for the time for filing a clemency petition, and for submitting supplemental materials in support of the petition, to the Office of the Pardon Attorney in the DOJ. They describe the process—and only avenue—

for the petitioner to present testimony and other materials in support of his petition to the Office

of the Pardon Attorney, and the process—and only avenue—for the victims of an offense to

provide their position on the petition. *See* 28 C.F.R. § 1.10. They specifically provide that

"*[o]nly one request for commutation of a death sentence will be processed to completion*, absent

a clear showing of exceptional circumstances." *Id*. (emphasis added).

34.     In addition to the procedures specifically applicable to persons under a death

sentence seeking commutation, 28 C.F.R. §§ 1.1-1.11 set forth formal regulations that must be

followed by anyone petitioning the President for relief in the form of executive clemency or

pardon. Among them are regulations requiring submission of any petition for such relief to OPA,

although petitions are to be addressed to the President, and requiring certain information be

included in the petition; regulations describing the role of the Attorney General in investigating

cases in which clemency relief is sought with assistance from agencies, such as the Federal

Bureau of Investigation, in determining issues about disclosure of files and contacting victims,

and in recommending favorable action by the President; regulations that permit the Attorney

General to delegate duties related to the clemency process to others within DOJ, including OPA;

and those that describe the process for notifications of grants and denials of petitions. *See* 28

C.F.R. §§ 1.1-1.11.

35.     Section 1.8(b) provides:

> Except in cases in which a sentence of death has been imposed,
> whenever the Attorney General recommends that the President deny
> a request for clemency and the President does not disapprove or take
> other action with respect to that adverse recommendation within 30
> days after the date of its submission to him, it shall be presumed that
> the President concurs in that adverse recommendation of the
> Attorney General, and the Attorney General shall so advise the
> petitioner and close the case.

28 C.F.R. § 1.8 (emphasis added). By extension, this rule establishes a requirement that, in capital cases, the President must take action, and cannot render an adverse recommendation by relying on the 30-day lapse rule.

36.     The clemency regulations purport to be "advisory only." 28 C.F.R. § 1.11. The President's authority to grant pardons and reprieves and to commute sentences derives from Article II, Section 2, Clause 1 of the U.S. Constitution. However, these procedures have been developed over the course of the last two centuries, in tandem with the growth of the administrative state, for members of the general public requesting a pardon as well as prisoners in custody requesting commutation, to seek and potentially obtain such relief.

37.     In the early years of the Republic, the President relied directly on the advice of the Secretary of State and the Attorney General for reviewing petitions and exercising his pardon and clemency powers. By 1858, the review of petitions was transferred to the Attorney General while the issuing of warrants granting relief remained in the State Department's purview. *See* Homer Cummings & Carl McFarland, Federal Justice: Chapters in the History of Justice and the Federal Executive 149 (1937). In 1865, Congress authorized the Attorney General to employ a pardon clerk to assist with the handling of petitions. *See* 13 Stat. 516, 38 Cong. C. 98 (1865) (authorizing the Attorney General to employ one "pardon clerk.").

38.     As the federal justice system grew in size and complexity, the U.S. Department of Justice was created, and the Office of the Clerk of Pardons became a part of it. *See* 13 Stat. 162 (establishing U.S. Department of Justice); *see also* Records of the Office of the Pardon Attorney, National Archives (Record Group 204), 1846-1965 (noting "The Office of the Clerk of Pardons became a component of the newly created Department of Justice, pursuant to its enabling act,

June 22, 1870 (16 Stat. 162).[1] By 1887, the early iterations of a more formal process for members of the public seeking pardon and those in custody seeking commutation to follow, and the rules for administrative officials to handle pardon and clemency petitions, began to take shape. According to the "Pardon Bureau" in the DOJ's Report to a Select Committee of the Senate, dated April 1887, for example, "Every application for pardon addressed to the President is referred to the Attorney General, and by him to the clerk of pardons for his prompt and appropriate attention." (*See* Ex. 8 at 292.) The Pardon Bureau further reported then that the Clerk of Pardons was directed to solicit the views of the U.S. Attorney and, if practicable, the views of the district judge, and to keep records of the progress of applications "at every stage of these proceedings," as part of the process for determining whether to make a favorable recommendation to president. (Ex. 8 at 292.) At the time, the Clerk of Pardons, according to the same Report to the Senate, was overwhelmed by the growing number of petitions and the volume of duties placed upon him, especially in connection with this ability to manage correspondence with members of the public, and made clear to Congress the need for additional staff to assist him. (Ex. 8 at 294.)

39.     In 1891, the Office of the Clerk of Pardons was superseded by the Office of the Attorney in charge of Pardons, established in the DOJ pursuant to an act of Congress. (*See* 26 Stat. 946; *see also,* Records of the Office of the Pardon attorney, National Archives, Record Group 204, 1846-1965[2].) In 1893, by executive order, the reviewing, investigating and issuing of all warrants in connection with petitions for commutation and pardons was consolidated within

---

[1] Available at https://www.archives.gov/research/guide-fed-records/groups/204.html

[2] Available at https://www.archives.gov/research/guide-fed-records/groups/204.html

the DOJ. (Ex. 9 at 295.) The Office of the Attorney in Charge of Pardons was redesignated the Office of the Pardon Attorney, as it is known today, in 1894. (*See* Records of the Office of the Pardon attorney, National Archives, Record Group 204, 1846-1965.)

40.     The formal clemency rules were approved by President McKinley in 1898 and contained a few of the features of the modern day regulations pursuant to 28 C.F.R. § 1.1-1.11.[3] For example, the rules directed members of the public and those in custody applying for such relief to address a petition to the President and forward it to the Attorney General, and they set out the process for soliciting views of the U.S. Attorney and trial judge, including in capital cases, and the effect of those opinions on the Office of the Pardon Attorney's favorable treatment of the petition.

41.     Between 1898 and 1962, the formal clemency rules underwent occasional revisions, some of which appear in the modern-day regulations. For example, the 1924 rules introduced the designated form to be submitted by members of the public and those in custody, and were adapted based on the expansion of the Republic, and in light of the growing number of individuals incarcerated in federal prisons or on parole, or those subject to prosecution under federal "Immigration, Narcotic, Naturalization, Postal, or Prohibition Laws." (*See* "Rules Relating to Application for Pardon," Department of Justice, Feb. 12, 1924 (noting special rules for petitioners from "Puerto Rico, Hawaii, Virgin Island, and the Canal Zone. . ."); *see also* 46 Stat. 325 (pursuant to 1930 Act of Congress, Bureau of Prisons was established within DOJ).) The Federal Bureau of Investigations was first assigned a formal role in investigating the "record

---

[3] Upon information and belief, the various versions of the formal clemency rules prior to their formal publication in the Federal Register are on file with the U.S. Department of Justice.

and conduct" of petitioners in 1946. (*See* "Rules Governing Petitions for Executive Clemency,"
Department of Justice, Jan. 19, 1946; *see also* 28 C.F.R. § 1.6(a).)

42.     In 1962, the "Rules Governing Petitions for Executive Clemency" took on their
modern day form and structure, and were for the first time formally published for the public in
the Federal Register, which contains agency rules, proposed rules, public notices, administrative
orders, and executive orders: "These regulations shall become effective on the thirty-first day
following the date of their publication in the Federal Register." (*See* "Rules Governing Petitions
for Executive Clemency," Department of Justice, Oct. 30, 1962.) The 1962 regulations remained
in place until 1983, when two additions to the regulations were made and published in the
Federal Register, 28 C.F.R. §§ 1.1-1.10. (*See* "Rules Governing Petitions for Executive
Clemency," Department of Justice, May 5, 1983.) They were amended in 1993 to include a
provision for notifying individuals about the disposition of their petitions. (*See* "Rules Governing
Petitions for Executive Clemency," Department of Justice, Oct. 12, 1993.)

43.     As noted previously, the regulations setting forth special procedures applicable to
petitioners under federal death sentence like Mitchell, codified at § 1.10, went into effect in
August 2000 and remain in place today.

44.     What was once an informal, ad hoc undertaking involving the President and a few
of his closest advisors has developed into a modern-day system operating with the hallmarks of
the administrative state. Duties related to the handling, investigation, and consideration of
clemency petitions, for example, have by and large been delegated to career officials in the OPA
and other agencies within the DOJ bureaucracy, more remote from the President; and formal
agency regulations have been promulgated for the general public and these administrative
officials to follow. Those seeking relief through the executive clemency process—including

those potentially eligible for pardon, the almost 200,000 people in federal custody,[4] and the 59

people under federal death sentence[5]—have no direct line to the President. Instead, they are by

legislative- and executive-branch design dependent on this firmly rooted administrative system.

**D.    Recent clemency proceedings.**

45.    On July 25, 2019, in addition to Mitchell, Defendant Watson provided notice to

Daniel Lee, Wesley Purkey, Alfred Bourgeois, and Dustin Honken that their executions would

be carried out on December 9, 2019, December 13, 2019, January 13, 2020, and January 15,

2020, respectively. Like Mitchell, condemned inmates Lee, Purkey, and Bourgeois timely

applied for clemency with OPA and were invited to, and did in fact, make oral presentations to

OPA in October 2019. However, their executions were halted in November 2019 by the district

court in *In the Matter of the Federal Bureau of Prison's Execution Protocol Cases*, D. D.C. Case

No. 19-mc-145, 2019 WL 6691814 (D. D.C. November 20, 2019). At that point, no decision on

clemency had been made for any of those petitioners. After the Supreme Court denied the

Government's request to vacate those stays of executions, *Barr v. Roane*, 140 S. Ct. 353 (2019),

they withdrew their petitions in light of the stays and OPA administratively closed their

clemency cases. (*See* Ex. 10 ¶ 5.)

//

//

---

[4] *See* U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, Prisoners in 2017 (April 2019), available at: https://www.bjs.gov/content/pub/pdf/p17.pdf, Table 1, p 3.

[5] Federal Capital Habeas Project, *Growth in Federal Death Row Population*, available at https://2255.capdefnet.org/General-Statistics/Growth-Federal-Death-Row-Population. The published statistic, from 2019, does not account for the three people executed in July 2020.

46.     On June 15, 2020, the Government rescheduled executions for Lee, Purkey, and Honken.[6] Also on June 15, 2020, Keith Nelson received notice that his execution was scheduled for August 28, 2020. Perhaps because Nelson had not previously received an execution date, Nelson's notice included the paragraph referenced above in (*see* ¶ 16) concerning clemency timelines. However, like Mitchell's notification letter described above in (*see* ¶ 21), information about the clemency application process was conspicuously absent from Lee, Purkey, and Honken's 2020 notices.

47.     On July 10, 2020, Lee submitted a timely, renewed petition for executive clemency. (Ex. 10 ¶ 9.) OPA acknowledged receipt of Lee's petition, but Lee was executed on July 14, 2020 without receiving a decision on his clemency petition. (Ex. 10 ¶¶ 10-11.)

48.     Since 1963, the Federal Government has executed six people, but before Lee, none had been executed while their clemency petition was pending.[7] Timothy McVeigh, who was executed in 2001, did not seek executive clemency review.[8] President George W. Bush denied clemency to Juan Raul Garza before he was executed in 2001, and also to Louis Jones Jr. before his execution in 2003.[9] Neither Honken nor Purkey had pending petitions at the time of their executions.[10]

---

[6] DOJ Press Release available at: https://www.justice.gov/opa/pr/executions-scheduled-four-federal-inmates-convicted-murdering-children.

[7] *See* BOP, Capital Punishment, available at: https://www.bop.gov/about/history/federal_executions.jsp

[8] *McVeigh Deadline Passes*, New York Times, February 16, 2001, available at: https://www.nytimes.com/2001/02/16/us/mcveigh-deadline-passes.html.

[9] *See* list of commutations denied by President George W. Bush, available at: https://www.justice.gov/pardon/commutations-denied-president-george-w-bush-2001-2009.

[10] *See* Clemency Case Status for Cases Opened Since 1989, available at: https://www.justice.gov/pardon/search-clemency-case-status-since-1989?

49.     It is against this backdrop that Mitchell, facing an unjust execution, has turned to

the traditional "'fail safe' in our criminal justice system." *Herrera v. Collins*, 506 U.S. 390, 415

(1993). In order to obtain such relief, Mitchell has no choice but to rely on the clemency process

that the government itself has created for review and consideration of clemency petitions for

individuals sentenced to death. Mitchell has sought to follow the requirements, adhere to the

deadlines, and use the procedures made available to him, pursuant to regulations formally

published for the public and prisoners alike, and those that apply to particular cases. In following

this process, Mitchell has been thwarted by the Government's attempts to execute him before he

can avail himself of these very procedures.

50.     Mitchell has no adequate remedy at law for these constitutional violations, and

will suffer irreparable injury unless this Court grants relief.

## V.     CLAIMS FOR RELIEF

### CLAIM ONE: DEFENDANTS' ACTIONS AND POLICIES DENIED MITCHELL HIS FIFTH AMENDMENT RIGHT TO DUE PROCESS IN HIS CAPITAL CLEMENCY PROCEEDINGS

51.     Mitchell re-alleges and incorporates by reference each of the foregoing

paragraphs as if fully set forth herein.

52.     The government may not deprive a criminal defendant of government-created

liberty interests without due process of law. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). "The

fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and

in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ((quoting *Armstrong*

*v. Manzo*, 380 U.S. 545, 552 (1965))). Where the government has created specific procedures for

---

first_name=dustin&last_name=honken; https://www.justice.gov/pardon/search-clemency-case-
status-since-1989?last_name=purkey

seeking clemency, the Due Process Clause of the Fifth Amendment guarantees them basic procedural safeguards in those clemency procedures. *See Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 288-89 (1998). In *Woodard*, a five-justice majority agreed that at least some procedural safeguards apply in capital clemency proceedings. *Woodard*, 523 U.S. at 288-89 (O'Connor, J., concurrence); *see also id.* at 292-95 (Stevens, J. concurrence); *see also Young v. Hayes*, 218 F.3d 850, 853 (8th Cir. 2000) (recognizing the majority in *Woodard* and acknowledging due process safeguards in the clemency process). "The Constitution of the United States does not require that a state have a clemency procedure, but . . . it does require that, if such a procedure is created, the state's own officials refrain from frustrating it. . . ." *Young*, 218 F.3d at 853.

53.     By setting an execution date with such a shortened timeline, the Department of Justice has severely impeded the President's ability to conduct his own deliberative process to bring Mitchell's clemency petition "to completion" under 28 C.F.R. § 1.10(e), thereby depriving Mitchell of basic procedural safeguards. *Gov't of Canal Zone v. Brooks*, 427 F.2d 346, 347 (5th Cir. 1970) (per curiam) ("[I]t is a denial of due process for any government agency to fail to follow its own regulations providing for procedural safeguards to persons involved in adjudicative processes before it."); *see also Duvall v. Keating*, 162 F.3d 1058, 1061 (10th Cir. 1998) (minimal application of due process ensures that a death row prisoner will receive the clemency procedures explicitly set forth by law, and will not be wholly arbitrary, capricious, or based on a whim, for example, flipping a coin). Mitchell has attempted to use the clemency process that the government has created for review and consideration of clemency petitions. But that process is unavailable to him due to the Defendants' interference. *Young*, 218 F.3d at 853.

54.     According to the clemency rules discussed above, a request for commutation should not be filed until a person's challenges to his convictions and his sentences are resolved.[11] The clemency scheme further provides that that a petitioner should file a clemency petition "no later than 30 days after the petitioner has received notification from the Bureau of Prisons of the scheduled date of execution." 28 C.F.R. § 1.10(b). This gives a death-sentenced person such as Mitchell at least a full 30 days after his legal challenges become final to seek executive clemency.

55.     Yet on July 29, 2020, despite an active stay of execution in the Ninth Circuit, Mitchell received notice of an execution date of set for August 26, 2020. Because he was given less than 30 days' notice of his execution date, on July 31, 2020, Mitchell filed a petition for executive clemency with OPA.

56.     The setting of an August 26, 2020 execution date hampered Mitchell's ability to seek clemency by forcing him to submit his clemency petition before his litigation was resolved. On August 11, 2020, the Ninth Circuit denied Mitchell's petition for rehearing/rehearing en banc and the mandate issued one week later, just eight days before his scheduled execution. *Mitchell v. United States*, 9th Cir. Case No. 18-17031, Dkts. 52, 56. Thus, under its own rules, OPA has only 8 days to consider Mitchell's clemency petition. (*See* Office of the Pardon Attorney, Frequently Asked Questions ("Under well-established procedures, this office will not process a clemency application while litigation concerning the case is pending.").)[12] Even assuming that OPA ignored these rules and began to consider Mitchell's clemency petition before his case became final, the timeframe is still extremely limited: Mitchell filed his clemency petition on

---

[11] Available at: https://www.justice.gov/pardon/file/960571/download

[12] Available at: https://www.justice.gov/pardon/frequently-asked-questions

July 31, 2020, and appeared for an oral presentation before OPA on August 11, 2020—just fifteen days before his scheduled execution. At Mitchell's oral presentation and during a subsequent telephone conversation, OPA could not assure his counsel that a decision would be reached within that timeframe. (Ex. 13 ¶¶ 5, 7.)

57.     Even accepting AUSA Lanham's representation that as of the time of filing, OPA has completed their investigation and the department has made a recommendation to the President (Ex. 13 ¶¶ 8.), there is simply not enough time for Mitchell's petition to be fairly processed to completion, before he is executed, now in less than 48 hours. As detailed on its website, under normal circumstances, OPA's process is multi-faceted and lengthy, with multiple steps and review by numerous stakeholders, culminating in a final decision from the President.[13]

58.     It is unclear when the President received the department's recommendation, but presumably it was on or after August 11, 2020, fifteen days before Mitchell's scheduled execution. Fifteen days is half of the time given to the President to review an adverse recommendation by the Attorney General in a noncapital clemency request before his or her silence is presumed to be a concurrence in that recommendation. 28 C.F.R. § 1.8. A president should have at least the same amount of time to consider a recommendation in a capital case.

59.     Further, the August 26 date is set for 28 days into the 30-day window allowed for filing a clemency petition. This deprives Mitchell of the full 30-day period where he may apply for clemency. The conflict between 28 C.F.R. § 1.10(b), providing 30 days to submit a clemency petition, and 28 C.F.R. § 26.4, which requires 20 days' notice of a scheduled execution date, is

---

[13] Available at: https://www.justice.gov/pardon/frequently-asked-questions

irreconcilable in this case. *See* 28 C.F.R. § 26.4 ("The Warden . . . shall notify the prisoner under sentence of death of the date designated for execution at least 20 days in advance.")

60.     These timelines also deprive Mitchell of due process because he has reasonably relied on the well-established procedures for seeking executive clemency, only to discover that the procedures are not available to him. The Supreme Court has recognized that a lack of adequate notice of issues implicates due process rights. *Lankford v. Idaho*, 500 U.S. 110, 126 (1991). These due process protections apply in capital clemency proceedings. *Wilson v. United States Dist. Court (Siripongs)*, 161 F.3d 1185 (9th Cir. 1998) (upholding a temporary restraining order prohibiting a capital clemency petitioner's execution where he and his counsel reasonably relied on, but were misled by clemency authority about issues to be considered).

61.     Here, Mitchell has relied on regulations and procedures for review of his executive clemency petition, and because of Defendants' actions and policies, those procedures are unavailable to him.

62.     Defendants' conduct reflects an awareness that the timeline they have established will result in Mitchell's execution before his petition can be processed to completion. On July 25, 2019, the Government initially notified Mitchell of an execution date of December 11, 2019. (Ex. 1 at 001.) Six days later, the Government sent an amended letter. (Ex. 2 at 002.) Both of these letters include a paragraph explaining to Mitchell that, "If you wish to apply for commutation of sentence *your petition must be filed within 30 days of the date you receive this notice*." (Ex. 1 at 001 (emphasis added); Ex. 2 at 002.) When the Government set an execution date on July 29, 2020, Mitchell received a similar letter. (Ex. 4 at 010.) However, the July 29, 2020 letter from Defendant Watson, identical in other respects, includes no language about the 30-day period for applying for commutation. That is because, if the execution goes forward as

planned, Mitchell will not be alive to request commutation within the period permitted by the regulations.

63.     Clemency review is essential in this case because the issues presented in Mitchell's clemency petition are extraordinary. Mitchell's request for clemency is joined by Navajo Nation leadership and national Native American rights groups representing hundreds of tribes and their members from across the country. (Ex. 6 at 274-82, Ex. 7 at 283-91.) This outcome would respect the inherent sovereignty of the Navajo Nation in a case where Mitchell is Navajo, the victims were Navajo, and the crime took place on the Navajo reservation. For this reason, it is critical that Mitchell's clemency petition make it to the ultimate decision-maker—the President.

64.     The truncated clemency process violates Mitchell's due process rights by preventing the President from exercising his constitutional authority. "Only the President has the power to grant clemency for offenses under federal law." *Harbison v. Bell*, 556 U.S. 180 & n.5 (2009) ("regardless of what assistance the President seeks, the federal proceeding is one for executive clemency under the Constitution."); U.S. Const. art. II, § 2, cl. 1.5. Indeed, the Supreme Court has recognized that a system prohibiting the President from exercising executive clemency "would be totally alien to our notions of criminal justice" and unconstitutional. *Gregg v. Georgia*, 428 U.S. 153, 199 n.50 (1976) (opinion of Stewart, Powell, and Stevens, J.J.); *see also Bundy v. Dugger*, 850 F.2d 1402, 1424 (it would be unconstitutional under the Eighth Amendment for a state to prohibit executive clemency). Accordingly, the federal clemency regulations expressly do not "restrict the authority granted to the President under Article II, Section 2 of the Constitution." 28 C.F.R. § 1.11. While the Office of the Pardon Attorney

prepares a recommendation to the President for final disposition of each clemency application,[14] the power to grant executive clemency is vested in the President alone.[15]

65.    By scheduling Mitchell's execution in a manner that does not allow adequate time for the President to render a decision, Defendants have unconstitutionally prohibited the President from exercising his clemency power, despite Mitchell's extreme diligence in submitting his clemency petition within two days of BOP's notice setting his execution date.

66.    OPA's website explains that every clemency application is decided by the President, with few exceptions.[16] These exceptions include situations where the proceeding "must be closed administratively," for several reasons, including because the applicant "dies during the processing of the application." *Id*. Thus, if the applicant dies during the lengthy clemency process *because he is executed by the Government*, the President will not consider his clemency petition and his application will be "administratively closed." Without this Court's intervention, such a scenario is likely in Mitchell's case. In July, 2020, Defendants executed Daniel Lee, another death-sentenced person, while his petition for executive clemency was still pending. (Ex. 10 ¶¶ 10-11.) That same day, his petition was "administratively closed." (Ex. 10 ¶¶ 10-11) Thus, Defendants have demonstrated their willingness to execute a death-sentenced individual who has not had the benefit of executive clemency review.

67.    This is impermissible. Under the extraordinary circumstances of a pending execution, due process requires a final decision from the President. Section 1.8 of the clemency regulations also implicitly requires presidential action. *See* 28 C.F.R. § 1.8 (creating a

---

[14] Available at: https://www.justice.gov/pardon

[15] Available at: https://www.justice.gov/pardon/pardon-information-and-instructions

[16] Available at: https://www.justice.gov/pardon/frequently-asked-questions

presumptive adverse recommendation within 30 days of submission to the President "*[e]xcept in cases in which a sentence of death has been imposed*") (emphasis added).

68.     By the actions and policies described above, Defendants have violated and deprived Mitchell of his constitutional right to due process of law as guaranteed by the Fifth Amendment, by denying him the basic procedural safeguards to which he is entitled in this capital proceeding, denying him notice and an opportunity to be heard, preventing the President's exercise of his authority, and making it impossible for Mitchell to benefit from a grant of clemency.

69.     If Mitchell's execution is carried out without his having been provided a fair and complete clemency process, he will have been deprived the due process to which he is entitled.

70.     An actual controversy exists between the parties regarding Defendants' actions and policies obstructing Mitchell's ability to avail himself of the clemency review procedures put into place for death-sentenced individuals. Accordingly, Mitchell seeks appropriate declaratory and injunctive relief restraining Defendants from continuing to violate his due process rights as alleged herein.

**CLAIM TWO: DEFENDANTS' ACTIONS AND POLICIES DENIED MITCHELL OF HIS EIGHTH AMENDMENT RIGHTS**

71.     Mitchell re-alleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

72.     "[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189. Although clemency proceedings are not the equivalent of sentencing proceedings at a capital trial, depriving Mitchell of a complete clemency proceeding also violates

the Eighth Amendment, which requires additional procedural protections in capital cases. *Gregg*,

428 U.S. at 188-92. The procedural scheme for federal executions fails to provide necessary

safeguards; it is not the "fail safe" that executive clemency has historically been relied on to

provide. *Herrera*, 506 U.S. at 415.

73.     This holds particularly true here, where the Ninth Circuit relied on the availability

of this process to safeguard against an unjust execution in this case. *Mitchell II*, 790 F.3d at 897

(Reinhardt, J. dissenting) ("Most important, there is still a place in our federal system for

clemency . . . I am hopeful that if and when the President is required to determine whether

capital punishment is the appropriate remedy for Mitchell's offenses, he (or she) will bear in

mind both the interests of justice and the wishes of the victims' family, the Navajo Nation, and

the American people."); *Mitchell,* 958 F.3d at 793 (Christen, J. concurring) and 794 (Hurwitz, J.

concurring) ("I respectfully suggest that the current Executive should take a fresh look at the

wisdom of imposing the death penalty. . . . I hope that the Executive will carefully consider

whether the death penalty is appropriate in this unusual case.").

74.     By the actions and policies described above, through their deliberate obstruction

of the clemency process, and by stripping Mitchell of the most basic procedural safeguards

required by due process, resulting in the unavailability of the clemency process, Defendants have

violated and deprived Mitchell of his constitutional right under the Eighth Amendment's

protection against cruel and unusual punishment inflicted in a wholly arbitrary fashion.

75.     An actual controversy exists between the parties regarding Defendants' actions

and policies obstructing Mitchell's ability to avail himself of the clemency review procedures put

into place for death-sentenced individuals. Mitchell also lacks adequate remedies at law to

address Defendants' violations. Accordingly, Mitchell seeks appropriate declaratory and

injunctive relief restraining Defendants from continuing to violate his due process rights as alleged herein.

**CLAIM THREE: DEFENDANTS' ACTIONS AND POLICIES DENIED MITCHELL OF EQUAL PROTECTION OF THE LAW**

76.     Mitchell re-alleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

77.     Defendants' actions and policies create an arbitrary system of clemency evaluation that violates equal protection principles. *See Baker v. Carr*, 369 U.S. 186, 225 (1962) (Equal Protection Clause violated where "discrimination reflects no policy, but simply arbitrary and capricious action"); *Yick Wo v. Hopkins*, 118 U.S. 356, 366, 374 (1886) (decrying "naked and arbitrary power": "Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye . . . , the denial of equal justice is still within the prohibition of the constitution"); *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954) (applying the equal protection principles of the Fourteenth Amendment to federal government action); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995) (equal protection guarantee of the Fourteenth Amendment, which applies to the states, is essentially the same as the equal protection guarantee of the Fifth Amendment, which applies to the federal government).

78.     By the actions and policies described above, Defendants have violated and deprived Mitchell of his Fifth Amendment right to equal protection of the law. Equal protection is denied where one group of death-sentenced individuals will have their clemency petitions evaluated by the President, and another similarly-situated group, including Mitchell, will be executed before the executive has completed the clemency process.

//

28

79.     Other death-sentenced individuals facing imminent execution have received a final decision on their clemency petitions under the rules for evaluation of executive clemency before they have been executed. Yet Defendants' actions in this case deny Mitchell access to the clemency process and prevent him from availing himself of the same rules and procedures.

80.     An actual controversy exists between the parties regarding Defendants' actions and policies obstructing Mitchell's ability to avail himself of the clemency review procedures put into place for death-sentenced individuals, in violation of his right to equal protection of the law. Mitchell also lacks adequate remedies at law to address Defendants' violations. Accordingly, Mitchell seeks appropriate declaratory and injunctive relief restraining Defendants from continuing to violate his equal protection rights as alleged herein.

//

//

//

## VI.   PRAYER FOR RELIEF

81.     Wherefore, Mitchell prays for relief as follows:

1)      Exercise jurisdiction over this action;

2)      Issue appropriate declaratory and injunctive relief to stop the constitutional

violations described above and to ensure that Defendants are enjoined from

interfering with and obstructing Mitchell's clemency application;

3)      Enjoin Defendants from carrying out Mitchell's scheduled execution so that his

clemency petition may be processed to completion and the President may issue a

decision unencumbered by the Defendants' violation of his rights under the Fifth

and Eighth Amendments; and

4)      Grant such other relief as this Court deems just and proper.


                                        Respectfully submitted,

                                        CUAUHTEMOC ORTEGA
                                        Interim Federal Public Defender

DATED:  August 24, 2020              By:  */s/ Jonathan C. Aminoff*
                                        JONATHAN C. AMINOFF
                                        Deputy Federal Public Defender

                                        Counsel for Lezmond Charles Mitchell

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE(S) |
|---------|-------------|---------|
| 1. | United States Dept. of Justice/Federal Bureau of Prisons Notice of Execution to Lezmond Charles Mitchell, July 25, 2019 | 001 |
| 2. | United States Dept. of Justice/Federal Bureau of Prisons Amended Notice of Execution, July 31, 2019 | 002 |
| 3. | Office of the Pardon Attorney emails to Federal Public Defender re: Petition for Commutation of Sentence, September - October, 2019 | 003-009 |
| 4. | United States Dept. of Justice/Federal Bureau of Prisons Notice of Execution to Lezmond Charles Mitchell, July 29, 2020 | 010 |
| 5. | Lezmond Charles Mitchell's Petition for Commutation of Sentence with Attachments, filed July 31, 2020 | 011-273 |
| 6. | Office of the Pardon Attorney emails to Federal Public Defender re: Receipt of Petition & Requirements for Consideration and Scheduling of Oral Presentation, August, 2020 | 274-282 |
| 7. | Tribal Council Letters to President Donald J. Trump in Support of Lezmond Charles Mitchell's Petition of Commutation of Sentence | 283-291 |
| 8. | Pardon Bureau Report, Dept. of Justice, March - April, 1887 | 292-294 |
| 9. | Executive Order of President Grover Cleveland, June 16, 1893 | 295 |
| 10. | Declaration of Elizabeth Luck, August 10, 2020 | 296-298 |
| 11. | Sen. Tom Udall (N.M.) Letter to President Donald J. Trump in Support of Lezmond Charles Mitchell's Petition of Commutation of Sentence, August 19, 2020 | 299-300 |
| 12. | Native American Bar Association of Arizona President Donald J. Trump in Support of Lezmond Charles Mitchell's Petition of Commutation of Sentence, August 21, 2020 | 301-302 |
| 13. | Declaration of Jonathan C. Aminoff, August 24, 2020 | 303-305 |

# EXHIBIT 1



**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
*Terre Haute, Indiana*

July 25, 2019

Mr. Lezmond Charles Mitchell
Reg. No. 48685-008
Special Confinement Unit
United States Penitentiary
Terre Haute, Indiana 47802

Dear Mr. Mitchell:

The purpose of this letter is to inform you that a date has been set for the implementation of your death sentence, pursuant to the Judgment and Order issued on January 8, 2004, by Senior Judge David G. Campbell of the United States District Court for the District of Arizona. This letter will serve as official notification that pursuant to Title 28, Code of Federal Regulations, Section 26.3 (a)(1), the Director of the Federal Bureau of Prisons has set December 11, 2019, as the date for your execution by lethal injection.

Under Title 28, Code of Federal Regulations, Sections 1.1 and 1.10, if you wish to seek commutation of sentence or reprieve from the President, petitions may be emailed directly to the DOJ Pardon Attorney at USPARDON.Attorney@usdoj.gov. If email is not available, petitions may be mailed to with the Office of the Pardon Attorney, U.S. Department of Justice, 950 Pennsylvania Avenue, RFK Main Justice Building, Washington, D.C 20530. The Office of the Pardon Attorney is responsible for receiving and processing on behalf of the President all requests for clemency. If you wish to apply for commutation of sentence your petition must be filed within 30 days of the date you receive this notice.

Soon, I will come to your housing unit to personally discuss with you many of the details surrounding the execution. At that time, I will be available to answer any questions you may have regarding the execution process.

Sincerely,

T.J. Watson
Complex Warden

cc: The Honorable David G. Campbell, U.S. District Court (D. Arizona)
    Mr. Brian D. Karth, Clerk of the Court (D. Arizona)
    Mr. Michael G. Bailey, United States Attorney (D. Arizona)
    Mr. William Voit, Assistant United States Attorney (D. Arizona)
    Ms. Statia Peakheart, Esq.
    Mr. Josh Minkler, Acting US Attorney (S.D. of Indiana)
    Mr. Joseph "Dan" McClain, US Marshal (S.D. of Indiana)
    Mr. Joseph H. (Jody) Hunt, Assistant Attorney General, Civil Division

Exhibit 1 - 001

# EXHIBIT 2



**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
*Terre Haute, Indiana*

July 31, 2019

Mr. Lezmond Charles Mitchell
Reg. No. 48685-008
Special Confinement Unit
United States Penitentiary
Terre Haute, Indiana 47802

Dear Mr. Mitchell:

The purpose of this amended letter is to inform you that a date has been set for the implementation of your death sentence, pursuant to the Judgment and Order issued on January 8, 2004, by Judge Mary H. Murguia of the United States District Court for the District of Arizona.   This letter will serve as official notification that pursuant to Title 28, Code of Federal Regulations, Section 26.3 (a)(1), the Director of the Federal Bureau of Prisons has set December 11, 2019, as the date for your execution by lethal injection. This does not change your execution date, but was amended to accurately reflect the name of your sentencing judge.

Under Title 28, Code of Federal Regulations, Sections 1.1 and 1.10, if you wish to seek commutation of sentence or reprieve from the President, petitions may be emailed directly to the DOJ Pardon Attorney at USPARDON.Attorney@usdoj.gov. If email is not available, petitions may be mailed to with the Office of the Pardon Attorney, U.S. Department of Justice, 950 Pennsylvania Avenue, RFK Main Justice Building, Washington, D.C 20530. The Office of the Pardon Attorney is responsible for receiving and processing on behalf of the President all requests for clemency. If you wish to apply for commutation of sentence your petition must be filed within 30 days of the date you receive this notice.

Soon, I will come to your housing unit to personally discuss with you many of the details surrounding the execution.   At that time, I will be available to answer any questions you may have regarding the execution process.

Sincerely,

T.J. Watson
Complex Warden

cc: The Honorable David G. Campbell, U.S. District Court (D. Arizona)
    Mr. Brian D. Karth, Clerk of the Court (D. Arizona)
    Mr. Michael G. Bailey, United States Attorney (D. Arizona)
    Mr. William Voit, Assistant United States Attorney (D. Arizona)
    Ms. Statia Peakheart, Esq.
    Mr. Josh Minkler, Acting US Attorney (S.D. of Indiana)
    Mr. Joseph "Dan" McClain, US Marshal (S.D. of Indiana)
    Mr. Joseph H. (Jody) Hunt, Assistant Attorney General, Civil Division

Exhibit 2 - 002

# EXHIBIT 3

| From: | US Pardon Attorney (imailagent) |
|---|---|
| To: | Celeste Bacchi |
| Cc: | Jonathan Aminoff |
| Subject: | Lezmond Charles Mitchell, Reg. No. 48685-008, Death Penalty Case No. C288750 (Intranet Quorum IMA00813062) |
| Date: | Wednesday, September 4, 2019 11:36:50 AM |
| Attachments: | IQFormatFile.txt |

September 4, 2019

Ms. Celeste Bacchi
Office of the Federal Public Defender
Central District of California
321 East Second Street
Los Angeles, CA 90012-4202

Death Penalty Case No. C288750

Dear Ms. Celeste Bacchi:

       This is to advise you that we have received the petition for commutation of sentence you submitted on Lezmond Charles Mitchell's behalf.  I must advise you of a few things, however, before we may consider the application.

       First, per our regulations, in order to process a requested commutation of a death sentence, we require either a submission from (a) the person under the sentence of death, or (b) a written and signed authorization permitting the petitioner's attorney to submit the request on his or behalf.  *Please see* 28 C.F.R. § 1.10(a).  Such an authorization is not included in the current materials you submitted to us on August 30, 2019.  Please provide such an authorization within 30 days of September 4, 2019, or this case will be closed administratively without further processing.  You may submit the authorization to USPardon.Attorney@usdoj.gov, and reference Death Penalty Case No. C288750 in the subject of your email transmission.

       Second, per our regulations, any substantive materials, which you wish to be included in the clemency application, must be received within 15 days of September 4, 2019.  We **cannot** guarantee that any submission, save for the written authorization identified above, will be considered in the clemency application if it is received more than 15 days from September 4, 2019. *See* 28 C.F.R. § 1.10(b).

       Third, per our regulations, only one clemency request for commutation of a death sentence will be processed to completion absent "a clear showing of exceptional circumstances." 28 C.F.R. § 1.10(e).  Moreover, because clemency is generally considered an option of "last resort," a petitioner should exhaust his or her readily available remedies prior to applying for clemency.  Should the date of execution be suspended or stayed by the court for any reason—other than to allow additional time for processing a clemency application—the petition may also be withdrawn without penalty, or may be suspended by this office to allow for the resolution of judicial proceedings. *See* 28 C.F.R. § 1.10(d).

       Fourth, the submission of your client's petition includes a request to make an oral presentation, as permitted by our regulations. 28 C.F.R. § 1.10(c).  The regulations permit an oral presentation of "reasonable duration" to the Office. (We cannot address your request to make a presentation to the President).  Though the exact parameters of the presentation will be determined by the Office of the Pardon Attorney (PARDON) after review of the application, you may reasonably anticipate being permitted to make a presentation of approximately one hour to a panel of representatives involved in the clemency analysis.  We would anticipate that no more than 2 to 3 individuals will be permitted to speak on Lezmond Charles Mitchell's behalf during that presentation.  The date of the presentation will be set after our office has reviewed the application and notification has been made to other government officials involved in the process.  Though we will attempt to provide you with at least two weeks' notice prior to setting the hearing date, given the time-sensitive nature of the death sentence process, particularly once a date of execution has been set, a two-week notice may not be feasible.

Exhibit 3 - 003

Please be aware that this office may request comments and recommendations from the United States Attorney in the district of conviction, other Department of Justice officials, as well as the sentencing judge.  Moreover, we will obtain relevant documentation of the crime, to include the presentence report and judgment, as well as documentation of Mr. Mitchell's prison conduct from the Bureau of Prisons.

Please advise your client that we have received the application you have submitted.  Please also ensure that your client is aware of information that is publicly available about the identities of executive clemency applicants.  If the President grants clemency, a public notice is released stating the recipient's name, city and state of residence, offense, sentence, and date and district of conviction for the offense for which clemency was granted.  The Office of the Pardon Attorney (PARDON) will also proactively disclose an electronic copy of the clemency warrant on our website.  Moreover, pursuant to long-standing policy, this office would, if asked, confirm that a specific individual has applied for or was granted or denied clemency.  Finally, PARDON is obligated pursuant to the Freedom of Information Act to release existing lists of the names of persons who have been denied executive clemency by the President to anyone who requests such records.

To ensure your correspondence receives immediate attention, please always be sure to reference Death Penalty Case No. C288750 in any future correspondence with this office.  We have attached a copy of our sentence of death regulations to this email.  These regulations are also available for review on our website at https://www.justice.gov/pardon/rules-governing-petitions-executive-clemency#procedures.  You may address any questions about your case to Acting Pardon Attorney Rosalind Sargent-Burns at USPardon.Attorney@usdoj.gov or leave us a voicemail at (202) 616-6070 and we will be sure to respond to you in a timely manner based on time restraints in your client's case.  Please note that the nature of the clemency review process limits the information we will be able to provide to you and your client, but we will attempt to be as responsive as possible.

Sincerely,
Office of the Pardon Attorney

Exhibit 3 - 004

| | |
|---|---|
| **From:** | Jonathan Aminoff |
| **To:** | US Pardon Attorney (imailagent) |
| **Cc:** | Celeste Bacchi |
| **Subject:** | RE: Case No. C288750 |
| **Date:** | Friday, October 4, 2019 2:14:51 PM |
| **Attachments:** | ClemencyAuthorization.pdf |

Good afternoon-

Attached please find Mr. Mitchell's signed authorization allowing the Office of the Federal Public Defender for the Central District of California to file clemency materials on his behalf and to represent him in these proceedings.  Please contact us if you have any questions.

Thanks very much.

_____
Jonathan C. Aminoff
Deputy Federal Public Defender
Office of the Federal Public Defender
Central District of California
321 East Second Street
Los Angeles, CA 90012
Direct: 213 894 5374
Fax: 213 894 0310

CONFIDENTIALITY NOTICE

This email, and any attachments accompanying this e-mail, contain information from the Federal Public Defender for the California Central District of  which is confidential or privileged.  The information is intended only for the use of the individual(s) or entity(s) named in this e-mail.  If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this e-mail in error, please notify us immediately by reply e-mail.

---

**From:** Celeste Bacchi <Celeste_Bacchi@fd.org>
**Sent:** Thursday, October 3, 2019 9:54 AM
**To:** US Pardon Attorney (imailagent) <uspardon.attorney@usdoj.gov>
**Cc:** Jonathan Aminoff <Jonathan_Aminoff@fd.org>
**Subject:** RE: Case No. C288750

Good morning,

Thank you for the opportunity to make an oral presentation on behalf of Mr. Mitchell's request for clemency. We will attend in person, and would like to give the presentation on the morning of October 22, if that date/time is still available. While Mr. Aminoff and myself will be in attendance, we are still in the process of determining the third person who will attend on Mr. Mitchell's behalf. Is it alright if we get you that name in a week or so?

Additionally, we intend to submit Mr. Mitchell's signed authorization on October 4, 2019.

Exhibit 3 - 005

Please let me know if you have any questions or need more information.  We look forward to meeting with you.

Sincerely,
Celeste Bacchi



**Celeste Bacchi**

**Deputy Federal Public Defender**
**Office of the Federal Public Defender**
**Central District of California**

321 E 2nd Street | Los Angeles, CA 90012 | fpdcdca.org
**O:** 213.894.1887 | **F:** 213.894.0081

---

**From:** US Pardon Attorney (imailagent) <uspardon.attorney@usdoj.gov>
**Sent:** Wednesday, October 2, 2019 9:17 AM
**To:** Celeste Bacchi <Celeste_Bacchi@fd.org>
**Cc:** Jonathan Aminoff <Jonathan_Aminoff@fd.org>
**Subject:** Your correspondence re: Lezmond Charles Mitchell (Intranet Quorum IMA00813062)

October 2, 2019

Ms. Celeste Bacchi
Jonathan Aminoff
Office of the Federal Public Defender
Central District of California
321 East Second Street
Los Angeles, CA 90012-4202

Re: Case Number C288750

Dear Ms. Bacchi and Mr. Aminoff:

We are writing in regards to your client, Lezmond Mitchell. First, we have still not received the signed authorization from Mr. Mitchell, seeking a commutation of his death sentence or allowing you to represent him in his clemency pursuit. Previous communication from Ms. Bacchi indicated that Mr. Mitchell's signature is forthcoming by no later than October 4, 2019. Given those assurances, we are willing to proceed in the clemency process at this time, but should we fail to receive that authorization we will have to suspend the clemency proceedings.

Exhibit 3 - 006

In your submission to our office, you asked for the opportunity to make an oral presentation to a panel of attorneys. We would like to schedule your presentation for October 22, 23, or 24. Our panel can be available at any time on those days, except that October 23 our availability is from 1 pm to 4 pm.

We anticipate your presentation to take no more than 90 minutes, which will include time for attorneys from our office to ask questions. Both of you may attend and you can bring one additional person to accompany you. No more than three people may speak on Mr. Mitchell's behalf. If you are unable to travel to our office in Washington, D.C., we can possibly arrange for a conference call or some other means of remote presentation.

If you do come in person and plan to present any sort of visual media, please email a copy of that media to our office at least five days in advance of the presentation , so that we can ensure that we can display the presentation on our systems. Unfortunately, our security protocols prohibit us from accepting any media that cannot be transmitted via email, such as dropbox files, USB files, etc.

Further, please provide the full names of all persons attending the presentation, so that we may prepare our security personnel for the visit. Please note that any visitor to our office will be subject to a brief security screening, must have a valid form of I.D., and must be escorted at all times while within our building.

Please advise us no later than close of business on October 3, 2019, if any of those dates work for you, and if you plan to attend in person; we must make arrangements to have the presentation recorded and transcribed. Please note that once you have selected a date, if will be very difficult for us to alter the schedule.

We look forward to seeing you in a few weeks and to receiving the missing signature of Mr. Mitchell.

Please reference case number C288750 in any future correspondence with this office.


Sincerely,

Office of the Pardon Attorney

Exhibit 3 - 007

| | |
|---|---|
| **From:** | US Pardon Attorney (imailagent) |
| **To:** | Celeste Bacchi |
| **Subject:** | Lezmond Charles Mitchell, Reg. No. 48685-008, Case No. C288750 (Intranet Quorum IMA00813062) |
| **Date:** | Monday, October 7, 2019 5:49:21 AM |
| **Attachments:** | IQFormatFile.txt |

October 7, 2019

Celeste Bacchi
Office of the Federal Public Defender
Central District of California
321 East Second Street
Los Angeles, CA 90012-4202

Re:     Lezmond Charles Mitchell
            Reg. No. 48685-008
            Case No. C288750
            Notification of Case Closure

Dear Ms. Bacchi:

We have just learned that on Friday, October 4, 2019, the U.S. Court of Appeals has issued a stay of execution in Mr. Mitchell's case to allow oral arguments scheduled for December 13, 2019. Therefore, according to 28 C.F.R. 1.10(d), this office will now administratively close Mr. Mitchell's clemency petition without prejudice to his ability to reapply should an execution date be imposed again at a later time. We have also canceled the presentation scheduled for October 22, 2019. We apologize for any inconvenience this causes.

If your client decides to renew their application in the future, they may submit a new application with updated information, or you may submit a new application on their behalf. We prefer communication by email at USPardon.Attorney@usdoj.gov.

Sincerely,
Office of the Pardon Attorney

Exhibit 3 - 008

| | |
|---|---|
| **From:** | US Pardon Attorney (imailagent) |
| **To:** | Celeste Bacchi |
| **Subject:** | RE: RE: Lezmond Charles Mitchell, Reg. No. 48685-008, Case No. C288750 (Intranet Quorum IMA00813062) |
| **Date:** | Tuesday, October 8, 2019 7:48:03 AM |
| **Attachments:** | IQFormatFile.txt |

October 8, 2019

Ms. Celeste Bacchi
Office of the Federal Public Defender
Central District of California
321 East Second Street
Los Angeles, CA 90012-4202

Dear Ms. Bacchi,

Thank you for your questions regarding the procedures should Mr. Mitchell's stay of execution by lifted. Unfortunately, I cannot provide you with specific answers, given that much will depend on timing in that case. However, should a stay be lifted, reinstating the original execution date, and upon notification from you or Mr. Mitchell that you wish to continue with the clemency process, we can restore the clemency petitions and authorization you recently submitted and proceed from there; we would allow an oral presentation, but naturally it would have to be scheduled at that time.

Should the originally imposed execution date pass and a new notification of execution be given from the Bureau of Prisons at some point in the future, then the process would have to begin again. I trust this answers your questions as best as we can.

Regards,
Kira Gillespie
Senior Attorney Advisor

Exhibit 3 - 009

# EXHIBIT 4



**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
*Terre Haute, Indiana*

July 29, 2020

Mr. Lezmond Charles Mitchell
Reg. No. 48685-008
Special Confinement Unit
United States Penitentiary
Terre Haute, Indiana 47802

Dear Mr. Mitchell:

The purpose of this letter is to inform you that a date has been set for the implementation of your death sentence, pursuant to the Judgment and Order issued on January 8, 2004, by Judge Mary H. Murguia of the United States District Court for the District of Arizona.  This letter will serve as official notification that pursuant to Title 28, Code of Federal Regulations, Section 26.3(a)(1), the Director of the Federal Bureau of Prisons has set August 26, 2020, as the date for your execution by lethal injection.

Soon, I will come to your housing unit to personally discuss with you many of the details surrounding the execution.  At that time, I will be available to answer any questions you may have regarding the execution process.

Sincerely,

T.J. Watson
Complex Warden

cc: The Honorable David G. Campbell, Senior Judge, U.S. District Court (D. Arizona)
    Ms. Debra D. Lucas, Acting Clerk of the Court (D. Arizona)
    Mr. Michael G. Bailey, United States Attorney (D. Arizona)
    Ms. Sharon Sexton, Assistant United States Attorney (D. Arizona)
    Mr. William Voit, Assistant United States Attorney (D. Arizona)
    Mr. Jonathan Aminoff, Assistant Federal Defender (California)
    Ms. Celeste Bacchi, Assistant Federal Defender (California)
    Mr. Josh Minkler, United States Attorney (S.D. Indiana)
    Mr. Joseph "Dan" McClain, U.S. Marshal (S.D. Indiana)
    Mr. Ethan P. Davis, Acting Assistant Attorney General, Civil Division
    Mr. Paul Perkins, Office of the Assistant Attorney General, Civil Division

Exhibit 4 - 010

# EXHIBIT 5

| | |
|---|---|
| **From:** | Celeste Bacchi |
| **To:** | US Pardon Attorney (imailagent) |
| **Cc:** | Jonathan Aminoff; Dolores Ramos |
| **Subject:** | Lezmond Mitchell - Petition for Executive Clemency |
| **Date:** | Friday, July 31, 2020 8:55:12 PM |
| **Attachments:** | 2020-07-31 FINAL Commutation Petition.pdf |

Dear Ms. Sargent-Burns:

Attached please find the petition for commutation of sentence for Lezmond Mitchell, Reg. No. 48685-008. The attachment to this e-mail includes: a cover letter from counsel; the commutation of sentence form; authorization; and petition in support of clemency. Due to the size of the attachments to our petition, they needed to be divided in order to ensure delivery. Therefore, Attachments A-E will be in a second email, and Attachments F-K in a third email, for three total emails.  We apologize for any inconvenience this may cause.

The petition and attachments are also being sent to you via FedEx, for delivery on Tuesday, August 4, 2020.

Please do not hesitate to contact me or my co-counsel, Jonathan Aminoff, if you have any questions or need more information.

Thank you,

Celeste Bacchi
Counsel for Lezmond Mitchell



### Celeste Bacchi
**Deputy Federal Public Defender**
**Office of the Federal Public Defender**
**Central District of California**

321 E 2nd Street | Los Angeles, CA 90012 | fpdcdca.org
**O:** 213.894.1887 | **F:** 213.894.0081

Exhibit 5 - 011

**FEDERAL PUBLIC DEFENDER**
CENTRAL DISTRICT OF CALIFORNIA
321 EAST 2nd STREET
LOS ANGELES, CALIFORNIA 90012-4202
213-894-2854
213-894-0310 FAX

**CUAUHTEMOC ORTEGA**
*Interim Federal Public Defender*
**AMY KARLIN**
*Chief Deputy*

**MARGO A. ROCCONI**
*Capital Habeas Unit Chief*

July 31, 2020

Rosalind Sargent-Burns
Pardon Attorney
U.S. Department of Justice
Office of the Pardon Attorney
950 Pennsylvania Avenue - RFK Main Justice Building
Washington, DC 20530

*Sent via FedEx and E-mail:* USPardon.Attorney@usdoj.gov

Re:     Lezmond Charles Mitchell - Petition for Executive Clemency
        Execution Scheduled for August 26, 2020

Dear Ms. Sargent-Burns:

On July 29, 2020, Lezmond Mitchell was served with a notice stating that the Bureau of Prisons intends to execute him on August 26, 2020. Accordingly, Mr. Mitchell timely files the attached petition for executive clemency with the Office of the Pardon Attorney ("OPA").

Mr. Mitchell was previously served notice in July, 2019, that he would be executed on December 11, 2019. He timely filed a petition for executive clemency in August, 2019 (Clemency Case Number C288750) and OPA scheduled an oral presentation for October 22, 2019. On October 7, 2019, however, OPA sent us an email informing us that because the Ninth Circuit Court of Appeals granted Mr. Mitchell a stay of execution, OPA was cancelling the presentation and administratively closing the case without prejudice to Mr. Mitchell's ability to reapply for clemency should a new execution date be imposed. Now that a new date has been imposed, Mr. Mitchell hereby reapplies for executive clemency.

We further reserve the right to file an addendum to the petition on or before August 14, 2020, in accordance with §1.10(b) ("All papers in support of a petition for commutation of sentence should be filed no later than 15 days after the filing of the petition itself.").

Exhibit 5 - 012

Rosalind Sargent-Burns
July 31, 2020
Page 2 of 2

We are mindful that the clemency process is multi-faceted and requires multiple levels of review, and yet we are filing this petition with less than 26 days before Mr. Mitchell's execution. Please note that we only received notice of Mr. Mitchell's execution two days ago, and are promptly filing this petition and bringing this matter to your attention.  Accordingly, we respectfully request that if OPA cannot reach a final decision on this matter before August 26, 2020, that OPA grants Mr. Mitchell a reprieve until such time that OPA can reach a final resolution.

Thank you for your consideration.

Yours sincerely,

Celeste Bacchi
Jonathan C. Aminoff
Deputy Federal Public Defenders

Counsel for Petitioner
Lezmond Charles Mitchell

Enclosure

Exhibit 5 - 013

# Petition for Commutation of Sentence

*Please read the accompanying instructions carefully before completing the application.  Type or print the answers in ink. Each question must be answered fully, truthfully and accurately.  If the space for any answer is insufficient, you may complete the answer on a separate sheet of paper and attach it to the petition.  You may attach any additional documentation that you believe is relevant to your petition.  The submission of any material, false information is punishable by up to five years' imprisonment and a fine of not more than $250,000.  18 U.S.C. §§ 1001 and 3571.*

**Relief sought:** *(check one)*

☑ **Reduction of Prison Sentence Only**          ☐ **Reduction of Prison Sentence and Remission**
☐ **Remission of Fine and/or Restitution Only**          ☐ **Other** _____

## To The President of the United States:

> **The undersigned petitioner, a Federal prisoner, prays for commutation of sentence and in support thereof states as follows:**

1. **Full name:** Lezmond _____ Charles _____ Mitchell _____
        *First*                              *Middle*                         *Last*

    **Reg. No.** 48685-008 _____     **Social Security No.** 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 _____

    **Confined in the Federal Institution at** Terre Haute, IN _____

    **Date and place of birth:** September 17, 1981; Fort Defiance, Arizona _____

    **Are you a United States citizen?**                                        ☑ yes ☐ no
    *If you are not a U.S. citizen, indicate your country of citizenship*

    _____

    **Have you ever applied for commutation of sentence before?**          ☑ yes ☐ no
    *If yes, state the date(s) on which you applied, and the date(s) when you were notified of the final decision on your petition(s).*

    Applied on 11/22/2016; withdrawn on 1/26/2017 (no decision)

    Applied on 8/30/19; administratively closed 10/7/2019 (no decision)

### Offense(s) For Which Commutation Is Sought

2. **I was convicted on a plea of** _____ not guilty _____ **in the United States District Court**
                                                      *(guilty, not guilty, nolo contendere)*

    **for the** _____ **District of** _____ Arizona _____ **of the crime of:**
                      *(Northern, Western, etc.)*                    *(identify state)*

## Offense(s) For Which Commutation Is Sought

Count 1, 5-Murder-18 USC 1153, 1111, 1112; Count 2-Carjacking-18 USC 2119: Count 3-
*(State specific offense(s); provide citation of statute(s) violated, if known)*

Felony Murder-18 USC 1153, 1111, 2111, 2112; Count 4, 8, 10-Robbery- 18 USC 1153, 2111,

2112; Count 6-Felony Murder-18 USC 1153, 1111, 1201, 2; Count 7-Kidnapping- 18 USC

1153, 1201; Count 9, 11- Use of a firearm- 18 USC 924(c)

I was sentenced on ___01-06___, ___2004___ to imprisonment for __Death+2xlife+384 mo__, to pay
            *(month/day)*   *(year)*                             *(length of sentence)*

☑ a fine of $ zero_____, ☑ restitution of $ 23,069.19_____, and to
          *(do not include special assessment)*

☑ supervised release or ☐ special parole for _____60 months_____, and/or to probation for

_____zero_____. I was ____20____ years of age when the offense was committed.
    *(length of sentence)*

3.    **I began service of the sentence of imprisonment on** __09-15__, __2003__, **and I am projected to**
                                                      *(month/day)*  *(year)*

    **be released from confinement on** ___never___, _____.
                                              *(month/day)*    *(year)*

    **Are you eligible for parole?**                                       ☐ yes ☑ no
    *If yes, indicate the date when you became eligible for release, and state whether your application for parole was granted or denied*

    **Have you paid in full any fine or restitution imposed on you?**        ☐ yes ☑ no
    *If the fine or restitution has not been paid in full, state the remaining balance.*

    $20,820.51

4.    **Did you appeal your conviction or sentence to the United States Court of**
    **Appeals?**                                                        ☑ yes ☐ no

    **Is your appeal concluded?**                                    ☑ yes ☐ no
    *If yes, indicate whether your conviction or sentence was affirmed or reversed, the date of the decision, and the citation(s) to any published court opinions.  Provide copies of any unpublished court decisions concerning such appeals, if they are available to you.*

    Convictions and sentences were affirmed on 9/5/07

    United States v. Mitchell, 502 F.3d 931 (9th Cir. 2007)

    **Did you seek review by the Supreme Court?**                   ☑ yes ☐ no

    **Is your appeal concluded?**                                      ☑ yes ☐ no
    *If yes, indicate whether your petition was granted or denied and the date of the decision.*

    Certiorari was denied on 6/9/08.

    Mitchell v. United States, 553 U.S. 1094 (2008)

Exhibit 5 - 015

## Offense(s) For Which Commutation Is Sought

**Have you filed a challenge to your conviction or sentence under 28 U.S.C. § 2255 (habeas corpus)?**   ☐ yes ☐ no

**Is your challenge concluded?**   ☑ yes ☐ no

*If yes, indicate whether your motion was granted or denied, the date of the decision, and the citation(s) to any published court opinions, if known.  Provide copies of any unpublished court decisions concerning such motions, if they are available to you.  If you have filed more than one post-conviction motion, provide the requested information for each such motion.*

Initial 2255 motion denied:  Mitchell v. United States, 790 F.3d 881 (9th Cir. 2015) certiorari

denied 137 S. Ct. 38 (2016). Rule 60(b) motion denied: Mitchell v. United States 958 F.3d 775

(9th Cir. 2020)

5.   **Provide a complete and detailed account of the offense for which you seek commutation, including the full extent of your involvement.  If you need more space, you may complete your answer on a separate sheet of paper and attach it to the petition.**

See attached statement

Exhibit 5 - 016

**Other Criminal Record**

6.    **Aside from the offense for which commutation is sought, have you ever been arrested or taken into custody by any law enforcement authority, or convicted in any court, either as a juvenile or an adult, for any other incident?**                              ☑ yes ☐ no

*For each such incident, provide:  the date, the nature of charge, the law enforcement authority involved, and the final disposition of the incident.  You must list every violation, including traffic violations that resulted arrest or in an criminal charge, such as driving under the influence.*

**Arrests:**

6/8/95 - I was cited by Navajo Nation Police for tagging on a bathroom wall.

9/12/01 - I was cited by Navajo Nation Police for criminal damage I pled guilty but I never received a

sentence and the case was dismissed after I was convicted in my federal capital case.

**Convictions:**

None

Exhibit 5 - 017

**Reasons for Seeking Clemency**

7.    **State your reasons for seeking commutation of sentence.  If you need more space, you may complete your answer on a separate sheet of paper and attach it to the petition.**

See attached statement
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Exhibit 5 - 018

## Certification and Personal Oath

I hereby certify that all answers to the above questions and all statement contained herein are true and correct to the best of my knowledge, information, and belief. I understand that any intentional misstatements of material facts contained in this application form may cause adverse action on my petition for executive clemency and may subject me to criminal prosecution.

Respectfully submitted this ___31___ day of ____July____, __2020__ .
                                                    *(month)*        *(year)*

_____
*Signature of Petitioner*

Celeste Bacchi, counsel for Lezmond
Mitchell, on behalf of Lezmond
Mitchell (see attached authorization)

Exhibit 5 - 019

I, Lezmond Charles Mitchell, do hereby authorize my attorneys of record, the Office of the Federal Public Defender for the Central District of California, to file a clemency petition on my behalf and to represent me in my clemency proceedings.

Dated: 10 - 4 -19

Lezmond Charles Mitchell

Exhibit 5 - 020

BEFORE THE PRESIDENT OF THE UNITED STATES

AND THE UNITED STATES PARDON ATTORNEY

———————————

**In re**

**LEZMOND CHARLES MITCHELL,**

**Petitioner.**

———————————

MEMORANDUM IN SUPPORT OF PETITION FOR
CLEMENCY AND FOR COMMUTATION OF DEATH SENTENCE

**DEATH PENALTY CASE**

**EXECUTION SET FOR AUGUST 26, 2020**


CUAUHTEMOC ORTEGA
Interim Federal Public Defender
CELESTE BACCHI
Email:  Celeste_Bacchi@fd.org
JONATHAN C. AMINOFF
Email:  Jonathan_Aminoff@fd.org
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0310

Attorneys for Petitioner
LEZMOND CHARLES MITCHELL


Email submission July 31, 2020 (paper copies arriving August 5, 2020 via FedEx)


*Petitioner Respectfully Requests the Opportunity to Make an Oral Presentation
Before the Pardon Attorney and the President.*


Exhibit 5 - 021

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................2

II.   FACTUAL AND PROCEDURAL HISTORY ............................................6

III.  LEZMOND MITCHELL'S BACKGROUND................................................8

IV.   REASONS FOR GRANTING CLEMENCY ..............................................11

      A.    Lezmond Mitchell's death sentence is an affront to the sovereignty
            of the Navajo Nation. ...........................................................11

            1.    The federal government ignored the entreaties of the Navajo
                  Nation, local prosecutors, and the victim's family and
                  insisted on a capital prosecution. ..............................................11

            2.    The DOJ's decision to capitally prosecute Lezmond was
                  unprecedented and contrary to its own protocols. ....................16

            3.    Comity and respect for the sovereign Navajo Nation support
                  a commutation of Lezmond's sentence to life without
                  parole.........................................................................19

      B.    Lezmond's death sentence is disproportionate to the sentences
            given to his more culpable co-defendant. ...........................................22

      C.    Lezmond's life is worth saving because he has accepted
            responsibility for his actions, and has the support of his family,
            community members, other Native American tribes, and even
            surviving victims in his bid for clemency. ...........................................25

V.    REASONS FOR GRANTING A REPRIEVE ............................................30

VI.   CONCLUSION.............................................................................31

i

Exhibit 5 - 022

*Mitchell will, unless spared by executive clemency, in all likelihood, suffer the ignominious fate of being the first person to be executed for an intra-Indian crime that occurred in Indian country. While this court's jurisprudence indeed gives the federal government the legal authority to exercise jurisdiction over this case for the purpose of obtaining capital punishment, succeeding in that objective over the express objections of the Navajo Nation and the victims' family reflects a lack of sensitivity to the tribe's values and autonomy and demonstrates a lack of respect for its status as a sovereign entity. Should the federal government pursue a death warrant for Mitchell, I hope that it will have better reasons for doing so than adherence to the wishes of a former attorney general.*

- Judge Stephen Reinhardt, Ninth Circuit Court of Appeals[1]

\*\*\*

*[T]he United States made an express commitment to tribal sovereignty when it enacted the tribal option, and by seeking the death penalty in this case, the United States walked away from that commitment. For all of these reasons, this case warrants careful consideration.*

- Judge Morgan Christen, Ninth Circuit Court of Appeals[2]

\*\*\*

*I do not question the government's legal right to seek the death penalty; indeed, we have already held that it had the statutory right to do so. But that the government had the right to make this decision does not necessarily make it right, and **I respectfully suggest that the current Executive should take a fresh look at the wisdom of imposing the death penalty. . . .***The decision to pursue—and to continue to pursue—the death penalty in this case spans several administrations. The current Executive, however, has the unfettered ability to make the final decision. Although the judiciary today has done its job, **I hope that the Executive will carefully consider whether the death penalty is appropriate in this unusual case.***

- Judge Andrew Hurwitz, Ninth Circuit Court of Appeals[3]

---

[1] *Mitchell v. United States*, 790 F.3d 881, 897 (9th Cir. 2015) (Reinhardt, J. dissenting).
[2] *Mitchell v. United States*, 958 F.3d 775, 793 (9th Cir. 2020) (Christen, J. concurring).
[3] *Mitchell v. United States*, 958 F.3d 775, 794 (9th Cir. 2020) (Hurwitz, J. concurring) (internal citations omitted) (emphasis added).

Exhibit 5 - 023

## I.   INTRODUCTION

Lezmond Mitchell is scheduled to be executed by the federal government on August 26, 2020.  Lezmond is a 38-year-old Navajo man convicted of murdering two Navajo people on Navajo reservation land in 2001.  He was barely 20-years-old at the time of the crimes, and this was his first serious criminal offense. Although the victims' family, the Navajo Nation, and the local United States Attorney's Office all advocated for a life sentence, the federal government chose to single Lezmond out for a federal capital prosecution.  This case represents the only time in the history of the modern death penalty that the United States government has sought the death penalty over the objection of a Native American tribe when the criminal conduct in question was committed on tribal land.[4]  In all other similar cases, the Attorney General honored the objection of tribal authorities and declined to seek the death penalty.  The Navajo Nation continues to advocate for a life sentence, and sees the federal government's decision to move forward with an execution as a violation of its sovereignty.  Similarly, tribal nations around the country have expressed their dismay at Lezmond's impending execution and join Lezmond in petitioning President Trump for clemency.[5]  Lezmond remains the only Native American on federal death row.

---

[4] Attachment D, Declaration of K. McNally, ¶ 4.
[5] Attachment J, Tribal Nation Letters in Support of Clemency.

Exhibit 5 - 024

To call Lezmond's prosecution and death sentence problematic is an understatement.  In addition to charging Lezmond with a capital crime over the express objections of the sovereign Navajo Nation, the FBI manipulated the tribal criminal justice system so that Lezmond was kept in a Navajo jail for 25 days, without access to a lawyer, while the FBI continuously interrogated him.  Under state and federal law, this kind of interrogation could never have happened to a non-Native American.[6]  These affronts to Lezmond's Navajo status and to the Navajo Nation generally were compounded when, at the government's request, Lezmond's trial was moved to Phoenix, over 200 miles from Navajo land.  This virtually assured that the majority of Navajos in the region would not be able to serve on the jury.  As a result, Lezmond was convicted by a jury of 11 white persons and only one Navajo.

Unfortunately, due to trial counsel's errors, the jury that sentenced Lezmond to death never heard profound mitigating evidence that would have supported a life sentence.  Lezmond's history of addiction, mental illness, and trauma was never presented to the jury, nor was his family's history of violence and abuse.  Nor was the jury informed of the extent of Lezmond's serious mental illness and drug

---

[6] *See United States v. Percy*, 250 F.3d 720, 725 (9th Cir. 2001) (holding that the Sixth Amendment right to counsel does not attach to defendants in tribal custody); *see also* Creel, Barbara L., *The Right to Counsel for Indians Accused of Crime: A Tribal and Congressional Imperative*, 18 Mich. J. Race & L. 317 (2013).

3

Exhibit 5 - 025

addiction at the time of the crimes. Had the jury heard this crucial mitigating evidence, it is more than likely that at least one of them would have determined that Lezmond's life was worth saving.

Additional considerations call for the exercise of President Trump's clemency powers. Lezmond's co-defendant, Johnny Orsinger, was the primary aggressor in this case. He instigated the carjacking and was initiated the attacks on both victims.[7] Unlike Lezmond, Orsinger had a history of lethal violence—he committed an unrelated double homicide months before the instant offenses. Yet because he was a juvenile at the time of the crimes, he received a life sentence, while Lezmond, who turned 20 just weeks before the crimes, was tried capitally and sentenced to death. Such an extraordinary sentencing disparity countenances in favor of clemency. What's more, Lezmond showed remorse for his actions by offering to plead guilty in exchange for a life sentence, but that offer was rejected by the government. He has matured and exhibited positive behavior while on death row, and has been rewarded with work assignments for his efforts. He has excelled in art, literature, health, music, and English classes, and has completed his

---

[7] The prosecutor who tried Mitchell's death-penalty case and also prosecuted Orsinger for an unrelated double-homicide, argued in favor of a maximum sentence for Orsinger at his 2016 re-sentencing hearing, stating: "As I've pointed out and the Court can see, [Orsinger is] the lead instigator in both cases. He fires the first gun. He stabs Alyce. He drops the first rock on Tiffany. He's always the instigator in the face of adults. He should not walk in his community again." *United States v. Gregory Nakai, et. al.*, 01-CR-1072, Dkt. No. 595 at 34:5-9.

Exhibit 5 - 026

GED.  Indeed, when the Bureau of Prisons evaluated Lezmond under the First Step Act, he was found to have low recidivism risk level[8].

Perhaps most importantly, Lezmond is a beloved friend and family member with the support of many in his community.  Despite the tragic nature of his crimes, a surviving victim and a relative of the homicide victims both support Lezmond's petition for clemency.  As one victim family member stated, in an extraordinary showing of grace,

> Yes, Lezmond Mitchell made a mistake.  I have made mistakes.  You have made mistakes.  When you ask God for forgiveness and you mean it, it's Done. . . .We do not need another murder (execution of Lezmond Mitchell) for our family to heal or feel better.  Having his family suffer is not the right thing to do.[9]

Lezmond respectfully and with humility asks the President to show similar mercy by granting executive clemency and modifying his death sentence to life in prison without the possibility of parole.  In the alternative, Lezmond respectfully asks for a reprieve from his execution date.  Lezmond received only 28 days' notice of his execution and a reprieve would provide the Office of the Pardon Attorney the time it needs to conduct a full clemency hearing with the active participation of Native American advocates.

---

[8] Attachment K, Bureau of Prison First Step Act Assessment.
[9] Attachment G, Letter from M. Slim, at 157.

Exhibit 5 - 027

## II.   FACTUAL AND PROCEDURAL HISTORY

On May 8, 2003, in the District Court for the District of Arizona, a jury returned guilty verdicts on all counts against Lezmond Mitchell, convicting him of multiple counts related to the murders of Tiffany Lee and Alyce Slim.  On May 14, 2003, the district court then commenced a penalty phase on Count 2 of the indictment (carjacking resulting in the deaths of Tiffany Lee and Alyce Slim), and the jury recommended that Mitchell be sentenced to death on May 20, 2003.  On September 15, 2003, the district court formally sentenced Lezmond to death.  In a 2-1 decision, the Ninth Circuit Court of Appeals affirmed Lezmond's convictions and sentences.[10]  The Supreme Court denied Lezmond's petition for writ of certiorari on June 9, 2008.[11]

On June 8, 2009, Lezmond timely filed a motion to vacate, set aside, or correct his convictions and sentence under 28 U.S.C. § 2255.[12]  The same judge who presided over Lezmond's trial denied his § 2255 motion.[13]  The district court granted a certificate of appealability on three issues concerning ineffective assistance of counsel at the guilt and penalty phases.[14]

---

[10] *United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007).
[11] *Mitchell v. United States*, 553 U.S. 1094 (2008).
[12] *Mitchell v. United States*, 09-CV-8089, Dkt. No. 9.
[13] *Id.*, Dkt. Nos. 56, 57.
[14] *Id.*, Dkt. No. 56.

Exhibit 5 - 028

After briefing was completed, the Ninth Circuit held oral argument on February 20, 2014.[15]  One week after oral argument, a three-judge panel of the Ninth Circuit (Judges Reinhardt, Silverman, and Wardlaw) unanimously referred the case to the Circuit Mediation Unit.[16]  Despite the defense team's efforts, mediation was not successful.

After mediation efforts failed, the Ninth Circuit, in another 2-1 decision, denied Lezmond's appeal.[17]  The Supreme Court denied Lezmond's petition for writ of certiorari on October 3, 2016.[18]

On March 6, 2018, Lezmond filed a motion to re-open his post-conviction proceedings pursuant to Federal Rule of Civil Procedure 60(b)(6).[19]  In that motion, Lezmond argued that a recent decision from the United States Supreme Court established that the district court had erroneously denied him the opportunity to interview the jurors in his case.  The district court denied relief.  While the case was on appeal, the Department of Justice scheduled Lezmond's execution for December 11, 2019.  The Ninth Circuit stayed the execution to allow Lezmond to litigate his appeal, but ultimately affirmed the lower court's decision in April, 2020.  *Mitchell v. United States*, 958 F.3d 775 (9th Cir. 2020).

---

[15] *Mitchell v. United States*, 11-99003, Dkt. No. 50.
[16] *Id.*, Dkt. No. 51.
[17] *Mitchell v. United States*, 790 F.3d 881 (9th Cir. 2015).
[18] *Mitchell v. United States*, 137 S. Ct. 38 (2016).
[19] *Mitchell v. United States*, 09-CV-08089, Dkt. No. 71.

Exhibit 5 - 029

On August 30, 2019, Lezmond timely filed a petition for commutation of sentence.  After the Ninth Circuit issued a stay of execution on October 4, 2019, the Office of the Pardon attorney contacted undersigned counsel on October 7, 2019, and cancelled the previously scheduled October 22 oral presentation and noticed that "this office will now administratively close Mr. Mitchell's clemency petition without prejudice to his ability to reapply should an execution date be imposed again at a later time."  On July 29, 2020, scheduled Lezmond's execution for August 26, 2020.

### III.  LEZMOND MITCHELL'S BACKGROUND

Lezmond Mitchell is not the typical federal death row inmate.  As Ninth Circuit Judge Stephen Reinhardt said,

> However gruesome the crime in this case, Mitchell, who was twenty years old at the time and had no prior criminal record, does not fit the usual profile of those deemed deserving of execution by the federal government—a penalty typically enforced only in the case of mass murderers and drug overlords who order numerous killings.[20]

Lezmond[21] was born on September 17, 1981 on the Navajo Reservation in Arizona.  He was presented at trial as a privileged, albeit somewhat neglected, child born into an academically gifted and professionally successful family.  This

---

[20] *Mitchell v. United States*, 790 F.3d 881, 894 (9th Cir. 2015) (Reinhardt, J., dissenting).
[21] A complete social history of Lezmond Mitchell is described in the declarations of social historian Hilary Weaver.  *See* Attachment F.

8

Exhibit 5 - 030

portrayal ignored Lezmond's traumatic and abusive upbringing.  Lezmond never

knew his father.  He was raised in physically and emotionally abusive homes, and

suffered violence at the hands of his maternal grandparents, who were his primary

caretakers for much of his childhood.[22]  Lezmond's mother, Sherry, was also

physically and emotionally abused as a child by her parents, who she described as

"a very dysfunctional family;"[23] yet Sherry entrusted these same people to care for

her child.  Lezmond's grandmother was notorious for her abusive behavior toward

Lezmond.  She displayed varied symptoms of mental illness including hoarding,

obsessive-compulsive behavior, and chronic depression.  As Auska Kee Charles

Mitchell, Sherry's brother and Lezmond's uncle, recounts:

> There was a lot of emotional and physical abuse in
> our house growing up. . . . My father was physically
> abusive to my mother and to me.  My mother was
> extremely manipulative and emotionally abusive to all of
> us.  She and my father used to beat me with a belt.  She
> demeaned and degraded all of us.
> [* * *]
> I wanted Lezmond to come live with me and my
> family.  I didn't want him to grow up exposed to the
> violence and emotional abuse that Sherry and I lived with
> from our parents.  He was a good kid and I wanted him to
> stay on the right path.  But my mother and sister believed
> it was better for Lezmond to live with his grandfather (my
> father), and I deferred to them.

---

[22] In addition to the facts set forth in Lezmond's social history (Attachment F), the
declaration of Lezmond's uncle, Auska Kee Charles Mitchell, supports these facts.  *See*
Attachment G, Declaration of A. Mitchell.

[23] Attachment I, S. Mitchell Interview, at 193.

Exhibit 5 - 031

> Lezmond always seemed like a follower to me. He was raised in traumatic circumstances, and he never got the support he needed from his parents. . . . I think if Lezmond had more support growing up, more guidance and caring from his family, he could have accomplished a lot in his life.  Lezmond is a caring soul.[24]

As a result of his abusive upbringing, Lezmond has suffered from post-traumatic stress disorder for much of his life, including at the time of the commitment offenses.  In his early adolescence, Lezmond began self-medicating with drugs and alcohol.  By the time he was seventeen, a mental health professional who treated Lezmond after he was caught with marijuana insisted that Lezmond was suicidal and required intensive psychotherapy and residential treatment to address his mental health and substance abuse issues.  But Lezmond, lacking the support of his family, went untreated, and his substance abuse and mental illness worsened.  In the months leading up to the commitment offenses, he was drinking alcohol and smoking marijuana daily, and using near-lethal doses of cocaine, methamphetamine, and ecstasy.  On the day of the crimes, Lezmond had been awake for several days bingeing on drugs and alcohol, and he and Orsinger continued to drink and use cocaine, methamphetamine, marijuana and ecstasy.  A board-certified psychiatrist has opined that Lezmond was psychotic at the time of the killings.  The jury that sentenced Lezmond to death knew none of this.

---

[24] Attachment G, Declaration of A. Mitchell, at 162-63.

Exhibit 5 - 032

While Lezmond's trauma, mental illness, and addiction were profound, he was and is more than the terrible things that happened to him or the crimes that he committed.  Those who know Lezmond well describe him as sensitive, thoughtful, and intelligent.[25]  He helped friends get through high school, stressed the importance of education, and worked to better himself.  When his own mother neglected him and turned him away, he was taken in by a neighboring family who loved him like one of their own, and he loved and respected them back.  He has developed deep and meaningful relationships with relatives and friends that last to this day.  As discussed further *infra*, these individuals continue to offer their unwavering love and support for Lezmond.

## IV.  REASONS FOR GRANTING CLEMENCY

**A.    Lezmond Mitchell's death sentence is an affront to the sovereignty of the Navajo Nation.**

**1.    The federal government ignored the entreaties of the Navajo Nation, local prosecutors, and the victim's family and insisted on a capital prosecution.**

The Navajo Nation has steadfastly objected to the use of the death penalty, both generally as well as specifically in Lezmond's case.  In late 2001, the United States Attorney's Office for the District of Arizona ("USAO") inquired whether the Navajo Nation would support a capital prosecution against Lezmond.  On January 22, 2002, Levon Henry, then-Attorney General for the Navajo Nation,

---

[25] *See generally* Attachment G.

11

Exhibit 5 - 033

responded to the USAO and stated the Nation's objection to a capital prosecution in this case.  As Henry explained, "Navajo cultural and religious values . . . do not support the concept of capital punishment.  Navajo holds life sacred.  Our culture and religion teach us to value life and instruct against the taking of human life for vengeance."[26]  Henry acknowledged that at the time of his letter, the Public Safety Committee of the Navajo Nation Council was in the process of holding public hearings on the issue of capital punishment.  While the Navajo Nation had not yet completed those hearings, Henry emphasized that "it is, at this time, the consensus of the Public Safety Committee of the Navajo Nation Council and the Judiciary Committee of the Navajo Nation Council to maintain the historic position of the Navajo Nation opposing the sentencing option of capital punishment for crimes committed on the Navajo Nation under any section of the United States criminal code."[27]  Thus, Henry formally requested that the USAO not seek the death penalty against Lezmond.[28]  The USAO recommended to the Department of Justice ("DOJ") that capital punishment not be sought in this case. However, Attorney General John Ashcroft overrode the recommendation, and the Navajo Nation's stated position, and instructed the USAO to seek death against Lezmond.

---

[26] Attachment A, Letter to DOJ from L. Henry, at 2.
[27] *Id.* at 3.
[28] *Id.* at 2.

Exhibit 5 - 034

In order to carry out Ashcroft's wishes, the USAO had to rely on a legal loophole.  With respect to crimes committed in Indian country, Congress passed the so-called "tribal option" of the Federal Death Penalty Act ("FDPA"), which allowed Native American tribes to decide whether the death penalty would apply to intra-Indian crimes committed in Indian country.[29]  Thus, because the FDPA requires a tribe to "opt-in" to a federal capital prosecution for those cases where federal jurisdiction is based on the crime occurring on tribal land, Lezmond was not, and could not, be sentenced to death by the federal government for murder. However, Lezmond could technically be sentenced to death for carjacking resulting in death because it is a federal offense of general applicability (i.e., the federal government had jurisdiction to charge this offense regardless of where the crime took place).[30]  As a result, DOJ took the unprecedented step of seeking the death penalty for Lezmond based on the carjacking offense alone.

This decision was a clear violation of the spirit, if not the letter, of the promise Congress made to tribal nations with the passage of the opt-in amendment. The whole purpose of the amendment was to respect tribal sovereignty and accord tribal governments a status similar to State governments by allowing them to choose whether to have the death penalty apply to crimes committed by their

---

[29] 18 U.S.C. § 3598.
[30] *United States v. Mitchell*, 502 F.3d 931, 946-949 (9th Cir. 2007).

13

Exhibit 5 - 035

members within their land.  As one of the sponsors of the tribal option, Senator

Daniel Inouye, pointed out during debate on the bill, "It may be difficult for most

Americans to understand that Indian governments are sovereign governments. . . .

[and] the U.S. Constitution and the debates in the Continental Congress recognize

and address Indian nations based upon their status as governments.  This has been

true since the earliest of times in our history."[31]  Therefore, Senator Inouye

stressed, "[P]erhaps the most important point to understand about this amendment

is that it is premised upon the sovereign status of tribal governments."  Co-sponsor

of the tribal option, Senator Pete Domenici—himself a supporter of the death

penalty—put it more bluntly:  "We ought to recognize the Indian people, their

legislative bodies, and this amendment gives [tribal governments] the authority to

elect whether or not murder committed on their land by an Indian is subject to the

death penalty or not. . . .  So, essentially this is fairness, a recognition of Indian

sovereignty, Indian self-determination. When it really counts, are we not going to

count it, or are we?"[32]

    In Lezmond's case, when it really counted, the federal government failed to

uphold its end of the bargain.  Despite the clear intent of the opt-in provision, DOJ

prevailed and ultimately sentenced Lezmond to death.  As noted by Judge Christen

---

[31] 137 Cong. Rec. S8488-03 (1991).
[32] *Id.*

Exhibit 5 - 036

of the Ninth Circuit Court of Appeals, this decision was nothing less than "a betrayal of a promise made to the Navajo Nation and demonstrates a deep disrespect for tribal sovereignty. . . . People can disagree about whether the death penalty should ever be imposed, but our history shows that the United States gave tribes the option to decide for themselves."[33]

Shortly after Lezmond's trial concluded in 2003, the Navajo Nation completed its public hearings to gauge tribal members' position on opting in to the FDPA.[34]  Once again, the Navajo Nation reaffirmed its position against the death penalty and refused to opt in.  During the extensive public hearing process, Marlene Slim, the daughter of Alyce Slim and mother of Tiffany Lee, spoke at one of these hearings and expressed her opposition to the death penalty.  She explained that she had requested that the USAO not seek death against Lezmond, but her wishes were "ignored and disrespected."[35]

---

[33] *Mitchell v. United States*, 958 F.3d 775, 793 (9th Cir. 2020) (Christen, J., concurring).
[34] Attachment B, 2004 Navajo Nation Report on the Death Penalty.
[35] *Id.* at 5; *see also* Attachment G, Letter from M. Slim.

15

Exhibit 5 - 037

2.     **The DOJ's decision to capitally prosecute Lezmond was unprecedented and contrary to its own protocols.**

The DOJ's disparate treatment of Lezmond's case, and its refusal to honor the wishes of the sovereign Navajo Nation, is both notable and disturbing—and worthy of clemency consideration under the DOJ's commutation guidelines.[36]

The DOJ specifically created a capital case review protocol to promote consistency and even-handedness in federal capital prosecutions.[37]  The protocol states that  "National consistency requires treating similar cases similarly, when the only material difference is the location of the crime.  Reviewers in each district are understandably most familiar with local norms or practice in their district and State, but reviewers must also take care to contextualize a given case within national norms or practice."[38]  Both national norms and practice advise against the federal government executing Lezmond, an enrolled member of the Navajo tribe, for a crime occurring on Navajo land.[39]  Yet Lezmond's death sentence remains, marking the only time in the history of the modern death penalty that the DOJ has

---

[36] *See* DOJ Justice Manual, Title 9-140.113, *Standards for Considering Commutation Petitions* ("Appropriate grounds for considering commutation have traditionally included disparity or undue severity of sentence. . . .").

[37] USAM 9-10.030.

[38] USAM 9-10.140.

[39] United States Attorney Paul Charlton, "a local Arizonan appointed by President George W. Bush, who was intimately familiar with the relations between the Navajo tribe and the citizens of the State of Arizona, declined to seek the death penalty."  *Mitchell*, 790 F.3d at 896 (Reinhardt, J., dissenting).

Exhibit 5 - 038

sought the death penalty over a Native American tribe's objection based on a crime occurring on that tribe's land.[40]

This discrepancy is made even more striking when one compares Lezmond's case to other cases where the Attorney General has rejected capital prosecutions for murders committed on tribal land. On at least twenty other occasions, under Presidents Bush, Obama, and Trump, the DOJ has considered a capital prosecution, but ultimately declined to do so, apparently based on the tribe's opposition to capital punishment. *Id.* Of these cases, several involved sources of jurisdiction independent of tribal land. For example, the Attorney General has rejected multiple capital prosecutions under 18 U.S.C. § 1114 in cases involving the murder of federal officers.[41]

The Attorney General has also rejected multiple capital prosecutions under 18 U.S.C. § 1512 in cases where a murder was committed to eliminate a witness or informant. In one such case, *United States v. Stanley Secatero*, Attorney General Reno declined to authorize capital prosecution where the defendant, a repeat violent felon, murdered four people (including a grandmother) and seriously injured a fifth.[42] In a separate case, Abel Hidalgo accepted a plea deal and

---

[40] Attachment D, Declaration of K. McNally, ¶ 4.

[41] *United States v. Vincent Cling*, D. Ariz. Case No. 96-CR-028; *United States v. Frank Monte Banashley, Sr.*, D. Ariz. Case No. 99-CR-1074; *United States v. Kirby Cleveland*, D. N.M. Case No. 17-CR-965.

[42] D.N.M. Case No. 98-546.

Exhibit 5 - 039

stipulated to a factual basis that set out that he murdered two women and also bludgeoned a 21-month-old child to death.  While Hidalgo ultimately pled guilty to two counts of first-degree murder, a capital prosecution could have been initiated under a witness-killing theory pursuant to 18 U.S.C. § 1513.[43]  And in a third case, death was not sought against Robert Pettigrew in a case in which he beat two people to death with a baseball bat.[44]  Finally, in *United States v. Gregory Nakai, Jimmy Nakai, Dennie Leal, Teddy Orsinger, and Johnny Orsinger*[45], a capital prosecution was not pursued against Gregory Nakai (aged 21), Jimmy Nakai (23), Leal (24), or Teddy Orsinger (35), for a carjacking resulting in two deaths.[46]

The Attorney General has also rejected capital prosecutions in several cases involving child victims.  In addition to the Hidalgo prosecution mentioned above in which a 21-month-old baby was beaten to death, in 2017, the Attorney General approved of a plea deal which allowed Tom Begaye Jr. to plead guilty to various charges in exchange for a life sentence after Begaye kidnapped, raped, and murdered an 11-year-old girl on the Navajo reservation.[47]

---

[43] D. Idaho 02-CR-0043.
[44] *United States v. Pettigrew*, D.N.M Case No. 07-CR-2143.
[45] This case is the unrelated double-homicide committed by Lezmond's co-defendant, Johnny Orsinger.
[46] D. Ariz. Case No. 01-CR-1072.
[47] D. N.M. Case No. 16-CR-2376.

Exhibit 5 - 040

There is no meaningful difference between Lezmond's case and the many cases where the DOJ has respected the sovereignty of Native American nations and refused to capitally prosecute in light of the tribe's objection to the death penalty. Such disparate treatment countenances in favor of clemency in this case.[48]

### 3.    Comity and respect for the sovereign Navajo Nation support a commutation of Lezmond's sentence to life without parole.

The Navajo Nation's letter of July 21, 2014[49] underscores the sensitive issues of comity present in this case.  The letter outlines the Navajo Nation's steadfast moral opposition to the death penalty and its continuing objection to the use of general-jurisdiction statutes to circumvent the tribe's refusal to opt-in to the FDPA.[50]  It also identifies two issues specific to Lezmond's arrest and trial that implicate the government-to-government relationship between the Navajo Nation and the United States.

First, the Navajo Nation objects to the FBI's use of tribal custody to interrogate Lezmond before he was appointed an attorney in federal court.[51] Lezmond was kept in tribal custody for 25 days, and during that time was continually interrogated by the FBI without arraignment or access to an attorney. Only the first of those four interviews conducted by the FBI was recorded.  The

---

[48] *See* DOJ Justice Manual, Title 9-140.113.
[49] *See* Attachment C, Letter to DOJ from H. Yazzie.
[50] *Id.* at 2-3.
[51] *Id.* at 3.

Exhibit 5 - 041

evidence developed from these interviews was crucial to the government's argument for a death sentence.

Second, the Navajo Nation highlights the troubling jury selection process in this case, which was moved hundreds of miles from the Navajo Reservation to Phoenix.[52]  The ensuing hardship to Navajo prospective jurors, as well as the exclusion of Navajo venirepersons who expressed views consistent with Navajo religion and culture or spoke Navajo as a first language, resulted in a petit jury that did not include a representative sample of Navajos.[53]

The letter also draws on the Navajo Nation's 2004 Report on the Death Penalty, which was not available at the time of Lezmond's trial and which accurately summarizes the Navajo Nation's decision to not opt in to the FDPA and the reasons therefor.[54]  The Navajo Nation's position is that were it to opt-in to the FDPA, its tribal sovereignty would be significantly diminished.  Lezmond's trial epitomizes the Navajo Nation's concerns for its dwindling sovereignty, and the DOJ's refusal to defer to the Navajo Nation is a reality the Navajo Nation always sought to prevent.

Professor Addie Rolnick, an expert in the field of Indian law, explains:

> [T]his case is an example of the exercise of federal jurisdiction being used to undermine the authority and

---

[52] *Id.*
[53] *Id.*
[54] *See* Attachment B, 2004 Navajo Nation Report on the Death Penalty.

Exhibit 5 - 042

policy choices of a tribal justice system.  Whether or not it was technically legal, the Attorney General's decision to seek the death penalty against the tribe's wishes for a crime committed by one Indian against another within tribal territory contradicts clear federal policy – in effect since 1968 and amplified since 2000 – in favor of strengthening tribal justice systems and limiting federal infringement on tribal sovereignty.  The Attorney General's decision to disregard the Nation's wishes undermined its sovereignty and did so in a manner that rendered tribal officials, who assisted in the arrest and early investigation, complicit in a prosecution that the Navajo Nation opposed.[55]

As Professor Rolnick concluded, the Attorney General's 2002 decision to pursue a death sentence against Lezmond was contrary to then-existing federal policy, and an outlier when viewed in the context of federal legislative intent and recent congressional action.[56]  Since Lezmond's 2003 trial, federal policy and judicial jurisprudence has shifted even further in the direction of increased tribal sovereignty and decreased non-tribal interference in tribal justice systems.[57] Congress has made efforts, most significantly with the 2010 Tribal Law and Order Act, to empower Native American tribes and allow them greater control of their

---

[55] Attachment E, Declaration of A. Rolnick, ¶ 8.

[56] *Id.*, ¶ 47.

[57] *Id.*; *see also, e.g.*, *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020) ("[H]old[ing] the government to its word" and reaffirming the continuing existence of the reservations that the federal government promised to the Five Civilized Tribes in the 1830s, such that the State of Oklahoma had no jurisdiction to criminally prosecute a Creek member for a crime against a Native American on Creek land).

Exhibit 5 - 043

citizens in the federal criminal justice system.[58]  These efforts continue today, with proposals by both Republicans and Democrats to remove jurisdictional hurdles that limit tribal sovereignty over criminal acts committed on their lands.[59]  Yet Lezmond's death sentence lingers as an unfortunate aberration, and clemency is now his only recourse to remedy the government's unprecedented overreaching.

**B.    Lezmond's death sentence is disproportionate to the sentences given to his more culpable co-defendant.**

Pursuant to DOJ Justice Manual Title 9-140.113, commutation of Lezmond's sentence is also warranted because of the "disparity or undue severity of sentence" compared to his more culpable co-defendant.

Because Johnny Orsinger was a juvenile at the time of the offense, he was not subject to the death penalty and was ultimately sentenced to five concurrent life sentences plus a concurrent term of 180 months in this case.[60]  In a separate case involving an earlier, unrelated carjacking resulting in the deaths of two additional people, Orsinger was sentenced to nine concurrent life sentences, three additional consecutive life sentences, and consecutive terms totaling 1800 years.[61]

---

[58] Attachment E, Declaration of A. Rolnick, ¶¶ 39-41.

[59] *See, e.g.*, Scott Turner, *Lawmakers seek protections for Native women, children*, Albuquerque Journal, May 12, 2019, available at https://www.abqjournal.com/1314628/lawmakers-seek-protections-for-native-women-children.html (last visited 8/29/19).

[60] *United States v. Lezmond Mitchell, et. al.*, 01-CR-1062, Dkt. No. 545.

[61] *United States v. Gregory Nakai, et. al.*, 01-CR-1072, Dkt. No 288.  Since Lezmond's trial, Orsinger moved, pursuant to 28 U.S.C. § 2255, for post-conviction relief under *Miller v.*

Exhibit 5 - 044

Lezmond, who turned 20 just weeks before the offenses of conviction, was less culpable than his juvenile co-defendant. As Vincent Kirby, the prosecutor who tried both Lezmond's case and prosecuted Orsinger's unrelated double-homicide, explained, "[Orsinger is] the lead instigator in both cases. He fires the first gun. He stabs Alyce. He drops the first rock on Tiffany. He's always the instigator."[62]

It is undisputed that Orsinger initiated the attack on Ms. Slim.[63] The carjacking strongly resembles the modus operandi of the offense Orsinger committed just two months earlier, where Orsinger had personally hog-tied victim David Begay, helped steal his car, placed him on the ground, and shot him in the head.[64] The fact that Lezmond's more culpable co-defendant—who, unlike Lezmond, had a violent criminal record—did not face death or even mandatory life imprisonment compounds the disproportionate nature of Lezmond's sentence.

Indeed, the same concerns that prohibit a death sentence for Orsinger similarly apply to Lezmond. In *Roper v. Simmons*, 543 U.S. 551 (2005), the

---

*Alabama*, 132 S. Ct. 2455 (2012), which held that the Eighth Amendment prohibits a court from imposing a mandatory life sentence on a juvenile defendant. *United States v. Mitchell, et. al.*, 01-CR-1062, Dkt. No. 545; *United States v. Gregory Nakai, et. al.*, 01-CR-1072 Dkt. No. 435; *Johnny Orsinger v. United States*, 13-CV-8159, Dkt. No. 1. Following a re-sentencing hearing on August 4, 2015, Orsinger was again sentenced to life in prison. *United States v. Gregory Nakai, et. al.*, 01-CR-1072, Dkt. No. 469, 472.

[62] *United States v. Gregory Nakai, et. al.*, 01-CR-1072, Dkt. No. 595 at 34:5-9.

[63] *Mitchell*, 502 F.3d at 943.

[64] *United States v. Nakai*, 413 F.3d 1019, 1021 (9th Cir. 2005).

Exhibit 5 - 045

Supreme Court found the death penalty unconstitutional when imposed upon a person who was under 18 when the capital offense was committed.  The Court cited scientific evidence supporting a lack of maturity and underdeveloped sense of responsibility in youth versus adult offenders.[65]  And in *Miller v. Alabama,* 132 S. Ct. 2455 (2012), the Supreme Court again noted the "fundamental differences between juvenile and adult minds."[66]  Emerging research establishes that changes in white brain matter, a material that supports impulse control and other types of cognitive functioning, continues through an individual's early twenties, and even into the mid-thirties.[67]

As the Supreme Court has recognized, brain maturation does not end at the age of 18, but the courts set 18 as an arbitrary bright line to limit capital punishment.[68]  The result is the unjust situation that presents itself here:  Orsinger, the primary aggressor with the violent history, gets a life sentence; Lezmond, the follower with no violent criminal history whatsoever, awaits execution.

---

[65] *Roper*, 543 U.S. at 569.
[66] 132 S. Ct. at 2464.
[67] *See*, *e.g.*, *Longitudinal Development of Human Brain Wiring Continues from Childhood into Adulthood*, C. Lebel and C. Beaulieu, The Journal of Neuroscience, July 27, 2011.
[68] *Roper*, 543 U.S. at 606-07.

Exhibit 5 - 046

**C.      Lezmond's life is worth saving because he has accepted responsibility for his actions, and has the support of his family, community members, other Native American tribes, and even surviving victims in his bid for clemency.**

Lezmond has accepted responsibility for his role in the crimes since before his trial, when he offered to plead guilty in exchange for a life sentence.  Members of the victim's family, then and now, have objected to the death penalty for Lezmond and supported a sentence of life in prison.  And numerous friends, family, and community members all ask for the President to extend mercy to Lezmond, both for who he is as a person, and out of respect for the Navajo Nation's belief in restorative justice and objection to capital punishment.

As noted above, Navajo traditions and the official position of the Navajo government forbid the taking of human life for vengeance.  As a surviving victim, a relative of the victims, and numerous members of the Navajo Nation all attest,[69] capital punishment has no place in the Navajo tradition of justice, as Navajo courts employ principles of restorative justice in their judicial system.  It is their longstanding position that only through peacemaking can the harm a crime causes in a community be redressed.  Thus, as former Attorney General of the Navajo Nation (and current Counsel to the President) Levon Henry explains, "Committing a crime not only disrupts the harmony between the victim and the perpetrator but it

---

[69] *See generally* Attachments A, B, C, G, and J.

Exhibit 5 - 047

also disrupts the harmony of the community.  The capital punishment sentence

removes [] any possibility of restoring the harmony in a society."[70]  In a letter to

the DOJ in 2014, Herb Yazzie, former Chief Justice of the Navajo Nation, echoed

the harm that the Navajo community would suffer if Lezmond were executed:

> In the twelve years since we originally offered our views of this case, the Navajo Nation's position on the death penalty has not changed:  we oppose capital punishment in all circumstances.  We have not opted-in to the Federal Death Penalty Act and we have never supported a capital prosecution for any of our citizens, including Lezmond Mitchell.
>
> Capital punishment is a sensitive issue for the Navajo people.  Our laws have never allowed for the death penalty.  It is our belief that the negative force that drives a person to commit evil acts can only be extracted by the Creator.  People, on the other hand, are vehicles only for goodness and healing.  By subjecting Mr. Mitchell to capital punishment, the Department of Justice has violated our laws and our belief system, and impeded the healing process our tribe must undertake in the wake of this tragic crime.[71]

The reality and depth of the tribe's stated beliefs is perhaps best exemplified

by the stance taken by Marlene Slim, the daughter of Alyce Slim and mother of

Tiffany Lee.  At the time of Lezmond's trial, Marlene expressed her opposition to

the government's decision to seek a death sentence for Lezmond.  Despite the

unimaginable loss she and her family suffered, she asked that the government have

---

[70] Attachment A, Letter to DOJ from L. Henry, at 2.
[71] Attachment C, Letter to DOJ from H. Yazzie, at 18.

Exhibit 5 - 048

Lezmond serve life without parole.[72]  She was dismayed when her request was "ignored and dishonored."[73]

Another victim family member and member of the Navajo Nation, Michael Slim, similarly objects to Lezmond's execution.  Michael, grandson to Alyce Slim and cousin to Tiffany Lee, testified at Lezmond's trial in support of the death sentence.  Since that time, Michael has had an extraordinary change of heart, and now advocates for Lezmond's sentence to be commuted to life:

> In 2003, it was very hard going to the trial and having to hear how the crime was done.  There were times at this point in my life when I felt Lezmond Mitchell was getting what he deserved.  I even gave testimony giving my input on this.  During this time in my life I thought this was the right thing to do.  As a form of revenge, thinking he should die for killing my family members. . . . I want to clarify, I'm not trying to get Lezmond Mitchell out of jail.  That's not my journey.  But [I now believe] that to take another person's life because he made a mistake is not forgiving.  It is revenge.  I Forgive Lezmond Mitchell for the double murder that affected my family.[74]

Charlotte Yazzie, one of the victims of the Trading Post Robbery, similarly supports Lezmond's bid for clemency, and states that her "heart goes out to the [Slim] family" but she does not want Lezmond "to be put to death[.]"[75]

---

[72] Attachment B, 2004 Navajo Nation Report on the Death Penalty, at 5.
[73] *Id.*
[74] Attachment G, Letter from M. Slim, at 157.
[75] *Id.*, Letter from Charlotte Yazzie, at 150-51.

Exhibit 5 - 049

Lezmond's family and friends, fellow members of the Navajo Nation, also talk about how Lezmond's execution would be a violation of their beliefs and a devastating loss on a personal level.[76]  Lorenzo Reed is Lezmond's closest friend from childhood; his family took Lezmond in when his own family neglected and abandoned him.  As Lorenzo explains:

> Lezmond was very much loved by everyone in my family, including my mother who saw him as another son. . . . My mother, who still sees Lezmond as one of her own children, is devastated and scared for him. . . . Not only are we heartbroken, but we are also very disappointed at the thought that the government is proceeding with Lezmond's execution with full disregard for Navajo beliefs and traditions.  There have been many other crimes committed in the past in the Navajo reservation and no one has been given the death penalty.  We ask ourselves, "Why Lezmond?"  We believe that Lezmond, like everyone else, should be given the opportunity to redeem himself instead of executing him. . . . Simply put, two wrongs do not make a right.  Should the government proceed with Lezmond's execution, the entire Navajo community will be heartbroken.[77]

Numerous people remember and cherish Lezmond as he was before his addiction and mental illness took hold, and pray that Lezmond's life may be spared, as the man he is now is not the boy he was at the time of the crimes.  John Fontes is a clinical laboratory scientist and the former assistant principal at Lezmond's high school.  He has remained close to Lezmond throughout his time

---

[76] *See generally* Attachment G.
[77] *Id*.

Exhibit 5 - 050

on death row.  He recalls how Lezmond had a difficult home life, but excelled in his studies and extra-curricular activities designed to improve the educational experience for himself and his fellow students—in effect, making a home for himself at his school.[78]  During their years of friendship, Lezmond has supported Fontes's educational and professional pursuits, even from behind bars.[79]  Fontes asks for Lezmond's life to be spared as he strongly believes that Lezmond "is capable of contributing to create positive change in others and to make our country a better place for everyone, especially for Native Americans."[80]

Everyone who has submitted letters of support for clemency describe similar experiences with Lezmond.  They recall how Lezmond always valued education and actively helped friends and relatives get through high school, work out problems with their families, and stay out of trouble.[81]  And despite their years of hardship, Lezmond has established a close relationship with his mother, who he checks on regularly and seeks to provide whatever emotional support he can.[82]  When his mother had an opportunity to work at Rough Rock, Lezmond's former high school, he begged her to take the job even though it was low-paying and

---

[78] *Id.* at 168-69.
[79] *Id.* at 169-70.
[80] *Id.* at 171.
[81] *See generally* Attachment G.
[82] Attachment I, S. Mitchell Interview, at 194.

Exhibit 5 - 051

"make it better, the high school there, for those kids, they need you. You're not there for a paycheck. You're there for the kids and an education."[83]  With a grant of clemency, Lezmond hopes to continue to provide love and support to his relatives and friends.

Finally, nearly a dozen Native American tribes from around the country have expressed their support for Lezmond, and for the values of the Navajo Nation, by submitting letters in support of clemency.[84]  As these tribal leaders state, "Federal criminal prosecutions of intra-Indian crimes occurring within the borders of Indian country bring up long-standing issues of tribal sovereignty.  In order to maintain tribal rights, as well as [Mr. Mitchell's] due process rights, we support Mr. Mitchell's position" for commutation of sentence.

## V.   REASONS FOR GRANTING A REPRIEVE

In the alternative, Lezmond respectfully requests a reprieve of his August 26, 2020 execution date.  Lezmond is mindful that the clemency process is multi-faceted and can be lengthy.  As such, Lezmond believes that a reprieve would provide the Office of the Pardon Attorney the time it needs to conduct its investigation, consider an oral presentation from Lezmond's counsel and advocates from the Navajo Nation, and prepare its recommendation for the Deputy Attorney

---

[83] *Id.*
[84] Attachment J.

Exhibit 5 - 052

General, and provide adequate time for the Deputy Attorney General to make his recommendation to the President and for the President to make his decision.

## VI.  CONCLUSION

It is for these reasons that Lezmond Mitchell seeks forgiveness and clemency from the President.  The disparities in sentencing between Lezmond and other Native American defendants, and Lezmond and his co-defendant in this case, are alone reasons to show mercy here.  Additionally, equitable factors,[85] such as comity and respect for the sovereign Navajo Nation, and the extraordinary grace shown to Lezmond by members of the victims' family and the community that he harmed, also support clemency.  Accordingly, Lezmond Mitchell, his family, his legal team, and his friends respectfully request that President Trump show mercy, grant clemency, and commute Lezmond Mitchell's sentence to life in prison without the possibility of parole.

Respectfully submitted,

DATED: July 31, 2020

_____
CELESTE BACCHI
Deputy Federal Public Defender

JONATHAN AMINOFF
Deputy Federal Public Defender

Attorneys for Petitioner
LEZMOND CHARLES MITCHELL

---

[85] *See* DOJ Justice Manual, Title 9-140.113 ("[E]quitable factors . . . may also provide a basis for recommending commutation in the context of a particular case.").

Exhibit 5 - 053

| | |
|---|---|
| **From:** | Celeste Bacchi |
| **To:** | US Pardon Attorney (imailagent) |
| **Cc:** | Jonathan Aminoff : Dolores Ramos |
| **Subject:** | Lezmond Mitchell - Petition for Executive Clemency, Attachments A-E (Email 2/3) |
| **Date:** | Friday, July 31, 2020 8:58:20 PM |
| **Attachments:** | Attachments A-E.pdf |

Dear Ms. Sargent-Burns:

As noted in our previous email, attached please find Attachments A-E of Mr. Mitchell's Petition for Executive Clemency. Attachments F-K will follow in a subsequent email.

Thank you,

Celeste Bacchi
Counsel for Lezmond Mitchell



**Celeste Bacchi**
**Deputy Federal Public Defender**
**Office of the Federal Public Defender**
**Central District of California**
321 E 2nd Street | Los Angeles, CA 90012 | fpdcdca.org
**O:** 213.894.1887 | **F:** 213.894.0081

Exhibit 5 - 054

# ATTACHMENT A

Exhibit 5 - 055



**NAVAJO NATION DEPARTMENT OF JUSTICE**
*OFFICE OF THE ATTORNEY GENERAL*

LEVON B. HENRY
ATTORNEY GENERAL

RECEIVED

2002 JAN 28   A 4: 51

U.S. ATTORNEY
PHOENIX, AZ

BRITT ETCLAFHAM II
DEPUTY ATTORNEY GENERAL

January 22, 2002

Paul Charlton, United States Attorney
U.S. Department of Justice
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, Arizona 85004-4408

      RE: <u>U.S v. Nakai, Nakai, Jr., Leal and Orsinger</u>,
         No. CR-01-1072-PCT
         <u>U.S. v. Mitchell and Kinlicheenie</u>, No. CR-01-1062-PCT

Dear Mr. Charlton:

      As you requested, this letter will express the current
position of the Navajo Nation with respect to the possibility of the
United States seeking capital punishment in the above cases. The Nation
realizes that your office is not necessarily seeking whether the Nation
wants to "opt in" to the idea of capital punishment under 18 U.S.C. 3598;
rather the question is whether the Nation would support the death penalty
sentencing option under 18 U.S.C. 2119 in these specific instances.
Although the Nation has not adopted a comprehensive policy on capital
punishment, in these cases, the Nation would not support a death penalty
option.

      I wish to thank you for the information you provided on the
pending cases, although the details of the cases were shocking it was,
nevertheless, helpful in our decision making process. The information
which you provided was shared with the Speaker of the Navajo Nation
Council, members of the Public Safety Committee of the Navajo Nation
Council, and members of the Judiciary Committee of the Navajo Nation
Council. Pursuant to your request the information was kept privileged
and all copies which were distributed were collected at the conclusion

P.O. Drawer 2010 ● Window Rock, AZ 86515 ● (928) 871-6343 ● FAX No. (928) 871-8177

Exhibit 5 - 056

Letter to: Paul Charton
January 22, 2002
Page 2

of our meeting.  It is with this understanding and based on the cultural
reasons outlined below that the Navajo Nation's position on the capital
punishment sentencing option remains unchanged at this time.  The Navajo
Nation would not support and therefore requests that the U.S. Attorney's
Office not seek capital punishment in either of these cases.  This
position is limited solely to the two cases listed.

        Previously the Public Safety Committee of the Navajo Nation
Council initiated public hearings on the issue of capital punishment in
light of 18 U.S.C. § 3598.  The Committee, unfortunately, has not yet
completed the hearings due to factors beyond their control.  In light of
the issue you raised, the Committee, in conjunction with the Judiciary
Committee of the Navajo Nation Council, may have an opportunity to
address the issue.  At the present time, however, it is the consensus of
all Committee members to hold to the Navajo Nation's previous position
on capital punishment.

        The three branch chiefs of the Navajo Nation - the President,
the Speaker of the Navajo Nation Council, the Chief Justice - adopted two
guiding principles, one of which speaks to the preservation of Diné
culture, language and values.  As part of Navajo cultural and religious
values  we do not support the concept of capital punishment.  Navajo
holds life sacred.  Our culture and religion teach us to value life and
instruct against the taking of human life for vengeance.  Navajo courts
recognize traditional peacemaking as part of the judicial system.  It is
through traditional peacemaking that harmony is restored in situations
which have been disturbed through an act of crime.  Committing a crime
not only disrupts the harmony between the victim and the perpetrator but
it also disrupts the harmony of the community.  The capital punishment
sentence removes with any possibility of restoring the harmony in a
society.

        The Navajo Nation leadership is looking for solutions to
address crime on the Nation.  The Nation's leadership emphasizes

Exhibit 5 - 057

Letter to: Paul Charton
January 22, 2002
Page 3

preventative and rehabilitative services for the offenders and counseling
and support services for the victims and the communities.  This positive
approach is in keeping with Navajo culture and values.

On behalf of the Navajo Nation I wish to express the Nation's
appreciation for your respect of the government-to-government
relationship which exists between the Navajo Nation and the United
States.    The Navajo leadership values the working relationship
established with your office and requests the support of your office in
any efforts to address the crime issues here on the Navajo Nation.  The
Navajo Nation may, at some time in the future, take a formal position on
capital punishment generally after full consultation with the governing
body and the executive offices.  However, in light of the need for a
response to your office, it is, at this time, the consensus of the Public
Safety Committee of the Navajo Nation Council and the Judiciary Committee
of the Navajo Nation Council to maintain the historic position of the
Navajo Nation opposing the sentencing option of capital punishment for
crimes committed on the Navajo Nation under any section of the United
States criminal code.

Sincerely,

NAVAJO NATION DEPARTMENT OF JUSTICE

Levon B. Henry, Attorney General
Office of the Attorney General

xc:   Kelsey A. Begaye, President
      The Navajo Nation
  :   Edward T. Begay, Speaker
      The Navajo Nation Council
  :   Public Safety Committee Members
  :   Judiciary Committee Members
  :   Navajo Division of Public Safety

Exhibit 5 - 058

# ATTACHMENT B

Exhibit 5 - 059

Report on the Death Penalty
Presented to the 20th Navajo Nation Council
Summer Session
Window Rock, Navajo Nation, Arizona
by the Public Safety Committee

Honorable Delegates of the 20th Navajo Nation Council, Mr. President, Mr. Vice President, the Honorable Chief Justice, distinguished guests and visitors, the Public Safety Committee is honored to present the Death Penalty Report.

We are making history today, as this is the first Council Session that will hear its first ever report on the Death Penalty.

THE PUBLIC SAFETY COMMITTEE HELD EXTENSIVE PUBLIC HEARINGS THROUGHOUT THE NAVAJO NATION ON THE QUESTION OF WHETHER THE NATION SHOULD OPT-IN TO THE FEDERAL DEATH PENALTY.

The Navajo Nation, the largest Indian tribe in the United States, through the Public Safety Committee of the Navajo Nation Council held hearings across the Navajo Nation to consider "opting in" on the federal death penalty. Hearings were held on the following dates and locations:

| September 11, 2003: | Shiprock, New Mexico |
| September 15, 2003: | Crownpoint, New Mexico |
| September 18, 2003: | Ft. Defiance, Arizona |
| September 23, 2003: | Chinle, Arizona |
| September 29, 2003: | Tuba City, Arizona |
| November 12, 2003: | Tohajiilee, New Mexico |
| November 21, 2003: | Kayenta, Arizona |

We heard from 106 witnesses, including Navajos from around our Nation, ranging from high school students to tribal council members, and experts from outside the Nation. An additional 200 or so persons who attended the hearings, but did not testify, submitted their comments in writing. The purpose of the hearings was to allow full public input on the question of whether the Nation should allow federal prosecutors to pursue capital punishment for first degree murders that occur on tribal lands.

Of the 106 persons who testified, 75 people (71%) recommended that the Nation should not opt-in to the federal death penalty, and 31 people (29%) recommended that the Nation should opt-in. Some organizations testified, including the Dineh Medicine Association, Incorporated, the National Association of Criminal Defense Lawyers, the Arizona chapter of the National Association of Social Workers, the Coalition of Arizona to Abolish the Death Penalty. Each of these organizations and Fredric Kay, the then-Federal Public Defender for Arizona, Jon Sands, the new and current Federal Public Defender for Arizona, Stephen

Exhibit 5 - 060

McCue, the Federal Public Defender for New Mexico, Richard Burr, Federal Death Penalty Resource Counsel, Geri Singer Hale, a Navajo who is a public defender in Tucson, and Esther Yazzie Lewis, who is the federally-certified Navajo language interpreter in the federal courts, urged the Navajo Nation not to opt-in to the federal death penalty.

In addition, two committee members and the legislative advisor attended a public forum organized by Native American law students Catherine Bryan and Vincent Knight at the University of New Mexico Law School in Albuquerque on December 5, 2003.

Here are some examples of individuals' testimony in our committee hearings:

Juan Melendez was a poor non-English speaking farmworker when he was charged in Florida with a murder he did not commit. He was convicted and spent 18 years on death row, several times coming close to execution, until it was discovered that all along the prosecutor had a tape-recording of the real killer confessing to the murder. He was released in January, 2002, but lost 18 years of his life unjustly. He described to the committee the devastating impact of being wrongly convicted and urged the committee not to opt-in to the death penalty.

Wallace Dale's 16 year old daughter, Diedra Dale, was murdered near Crownpoint. He attended several of the committee's hearings, and tearfully testified to the terrible impact this crime has had on his family. At the earlier hearings, he urged the committee that the Nation should opt-in to the death penalty. However, he later testified that he now believes the Nation should not opt-in to the death penalty; rather he urged that the Navajo Nation provide grief counseling and assistance to the families of murder victims.

Marlene Slim of Crystal, New Mexico, the daughter of Alyce Slim and mother to Tiffany Lee, testified before the Committee. She stated that she is a victim of homicide because both her mother and daughter were murdered in the mountains of Tsaile, Arizona. This incident really affected and impacted the family, relatives and friends. She attended the sentencing hearing of Lezmond Mitchell in Phoenix, Arizona, who murdered her mother and daughter. Ms. Slim indicated that the issue of the Death Penalty is a very touchy issue, and opting-in would diminish the sovereignty of the Navajo Nation, and that she opposes the Nation opting-in to the death penalty. Her request to the federal prosecutor to have the murderer of her mother and her daughter serve life without parole was ignored and dishonored.

2

Exhibit 5 - 061

LEGISLATIVE HISTORY: IN 1994 THE U.S. CONGRESS ALLOWED INDIAN TRIBES/NATIONS TO CHOOSE WHETHER TO HAVE THE FEDERAL DEATH PENALTY APPLY TO FIRST DEGREE MURDERS ON THAT TRIBE OR NATION'S LAND.

The United States Supreme Court ruled in 1972 that the arbitrary way executions were carried out violated the Eighth Amendment of the United States Constitution. The Eighth Amendment bans the use of cruel and unusual punishment. Many states reacted by enacting laws designed to reduce the arbitrariness, and in 1976, the Supreme Court allowed capital punishment to continue. In 1989 and 1990 the U.S. Congress considered legislation to resurrect the federal death penalty.

Tova Indritz, Attorney, on behalf of the National Association of Criminal Defense Lawyers, Native American Justice committee, testified before the Committee on the legislative history of the Death Penalty. Ms. Indritz is a criminal defense attorney from Albuquerque, New Mexico. Formerly Federal Public Defender for New Mexico, she has been a lawyer since 1975, is recognized by the New Mexico Board of Legal Specialization as a trial specialist in criminal law, and has been in private practice since 1995. Ms. Indritz provided testimony before the Committee that the United States Attorneys in the three states within the Navajo Nation already have the power to decide which felony cases arising on Navajo reservation to prosecute. Under current law tribal courts can only hear misdemeanor and petty misdemeanor cases. However, if the Navajo Nation opts-in to the death penalty it will be giving those United States Attorneys the power and authority to decide whether to seek the death penalty against a member of the Navajo Nation, and the Nation will have no power to decide on any particular case or even have the right of consultation with the U.S. Attorney in any case. Further, juries who decide whether an individual Navajo would be put to death would include few, if any, Native Americans.

When Congress was considering the shape of legislation to resurrect the federal death penalty after the U.S. Supreme Court had invalidated the prior method for imposing the death penalty, Ms. Indritz had the privilege of testifying before the U.S. Senate Judiciary Committee, and the U.S. House of Representative Judiciary Committee's Subcommittee on Crime regarding the impact on Native Americans of the death penalty provisions of the pending crime bills. At those hearings, Ms. Indritz testified to Congress if there was "truth in labeling" Congress should call the proposed law to resurrect the death penalty the "Indian Death Penalty Act" because it would primarily affect Native Americans. This is based on the fact that most murder cases go to the State courts, and Native Americans are among the few peoples who live on land over which there is federal jurisdiction. Further, all of the tribes who testified on this issue before Congress stated that the death penalty is against their religious beliefs and urged Congress to exempt Indian Country from the death penalty. Due to the testimony and suggestion of then-Navajo Nation Chief Justice Tom Tso, Congress in enacting the Violent

3

Exhibit 5 - 062

Crime Control and Law Enforcement Act of 1994, which became federal law on September 13, 1994, exempted murders in Indian Country by the following language:

"18 U.S. Code §3598.  Special provisions for Indian Country"

"Notwithstanding sections 1152 and 1153, no person subject to the criminal jurisdiction of an Indian tribal government shall be subject to a capital sentence under this chapter for any offense the Federal jurisdiction for which is predicated solely on Indian country (as defined in section 1151 of this title) and which has occurred within the boundaries of Indian country, unless the governing body of the tribe has elected that this chapter have effect over land and persons subject to its criminal jurisdiction."

Thus, this provision allows a tribe the choice to opt-in to the federal court having power to impose the death penalty in first degree murder cases arising on that tribe's land.

The ability of tribes to make a choice about the death penalty allows tribes to take into account traditional tribal beliefs about how social conflict should be handled and how wrong-doers should be punished.

Of the 520 federal recognized tribes, thus far the only tribe that has opted-in to the Death Penalty is the Sac and Fox Tribe of Oklahoma, a small tribe of a few hundred members. This decision was made only by the Tribe's Business Committee and not by their Tribal Council.

THE HISTORY OF THE DEATH PENALTY INCLUDES ITS EARLY APPLICATION TO NATIVE AMERICANS.

The first recorded execution in America occurred in 1608.  The victim was George Kendall, a Virginian accused of plotting to betray the colony to the Spanish.  Hanging was the preferred method of execution in the colonies at that time, although slaves and Indians were sometimes burned at the stake.

The United States' largest mass execution was the simultaneous hanging of 38 Santee Sioux on December 26, 1862, in Mankato, Minnesota; in fact 303 Native Americans were sentenced to death but President Abraham Lincoln reduced that number to "only" 38.  After the hanging it was found that two Santees were executed by mistake.

OUR CHOICE:  THE NAVAJO NATION CAN CHOOSE TO SUBJECT ITS MEMBERS TO THE FEDERAL DEATH PENALTY OR CAN CHOOSE TO REFUSE TO ALLOW FEDERAL PROSECUTORS AND FEDERAL JURIES TO KILL NAVAJOS.

Here, the Navajo Nation has two choices:

4

Exhibit 5 - 063

1) to take no action, and thus to continue to have the maximum penalty for first degree murder on Navajo land, as it now is, life without parole. Persons convicted spend their whole life in prison and never come back to our community.

2) The second choice is to opt-in to have the death penalty apply to any first degree murder, thereby giving the federal prosecutors, specifically the Attorney General after hearing the recommendation of the local U.S. Attorney, authority to decide against whom to pursue the death penalty, and in which cases not to go after the death penalty, and a non-Indian jury decide whether a Navajo should die.

Either way, the Tribe will have no choice over which murder cases are death penalty cases.

WHAT FACTORS SHOULD THE 20TH NAVAJO NATION COUNCIL CONSIDER IN MAKING ITS CHOICE?

1. NAVAJO TRADITION, BELIEF, AND MORALITY HOLD THAT THE CREATOR AND THE HOLY PEOPLE MADE LIFE AND WE HUMANS CANNOT TAKE ON OURSELVES THE POWER TO TAKE AWAY LIFE.  CHRISTIAN BELIEF IS SIMILAR.

The Navajo Medicine Men's Association testified and also submitted written testimony. They gave eloquent testimony, attached hereto, prepared after four years of "intimate and public discussion" that

"Nothing in our traditional laws give us direction and procedures for killing our own as a punishment to correct behavior which is not ours. . . .

It is the negative force of the Creator to extract, destroy that which is not in the good interest of Dineh society, we have been created for goodness.  This negative force is the domain of destruction is best left to the Creator and in its power and wisdom. . . .

History has indicated [the death penalty] does not work as a deterrent or prevention.  As medicine people of the Dineh, and as Dineh we are in a position to advocate only for Life and healing.  The "Penalty of Death" is best to be left to the beings who strongly use such measures.  It is not a part of our society to use goodness to kill another. . . .

Death and destruction are the teachings of punishment, which are not ours, and ought to be left outside of our domain and jurisdiction, outside of our Four Sacred Mountains.  This is the position of the Dineh Medicine People."

The Catholic Church is also against the death penalty. For example, Sister Margaret Sullivan of Shiprock, New Mexico, came to our first hearing and wrote, in her own words,

"It isn't the right of humans to take away another person's life.  God gives Life and it is only He who calls that life back in His timing."

5

Exhibit 5 - 064

## 2. A DECISION TO OPT-IN TO THE FEDERAL DEATH PENALTY WILL DIMINISH THE SOVEREIGNTY OF THE NAVAJO NATION.

Professor Kenneth "Kip" Bobroff of the University of New Mexico Law School, an expert in Indian law and a member of the Navajo Nation Bar Association, testified that the U.S. government has consistently used its authority to take power away from the Navajo Nation and that opting-in to the federal death penalty will further diminish Navajo sovereignty. Opting-in to the death penalty would mean that non-Indians, instead of Navajos, would be making critical decisions about justice both for Navajo victims and defendants. If the Navajo Nation opts-in, then any changes in federal law or procedure pertaining to the death penalty would apply to Navajos, regardless of the wishes of the Navajo Nation, since the Nation would have already surrendered it sovereignty over those decisions.

The Navajo Nation, if it opts-in to the federal death penalty, would be giving over to the U.S. Attorneys for Arizona, New Mexico, and Utah, and to U.S. Attorney General John Ashcroft complete power to decide which accused Navajos to charge with the death penalty. If the Navajo Nation opts-in, it will not have the power to make a decision about the death penalty in any particular case; the Nation would have no voice on whether the case is prosecuted as a death penalty case or whether a particular tribal member is executed. The Nation would be relinquishing more of its sovereignty to the federal government.

As stated above, a 1994 expansion of the federal death penalty allows for a Tribe or Nation to opt-in to the federal death penalty. Once a Nation chooses to "opt-in", the decision to apply the death penalty in a particular case is no longer in the hands of the tribe, but in the hands of the federal government. Although the appointed United States Attorney (in our case the United States Attorneys for the Districts of Arizona, New Mexico, and Utah) can recommend to the U.S. Attorney General John Ashcroft whether or not to seek the death penalty in any particular case, Attorney General Ashcroft has rejected the local U.S. Attorney's recommendation not to pursue death in far greater proportion than any prior Attorney General, and in many cases has required the local U.S. Attorney to seek the death penalty, even where the local U.S. Attorney recommended not to do so.

When the U.S. Department of Justice decides to try to execute a Navajo, the actual decision would be made by a federal court jury on which there would be few, if any, Navajos. Who would be on juries that would consider whether a Navajo should be executed? The cases will be tried in a federal court before a jury on which Native Americans may well be underrepresented and certainly on which Native Americans will not be the majority. The actual decision of whether an individual is to be executed is up to the federal jury. Even where Native Americans are fully represented in the jury pool, they are usually a small percentage of the state's population, and thus a small percentage of a federal jury. Native Americans are often under-represented on the federal court jury rolls, particularly in those federal court

6

Exhibit 5 - 065

districts where the jury rolls are taken exclusively from the state's voter list, as is the case in federal court in Arizona, New Mexico, and Utah. For example, the U.S. District Court Clerk for the District of New Mexico's own figures show the great under-representation of Native Americans who are 8% of the New Mexico adult population and only 3% of the state-wide jury pool (a 166% comparative disparity), and in the Albuquerque/Santa Fe division, the location where the cases arising on the New Mexico portion of the Navajo Nation would be tried, Native Americans are 11% of the adult population but only 3% of the jury pool (a 266% comparative disparity). Also, federal trials are always held off the reservation, in cities such as Phoenix, Albuquerque, and Salt Lake City. As the federal court clerk in Arizona noted, many Native Americans live far from the places where court is held, have difficulty traveling, or insufficient money to pay for their travel, so they seldom serve on juries. Native American defendants in federal court seldom have other Native Americans, no less from their own tribe, on their juries.

To the extent that the death penalty may be in conflict with traditional Navajo beliefs and values, Navajos will be excluded from serving on juries in which a Native American is facing the death penalty. Any Navajo called to jury duty who expresses the view, explained by the Dineh Medicine Association, that the death penalty is inconsistent with Navajo customs and beliefs, and thus those Navajo's traditional or religious beliefs prevent them from ever imposing the death penalty, they will be excluded from jury duty in any death penalty case, under the U.S. Supreme Court's holdings in Witherspoon v. Illinois, 391 U.S. 510 (1968) and Wainwright v. Witt, 469 U.S. 412 (1985).

3.   THERE IS A LONG-STANDING HISTORY OF RACIAL PREJUDICE IN THE IMPOSITION OF THE DEATH PENALTY AND A DEFINITE PATTERN OF FEDERAL PROSECUTORS SEEKING THE DEATH PENALTY DISPROPORTIONATELY AGAINST MINORITY RACE PERSONS.

The death penalty is racist in its application. Racial minorities in the United States receive the death penalty far out of their proportion to the population, especially where the victim is a white person. Study after study has shown that race of the defendant or the race of the victim, or both, influence the decision to apply the death penalty more than any other factor.

According to a U.S. Government General Accounting Office study done in February, 1990, on death penalty sentencing, "in 82% of the studies [reviewed], race of the victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty".

Any tribe whose members have felt the sting of discrimination by the non-Indian community may be aware that racial stereotypes and prejudices have been reflected in

7

Exhibit 5 - 066

statistical patterns of imposition of the death penalty, although they may be hard to prove in any individual case.

More than half of the defendants now on death rows in the U.S. are racial minorities.

Currently 20 of the 29 people on the federal death row, 69%, are minorities, including Lezmond Mitchell, a Navajo. Of the three federal prisoners already executed, one was Hispanic and one was Black.

Of the 300 people against whom the federal death penalty has been authorized since its reinstatement in 1988 to 2000, 75% are members of minority racial groups. From 1995-2000, 80% of all the federal cases submitted by U.S. Attorneys involved defendants from minorities. Under Attorney General Janet Reno, 72% of the defendants against whom the federal death penalty was sought were minorities. Under current Attorney General John Ashcroft 74% of the defendants against whom the federal death penalty was sought were minorities. This problem of racism in the application of the death penalty continues; even after review by the Attorney General, 72% of the cases approved for death penalty prosecution involved minority defendants.

The National Association for the Advancement of Colored People (NAACP) in 2000 called for a moratorium on all death sentences.

As described above, juries in any Navajo death penalty case in federal court in Arizona, New Mexico, or Utah, will be almost exclusively non-Indians.

The Navajo Nation's election for the death penalty may subject a Navajo to harsher punishment than is available in the state court. For example, New Mexico's death penalty is not available in all first degree murder cases, but only in the presence of certain circumstances, such as the killing of a witness, police officer, or prison guard, or murder for hire, or a killing while escaping from prison, NMSA §31-20A-5, whereas opting-in to the federal death penalty allows the prosecutor to seek the death penalty in any first degree murder case.

If the Navajo Nation opts-in to the federal death penalty, Navajos would be subject to the death penalty in cases where a non-Indian would not. For example, if the victim of the murder were a non-Indian (a circumstance in which classically there is a greater risk of imposition of the death penalty on a minority person), a non-Indian co-defendant would be prosecuted in state court even though the crime happened on a federal jurisdiction Indian reservation, whereas an Indian co-defendant in the same case would be subject to the death penalty if the tribe had opted to have the death penalty apply on their land.

8

Exhibit 5 - 067

Although the 1994 crime act requires that the jurors certify that they did not take into account the race of the defendant or the victim in deciding to impose the death penalty, this certainly does not guarantee the lack of racism. First, the mere fact that people say they did not take racial issues into account does not necessarily, in human experience, mean that they did not. More importantly, in order for a federal court to have jurisdiction over an Indian Country murder in the first place, one of the elements of proof is that the government prove beyond a reasonable doubt that the offense occurred in Indian country and that either the defendant or the victim is an Indian. Thus, the jury will hear evidence on this and have to be convinced beyond a reasonable doubt that the defendant is an Indian or that the victim was an Indian. Then the same jurors would be asked to turn to the death penalty phase of the trial and to totally erase from their minds the fact that the defendant is an Indian or the race of the victim in deciding whether to impose the death penalty. This is simply an unsustainable fiction.

## 4. MURDER RATES ON THE NAVAJO NATION ARE HIGHER THAN THE NATIONAL AVERAGE AND RECENTLY THERE HAVE BEEN HIGH PROFILE NON-TYPICAL MURDERS.

The number of murders on the Navajo Nation increased in the last ten years, peaking in 1996. Although the number of murders has dropped slightly since then, and appeared to stabilize, the murder rate is higher on the Navajo Nation than it is nationwide.

The Navajo people have recently heard or read about several high-publicity tragic murders. Several examples of recent violent crimes on the Navajo Nation include a father who gunned down his four daughters, a mother who opened fire on her three children, a man who strapped on an ammunition belt and opened fire on his family Hogan, killing four relatives. Such high profile violent crimes have brought forth discussions of capital punishment on the Navajo Nation.

The worst case involved a young Navajo man with no prior criminal record who was prosecuted for murders which occurred on Navajo Indian land, but he was prosecuted based on the jurisdictional basis that it was a murder in the course of a carjacking. The facts of this case are highly unusual for a Navajo murder case, and quite upsetting. In the fall of October, 2001, 65 year old Alyce Slim and her 9 year old granddaughter, Tiffany Lee, drove to New Mexico to visit a medicine woman. Ms. Slim had a leg ailment and went to see a traditional Navajo medicine woman to seek relief. That evening, while driving home, their pickup truck was hijacked at a local gas station by 19 year old Lezmond Mitchell, a Navajo from Rock Point, Arizona. Ms. Slim's truck was later used to rob the Red Valley Trading Post for $5,000. According to information provided by the Federal Bureau of Investigation, Mr. Mitchell stabbed Ms. Slim thirty-three (33) times with butterfly knives in a wooded area in the Tsaile mountain. Ms. Slim, according to the autopsy reports, put up a fight against her hijackers. Tiffany, according to testimony provided by one of the attackers indicated that she

9

Exhibit 5 - 068

did escape from her attackers, but was recaptured. They then shoved her body in back of her truck along with her grandmother Alyce. Mitchell then slit the throat of 9 year old Tiffany and told her to "lay down and die". They then stoned her to death with a 20 pound rock. A few days later, they returned to the bodies, chopped off their heads and hands, buried them in a hole and burned their clothes. In September, 2003, Lezmond Mitchell was sentenced to die by a federal jury in Phoenix, Arizona. He is the first Native American to be sentenced to death by a federal court since the federal death penalty was reinstated nine years ago.

5. THE COUNCIL MUST CONSIDER WHETHER PREVENTIVE MEASURES OR THE DEATH PENALTY WILL BE MORE EFFECTIVE IN COMBATING THIS PROBLEM IN THE LONG TERM.

In many communities, the public would be better served by measures such as the hiring of additional police officers, the implementation of community policing, drug interdiction programs, early childhood intervention programs, weapon control programs, or better funded probation and parole departments, than by an occasional death sentence on an isolated individual, to be carried out, if at all, only many years later. The death penalty may fascinate the media and the public, but it is truly peripheral to our efforts to make our society safer.

During the hearings several of the family members of murder victims testified to their great grief and loss, and that they had to go outside of the Navajo Nation to receive any grief counseling services. This lack of services presents particular problems to those who wish to express their grief and family disruption in their own Navajo language and to persons sensitive to Navajo culture. The Public Safety Committee recommends that the Navajo Nation establish grief counseling and family services to the survivors of homicide throughout the Nation, at no cost to those seeking such services, and with appropriate training for service providers and adequate resources to address the backlog of unaided victims' families over many years.

6. THE DEATH PENALTY DOES NOT DETER MURDER.

Another expert who testified before the Committee was Professor Michael Radelet, a Professor of Sociology at the University of Colorado. For 22 years before that, he was a professor at the University of Florida in Gainesville. While in Florida he worked with approximately 50 men and woman who were executed. He has worked extensively with families of homicide victims and currently serves on the Board of Directors of an organization called "Families of Homicide Victims and Missing Persons". Professor Radelet addressed three issues before the Committee: deterrence, erroneous convictions and disparities in the application of the death penalty. He submitted a paper showing that leading scholars have concluded that the "available evidence remains 'clear and abundant' that, as practiced in the United States, capital punishment is not more effective than imprisonment in deterring murder", that there is widespread agreement among leading criminologists and law

10

Exhibit 5 - 069

enforcement officials that capital punishment has no effects on homicide rates that are superior to long term imprisonment, and that 85% of leading experts agree that the empirical research on deterrence has shown that the death penalty never has been, is not, and never could be superior to long prison sentences as a deterrent to criminal violence.

## 7. IN THE UNITED STATES THERE HAVE BEEN MANY INNOCENT PEOPLE SENTENCED TO THE DEATH PENALTY. EXECUTIONS ARE PERMANENT; MISTAKES CANNOT BE CORRECTED.

> "Perhaps the bleakest fact of all is that the death penalty is imposed not only in a freakish and discriminatory manner, but also in some cases upon defendants who are actually innocent."
>
> Justice William J. Brennan, Jr., U.S. Supreme Court, 1994

Since 1973, 114 men and women in 25 states have been exonerated and released from death row with evidence of their innocence, including one Native American.   Six innocent people were exonerated in Arizona and four in New Mexico.

There were 10 such releases in 2003, and already 4 more in 2004.   Thus it is clear that even in very serious cases, or maybe even especially in serious cases where the community desires to punish someone for a heinous crime, sometimes it is the wrong "someone" who is convicted.   DNA evidence was a significant factor in only about 10% of the exonerations; the problems are erroneous eye-witness identifications, false testimony by jailhouse informants, false confessions, incorrect forensic evidence, and sometimes inadequate defense resources.

The possibility for such errors increases where there are language difficulties, cultural differences, communications problems between investigators and the potential witnesses, and technological problems with the collection of physical evidence, all factors present in Navajo cases.

At least 23 innocent people have been executed in the U.S. in the 20th century.[1]  Federal court review of state court death penalty cases have found that error occurred in 40% of the cases.

If the wrong person is convicted during hysteria over an ugly crime, or if a person's rights are violated, or if it later turns out that the person was innocent, there is no way to undo an execution.

Because of such mistakes, the Governor of Illinois placed a moratorium on the imposition of the death penalty, and then later granted clemency for all the people on death row. Maryland has now also placed a moratorium on the death penalty, and other States have to consider that people on death row were wrongfully convicted and were in fact innocent.  The American Bar Association, a

---

[1]  Innocence and the Death Penalty: Assessing the Danger of Mistaken Executions, Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, One Hundred Third Congress, First Session, October, 1993, see also Radelet and Bedau, In Spite of Innocence, Northwestern University Press, 1991.

Exhibit 5 - 070

conservative national organization of lawyers, has called for a nationwide moratorium on the death penalty.

### 8. FIRST DEGREE MURDER ON NAVAJO LAND IS ALREADY PUNISHABLE BY LIFE WITHOUT PAROLE.

The current alternative to the death penalty in a first degree murder case in federal court is life without parole. Under federal law and the Federal Sentencing Guidelines, if a person is convicted of first degree murder, he or she will receive a life sentence and cannot be paroled. Thus, the tribe is not facing return of an individual in such a circumstance to the community. The person will be banished and therefore incapacitated from any future harm to the community.

### 9. IMPOSITION OF THE DEATH PENALTY IS MORE EXPENSIVE THAN IMPOSITION OF A LIFE SENTENCE.

A 1993 Duke University study showed that the Death Penalty in North Carolina costs $2.16 million dollars more per execution than a non-death penalty murder trial. Research in other states indicates executions are three to six times more costly than life imprisonment.

### 10. MOST CIVILIZED NATIONS IN THE WORLD HAVE REJECTED THE DEATH PENALTY.

Since the United States reinstated the death penalty in 1976, over 40 countries have abolished it. In December 1998, the European Parliament called for immediate and global abolition of the death penalty, with special notice to the U.S. to abandon it. Abolition is a condition for acceptance into the Council of Europe, leading countries such as Russia and Turkey to abolish the death penalty. Recently, South Africa, Canada, France and Germany have ruled against extraditing prisoners to the U.S. if death sentences would be sought. The World Court, in a unanimous decision reached on February 5, 2003, ruled that the United States must delay the execution of three Mexican citizens while it investigates the cases of all 51 Mexicans on death row in the U.S. The Mexican government asserts that the U.S. has violated the Vienna Convention by not informing its citizens that they have the right to contact their consulate when arrested. The death penalty has long been a source of tension between the U.S. and countries that oppose capital punishment.

The United States faces international pressure to eliminate the death penalty. Amnesty International, the International human rights watchdog, reports that while 112 countries have abolished the death penalty by law or practice, 83 countries continue to utilize capital punishment. In 2002, 81 percent of all known executions took place in three countries: China, Iran, and the United States. Other countries that use the death penalty include Afghanistan, Iraq, Egypt and Kuwait. International human rights treaties prohibit executing

12

Exhibit 5 - 071

children or anyone under 18 years old at the time the crime was committed. Since 1990 seven countries executed children: Congo, Iran, Nigeria, Pakistan, Saudi Arabia, Yemen, and the country with the greatest number of child executions, the United States. In 2002, Amnesty International recorded three child executions; all three were in the state of Texas.

The Public Safety Committee has received international attention from as far away as the country of Germany. Their interest in the Navajo Nation's decision is closely monitored.

### CONCLUSION AND RECOMMENDATION

Should the Navajo Nation "opt in" to the death penalty? Put another way, should the Navajo Nation Council allow the federal government to pursue the death penalty against Navajos before non-Navajo, and indeed non-Indian, federal juries? The Public Safety Committee recommends to the 20th Navajo Nation Council the following:

1. That the Navajo Nation establish a program to provide grief counseling and direct service assistance to the families of victims of homicide on the Navajo Nation.

2. That the Navajo Nation, for all the reasons set forth above, adopt legislation stating that the Navajo Nation rejects the federal death penalty and chooses not to opt-in to the federal death penalty.

Respectfully submitted,

_____
Hope MacDonald-LoneTree, Chairperson
Public Safety Committee

June _____, 2004

13

Exhibit 5 - 072

# ATTACHMENT C

Exhibit 5 - 073

## *JUDICIAL BRANCH OF THE NAVAJO NATION*

*HERB YAZZIE*
*Chief Justice of the Navajo Nation*

*Eleanor Shirley, Associate Justice*



### Supreme Court
P.O. Box 520  ◆  Window Rock, Arizona 86515
Telephone 928-871-7669  ◆  Fax 928-871-6866

July 21, 2014

John Leonardo
United States Attorney
Vincent Q. Kirby
Assistant United States Attorney
Office of the United States Attorney
for the District of Arizona
Two Renaissance Square
40 North Central, Suite 1200
Phoenix, AZ 85004-4408

    Re: *United States v. Lezmond Mitchell*, No. 11-99003

Dear Mr. Leonardo and Mr. Kirby:

    Counsel for Mr. Mitchell have advised us of the pending mediation ordered by the Ninth Circuit Court of Appeals in this matter. We wanted to take this opportunity to, once again, express our view that Mr. Mitchell should not be subject to the federal death penalty. By this letter, we formally request that the Department of Justice stipulate to a re-sentencing whereby Mr. Mitchell would receive a sentence of less than death.

    The United States Attorney's Office for the District of Arizona sought input from the Navajo Nation in 2001 as to whether we would support a capital prosecution against Lezmond Mitchell. We considered this issue carefully. We held discussions with various members of our government including the Speaker of the Navajo Nation Council, the members of the Public Safety Committee of the Navajo Nation Council, and the members of the Judiciary Committee of the Navajo Nation Council. After careful thought and deliberation, on January 22, 2002, the Navajo Nation formally requested that the Department of Justice not seek the death penalty against Lezmond Mitchell. Attachment A, Letter from Levon Henry, Attorney General of the Navajo Nation to Paul Charlton, United States Attorney, 1/22/2002.

    Over the objection of the Navajo Nation, Mr. Mitchell was charged with federal capital crimes and formally sentenced to death in September 2003 in the Federal District Court for the District of Arizona.

Exhibit 5 - 074

Letter to John Leonardo
United States Attorney
July 21, 2014

While considering Mr. Mitchell's case, the Navajo Nation was separately considering the broader issue of whether the Nation would "opt in" to the federal death penalty act under 18 U.S.C. § 3598. After Mr. Mitchell's conviction and sentencing, the Public Safety Committee of the Navajo Nation Council held hearings to gauge public opinion and accurately report the stance of its citizens. Seven public hearings were held, at which over 100 witnesses testified, 200 more submitted written comments, and various organizations participated, including the Dineh Medicine Association, Incorporated. Of particular relevance to the matter at hand is the testimony of Marlene Slim. Ms. Slim, who is the daughter of Alyce Slim and the mother of Tiffany Lee (the two victims in Mr. Mitchell's case), testified as to her opposition to opting-in to the death penalty. She explained how she requested that the United States Attorney's Office not seek death against Mr. Mitchell, but her request was not heeded. Attachment B: Report on the Death Penalty Presented to the 20th Navajo Nation Council Summer Session. The Navajo Nation elected not to opt-in to the Federal Death Penalty Act.

In the twelve years since we originally offered our views of this case, the Navajo Nation's position on the death penalty has not changed: we oppose capital punishment in all circumstances. We have not opted-in to the Federal Death Penalty Act and we have never supported a capital prosecution for any of our citizens, including Lezmond Mitchell.

Capital punishment is a sensitive issue for the Navajo people. Our laws have never allowed for the death penalty. It is our belief that the negative force that drives a person to commit evil acts can only be extracted by the Creator. People, on the other hand, are vehicles only for goodness and healing. By subjecting Mr. Mitchell to capital punishment, the Department of Justice has violated our laws and our belief system, and impeded the healing process our tribe must undertake in the wake of this tragic crime.

In addition to the moral issues laid out in the previous paragraph, capital prosecutions of Navajos implicate issues of tribal sovereignty that are troubling to the Navajo Nation. One of the primary reasons we chose not to opt in to the federal death penalty act was the fear of losing authority over prosecutions. Attachment B at 6. The United States government has consistently used its power to reduce the Navajo Nation's sovereignty. Had the Nation opted-in to the federal death penalty act, our sovereignty would have been further diminished. The decision whether to seek the death penalty against a Navajo would have been solely left to the discretion of the United States Attorney for the relevant district and the United States Attorney General. We would have had no voice in the discussion for justice regarding Navajo victims and defendants. This was not a tolerable reality for the Navajo people, and fueled our decision to reject the federal death penalty. However, despite our wishes, this was precisely the reality of Mr. Mitchell's case. After we made clear that we would not support a capital prosecution for Mr. Mitchell, the Department of Justice relied on a technicality to bypass us. Instead of respecting the opt-in provisions, the Department of Justice sought death against Mr. Mitchell not for murder, but for carjacking resulting in death. The difference was in name only. The federal jurisdictional basis for first-degree murder was based on the fact that the crime took place on Navajo land, thus implicating the Federal Death Penalty Act's requirement of the tribe's approval. But the jurisdictional basis for the carjacking charge was interstate commerce, which

Exhibit 5 - 075

Letter to John Leonardo
United States Attorney
July 21, 2014

allowed the Department of Justice to disregard our wishes. This loophole allowed the federal government to bypass our wishes, and we view this action as both a moral and political affront to Navajo sovereignty.

The Navajo Nation has separate concerns about other issues regarding Mr. Mitchell's trial. The fact that Mr. Mitchell was held in tribal custody, but repeatedly interrogated by the FBI to develop evidence later used to support a federal death sentence, illustrates once again the Department of Justice's reliance on a technicality to disrespect the Navajo Nation. Moreover, Mr. Mitchell was tried before an Arizona jury in a federal district court. He was not tried on Navajo land or by a Navajo jury. Indeed only 30-36 of the 207 venirepersons called for potential jury service in this case were Native American. *United States v. Mitchell*, 502 F.3d 931, 950 (9th Cir. 2007). Of these, all but one were excluded from sitting on Mr. Mitchell's jury before the court even reached the peremptory challenge phase of jury selection. The prospective Navajo jurors were excluded from the jury panel for: (1) reservations regarding capital punishment consistent with Navajo religion and culture, *id.* at 953; (2) use of Navajo as a first language (e.g. Veniremembers 1 and 11); and (3) hardship. These rationales are troubling to us. The hardship exclusions were a direct consequence of the trial being transferred from Prescott to Phoenix, which is considerably further from Navajo land. No special arrangements were made or offered to alleviate the hardships such that Navajos could serve on the jury. No translation services were offered to the non-English speaking Navajo venirepersons. No respect was afforded to the venirepersons who expressed their religious beliefs. When we decided not to opt-in to the Federal Death Penalty Act, all of these issues were a concern to us. Attachment B at 6-7. Mr. Mitchell's trial represents a reality we expressly attempted to avoid.

By this letter, the Navajo Nation asks the Department of Justice to right the wrongs of previous administrations and honor our Nation's sovereignty. We thus formally request, on a government-to-government basis, that this case be removed from the death penalty context and Mr. Mitchell be permitted to plead to a sentence of less than death.

Thank you for your consideration.

Yours sincerely,

Herb Yazzie
Chief Justice

Exhibit 5 - 076

# ATTACHMENT D

Exhibit 5 - 077

1    **DECLARATION OF KEVIN McNALLY**

2    I, Kevin McNally declare:

3        1.    I am the Project Director for the Federal Death Penalty Resource Counsel

4    (FDPRC), a group that is funded by the Administrative Office of the United States

5    Courts, to study federal death penalty issues and advise all appointed counsel in

6    potential federal capital cases.

7        2.    FDPRC maintains records regarding all defendants considered for federal

8    capital prosecution.  I reviewed FDPRC records regarding potential federal capital

9    cases arising from a homicide that occurred on tribal lands.  Based on my review of

10   records, I am aware of at least twenty potential federal capital cases in which a Native

11   American was accused of committing homicide on tribal lands.

12       3.    In my experience, tribal governments oppose the application of the death

13   penalty to persons accused of committing homicide on tribal lands.  I understand

14   Navajo officials opposed seeking the death penalty against Lezmond Mitchell, a 20-

15   year-old Native American, accused of killing two Native Americans on Navajo land.

16   Despite this, U.S. Attorney General John Ashcroft directed the U.S. Attorney of

17   Arizona to seek the death penalty over the objection of the Navajo government.

18       4.    *United States v. Lezmond Mitchell,* United States District Court No. CR-

19   01-01062-PCT-MHM, is the only case in the modern era in which the U.S. Attorney

20   General pursued the death penalty against a Native American accused of committing a

21   homicide on tribal lands over the objection of the tribal government where the crime

22   was committed.  In all other similar cases, the U.S. Attorney General honored the

23   objection of tribal authorities and declined to seek the death penalty.

24       5.    Mitchell is the only Native American on federal death row.  DOJ officials

25   often represent that the purpose of the DOJ death protocols is to ensure fair and

26   consistent administration of the federal death penalty.  The *Mitchell* case, however, is

27   inconsistent with prior applications of the DOJ death protocols as applied to Native

28

1

Exhibit 5 - 078

1 | Americans.  I know of no reason why Mitchell was treated differently than similarly
2 | situated defendants.
3 |     I declare under penalty of perjury under the laws of the United States of America
4 | that the foregoing is true and correct.
5 |     Executed on July 22, 2014, at Frankfort, Kentucky.
6 |
7 |                                Kevin McNally
8 |

2

Exhibit 5 - 079

# ATTACHMENT E

Exhibit 5 - 080

**DECLARATION OF ADDIE ROLNICK**

I, Addie Rolnick, Esq., declare, under penalty of perjury as follows:

1.  I am an attorney duly licensed to practice law in the state of California and licensed in the state of Nevada under Rule 49.1 (Limited Practice for Clinical Law Faculty Members). I received my Juris Doctorate from the U.C.L.A. School of Law, and I was admitted to the State Bar of California in 2005. I received my Master of Arts in American Indian Studies from U.C.L.A. in 2007. From 2004-2008, I represented Indian tribes as an attorney and lobbyist with Sonosky, Chambers, Sachse, Endreson & Perry, LLP, in Washington, D.C. I left practice in 2008 to pursue teaching and research full time.

2.  I am an Associate Professor of Law at the William S. Boyd School of Law at the University of Nevada, Las Vegas. My research and teaching focus on federal Indian law, tribal law, criminal law, and race and law. My areas of expertise are tribal criminal/juvenile justice systems and racial disparities in criminal justice. I am the author of *A Tangled Web of Justice: American Indian and Alaska Native Youth in Federal, State, and Tribal Justice Systems* and a forthcoming article about the scope of tribal criminal jurisdiction. I recently provided expert commentary in response to the 2013 Indian Law and Order Commission Report and before the Attorney General's Task Force on American Indian and Alaska Native Children Exposed to Violence. I regularly provide training and assistance to tribes seeking to amend and improve their criminal laws.

3.  I was consulted by Lezmond Mitchell's post-conviction counsel because of my expertise in Indian country criminal justice issues. Prior to being consulted, I was not familiar with Mr. Mitchell's case.

4.  In addition to the published record, Mr. Mitchell's counsel has provided me with (1) the 2002 Letter from Levon Henry, Navajo Nation Attorney General to Paul Charlton, United States Attorney, (2) the 2010 Declaration of Kathleen Bowman, Esq., and (3) the 2014 Letter from the Honorable Herb Yazzie, Chief Justice of the Navajo Supreme Court, to John Leonardo, United States Attorney. I have reviewed each of these documents.

5.  I understand from the record and from counsel that Lezmond Mitchell, a Navajo, was convicted in federal court for the killing of two other Navajos. I further understand that the crime occurred on the Navajo reservation, and that both federal and tribal officials were involved in the arrest and investigation. I assume these facts to be true.

6.  Although the murder of one Indian by another Indian in Indian country would be eligible for federal prosecution pursuant to the federal government's Indian country jurisdiction, and although the defendant was

1

Exhibit 5 - 081

indeed charged under 18 U.S.C. § 1153, I understand that federal prosecutors also chose to prosecute Mr. Mitchell under a federal (non-Indian country) carjacking statute, making him eligible for the death penalty whether or not the tribe chose to opt in pursuant to 18 U.S.C. § 3598. The law regarding the federal death penalty in Indian country is explained further in paragraph 36.

7. I understand from the documents provided that the Navajo Nation specifically objected to the imposition of the death penalty in this case. I further understand that the Nation later officially determined, after internal deliberations, that it did not wish to opt in to capital punishment pursuant to 18 U.S.C. § 3598, and that it remains opposed to the death penalty in all circumstances today.

8. It is my opinion that this case is an example of how of the exercise of federal jurisdiction in Indian country can undermine the authority and policy choices of a tribal justice system. Whether or not it was technically legal, the Attorney General's decision to seek the death penalty against the Nation's wishes for a crime committed by one Indian against another within tribal territory contradicts clear federal policy – in effect since 1968 and amplified since 2000 – in favor of strengthening tribal justice systems and limiting federal infringement on tribal sovereignty. The Attorney General's decision to disregard the Nation's opposition to capital punishment damaged tribal sovereignty by undercutting the Nation's ability to determine the fundamental character of criminal justice in its territory, and it did so in a manner that rendered tribal officials, who assisted in the arrest and early investigation, complicit in a prosecution that the Navajo Nation opposed. The basis for my opinion is set forth in detail below.

I. **Historically, the extension of federal criminal jurisdiction into Indian country has been premised on the idea that tribal justice systems were deficient, and the exercise of federal power has had the effect of undermining tribal justice systems.**

9. Federal Indian law has followed a series of policy shifts. Although legal scholars have different views about the precise dates and descriptions of each policy era, they generally agree that at least six major policy shifts have shaped the course of federal Indian law.

10. The Treaty Era lasted from before the founding of the United States until about 1820. During this time, the federal government interacted with tribes primarily through treaties. In these treaties, tribes ceded land and promised peace in exchange for promises by the federal government to provide health care, education, subsistence, and protection.

Exhibit 5 - 082

11. During the Removal Era, from approximately 1820-1850, the federal government sought to remove Eastern tribes into what is now the Midwest and West to make room for American settlement.

12. During the Reservation Era, from 1850-1887, the federal government sought to confine Native nations to smaller areas of reserved land within their former territories. Congress ended treaty-making with Native nations in 1871.

13. During the Allotment and Assimilation Era, approximately 1887-1934, the federal government pursued an explicit policy of attempting to assimilate Native people, breaking up tribally held land into individual parcels, and dismantling tribal institutions.

14. With passage of the Indian Reorganization Act of 1934, Pub. L. No. 73-383, 48 Stat. 984, codified at 25 U.S.C. § 461 et seq, Congress repudiated the assimilation policy and switched to a policy of supporting tribal governments, restoring tribal land, and rebuilding tribal institutions. This is known as the Indian Reorganization Era.

15. From 1953-1968, federal policy reversed again to one in favor of minimizing the special status of Native people and Indian tribal governments. During this Termination Era, the federal government formally "terminated" its government-to-government relationship with several tribes, passed laws to extend state jurisdiction over certain reservations, and relocated many Native people from reservations to cities.

16. Since 1962, the federal government has pursued a policy of Tribal Self-Determination. This policy was formally announced by President Richard Nixon in 1970, Special Message to Congress on Indian Affairs, 1 Pub. Papers 564 (July 8, 1970), and has been reaffirmed by every subsequent President. *See* Memorandum No. 215, 74 Fed. Reg. 57,881 (Nov. 5, 2009) (President Barack Obama); Proclamation No. 7500, 66 Fed. Reg. 57,641 (Nov. 12, 2001) (President George W. Bush); Exec. Order No. 13,175, 65 Fed. Reg. 67,249 (Nov. 9, 2000) (President Bill Clinton); Memorandum No. 85, 59 Fed. Reg. 22,951 (Apr. 29, 1994) (President Bill Clinton); Exec. Order No. 13,084, 63 Fed. Reg. 27,655 (May 14, 1998) (President Bill Clinton); Statement Reaffirming the Government-to-Government Relationship Between the Federal Government and Indian Tribal Governments, 1 Pub. Papers 662 (June 14, 1991) (President George H.W. Bush); Statement on Indian Policy, 1 Pub. Papers 96 (Jan. 24, 1983) (President Ronald Reagan).

17. Self-Determination policy favors respecting tribal sovereignty, supporting tribal governments, protecting tribal land, strengthening tribal institutions, and maintaining a government-to-government relationship between tribes and the federal government. It is similar to the policy of the Indian

3

Exhibit 5 - 083

Reorganization Era in its support for tribal governments and tribal institutions. However, in that era the federal government required tribes to conform their institutions to an American model in order to benefit from federal recognition and support, whereas the Self-Determination Era has been marked by even greater respect for tribal governments and a willingness to let tribes and Native people determine the policies that will shape their futures. The effect of Self-Determination policy on criminal justice laws is discussed further below.

18. The history of federal criminal jurisdiction in Indian country, and its relationship to tribal criminal jurisdiction, reflects these policy shifts.

19. Tribes have long been recognized as independent sovereigns with the power to handle internal criminal matters without outside interference. The Supreme Court has confirmed this in several cases throughout various policy eras, including *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 519-520 (1832) (holding that state criminal laws have no effect in Indian country), *Ex Parte Crow Dog*, 109 U.S. 556, 571-572 (1883) (refusing to imply federal criminal jurisdiction over an on-reservation crime between Indians in light of federal policy that such crimes "were left to be dealt with by each tribe for itself, according to its local customs") (later superseded by the Major Crimes Act, discussed below), *Talton v. Mayes,* 163 U.S. 376, 383 (1898) (holding that tribal criminal jurisdiction is an aspect of inherent tribal sovereignty and therefore not controlled by the federal Bill of Rights), and *United States v. Wheeler*, 435 U.S. 313, 323-324 (1978) ("It is evident that the sovereign power to punish tribal offenders has never been given up by the Navajo Tribe and that tribal exercise of that power today is therefore the continued exercise of retained tribal sovereignty.").

20. Tribal criminal jurisdiction includes the power of a tribe to determine the form, procedure, and fundamental character of criminal justice within that tribe's territory and affecting its people. The Navajo Nation is well known for having a justice system founded on principles of community participation, restoration, and healing, as opposed to individual retribution, adversarial proceedings and punishment.

21. The earliest treaties and laws extending federal criminal jurisdiction into Indian country limited this jurisdiction to crimes between Indians and non-Indians. For example, the Treaty of Fort Sumner, entered into in 1868 with the Navajo Nation, contained such a provision, in which the U.S. government agreed to punish any "bad men among the whites" who committed a crime against the Navajos, and the Navajo Nation agreed to deliver "bad men among the Indians" who committed crimes against anyone under U.S. authority to the United States for federal prosecution. *Treaty of Fort Sumner with the Navajo Nation*, 15 Stat. 667 (signed June 1, 1868).

Exhibit 5 - 084

22. These early provisions were eventually enacted as the Indian General Crimes Act, first codified in 1817 and codified as amended at 18 U.S.C. § 1152, which extended federal enclave jurisdiction to Indian reservations, but provided that this jurisdiction "shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe . . . ." This approach was consistent with the federal government's policy throughout most of the 19th century of exercising jurisdiction over relations between tribes and non-Indians, including inter-racial crimes, but staying out of internal criminal matters on reservations.

23. Several major laws affecting criminal justice in Indian country were passed between the Treaty Era and the 1960s. In general, these laws infringed on tribal sovereignty and corresponded with federal policies that were paternalistic and anti-tribal. They significantly weakened tribal justice systems by extending federal and state criminal jurisdiction into Indian country in various forms.

24. The first major extension of federal criminal law into internal, on-reservation criminal matters was the Major Crimes Act. Act of Mar. 3, 1885, ch. 341, § 9, 23 Stat. 362, 385, codified as amended at 18 U.S.C. § 1153. The Act expressly authorized federal prosecution of specific "major" crimes involving only Indians in Indian country. It was a direct response to *Ex Parte Crow Dog*, 109 U.S. 556 (1883), in which the Court held that the federal government lacked jurisdiction over an intra-Indian murder. In *Crow* Dog, the tribe had already exercised its criminal jurisdiction to order restitution, but federal officials were dissatisfied with that result. Passed on the eve of the Allotment and Assimilation Era, the Major Crimes Act reflected the prevailing belief that tribal justice systems were inferior and incapable of maintaining law and order or dispensing justice for serious crimes.

25. In 1883, the federal Bureau of Indian Affairs established the first Courts of Indian Offenses. These courts, known as "CFR courts" because they derive authority from the Code of Federal Regulations, were administrative courts in which agency-appointed judges policed and punished violations of federal regulations. The CFR courts were intended to function as instruments of education and assimilation as well as to ensure law and order on reservations; in addition to standard criminal offenses, federal regulations outlawed certain religious and lifestyle practices ranging from participation in religious ceremonies to unmarried cohabitation. CFR courts extended federal agency authority over purely local low-level offenses. Although CFR courts are often described as the precursor to modern tribal courts, they were actually federal agency courts that usurped the role of traditional tribal justice authorities. Together with the Major Crimes Act, they facilitated the goals of the Allotment and Assimilation Era by submerging tribal justice systems under a network of federal prosecution authority.

5

Exhibit 5 - 085

26. During the Indian Reorganization Era, tribes were encouraged to "reorganize" and to adopt constitutions modeled after sample constitutions provided by the Bureau of Indian Affairs. These model constitutions established tribal courts that more closely resembled American courts. However, reorganized courts had limited power because most were established as subordinate to the tribe's legislative body. This recognition of "reorganized" tribal courts reflected the federal government's policy of acknowledging tribal government authority while at the same time encouraging tribes to model their institutions after American ones.

27. The next major incursion into tribal authority over internal criminal matters occurred during the Termination Era, when Congress again withdrew support for tribal sovereignty and pursued a policy that favored disestablishing separate tribal governments and integrating individual Native people into American society. In 1953, Congress passed Public Law 280, Pub. L. 83–280, August 15, 1953, codified as 18 U.S.C. § 1162, 28 U.S.C. § 1360, and 25 U.S.C. §§ 1321–1326, which automatically extended state criminal jurisdiction over reservations in six states, without tribal consent, and authorized other states to assume such jurisdiction at their option. In passing Public Law 280, Congress effectively handed the federal responsibility for public safety in Indian country over to the states. The existence of and effect on tribal justice systems was not considered.

28. In 1978, in *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 197-205 (1978), the Supreme Court relied in part on the existence and long history of federal criminal jurisdiction in Indian country, and the comparative lack of tribal court prosecutions involving non-Indian defendants, to hold that tribes had been divested of their inherent authority to prosecute non-Indians.

**II. By contrast, laws affecting criminal justice in Indian country passed during the Self-Determination Era reflect a federal policy of strengthening and rebuilding tribal justice systems.**

29. Although the federal government has remained very involved in every aspect of tribal government operations and reservation life during the Self-Determination Era, its role has changed to one of support. Legislation passed during this era, including the Indian Self-Determination and Education Assistance Act of 1975, Pub. L. No. 93-638, 88 Stat. 2203, the Indian Health Care Improvement Act of 1976, Pub. L. No. 94-437, 90 Stat. 1400, the Tribally Controlled Community College Assistance Act of 1978, Pub. L. No. 95-471, 92 Stat. 1325, the Tribally Controlled Schools Act of 1988, Pub. L. No. 100-297, part B, 102 Stat. 394, and the Native American Housing Assistance and Self-Determination Act of 1996, Pub. L. No. 104-330, 110 Stat. 4030, has consistently affirmed the right of tribes to exert greater control over their own institutions and has allocated federal resources to support tribal goals.

Exhibit 5 - 086

30. Laws passed during the Self-Determination Era affecting criminal justice in Indian country have focused on strengthening tribal justice systems.

31. The Indian Civil Rights Act of 1968, Pub. L. No. 90-284, tit. II, 82 Stat. 77, both affirmed and infringed upon tribal sovereignty. The ICRA affirmed the inherent criminal jurisdiction of tribal courts, but Congress unilaterally imposed significant limitations on the exercise of that jurisdiction by requiring that tribal courts adhere to due process requirements that largely (but not entirely) mirrored those in the federal constitution and by limiting the length of sentences and amount of fines that could be imposed by a tribal criminal courts.

32. Also in 1968, Congress amended Public Law 280 to require tribal consent for future assumptions of state jurisdiction and to allow states to retrocede jurisdiction to the federal government should they wish to do so. Since the amendment, no tribe has consented to a new extension of state jurisdiction. The amendment stemmed the future expansion of state jurisdiction over reservations, but it did not provide a mechanism for tribes already subject to the law to request retrocession.

33. In 1990, Congress amended the Indian Civil Rights Act to clarify that tribes have inherent authority to prosecute "all Indians" in their criminal courts. This law superseded the Supreme Court's holding in *Duro v. Reina*, 495 U.S. 676 (1990), that tribes' retained criminal jurisdiction was limited to Indians who were enrolled members of that tribe. In passing this law, Congress confirmed that tribes retain inherent authority to prosecute crimes involving Indians that occur within their territory.

34. In 1993, Congress passed the Indian Tribal Justice Act, Pub. L. 103-176, § 2, 107 Stat. 2004, codified at 25 U.S.C. §§ 3601-3631. That Act recognized that "tribal justice systems are an essential part of tribal governments" and reiterated the federal government's commitment to protecting tribal sovereignty.  The Act recognized that tribal justice systems were inadequately funded, established a federal Office of Tribal Justice Support, authorized the Secretary of the Interior to enter into contracts allowing tribes to carry out all aspects of tribal justice systems, and directed the Secretary to consult with tribes in establishing a base funding formula for tribal justice contracts.

35. In 2000, Congress passed the Indian Tribal Justice Technical and Legal Assistance Act, Pub. L. No. 106-559, 114 Stat. 2778, codified at 25 U.S.C. §§ 3651-3682. That Act recognized that "enhancing tribal court systems and improving access to those systems serves the dual Federal goals of tribal political self-determination and economic self-sufficiency." The Act directed the Department of Justice to create an Office of Tribal Justice and authorized

Exhibit 5 - 087

grants to tribes and non-profit organizations to improve tribal courts and provide legal services to civil and criminal litigants in tribal courts. Notably, the Act specifically provided that it should not be construed to "encroach upon or diminish in any way the inherent sovereign authority of each tribal government to determine the role of the tribal justice system within the tribal government or to enact and enforce tribal laws," to "impair the rights of each tribal government to determine the nature of its own legal system or the appointment of authority within the tribal government," or "alter in any way any tribal traditional dispute resolution fora."

36. During this period, Congress passed the Federal Death Penalty Act, Pub. L. No. 103-322, tit. VI, Sept. 13, 1994, 108 Stat. 1968, codified at 18 U.S.C. § 3591-3599, which created sixty capital offenses under federal law. Underscoring the policy of respect for tribal sovereignty, the law specifically provides that "no person subject to the criminal jurisdiction of an Indian tribal government shall be subject to a capital sentence under this chapter for any offense the Federal jurisdiction for which is predicated solely on Indian country . . . , unless the governing body of the tribe has elected that this chapter have effect over land and persons subject to its criminal jurisdiction." To my knowledge, only one tribe has opted in to the federal death penalty pursuant to this law.

37. Despite the affirmations of inherent tribal authority, including criminal jurisdiction, and the authorization of federal funding to support and strengthen tribal courts, the scope of tribal jurisdiction remained largely the same during this period. Moreover, the continued exercise of federal and state jurisdiction as a result of older laws frequently had the effect of undermining tribal jurisdiction. For example, federal and state officials did not always consult with tribal officials in deciding whether and how to prosecute a crime, even if the tribe retained concurrent jurisdiction, leading to both under-enforcement and over-prosecution.

III.   **Laws passed since the turn of the century have expanded tribal jurisdiction and correspondingly reined in federal and state law enforcement authority in Indian country.**

38. In the past decade, Congress has underscored its support for strengthening tribal justice systems by slowly expanding tribal jurisdiction and acting to ensure that the exercise of federal and state criminal jurisdiction present minimal interference with tribal justice systems. Beyond showing neutral support for tribal justice systems, these recent laws seek to limit or contain the exercise of federal and state criminal power in Indian country, counteracting the paternalistic history of federal criminal jurisdiction in Indian country.

Exhibit 5 - 088

39. In 2010, Congress passed the Tribal Law and Order Act. Pub. L. No. 11-211, tit. II, 124 Stat. 2261, codified in scattered sections of the U.S. Code. In addition to authorizing funding for tribal justice systems, the Act contained several provisions designed to increase the accountability of federal criminal justice agencies to the tribes they serve.  Among other provisions, the Act required federal law enforcement officials to share crime data with each tribe annually, required federal prosecutors to report and coordinate with tribal officials on each Indian country case that federal officials decline to prosecute, required that the U.S. Attorney appoint a tribal liaison for each district containing Indian country, authorized the U.S. Attorney to deputize tribal prosecutors to serve as Special Assistant United States Attorneys to assist in the prosecution of minor crimes, established the Native American Issues Coordinator within the Department of Justice to coordinate Indian country prosecutions at the national level, required three different federal agencies to enter into a Memorandum of Agreement to coordinate mental health and substance abuse services in Indian country, and required the Departments of Justice and Interior develop a plan regarding detention and detention alternatives in Indian country.

40. Section 234 of the Tribal Law and Order Act expanded tribal courts' sentencing authority, authorizing tribes to incarcerate offenders for up to three years as long as specific due process requirements are met. The Act also created a pilot program to allow tribally-sentenced offenders to be incarcerated in a federal facility at federal expense.

41. Section 221 of the Tribal Law and Order Act authorized tribes in Public Law 280 states to request that the Attorney General reassume federal jurisdiction over that tribe's reservation. Prior to enactment of this law, tribes included in Public Law 280's original grant of jurisdiction could ask the state to retrocede jurisdiction to the Attorney General, but could not achieve retrocession without the state initiating it.

42. In 2013, as part of its reauthorization of the Violence Against Women Act, Congress again expanded tribal criminal jurisdiction by authorizing tribes to prosecute certain non-Indian domestic violence offenders for up to three years as long as specific due process requirements are met. Pub. L. No. 113-4, tit. IX, 127 Stat. 54, to be codified at 25 U.S.C. § 1301-1304.

43. Taken together, these laws demonstrate an acknowledgement by Congress that strengthening and supporting tribal justice systems requires expanding tribal jurisdiction to restore some of the sovereignty diminished as a consequence of earlier laws and may also require limiting the exercise of federal and state criminal jurisdiction in order to ensure that the exercise of jurisdiction by another government does not undermine tribal sovereignty.

Exhibit 5 - 089

44. In 2013, the Tribal Law and Order Commission, an independent, bipartisan commission created by the Tribal Law and Order Act to recommend ways to improve criminal justice in Indian country, released its final report entitled *A Roadmap for Making Native America Safer*. The report recommends that Congress move even further in this new direction by limiting federal jurisdiction in Indian country and expanding tribal jurisdiction. For example, the Commission recommends that tribes should be permitted to opt out entirely of federal Indian country criminal jurisdiction; that Congress should recognize the inherent authority of all such tribes to prosecute everyone within their territory without restrictions on sentence length as long as specific due process requirements are met; and that Congress amend the Federal Juvenile Delinquency Act to prevent federal prosecution of juveniles based on Indian country jurisdiction unless the local tribe has first declined to exercise its jurisdiction over the case.

45. The Commission puts words to this new policy direction in criminal justice by laying the blame for weakened and ineffective criminal justice systems squarely on the problem of federal interference: "Ultimately, the imposition of non-Indian criminal justice institutions in Indian country extracts a terrible price: limited law enforcement; delayed prosecutions, too few prosecutions, and other prosecution inefficiencies; trials at distant courthouses; justice system and players unfamiliar with or hostile to Indians and Tribes; and the exploitation of system failures by criminals, more criminal activity, and further endangerment of everyone living in or near Tribal communities. When Congress and the Administration ask why the crime rate is so high in Indian country, they need look no further than the archaic system in place, in which Federal and State authority displaces tribal authority and often makes Tribal law enforcement meaningless."

46. Each of the recommendations described above, and others contained in the Commission's report, serve the goal of strengthening tribal criminal justice systems while correspondingly rolling back federal and state criminal jurisdiction in Indian country.

47. In view of special tribal-federal relationship, the paternalistic history of federal criminal jurisdiction in Indian country and its role in weakening tribal justice systems, and the subsequent shifts in federal policy toward progressively stronger support for tribal justice systems and corresponding limits on federal power, I believe that faithful adherence to the federal government's Indian Self-Determination policy requires meaningful consultation with the tribe on core criminal justice matters, including the decision whether to pursue capital punishment. It is my opinion that the Attorney General's disregard of the tribe's expressed preference in this case was inconsistent with federal policy in 2002. Furthermore, it is my opinion that federal policy since that time has shifted significantly to embody an even stronger support for expanding tribal power and limiting non-tribal

10

Exhibit 5 - 090

interference, making it appropriate for the Department of Justice to reconsider that decision.

I declare under the penalty of perjury of the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct.

Signed this 22nd day of July 2014 in Las Vegas, Nevada.

Addie Rolnick, Esq.

11

Exhibit 5 - 091

| From: | Celeste Bacchi |
|---|---|
| To: | US Pardon Attorney (imailagent) |
| Cc: | Jonathan Aminoff : Dolores Ramos |
| Subject: | Lezmond Mitchell - Petition for Executive Clemency, Attachments F-K (Email 3/3) |
| Date: | Friday, July 31, 2020 9:02:36 PM |
| Attachments: | Attachments F-K.pdf |

Dear Ms. Sargent-Burns:

Attached are Attachments F-K of Mr. Mitchell's petition for executive clemency.

Thank you,

Celeste Bacchi



**Celeste Bacchi**

**Deputy Federal Defender**
**Office of the Federal Public Defender**
**Central District of California**

321 E 2nd Street | Los Angeles, CA 90012 | fpdcdca.org
**O:** 213.894.1887 | **F:** 213.894.0081

Exhibit 5 - 092

# ATTACHMENT F

Exhibit 5 - 093

### DECLARATION OF HILARY N. WEAVER, D.S.W.

I, Hilary N. Weaver, D.S.W., declare:

1)  I am a social worker with expertise in cultural issues in the counseling process, cultural competence, with a particular emphasis on Native Americans. I am a Professor at the University of Buffalo – State University of New York (SUNY) in the Social Work program. I have taught at the University of Buffalo (SUNY) since 1993. I have a doctorate degree from Columbia University School of Social Work. A true and correct copy of my education, publications and professional experience is contained in my curriculum vitae, attached to this report as Exhibit A.

2)  Attorneys for Lezmond Mitchell have asked me to evaluate Lezmond's social history and background, with particular attention to his family, cultural, education, medical and psychiatric history. I conducted this assessment to determine what social, emotional, and intellectual factors influenced Lezmond's prenatal development, childhood, adolescence and adulthood. They asked me to determine whether Lezmond experienced childhood trauma (*i.e.*, physical and emotional abuse, deprivation, abandonment and/or neglect); and if so, to identify the possible effects of childhood maltreatment on Lezmond's subsequent social, emotional and intellectual development. In addition, they asked me to consider

1

Exhibit 5 - 094

Lezmond's experiences growing up in abusive and neglectful circumstances in Arizona and California. They asked me to determine if his family, social service agencies, schools and correctional institutions failed to intervene in such a manner as to effect his social, psychological and intellectual development from birth to childhood. One goal of my evaluation is to identify social history information that could have been presented at Lezmond's capital murder trial, particularly at the sentencing or penalty phase of his trial.

3)     In reaching my professional opinion, I have reviewed extensive documentary evidence about Mr. Mitchell, his family and the trial at which he was sentenced to death, including the following: medical and psychological records of Lezmond Mitchell; school records of Lezmond Mitchell; institutional records of Lezmond Mitchell; approximately thirty written statements of Mitchell family members and acquaintances; and the written statements of professionals who chronicle Lezmond's life in his family, at school and in his community. I attach a true and correct copy of the list of materials I reviewed as Exhibit B. I also interviewed Lezmond Mitchell at the federal penitentiary in Terre Haute, Indiana, as well as his mother, Sherry Mitchell in her home, on the Navajo reservation. Finally, I traveled to various locations on the Navajo reservation to gain familiarity with the area where Lezmond spent some of his childhood and teenage years,

2

Exhibit 5 - 095

including visiting the communities of Lukachukai, Round Rock and Red Mesa, Arizona.

**Overview**

4)      Lezmond Mitchell is a twenty-seven-year-old condemned inmate incarcerated on death row in Terre Haute, Indiana since December 2003. Born in September 1981, Lezmond is one-fourth Navajo, one-fourth white, and one-half Marshallese. (Ex. 2.) He is enrolled as a member of the Navajo Nation and is listed as one-quarter Navajo. (Ex. 3.) Lezmond's maternal grandparents, Bobbi Jo and George Mitchell, were his primary caretakers most of his life, at times together and more often one of them separately. George Mitchell was full-blooded Navajo, and Bobbi Jo Mitchell was white, though she claimed Native American heritage. Both Bobbi Jo and George are deceased. Lezmond's mother, Sherry Mitchell, presently lives on the Navajo reservation.

5)      Lezmond's father, Foster Hemil, was from the Marshall Islands. Foster Hemil is deceased. His death certificate lists the cause of death as liver failure secondary to chronic liver disease, which was itself due to a chronic and active Hepatitis B-infection. (Ex. 35.) Sherry Mitchell and Foster Hemil did not marry and Lezmond never met his father or any paternal family members.

3

Exhibit 5 - 096

6)    Sherry was a student at Navajo Community College when she found out she was pregnant with Lezmond. She did not tell her parents she was pregnant, though her father found out when he came to visit Sherry. Sherry never told her mother; Bobbi found out when Sherry was admitted to the hospital to deliver Lezmond. Sherry wanted to establish a separate life from her parents, particularly to remove herself from their constant fighting and abusive treatment of her. (Ex. 105, ¶. 22.)

7)    Lezmond's life was marked by significant conflictual family relationships. These dysfunctional family dynamics preceded his birth and continued throughout his childhood and adolescence. Related to this was the continuous mobility in Lezmond's life. Rather than a stable, nurturing home, Lezmond experienced significant instability; he moved frequently, passed between various configurations of his three caregivers, his mother and his grandmother and grandfather. Sometimes Lezmond lived alone with one caretaker, and at other times he lived with two or three caretakers in the same home. Depending on whom Lezmond was living with, the degree of conflict at home fluctuated. Conflict and instability were the constants throughout Lezmond's childhood and adolescence.

8)    Three people had strong, shaping influences on Lezmond's life: his mother, Sherry Mitchell, and his maternal grandparents, Bobbi Jo and George

4

Exhibit 5 - 097

Mitchell.  It is notable that Lezmond has little recollection of any early peer relationships and the three adults noted above seem to dominate his life completely. In adolescence his peer relationships were stunted.  At a time when peers typically take on increasing importance, Lezmond had only a few superficial peer relationships.  He reports spending time with peers at that time in his life, but Lezmond also reports not having any close friends in whom he could confide.  The brief exception to this is Lorenzo Reed, who Lezmond reports as like a brother to him and "the only really good friend I've ever had."  The following sections recount the primary relationships that Lezmond had and the shaping influences they were on his social, emotional and intellectual development; the dominant sources of trauma in Lezmond's life from his childhood and adolescence, and an evaluation of the possible effects of trauma on Lezmond's subsequent responses to his life circumstances.

### The Shaping Relationships in Lezmond Mitchell's Life

#### Sherry Mitchell

9)      Sherry Mitchell was the first child born to Bobbi Joe and George Mitchell in May of 1958 at Arkansas, Kansas. (Ex. 22.)  During her childhood, Sherry's family moved frequently as her parents pursued different educational and employment opportunities.  While some of Sherry's childhood was spent on the

5

Exhibit 5 - 098

Navajo reservation and she attended Bureau of Indian Affairs' schools, she also
spent significant periods of time in California and graduated high school in North
Carolina after transferring from Albuquerque, New Mexico.  Sherry continued her
education in Fresno, California area colleges until she attained a Bachelor degree
that emphasized Early Childhood Education and Science.  (Exs. 26, 27, and 28.)
From 1992 to 1995, she attended a Lemoore, California college, achieving a Master
of Education in Curriculum and Instruction and Administration.  (Ex. 28.)

      10)    Despite her parents own advanced degrees in childhood development
and education, Sherry suffered significant childhood abuse, particularly at the hands
of her mother.  Bobbi Jo was a demanding parent, assigning Sherry difficult tasks
even when she was quite young.  When Sherry's brother, Auska Kee Charles
Mitchell, was born in 1966, Bobbi made Sherry responsible for his care.  While still
in elementary school, Sherry was responsible for the household cleaning and the
care of her baby brother.  (Ex. 105, ¶. 4.)  No doubt this was difficult for a young
child, yet Bobbi was never satisfied with Sherry's efforts.  On at least one occasion,
Bobbi's dissatisfaction with Sherry's vacuuming, resulted in her beating Sherry's
body and head with the steel hose of the vacuum cleaner.  (Ex. 105, ¶. 6.)  Auska
was also beaten regularly by both Bobbi and George, usually with a belt.  (Ex. 104,
¶. 10.)

6

Exhibit 5 - 099

11)   Both of her parents beat Sherry.  As demonstrated above, Bobbi beat Sherry with whatever implement was at hand.  George also beat Sherry, often with a belt, but including at least once with a hammer.  (Ex. 105, ¶. 8.)

12)   When Sherry got older, the fights with her mother became more physical and Sherry periodically fought back.  During one argument when Sherry was in high school, Bobbi began to choke her.  Sherry reacted by hitting Bobbi on the head.  When Bobbi fell, Sherry left the house and began walking to her job.  When her friend pulled up to offer her a ride, Sherry told her perhaps she should not be her friend because she may have just killed her mother.  (Ex. 105, ¶. 16.)

13)   During one fight between George and Bobbi, Sherry saw her mother storm out of the house with a gun.  Bobbi went up to the mesa behind their house; Sherry heard the gun go off.  When Sherry started to see if her mother were okay, her father stopped her, saying, 'If she killed herself, she killed herself, let her go.'  (Ex. 105, ¶. 9.)

14)   Auska confirms the constant fighting and violence in their home.  For example, his father once got out a bow and arrow and threatened to kill their mother.  (Ex. 104, ¶. 5.)  Another time, in desperation over his parents fighting, Auska yelled that his parents should just go ahead and kill him.  "So, my mother told me to stand behind the truck.  She then got in the truck, put it in reverse, and hit the gas.  I

7

Exhibit 5 - 100

managed to jump out of the way and avoid being hit before my mother slammed the truck into the side of the barn." (Ex. 104, ¶. 12.)

15)    Besides the physical abuse, Bobbi Jo did things to humiliate and demean both Sherry and Auska. For example, Bobbi forced Sherry to take ballet classes for years, although Sherry was obese and embarrassed by her appearance in a ballet outfit. (Ex. 105, ¶. 5.) Bobbi often told Auska how mean her own father had been to her and then declared how, much to her regret, Auska looked like his maternal grandfather. (Ex. 104, ¶. 9.) On one occasion, Bobbi announced to a crowd of people that she had been raped, and consequently Sherry's younger brother, Auska, might be the son of George's brother. This was a source of deep shame to Sherry, whose friend told her about it. The shame continues to this day, as Sherry links a particular beating by her mother, to Bobbi's discovery she was pregnant. (Ex. 105, ¶. 7.) In high school, Sherry remembers her mother often telling her that she was no better than a slave.

16)    Sherry's response to these verbal assaults was to be compliant to the demands of her mother, despite their conflicts, to keep a roof over her head. Even at that, Sherry slept on a shelf in an unheated garage of her parents'' house when she was a senior in high school; she desperately wanted to be away from her parents. (Ex. 105, ¶. 16.)

8

Exhibit 5 - 101

17)   Perhaps most damaging to Sherry, and ultimately to Lezmond, was Bobbi's frequent charge against Sherry that Sherry and her father had a sexual relationship. Bobbi often accused Sherry of having sex with her father, including accusing Sherry of breaking up Bobbi's relationship with George. During one argument, Bobbi insinuated that Sherry was using birth control to accommodate having sex with her father. (Ex. 105, ¶. 11-12.) It seems George also used this inference in his fights with Bobbi, insinuating that he was in a sexual relationship with Sherry. (Ex. 105, ¶. 12.)

18)   In fact, when Sherry was a child and she traveled to ceremonies with her parents, they often shared a bed. When Bobbi stopped attending ceremonies with the family, and Sherry and George traveled alone, they continued to share a bed. Sherry thought it was a normal occurrence, to share a bed with her father. It was only as an adult she began to look at her father's ambiguous relationship with her. For example, besides sharing her bed when they traveled, George dyed his hair to maintain a younger appearance. People often mistook George and Sherry for husband and wife. (Ex. 105, ¶. 13.) Sherry had a dream as a teenager, which involved someone with whiskers kissing her. When she woke up, no one was there. In a later conversation, her father told her it was a spirit she felt. As an adult, a medicine man told Sherry he believed her father molested her. (Ex. 105, ¶. 15.)

9

Exhibit 5 - 102

Some degree of family dysfunction is apparent in these behaviors, whether sexual intercourse was involved or not. It may have also been a way for George to antagonize his wife further. Clearly other people in the community knew of these twisted family relationships.

19)    Later in Lezmond's life, he heard these accusations and insinuations about his mother and grandfather. He did not understand what the words suggested until he was older. When Lezmond was younger, his grandmother instructed him to call his grandfather, Poppa, as though he was Lezmond's father figure. (Ex. 105, ¶. 14.) Then, during an argument in middle school, Bobbi yelled at Lezmond, saying his mother had been raped and no one knew who his father was. (Ex. 135, ¶. 13.)

20)    Bobbi Jo was apparently struggling with some degree of mental illness during these years. Both Sherry and Auska describe unusual symptoms in their mother, beyond what they saw as her abusive behavior. Auska linked the change in his mother to a time when a student threw her against a brick wall; he heard talk at home about Bobbi having a brain injury. (Ex. 104, ¶. 3.) However, when Sherry was still in elementary school, she thought her mother went into long-lasting trances. Sherry remembers Bobbi was seeing a psychologist and taking prescription medications, including Darvon and Valium, during this time. (Ex. 105, ¶. 32.)

10

Exhibit 5 - 103

21)    These arguments and beatings and threats to life, are grossly outside the realm of the loving, supportive environment a child needs to become a well-adjusted, functioning adult.  Growing up, Sherry and Auska managed to survive in this extremely violent environment, but neither emerged unscathed.  The damage done to Sherry affected every aspect of her life, including her ability to effectively parent Lezmond.  Both Sherry and Auska fled home when they could do so.

22)    Sherry met Lezmond's father, Foster Hemil, when they were both college students in Arizona.  Today, Sherry's presentation is that she decided to have a child and selected Hemil as an appropriate man to father her child.  However, three years prior to Lezmond's birth, Sherry sought an abortion, and Hemil's background suggests a more complicated beginning to Lezmond's conception.  (Ex. 65; Ex. 30.)  Hemil was born in the Marshall Islands and had come to Arizona to attend community college.  (Ex. 37.)  He was a student at Diné College from the fall of 1979 to the spring of 1981.  (Ex. 38.)  Lezmond was born in September of 1981.  (Ex. 2.)  Sherry and Hemil had no contact after Lezmond was born, until Sherry filed a Petition for Child Support in April of 1983, in Orange County, California.  She named Foster Hemil as Lezmond's father in that petition.  (Ex. 32.)  Hemil was already in the custody of the Orange County Sheriff's Department on burglary and sexual battery charges filed the previous month.  (Ex. 40.)  From the records

11

Exhibit 5 - 104

available, it appears Hemil avoided a prison sentence on the burglary and sexual assault charges by agreeing to return to the Marshall Islands. He did not pay child support to Sherry for Lezmond. At the time of Hemil's death, he was the father of at least six children by four different women, including Lezmond Mitchell. (Ex. 67; Ex. 101, ¶. 6.) One of his children, Foster Hemil, Jr., Lezmond's half-brother, recently committed suicide. [Ex. 138]

23)    Sherry hid her pregnancy from her parents. It was not until George came to visit Sherry at college and saw her pregnant that anyone in her family knew Sherry was expecting. Bobbi did not find out Sherry had become a mother, until after the delivery of Lezmond. (Ex. 105, ¶. 22.)

**Sherry's Relationship with Lezmond during His Childhood**

24)    Sherry and Lezmond lived in their own home in Chilchinbito, Arizona, on the Navajo Reservation, but away from Sherry's parents. Sherry attended college, while trying to care for Lezmond. It was a tremendous load to balance - her own education, maintaining a home for herself and Lezmond and meeting the needs of a baby. Within a year or so, Sherry concluded she could not maintain herself, her toddler son and complete her education. She needed the help of her parents. Sherry asked her parents to care for Lezmond.

12

Exhibit 5 - 105

25)    At first, Sherry maintained a strong presence in Lezmond's life, even while Bobbi or George was providing his primary care taking. This proved difficult for Sherry, as Bobbi's domineering personality continuously undermined Sherry's authority with Lezmond. Sherry found it hard to stand up to Bobbi in decisions concerning her son. Sherry fought with her mother over this, in their life long pattern. At one point, during an argument Sherry told her mother she wanted Lezmond back; she was tired of arguing over the Lezmond's care. During that argument, Bobbi became violent and hit Sherry with a porcelain figure. When Lezmond was five years old, he lived in Sanders, Arizona with his grandfather, where he started kindergarten. Part way through Lezmond's kindergarten year, George moved to Kin-Li-Chee, Arizona, also on the reservation. Lezmond lived with George and Bobbi there. Lezmond's primary memory from this time is the constant fighting in his family. (Ex. 135, ¶. 12.)

26)    For example, during one visit by Sherry and Bobbi, Lezmond was lying on the floor, trying to hit flies with a swatter. Bobbi and George were arguing over something and Sherry was about to start arguing with Bobbi. Lezmond felt the tension in the room. When a fly landed on Bobbi a second time, she grabbed the swatter and hit Lezmond on his back and legs; he covered his head with his hands

13

Exhibit 5 - 106

and she hit his hands too. This went on as neither Lezmond's grandfather nor
mother intervened on his behalf. (Ex. 135, ¶. 10.)

27)   When Lezmond was six years old, Sherry relinquished his guardianship
to Bobbi Jo. The document created for the legal purpose of giving Bobbi the
authority to raise Lezmond states Bobbi has been supporting Lezmond for six years
and has full decision making authority over him. (Ex. 33, p. 1.) In the ongoing tug-
of-war over Lezmond, the following year, Sherry tried to revoke the guardianship.
(Ex. 33, p. 2.)

28)   This decision is a reflection of the depth of damage done to Sherry,
inflicted on her by Bobbi Jo. Sherry knew her parents were abusive; she knew her
mother was demeaning, argumentative and violent. Sherry knew her mother, in
particular, had been abusive to her as a child and young adult. Sherry knew her
mother was already playing out the same abusive patterns on Lezmond. Knowing
all of this, Sherry nonetheless left her son with her mother. This act speaks to the
tremendous pressures Sherry must have felt to complete her education, to have a
measure of "success" in her life. Both of her parents were well-educated. Bobbi had
obtained a doctoral degree. They had given Sherry the message many times and in
many ways as a child and adolescent that she had not measured up to her mother's
expectations. It is likely Sherry was both told and felt she had little choice but to put

14

Exhibit 5 - 107

her own education over her child's well-being. Sherry's desire to be independent and to support her child necessitated attaining a stable income. (Ex. 105, ¶. 24-25.) She hoped this would be a brief solution to her situation and told all involved that she would be able to reclaim Lezmond shortly. These things likely played a part in the decision to deliver Lezmond to the person who was a source of so much pain in Sherry's own life, Bobbi Jo. Sherry felt she had no choice; she had been so injured by her own mother that she could not recognize what she was going to Lezmond.

29)   Lezmond is clear about the pain this abandonment by his mother caused him. His strongest memory from this time in his childhood is his heartbreak in trying to figure out why his mother was leaving him behind and why she did not allow him to go with her. Throughout Lezmond's life thereafter, he knew Sherry was his biological mother and he continued to love her, he never again saw her as the primary adult in his life. In conversation with Lezmond about his mother, he recounts all of his experiences with her with a taint of great sadness.

30)   Lezmond moved to Hanford, California in 1988, where Bobbi was employed as a special education teacher. He began kindergarten again; Sherry told Lezmond he had to repeat kindergarten because he was immature. Sherry lived with Lezmond and Bobbi in Hanford that school year, while she worked as a secretary.

15

Exhibit 5 - 108

She left the area before Lezmond started first grade. Lezmond saw his grandfather, George during vacations and holidays.

31) Lezmond lived with his grandmother in California for three years, until 1991. He attended three different elementary schools during that time, transferring from public to private and back to public school. (Exs. 7, 8, 9.) The changes in schools added to the instability in Lezmond's life, due to the chaos he lived with at home. Bobbie beat Lezmond regularly with whatever she could get her hands on - broom handles, appliance parts, and a ruler. (Ex. 135, ¶. 16.) Sometimes the beatings were related to problems Lezmond had at school, but other times the beatings were completely random. For example, once when Lezmond was lying on his bed in his bedroom with headphones on, listening to music, he did not hear his grandmother calling him. When Bobbi charged into his room, she tore the headphones from his head and hit Lezmond with the cassette tape player, narrowly missing his head. (Ex. 135, ¶. 16.)

32) Lezmond's school records during this time reflect this chaos. The teachers' notes on his curriculum records indicate Lezmond's problems with self-control, motivation to finish his work, following instructions, and appropriate social behavior. (Exs. 8, 9.)

16

Exhibit 5 - 109

33)     During these years, Bobbi gave an outward appearance of being a concerned parental figure in Lezmond's life, available for school conferences, and participating in Lezmond's school life as a well-educated professional in the developmental needs of children. However, at home, Bobbi was cruel to Lezmond, using shame and humiliation as part of her parenting arsenal. She berated Lezmond about his weight. (Ex. 105, ¶. 19.) She frequently told him that he would not amount to anything. She called him vile names. (Ex. 135, ¶. 18.) The upheaval in Lezmond's life was all-encompassing. On any given day, Lezmond was not sure what would happen when he got home due to the persistent verbal and, sometimes, physical abuse. Even when Sherry was living with them, she did not intervene with her mother, on Lezmond's behalf. Lezmond only felt safe when his grandmother went to bed at night. (Ex. 135, ¶. 23.)

34)     Sadly, though Lezmond's mother felt a determination to break what she termed the cycle of abuse she had suffered at the hands of her mother, Bobbi, she was not able to do that. At best, she ignored the abuse Bobbi inflicted on Lezmond. At worst, Sherry abused Lezmond herself. (Ex. 93, p. 9.)

35)     Lezmond began third grade at Avenal Elementary School in the fall of 1990. He struggled at school. One teacher described Lezmond as likeable, but

17

Exhibit 5 - 110

acting out for his peers. (Ex. 9.) Lezmond performed below grade level on all standardized tests that year. (*Id.*)

36)    There are conflicting explanations for what prompted Lezmond to be sent to live with George in 1991. Lezmond believes his school performance prompted Bobbi to send him away. Sherry believes she had to send Lezmond to live with her father, because an assistant principal told her Lezmond had to leave the school. Sherry worked at the school, but did not yet have her teaching certificate. She feared losing her job if she did not send Lezmond to the reservation to live with his grandfather. (Ex. 105, ¶. 25.) Lezmond remembers his mother getting ready to go to work one morning, and as she went out the door, she quickly told him he was not going to school, but going with his grandfather to live in Arizona. She left without a good-bye. For Lezmond, as an 8-year-old child, this was another time when his mother abandoned him. (Ex. 135, ¶. 24.) Lezmond returned to the Navajo reservation and was placed in the third grade at Round Rock Elementary School. (Ex. 10.)

37)    At Round Rock Elementary School, Lezmond's grades improved in most subjects, however Lezmond was literate only in English. The other students in Lezmond's class were literate in the Navajo language and were beginning to learn English as their second language. It was a source of ostracism and isolation for

18

Exhibit 5 - 111

Lezmond; they teased him for his lack of Navajo language skills, even as he excelled in English classes in school. The resulting fallout for Lezmond was isolation from classmates and difficult social relationships with others. (Ex. 10.) In the fall of 1992, Lezmond entered fourth grade at Round Rock Elementary School. His grandfather was his teacher. His cumulative record again notes, Lezmond's lack of Navajo language skills. (Ex. 10.)

38)     Lezmond returned to California to live with his mother for his sixth grade year. By this time, Lezmond had not lived with his mother for four or five years. When he last lived with Sherry, she had dismissed him with little notice, sending him back to the reservation when she felt his behavior at school threatened her job. This was another year of changing schools for Lezmond and now returning to his mother who previously abandoned him, all of which was extremely stressful for Lezmond.

39)     Sherry's response to having Lezmond live with her again was to attempt to exert extreme control - asking her former students to report on Lezmond's conduct at school to her, requiring him to check in every thirty minutes with her when he was out of school. (Ex. 135, ¶. 26.) Sherry expressed frustration at the amount of food Lezmond ate, and the strain it placed on her budget. She was also frustrated that he did not keep his room clean, nor keep up with chores she assigned to him. Sherry

19

Exhibit 5 - 112

blamed Lezmond's "bad habits" on the lack of structure imposed on him while he lived on the Navajo reservation. Amid the arguments and struggles between Sherry and Lezmond, it is no surprise that given opportunity, Lezmond began to experiment with smoking marijuana and drinking alcohol as a method of coping with his feelings. (Ex. 135, ¶. 26.)

40)   Lezmond spent time during the summer between his sixth and seventh grade years, staying in Arizona with his grandparents. The violent atmosphere continued - both verbally and physically. Lezmond returned to California to live with his mother at the beginning of seventh grade.

41)   During the Christmas holidays, Sherry and Lezmond returned to the reservation to stay with George and Bobbi. Lezmond and his mother got into an argument; Lezmond ran away, only to be found by his grandfather six or seven hours later at the trading post. For Sherry, her memory of this argument is wrapped up in her history of the tug-of-war with her parents over Lezmond. "One Christmas when Lezmond was in the seventh grade, he and I were visiting my parents on the reservation. Lezmond and I got into a fight, and he refused to return to California with me. George told Lezmond that Lezmond did not have to listen to me, or go with me. This made me angry, it was another time when they didn't respect my

20

Exhibit 5 - 113

parental authority.  They did not back me up and gave him an out.  Since then, I feel

they stole Lezmond from me." (Ex. 105, ¶. 26.)

42)   Lezmond stayed behind on the reservation with his grandfather, and

finished seventh and eighth grades at Red Mesa Junior High School in Arizona.

Lezmond's school records from these years mirror the accumulated hurt, broken

family relationships, the damage done by adults who fought over him, with him, and

all around him without ever putting his needs ahead of their own.

43)   Lezmond did not live with Sherry again.  She saw him periodically

when she was working on the reservation and sometimes she spent weekends

helping her aging parents at their home.  At a peyote ceremony following Lezmond's

high school graduation, Lezmond told Sherry, in front of all who attended the

ceremony, that she had been a "lousy mother." (Ex. 105, ¶. 28.)  Rather than hearing

the thread of truth in that statement, Sherry saw this as another humiliating instance

of her parents' failure to back her up, this time publically. (Ex. 105, ¶. 28.)

44)   One final aspect of Sherry's influence in Lezmond's life bears noting:

Sherry has a strong belief in and aspect of the Dine' that has no exact English

translation or counterpart, but it is commonly referred to as "Witchcraft."  Very

simply put, to the Dine', to believe in witchcraft is to believe in supernatural forces

or phenomena.  Sherry believes that her parents, George and Bobbi Jo, were

21

Exhibit 5 - 114

involved in the "bad" or "evil" aspect of witchcraft. Sherry speaks of witchcraft as a means of explaining to herself what has happened to Lezmond.

45)   Sherry is an articulate and educated woman whose life has been dominated by extreme struggles with her parents. She experienced physical and verbal abuse and likely sexual abuse as well, at the hands of her parents. Those negative relationships between Sherry and her parents continued into her adulthood and were directly passed on to Lezmond. In spite of Sherry's stated desire to provide a stable and nurturing home for Lezmond, she replicated the dysfunctional pattern of multi-generational instability that was ultimately extremely damaging to Lezmond. Finally, Sherry does not take responsibility for her part in allowing Lezmond to be battered about, literally and figuratively, seeking refuge in an explanation anchored in witchcraft.

22

Exhibit 5 - 115

**Bobbi Jo Erwin Mitchell**

46)    Bobbi Jo, Lezmond's maternal grandmother, was born January 5, 1942 in Cambridge, Kansas. (Ex. 48.) She died in May of 2005, on the Navajo reservation in Arizona. (Ex. 49.) As a child, Bobbi's family moved frequently, oil field to oil field, chasing work opportunities throughout Kansas and Oklahoma. Bobbi's mother was married several times that further complicated the family's frequent moves. Bobbi told others she attended twenty-six public schools by the time she was in the sixth grade. (Ex. 93, p. 3.) Various records describe Bobbi as Cherokee, Kiowa, or White; in conversation Bobbi usually stated an uncertainty about her own ethnic background but thought it was some mixture of Oklahoma Indian and Anglo.

47)    Very little detail is known about Bobbi's childhood. Later in Bobbi's life, she told a co-worker that she had a difficult childhood; she described her mother as an alcoholic and said she had been forced to work hard from the time she was about nine years old. (Ex. 117, ¶. 10.)

48)    Bobbi Jo Erwin met George Mitchell in Talequah, Oklahoma. George taught at Chilocco Indian School, while he attended college at Northeastern University in Oklahoma. They married in December of 1956; Bobbi was fourteen years old and George was thirty three years old at the time of their marriage. The

23

Exhibit 5 - 116

marriage certificate application indicates Bobbi and George added three years to Bobbi's age, listing her as a seventeen year old. (Ex. 43, 48.) When their first child was born, Sherry, in 1958, Bobbi was sixteen years old. (Ex. 22.) Bobbi and George's second child, Auska, was born in 1966. (Ex. 104, ¶. 1.)

49)    Despite marrying at a very young age and giving birth to her daughter when she was only sixteen years old, Bobbi Jo completed her G.E.D. in 1963. (Ex. 53.) After her second child was born, Bobbi Jo went on to graduate from Pacific College of Fresno in 1971. (Ex. 53.) Bobbi and George moved their family frequently, in part to support her educational aspirations as well as pursue career opportunities for herself and her husband. Bobbi completed a doctorate in education in 1989 and attained her credential as a school psychologist in 1992. (Ex. 53.) She held several prominent positions such as vice principal in Dos Palos-Oro Loma Joint Unified School District, principal of Tsaile Elementary School, and school psychologist at Kern County schools, along with various teaching positions for a total of two decades. (Ex. 54.) Bobbi Jo was an extremely well-educated woman.

50)    A review of Bobbi Jo's employment records show frequent changes in her professional positions, and all held for a relatively short period. Some of this mobility is due to Bobbi's career advancement or moving to accommodate the needs of the family. Among the family members, however, a significant change in Bobbi

24

Exhibit 5 - 117

Jo is noted following her departure from her job at Sanders Elementary School. Lezmond believes Bobbi was fired from her positions. Family conflict increased at the same time, particularly between George and Bobbi. Lezmond does not remember his grandparents ever living together for any period after Bobbi stopped working at Sanders Elementary School.

51)    It was a pattern that Bobbi continued for most of her professional career. Ten years later, she abruptly left a job at Bernhard Marks Elementary School in Dos Palos, California. Bobbi's job was terminated before the completion of the school year. (Ex. 53.) Her co-workers did not know the details around Bobbi losing her job that year, but there were a variety of reasons why she was either fired or asked to resign. (Ex. 95, ¶. 6.)

52)    A Resource Specialist for Special Education at the Dos Palos-Oro Loma Joint Unified School District, Karin Dunn, worked with Bobbi Jo, when Bobbi was employed by the district as a school psychologist.

> It was not just that Dr. Mitchell was not personable
> or kind, in my view, she had poor judgment about her role
> in the school. For example, she overloaded me with work
> that was not part of my position, such as testing other
> teachers' students. In fact, it was my understanding,

25

Exhibit 5 - 118

testing students was her job. I finally went to the principal
who put a stop to it.

One day I heard that Dr. Mitchell would be leaving
the school. The District did not allow her to finish the
school year. I feel somewhat bad saying this, but the day
she left was a happy day for us. Finally, the dark cloud
was going away. Everyone seemed joyful as the word got
around that Dr. Mitchell was finally gone. It was funny to
me how everyone suddenly started to talk about her
openly, relieved to hear that we were not the only ones that
felt like this about Dr. Mitchell. In fact, there was a party
when Dr. Mitchell left. Someone brought a cake that said:
DING DONG, THE WICKED WITCH IS DEAD.

(Ex. 98, ¶. 8-9.)

53)     Another co-worker, Donnarae Sowell, kept in touch with Bobbi Jo for
several years after the time they worked together.  Donnarae noted that Bobbi had
problems wherever she worked, even after receiving her doctoral degree.  Bobbi
usually moved every school year because her employment contract was not renewed.
(Ex. 117, ¶. 6.)

26

Exhibit 5 - 119

54)     One of Bobbi's co-workers at Dos Palos - her assistant - knew that Bobbi misappropriated grant money intended for school projects and used it for her own purchases. (Ex. 96, ¶. 4.) When Bobbi realized her assistant was aware of her theft, Bobbi prohibited the woman from ever having contact with the school district office employees and school board members, all to keep her theft from being revealed to superiors. (Ex. 96, ¶. 5.)

55)     Several people noticed Bobbi Jo's frequent erratic behavior and questionable judgment who worked with Bobbi. She was known for making a crisis out of minor things (Ex. 117, ¶. 7.); being inflexible with her co-workers – they were either on her good side or her bad side (Ex. 120, ¶. 3.); an explosive and violent temper (Ex. 120, ¶. 3; Ex. 96, ¶. 3.); and falsely accusing others of major wrong doing. (Ex. 96, ¶. 9.)

56)     In one incident, Bobbi Jo accused her assistant, Mary Coronado, of embezzlement when Mary gave out treats at work to children and adults alike - treats Mary had brought to work. Bobbi's campaign against Mary over this simple distribution of brownies was out of control; she accused Mary of theft and told others Mary was a thief. When Mary responded to this crazy behavior by both leaving her job and reporting Bobbi to the school district officials, Bobbi's response was to harass Mary by calling her at home at all hours and parking in Mary's

27

Exhibit 5 - 120

driveway and honking her horn.  (Ex. 96, ¶. 12.)  Bobbi Jo eventually had another

co-worker call Mary at home and to tell her if she came back to work, all would be

forgiven and alternatively, if Mary did not return Bobbi would make sure no one

hired her.  (Ex. 96, ¶. 13.)

57)    Bobbi was unprofessional in the extreme.  She hired a woman to be an

office manager who had limited qualifications, and then asked the woman to spy on

other employees for her.  (Ex. 120, ¶. 2.)  Bobbi tried to get individual employees to

reveal negative things about their co-workers.  (Ex. 99, ¶. 7.)  They describe her as

obsessive, rude, pushy and paranoid (Ex. 120, ¶. 5); controlling to the point of being

abusive (Ex. 95, ¶. 3); demeaning of other professional staff in front of students and

their parents (Ex. 98, ¶. 2); and, having a personality that went from one end of the

spectrum to the other (Ex. 95, ¶. 3), like Dr. Jekyll and Mr. Hyde.  (Ex. 96, ¶. 3.)

She seemed to go out of her way to humiliate, demean and manipulate staff she

supervised.  (Ex. 99, ¶. 5; Ex. 98, ¶. 3.)

58)    Bobbi Jo was unprofessional with both the adults she supervised, as

well as the children she encountered in her work.

> The kids at the community center were all terrified
>
> of Dr. Mitchell.  They wanted nothing to do with her.
>
> Although the center had computers, televisions and games

28

Exhibit 5 - 121

for the kids to enjoy, they could only use them when Dr.

Mitchell said they could.  If you did not obey Dr.

Mitchell's orders, she would go off on whoever was in

charge at the time.  Dr. Mitchell yelled a lot; she did not

hide her emotions when she was upset and she was upset

often.

(Ex. 96, ¶. 7.)

Dr. Mitchell could not stand kids. She yelled at

them constantly, and called them 'spoiled kids' or 'stupid

kids.' Dr. Mitchell's attitude toward kids was awful and

kids knew it, they stayed out of her way.

(Ex. 120, ¶. 7.)

Before Dr. Mitchell took over the community center, there

were kids there all the time, they loved to come to the center.

But, once Dr. Mitchell came on board, kids stopped showing up.

They knew, kids sense very well about people.

(Ex. 99, ¶. 3.)

29

Exhibit 5 - 122

59)     Although not Navajo herself, Bobbi Jo claimed to embrace Navajo
culture. She sometimes cited her harsh ways of dealing with students as being
grounded in Navajo traditions. Donnarae Sowell stated,

> Bobbi told me that the Navajo way is to use shame
> and humiliation as discipline. Bobbi could be very
> verbally unkind toward kids at times, even the ones in her
> classroom. I remember Bobbi had a student who suffered
> severely from Tourette's Syndrome. According to Bobbi,
> this child was very violent because she had so many
> behavior problems with him, so the county school
> psychologist transferred him to my class which was a more
> restricted environment than the RSP class. In my class, this
> boy had no problems. However, instead of being happy
> with his improvement in behavior, Bobbi began coming
> into my classroom just to check on him and at times
> belittled and put him down. She scolded him for using the
> computer and she hovered over him. During recess, Bobbi
> would keep him indoors as punishment. Bobbi also said
> that he was not truly a real Tourette's case. Bobbi at one

30

Exhibit 5 - 123

point told this child that he was not moving into the next

grade although his academic work was at 8th grade level,

and that she would see to it that he would stay in her class

another year- she told him this to upset and control him.

Once I felt I had to put a stop to her verbal abuse of this

child, I went to our superintendent and told him what I had

witnessed and that my aide and I felt it was an abusive

situation. Reporting Bobbi was extremely difficult for me.

I felt like I was betraying a friend but I knew it was the

right thing to do. It also bothered me because Bobbi and

the superintendent were friends of mine. In Bobbi's mind,

this was the Navajo way, using fear and humiliation but

that certainly was extremely unkind and unprofessional.

Another student, who was retarded, told me Bobbi was

very mean.  In fact, he refused to take Bobbi a note

because she said such cruel things.

(Ex. 117, ¶. 5.)

     60)    Finally, a co-worker noted that, while Bobbi seemed to try hard in that

she had a large work load and worked many hours, she was not a happy person –

31

Exhibit 5 - 124

personally or professionally. "I think deep inside, Dr. Mitchell was a very insecure person. There was something definitely going on inside her that she had to stomp on people to make herself feel good." (Ex. 98, ¶. 8.)

61)    These are behaviors that Bobbi regularly engaged in during her work life, in a professional environment. It is easy to imagine even greater extremes in her abusive behavior toward others in the privacy of her home.

**Bobbi Jo's Relationship with Lezmond during Childhood:**

62)    Lezmond was born at a time when Bobbi Jo had begun to experience multiple medical ailments, as well as mental health concerns. Bobbi Jo was obese all of her adult life. By the mid 1970s, when Bobbi was in her 30s, she had various health issues that were never fully understood or resolved. There were concerns about her pituitary gland and suspicion of a tumor. In 1975 she went to the Mayo Clinic for testing. The Mayo Clinic medical personnel there did not find anything significant during their evaluation, but Bobbi also declined to stay at the clinic to complete the battery of tests ordered for her. In 1976, Bobbi again had an array of medical tests done in North Carolina, including a lumbar puncture and a brain scan. In 1985, just four years after Lezmond's birth, Bobbi was diagnosed with diabetes, as well as severe situational, chronic depression. (Ex. 50; Ex. 51.)    Although Sherry remained in Lezmond's life, Bobbi Jo took on the role of primary care giver

32

for much of Lezmond's early childhood, as discussed above. Indeed, Bobbi Jo treated Lezmond like he was her own son rather than a grandson; this was to Sherry's dismay who believed that Bobbi Jo undermined her parental authority throughout Lezmond's life. Bobbi Jo was more advanced in her education and had more career opportunities than Sherry, which meant she was better situated financially to care for a young child. Bobbi Jo's educational aspirations and frequent job changes caused her to move frequently throughout Lezmond's early childhood. This mobility was influential in that Lezmond changed schools frequently, lacking the continuity of learning that is vital for young children. The instability also gave Lezmond a limited cultural grounding in Navajo traditions, and left him with an inability to speak the language. That limited exposure and grounding in his culture were quite traumatic for Lezmond when he returned to the reservation in third grade. Finally, it left Lezmond with one less potential internal resource to use in coping with the failures of adults in his life to care for and nurture him.

63)     As noted above, Bobbi Jo beat Lezmond regularly during his childhood. When she was angry with Lezmond, she whipped him with whatever implements were at hand. Lezmond was beaten one or two times weekly; sometimes in response to getting into trouble at school. At other times the beatings were arbitrary. For example, once during the years Lezmond lived in California with

33

Exhibit 5 - 126

Bobbi Jo, there were problems with the cable television. Bobbi became frustrated with the television not working property and demanded Lezmond fix it. Lezmond could not figure out the problem with the TV, which made Bobbi Jo even angrier. She began to look around for something to beat him with.

64)    Housekeeping was a trigger for Bobbi Jo's abusive behavior. Neither Sherry nor Lezmond was ever able to live up to Bobbi's standards for maintaining a clean household; their efforts were never good enough. Most emblematic of this, are the detailed descriptions Sherry and Lezmond gave me in their separate interviews of Bobbi Jo beating them with metal vacuum cleaner hoses.

65)    Lezmond's experience in the above incidents and others is strikingly similar to incidents reported by adults that Bobbi Jo supervised at work. She was highly judgmental, her rage was erratic, appearing out of nowhere, and things were rarely done to her satisfaction. Bobbi Jo inspired fear in both adults and children that she encountered in her work. Lezmond similarly learned to fear his grandmother, and discovered no one in his family would protect him from her.

34

Exhibit 5 - 127

**Bobbi Jo's Relationship With Lezmond During His Adolescence:**

66)     Periodically during his adolescence Lezmond lived with Bobbi Jo; their relationship remained filled with conflict and abuse.  Even when he did not live with Bobbi Jo, she remained a factor in his life.  When Lezmond was living with his grandfather on the Navajo reservation and became involved in disciplinary matters at school, Bobbi Jo attempted to stay involved, asserting her concerns via telephone from California.  It is noteworthy, however, that both Bobbi Jo and George took a position that blamed the school for Lezmond's problems rather than a solution-focused approach of willingness to work with the school to resolve the concerns and move forward in a positive way for Lezmond.  Most tellingly, Bobbi Jo's primary concern involved her edits to a transcript of the school meeting, in which the changes she insisted on were focused on the words she spoke, and insuring that they that called her Dr. Mitchell in all instances, rather than Mrs. Mitchell.  (Ex. 12.) Despite outward appearances, these efforts were not about Lezmond's well-being, rather, they were about George and Bobbi Jo's standing in the community.

67)     Lezmond's drug and alcohol use grew steadily over the years, from the time he was eleven years old, increasing in high school, as noted in Dr. Stewart's declaration.  By the time Lezmond was in high school he reported using LSD, crack cocaine, methamphetamine, marijuana and drinking alcohol every weekend to

35

Exhibit 5 - 128

intoxication. (Ex. 135, ¶. 30.) The use of substances, along with the serious problems Lezmond had at school, are all symptomatic of his need to dull his internal pain, control the trauma he continued to live with, and let all who would listen know that he did not know how to find his way in the world.

68)    Following Lezmond's forced high school transfer due to fighting at school, his grandparents initiated a counseling referral for him. The initial mental health evaluation notes that Lezmond had experienced lots of family fighting since a young child; he admitted to some marijuana and tobacco use; and, he spoke of suicide without a plan or any past attempts. The evaluation concluded with a recommendation that Lezmond participate in intensive psychotherapy. (Ex. 6, bates No. 43.) Lezmond attended only five counseling sessions over the next seven months. The counseling notes from one of those sessions, records how Lezmond sobbed when talking about his need to get away from his family conflict and his feelings of wanting to kill himself at times. (Ex. 6, bates # 44.)

69)    Despite the urgency expressed by the mental health evaluator and Bobbi Jo's prior diagnosis of depression, Lezmond did not get the intensive therapy recommended for him. No one in Lezmond's family, including his grandmother and grandfather with all their public display of concern, saw to it that Lezmond got the

36

Exhibit 5 - 129

psychotherapy he needed. Lezmond went on abusing substances in his meager
effort to cope with his feelings of abandonment, shame and loneliness.

70)    Lezmond lived with Bobbi Jo one last time after he graduated from
high school, while she was still in California. Lezmond had been living and
working in Phoenix, but lost his job and his ability to pay his portion of the rent. He
was forced to move, and had few choices of where to go. He dreaded returning to
live with his grandmother, but saw it as a temporary choice out of economic
necessity. Once they were in the same household, Bobbi Jo and Lezmond began
arguing about small things, over taking out the trash or other housekeeping chores
assigned to Lezmond. When Lezmond left his grandmother's house, she filed a
police report against him for theft of her computer, some cash and a bankcard. The
police report notes Bobbi Jo's statement that Lezmond is likely to return to the
Navajo reservation as he has no friends in California. (Ex. 56.)

71)    Bobbi Jo was one of the most dominant forces in Lezmond's life. She
took on significant responsibilities for raising him as a child, even when his mother
lived in the same household. Bobbi Jo had an overpowering personality and was
frequently abusive to Lezmond, as she had been to her own children. People that
she worked with documented that she commonly demeaned people, leading children
that she worked with to fear her. There are occasions when Bobbi drove adults to

37

Exhibit 5 - 130

tears or to quit a job because of her mistreatment of them. Bobbi Jo's erratic and vindictive behaviors targeted the adults she supervised and disabled children alike. Her professional judgment and sense of boundaries were seriously compromised, at best. Bobbi Jo's inappropriate behaviors at work were doubtless a muted version of her interactions at home. While a school district could fire Bobbi Jo when she was out of control, Lezmond had no control over who was assigned as his guardian.

72)    The arbitrariness of Bobbi Jo's violence against Lezmond contributed to his sense that no place was safe for him and that he had little control over the things that happened to him. Bobbi Jo's physical and mental health issues no doubt contributed to her conflictual relationship with her children, Sherry and Auska, and her grandson, Lezmond.

38

Exhibit 5 - 131

**George Mitchell**

73)     George Mitchell, Lezmond's maternal grandfather, was born in March of 1923, near Lukachukai, Arizona on the Navajo reservation. (Ex. 42.) He died in January of 2004, while residing on the family home site near where he was born. (Ex. 44.) George was a full-blooded Navajo and a follower of the Native American Church.  George served in the U.S. Navy during World War II.  After his discharge he obtained his college degree in education from Northern Arizona University. He became a teacher certified to teach in kindergarten through eighth grades as well as a school administrator.  (Ex. 47.)

74)     George met Bobbi Jo Erwin, when he was teaching at Chilocco Indian School in Oklahoma.  She was a local high school student.  As previously noted, they married in December of 1956; Bobbi Jo was a fourteen-year-old at the time. George was more than twice her age, at thirty-three years old.  (Ex. 43.)  Their daughter, Sherry, their first child, was born in February of 1958 and their son, Auska, born in September of 1966.

75)     There are few records and known details about George during his life. In my interview with Sherry, she spoke of persistent rumors regarding George molesting children; she acknowledged the credibility of the rumors.  Sherry also stated an uncertainty whether or not George may have molested Lezmond, when

39

Exhibit 5 - 132

Lezmond was a child. Sherry also believes her father may have had another family, and suspects the many accusations her mother made against her father about infidelity were attributable to George's other family. Bobbi Jo once told Sherry that she married George to help him get out of a difficult situation related to this separate family.

76)     Unfortunately George died before these questions could be put to him. The fact of his frequent moves - both with and apart from Bobbi Jo, coupled with rumors of marital infidelity and child molestation, Bobbi Jo's extreme youth at the time of their marriage, and the ambiguity of Sherry's statements regarding her father's relationship with her, suggest some truth to the allegations of George's sexual misconduct. Certainly George's conduct with Sherry was sexually suggestive and inappropriate in many ways, whether or not he engaged in an incestuous relationship with his daughter.

77)     George was grossly inappropriate in other ways, as well. For example, he held many stereotypes to be true and often used those stereotypes to Lezmond's detriment. George compared Lezmond with stereotypes he held of Asian/Pacific Islanders. George commented on Lezmond's enjoyment of yams and attributed this to his father's origin in the Marshall Islands. Likewise, he compared Lezmond with

40

Exhibit 5 - 133

a sumo wrestler when his hair was pulled up in a high ponytail as a young child because of his Pacific Island heritage.

### George's Relationship With Lezmond During Childhood

78)     During Lezmond's early childhood he often lived in George's household, just he and his grandfather. When Sherry left the household to attend Northern Arizona University, George had the primary responsibility for Lezmond who was about five years old five at the time. Generally, Lezmond was left alone and allowed to wander around the nearby mesas unsupervised. George's attitude was casual at best in his supervision of Lezmond, and grossly neglectful at worst. In my interview with Lezmond, he described to me a time when he was five years old and his grandfather took him into Gallup, New Mexico - a town more than 100 miles away. They went to a movie theater; George sent Lezmond in to see the movie *La Bamba* while George went to see a different movie. Lezmond reported watching *La Bamba* by himself.

79)     The fact that George allowed a five-year-old to attend a movie alone, particularly in a city far from home, reflects on both his judgment and his priorities. *La Bamba* is not a child-oriented movie and most care givers would not find it a suitable movie for a five-year-old. In addition, George set priorities what he wanted

41

Exhibit 5 - 134

to do over the needs of a five-year-old. This is one example of the lack of personal responsibility George assumed for Lezmond's care.

80)   After living in California, first with his mother and grandmother, then with his grandmother alone, as detailed above, in third grade Lezmond was sent back to the reservation to live with his grandfather. They lived alone, together at the family homesite. Lezmond did reasonably well in school in third grade, though his problems with Navajo language skills resulted in his isolation and poor social skills. As noted in Dr. Stewart's declaration, George was Lezmond's fourth grade teacher Round Rock Elementary School. (Ex. 135, ¶. 25.)

81)   George's lax way of raising Lezmond was in stark contrast to the restrictions and controls Lezmond experienced when living with either Sherry or Bobbie Jo. Lezmond adapted to being unsupervised. The only discipline George used on Lezmond during these years, were verbal warnings, for example telling him "don't be stupid" or calling Lezmond "stupid." After all the physical and verbal abuse Lezmond endured with his grandmother, living with George was enjoyable, if lonely. When Bobbi Jo came home to visit, the atmosphere was immediately charged with arguments, physical fights and emotional abuse, usually directed at least in part, at Lezmond.

42

Exhibit 5 - 135

### George's Relationship With Lezmond During Adolescence

82)     Lezmond returned to California to live with his mother for his sixth grade year. This was the year Lezmond began his drug and alcohol use, starting with smoking marijuana and drinking beer, when he could get it. (Ex. 135, ¶. 26.) Lezmond's time with his mother has been discussed. In the 7th grade, Lezmond fought with Sherry while they were visiting the Navajo reservation over Christmas break. George encouraged Lezmond to stay with him in defiance of Sherry's wishes. After that Lezmond never lived with his mother again.

83)     Lezmond experienced a change in how George treated him, when he lived with his grandfather this time. George was no longer lax and inattentive. Instead George was much stricter with Lezmond about his comings and goings, which Lezmond experienced as an abrupt and unexpected change. As Lezmond got into trouble at school, school personnel tried to work with George to help remedy the problems. Notes from these meetings indicate that school personnel found George to be somewhat uncooperative; on one occasion George's response was to tell Lezmond to fight back when his peers picked on him. The school principal also accused Lezmond of trying to play off his grandparents against the school. (Ex. 15.) Lezmond's behavior at school reflects a very unhappy adolescent.

43

Exhibit 5 - 136

84)     Lezmond attended Red Mesa High School for his ninth and tenth grade years. His reliance on drugs increased, including Lezmond's use of LSD when he was a sophomore in high school. (Ex. 135, ¶. 30.) His problems at school became more regular and pronounced. His cumulative record reflects grades from A to D. (Ex. 12, bates ## 26-27) Lezmond accumulated many absences, tardies, and detentions that all negatively affected his grades. They also indicate that while George may have been strict in some ways, in other more fundamental things, George did not ensure that Lezmond attended school regularly, nor got there on time. After Lezmond became involved in a fight at Red Mesa High School early in his junior year, George arranged for Lezmond to voluntarily withdraw from school rather than face expulsion. (Ex. 12, bates # 28.) He also arranged for Lezmond to attend counseling.

85)     An MMPI-A was administered to Lezmond as part of his initial counseling evaluation. Lezmond's mental health provider labeled Lezmond as a very troubled young man. Intensive psychotherapy was proposed as Lezmond's treatment plan. The evaluation goes on to note that if outpatient treatment is not successful, residential treatment should be used. Lezmond was considered in serious jeopardy without treatment, at risk for significant criminal behaviors. (Ex. 6, bates # 45.)

44

Exhibit 5 - 137

86)    The counseling records also reflect the deep despair Lezmond displayed in his few therapy sessions; Lezmond spoke of the endless conflict in his family, his own thoughts of suicide, Lezmond's sobs over his desire to get away from all the trauma his family embodied for him. (Ex. 6, bates # 43.)  Again, despite initiating the counseling referral for Lezmond and the seriousness of Lezmond's need for treatment, neither George, nor anyone else in Lezmond's family, saw to it that Lezmond continued to get the therapy he needed.  Not surprisingly, Lezmond's school performance was very poor during this school year, with standardized test scores below average range.  (Ex. 12, bates ## 120-121.)

87)    In addition, despite George's apparent concern about Lezmond in his contact with school officials, Lezmond was left to live alone at the Mitchell family homesite, for four months during his junior year of high school.  During this four-month period Lezmond binged on cocaine, smoked large quantities of marijuana and used his first gram of methamphetamine.  Lezmond rarely slept during his binge. (Ex. 135, ¶. 30.)

88)    This same year, Lezmond was a passenger in a car involved in an accident, which resulted in the death of the driver.  Both Lezmond and the driver were intoxicated; they had been at a party where several people were drinking.  The

45

Exhibit 5 - 138

driver was thrown from the car and pronounced dead at the scene. Lezmond refused medical care. (Ex. 5.)

89)    During his senior year in high school, Lezmond moved away from his grandfather and went to live with another family, the Reeds. There are differing statements offered by various witnesses as to the reasons for Lezmond's move to the Reed's home. Lezmond's closest friend, Lorenzo Reed, reflects Lezmond's feelings about the move to his house – Lezmond needed a family. (Ex. 111, ¶. 10.) One of Lorenzo's sisters, Tara, remembers Lezmond as a positive influence on her brother while he lived with their family. When Tara asked Lezmond why he did not live with his mother in California, he told to her his mother did not want him there. While Lezmond was generally upbeat around the Reed home, there were times when he appeared very depressed, sitting quietly by himself as though deep in thought. (Ex. 113, ¶. 3, 5, 8.)

90)    Lezmond managed to graduate from high school; his GPA was 2.224. (Ex. 14.) While he was not chosen to speak at his graduation, he requested permission to do so and was granted time to say a few words at the graduation ceremony. This reinforced some part of the community's perception that Lezmond had potential, his family was successful, and he was headed on a positive path toward adulthood. (Ex. 93.)

46

Exhibit 5 - 139

91)   Rumors of George's extramarital affairs and possible molestation of children are unconfirmed yet these suspicions clearly led to family conflict and instability. This bedrock of conflict and instability are primary in shaping Lezmond's life.

92)   While George was always in Lezmond's life, the nature and quality of that relationship changed substantially. As a young child Lezmond had a positive image of his grandfather, largely because, unlike Lezmond's other parental figures, George asserted little control over Lezmond. The incident in Gallup is one small example of not only George's inattentiveness, but neglect as a guardian who prioritized his own desires over caring for a young child.  It is telling that this is the most positive relationship Lezmond experienced during his childhood.

93)   When Lezmond was an adolescent, George oversaw his high school years.  During this time, Lezmond felt unduly restricted by George.  To Lezmond, George was not only unsupportive, but also very judgmental about Lezmond's behavior.   George's response to Lezmond was to impose rules without guidance and when Lezmond did not comply, to wash his hands of Lezmond entirely.  This was another abandonment of Lezmond.

94)   These three people, Sherry, Bobbi Jo, and George Mitchell were Lezmond's parent figures during his youth and exerted by far the strongest

47

Exhibit 5 - 140

influences on him. Each of these relationships was fraught with pain, stress, abuse, neglect and/or trauma for Lezmond. Not one of these well-educated, outwardly "successful" adults made Lezmond's well-being and healthy childhood development their priority, their life work.

**Lezmond Could Not Rely On His Family**

95)    When I interviewed Lezmond, I asked him about his strongest childhood memories. It was striking that Lezmond remembers very little from his early childhood, only his feelings about that time in his life. As a child, Lezmond knew that something was not right in the relationships between his mother and his grandparents. It was only as Lezmond got older that he realized the level of the dysfunction in his family life was abnormal.

96)    What Lezmond does remember with clarity, in a painful, visceral way, is his mother leaving him when he was a preschooler, so that she could devote herself to pursuing her degree. He could not understand it at the time, why his mother left and did not take him with her. When he was old enough to have Sherry's leave-taking explained to him, Lezmond accepted the explanation on a rational level. On an emotional level, this has been a lasting trauma for Lezmond - his mother made a choice to pursue priorities that did not include him.

48

Exhibit 5 - 141

97)   Lezmond's childhood was filled with a nomadic moving from place to place and shifting of care givers.  In Lezmond's interview, Sherry's interview, and the information from Bobbi Jo to the trial investigator, it is notable that all of them have difficulty remembering where they were living any given year of Lezmond's life.  Moving as a constant phenomenon is a significant piece of what was the chaotic and unstable world of Lezmond as a child.  Coupled with these moves were the shifts in care giving responsibilities.  Each of these care givers had different parenting styles and expectations of Lezmond.  The combination of moving and changing family constellations led to a deeply confusing and inconsistent home environment.  To Lezmond, moving so frequently seemed normal because it was all that he had ever known, but this nomad's existence prevented him from having a sense of stability, consistency, and reliability which are so vitally important to a child's development.

98)   Conflictual family relationships between Bobbi Jo, George, and Sherry predated Lezmond's birth but continued and intensified, leading to a strong influence on him throughout his childhood.  Their power struggles, particularly between Bobbi Jo and Sherry, played out with Lezmond as the battlefield.  Conflicts over who would parent him and how were compounded by pre-existing dysfunctional family dynamics.  Lezmond remembers constant arguing and fighting in the household.

49

Exhibit 5 - 142

99)     Abuse also became a norm in Lezmond's life, particularly during the times he lived with Bobbi Jo. At times beatings seemed to come out of nowhere for no apparent reason. Bobbi Jo beat him with whatever she could get her hands on. Every part of Lezmond's environment was filled with uncertainly.  Under these circumstances it was impossible to develop a sense of security, safety, and trust; all part of natural developmental stages.  Lezmond learned that the world is an arbitrary, unfair, and chaotic place and that he could not count on his family.

### Lezmond Lost The Chance To Have A Community To Rely On

100)    There were many ways in which Lezmond never fit in as a child and he often experienced teasing.  Donnarae Sowell, one of Bobbi Jo's colleagues in California, babysat Lezmond when he was in kindergarten. She remembers Lezmond as a gifted child, even at that early age.  Among other things, he drew beautifully detailed pictures, and could talk to her about them.  However, Lezmond had a hard time when he started school in the Central Valley part of California, in part because he was not part of an identifiable ethnic group – not white, nor black, nor Hispanic – and other kids teased him. Donnarae reflects, "I think he felt trapped and could go nowhere, including his home, for anything positive." (Ex. 117, ¶. 4.)

101)    From a young age Lezmond had a problem with his weight. Sherry reported that other children often teased him about this, particularly when they lived

50

Exhibit 5 - 143

in California. Bobbi Jo frequently disparaged him about it. When Lezmond returned to the Navajo reservation in the third grade, he stood out as odd for not being able to speak the Navajo language. He reported that other children teased him extensively for this, along with the fact that he was not a full-blooded Navajo like most of his peers. Lezmond also experienced teasing because his mother was not married and because his grandfather was a teacher. Lezmond stood out because of his own characteristics, his appearance and lack of language fluency, as well as his family relationships. The cruelty of peers compounded the pressures of his home environment leaving him with no place where he was accepted and could be safe and secure.

102)  In my interview with Lezmond, he spoke wistfully, wishing his grandfather had raised him in a more culturally-grounded way. Although his George was a full-blooded Navajo, fluent in the language, he passed very little of his culture and heritage onto Lezmond. During most of his junior and all of his senior year Lezmond attended Rough Rock High School, a school that emphasized Navajo culture. From the outside, this gives the appearance of offering Lezmond an opportunity to learn some of what he had not been exposed to at home. Instead, it reinforced Lezmond's reality of how different he was from his peers in his need to try to learn what most of his peers had been immersed in naturally from birth.

51

Exhibit 5 - 144

Lezmond, in fact, was an anomaly with little preparation to function within his own Navajo cultural context adequately.  While his grandfather George was fully capable of giving him more cultural grounding, he chose not to do so and raised him as a monolingual, English-speaker.

**Conclusion**

103) Conflictual family relationships between Bobbi Jo, George, and Sherry pre-dated Lezmond's birth but continued to be a significant shaping influence throughout his childhood. Their power struggles, particularly between Bobbi Jo and Sherry, played out with Lezmond as the battlefield. Abuse and shame were the norm in Lezmond's life, particularly during the times he lived with Bobbi Jo.

104) Lezmond's childhood was filled with constant moving from place to place and shifting of care givers. The combination of moving and the changing family constellations, along with the sharp fluctuations in disciplinary styles and expectations among his care givers, led to a confusing and inconsistent home environment as well as a chaotic and unstable world for young Lezmond. This prevented him from having a sense of stability, consistency, and reliability necessary in an optimum childhood environment.  His care givers entirely ignored a therapist who waved red flags about his mental illness and suffering.  No one considered the family history of depression.  Under all these circumstances, it was impossible to

Exhibit 5 - 145

develop a sense of security, safety, and trust - all part of natural developmental

stages. Lezmond learned that the world is an arbitrary, unfair and chaotic place.

105) Childhood is a time when a child should have a sense of security and

support that can be built upon when striving to acquire new knowledge and master

new tasks. All aspects of his environment were filled with uncertainty. Lezmond

never had a solid foundation upon which to build and grow into a secure adult. He

was thus unable to establish any sense of control over his own life or believe that

through his own efforts he would consistently be able to accomplish tasks that he set

out to do. From this extremely dysfunctional family context, addiction provided an

escape. By all accounts, Lezmond's drug use escalated significantly in the summer

of 2001 and continued until his arrest in November 2001.

106) Lezmond was powerless over many of the events in his life. He was

unable to have any control over his mother's leaving and reentering his life

sporadically. He was unable to control the complete absence of his father in his life.

He was unable to control his grandmother's abusive behavior that often came out of

nowhere. His grandfather's changing expectations seemed arbitrary and unfair. His

lack of grounding in a culture that might have sustained him was largely due to a

lack of effort on the part of the adults in his life. Lezmond made several attempts to

live away from domineering family members but economic circumstances made this

53

Exhibit 5 - 146

impractical for long.

107) Lezmond suffered abandonment, extreme lack of stability, cultural isolation, violence and loss.  While many people, including addicts and alcoholics, can and do make appropriate choices in their lives, for twenty year old Lezmond Mitchell, the combination of these forces rendered him unable to make appropriate decisions that would lead him to find a healthy place in the world.  These

///

///

///

54

Exhibit 5 - 147

experiences and conditions formed the context for his behavior in November of 2001.

I declare under the penalty of perjury under the laws of the State of New York and United States of America that the foregoing is true and correct.

Signed this 3rd day of November, 2009

_____
Hilary N. Weaver, Ph.D.

55

Exhibit 5 - 148

experiences and conditions formed the context for his behavior in November of 2001.

I declare under the penalty of perjury under the laws of the State of New York and United States of America that the foregoing is true and correct.

Signed this 3rd day of November, 2009

Hilary N. Weaver, Ph.D., DSW

55

Exhibit 5 - 149

# EXHIBIT A

Exhibit 5 - 150

**HILARY N. WEAVER**

624 Baldy Hall                          465 Breckenridge St.
School of Social Work                   Buffalo, NY  14213
SUNY, Buffalo                           (716) 881-7846
Buffalo, NY  14260
(716) 645-3381 ext. 241
e-mail: hweaver@acsu.buffalo.edu

## EDUCATION/CREDENTIALS

| | | |
|---|---|---|
| DSW | Columbia University School of Social Work<br>Sequence: Policy/Planning/Administration<br>Dissertation: "Enhancing the Health Status of<br>Native American Youth in the Northeast" | 1994 |
| CSW | Idaho certification in social work | 1989 |
| CSW | New York certification in social work | 1986 |
| MS | Columbia University School of Social Work<br>Concentration: Clinical; Field of Practice: Occupational | 1986 |
| BA | Antioch College<br>Major: Social work, cross cultural focus | 1984 |

## WORK EXPERIENCE

State University of New York
Buffalo, NY
Assistant Professor                     1993-1999
Associate Professor                     1999-2007
Professor                               2007-Present

George Warren Brown School of Social Work, Washington University
St. Louis, MO
Adjunct Professor                       2008

University of Waikato
Hamilton, New Zealand
Visiting Scholar                        1996

University of Idaho
Moscow, ID
Coordinator, Social Work Program        1988-1993
(Leave of absence 1990-1991 academic year)

Exhibit 5 - 151

<u>Center for Social Policy and Practice in the Workplace,</u>
<u>Columbia University School of Social Work</u>
New York, NY
Program Associate                                         1990-1991
<u>Greater New York Fund/United Way of New York City</u>
New York, NY
Assistant Director of Information and Referral            1986-1988

<u>District Council 37, Municipal Employees Legal Services</u>
New York,NY
Social Work Intern                                        1985-1986

<u>Riverside Church, Social Service Ministries</u>
New York, NY
Social Work Intern; Social Worker                         1984-1985

## HONORS

Honoree, Institute for Research and Education on              2005
      Women and Gender, SUNY, Buffalo

Honoree, Career Services, Division of Student Affairs        2005
      SUNY, Buffalo

First Nations Social Work Scholar in Residence               2004
      Humboldt State University

Social Work Educator of the Month                       Oct. 2002
      www.aboriginalsocialwork.ca

Nominated, Outstanding Faculty Teaching Award                1998
      School of Social Work, SUNY, Buffalo

Outstanding Faculty Member of the Year                  1992-1993
      University of Idaho

Listed, <u>Who's Who in Human Service Professionals</u>            1988

## PROFESSIONAL ASSOCIATION ACTIVITIES

**National Association of Social Workers:**
Member                                                  1985-Present
Chair, American Indian Caucus                           1995-Present
Member, Gosnell Memorial Scholarship Committee          2000-2003
Member, Board of Directors                              1998-2001
Member, Membership & Chapter Coordinating Committee     1998-1999
Chair, Chapter Development Fund Subcommittee            1998-1999
Liaison, Idaho/National offices                         1989-1993

2

Exhibit 5 - 152

(Occupational social work)

| | |
|---|---|
| Member, Committee on Inquiry, Idaho Chapter | 1989-1993 |
| Chair, North Branch, Idaho Chapter | 1992-1993 |
| Member, Board of Directors, Idaho Chapter | 1992-1993 |

**Council on Social Work Education:**

| | |
|---|---|
| Member | 1991-Present |
| Member, Commission on Professional Development | 2004-Present |
| Member, Task Force on Native Americans in Social Work Education | 2007-Present |
| Member, Publications and Media Commission | 2001-2004 |
| Member, Ad hoc workgroup on research issues | 2004-2004 |
| Member, Ad hoc workgroup to develop the Commission on Diversity and Social and Economic Justice | 2004-2004 |
| Member, Commission on the Role and Status of Women | 1998-2001 |
| Member, Abstract Review Committee | 2000 |
| Reviewer, Feminist Scholarship award | 2000 |
| Member, Advisory Task Force on Diversity video project | 1993-1996 |
| Member, Faculty Development Program Planning Commission | 1992-1995 |

**American Indian Social Work Educators' Association:**

| | |
|---|---|
| Member | 1991-Present |
| Chair, Annual conference planning Committee | 1996-Present |
| President | 1997-Present |

**Bertha Capen Reynolds Society: (aka Social Welfare Action Alliance)**

| | |
|---|---|
| Member | 1994-2000 |
| Member, National Steering Committee | 1997-1998 |

**International Federation of Social Workers:**

| | |
|---|---|
| Friend (non-institutional member) | 1998-Present |

### UNIVERSITY COMMITTEES/APPOINTMENTS (UB)

| | | |
|---|---|---|
| Member, | Graduate Faculty | 1996-Present |
| Member, | Social and Behavioral Sciences Institutional Review Board | 2006-Present |
| Member, | Faculty Senate Affirmative Action Committee | 2007-Present |
| Member, | Tripartite Panel for SUNY Discrimination Complaints | 2007-Present |

3

Exhibit 5 - 153

| Member, | Search Committee, Dean, School of Management | 2007-Present |
| Member, | American Studies Faculty Advisory Committee | 2008-Present |
| Member, | Steering Committee, Institute for Research and Education on Women and Gender | 1997-2002 |
| Member, | Executive Committee, Institute for Research and Education on Women and Gender | 2000-2002 |
| Member, | Provost's Junior Faculty Advisory Committee | 1993-1999 |
| Member, | Affirmative Action Committee | 1994-1995 |

### SCHOOL OF SOCIAL WORK COMMITTEES (UB)

| Chair, | Diversity Sequence | 2003-Present |
| Chair, | PhD Committee | 2004-Present |
| Member, | Recruitment Committee | 2004-Present |
| Member, | International Issues Workgroup | 2007-Present |
| Member, | Research Center Grant Proposal Review Team | 2005-2006 |
| Chair, | Committee on Students | 2003-2004; 2001-2002; 1999-2000 |
| Chair, | Advanced Interventions Sequence | 2001-2002 |
| Chair, | Interventions Sequence | 1998-1999 |
| Chair, | Personnel Committee | 2000, 2002 |
| Member, | PhD Committee | 1997-1999 |
| Chair, | Retreat Committee | 1998 |
| Member, | Field Education Committee | 1993-1997 |
| Member, | Faculty Responsibility Committee | 1993-1994 |

### UNIVERSITY AND DEPARTMENTAL COMMITTEES (other institutions)

4

Exhibit 5 - 154

| Member, | Committee on Integrating Diversity Content into Human Service Curricula (Buffalo State College) | 1997-2000 |
|---|---|---|
| Member, | Academic Hearing Board (University of Idaho) | 1992-1993 |
| Member, | Tenure Committee (Sociology & Anthropology Department; University of Idaho) | 1991 |
| Member, | President's Task Force on Child Abuse (University of Idaho) | 1990 |

## COMMUNITY ACTIVITIES

**Native American Community Services:**

| | |
|---|---|
| Member, Board of Directors | 1994-Present |
| President, Board of Directors | 2000-Present |
| Member, Executive Director Search Committee | 2000 |
| Vice President, Board of Directors | 1995-2000 |

**Native American Leadership Commission on Health and AIDS:**

| | |
|---|---|
| Member | 1993-Present |

**Refugee and Immigrant Coalition of Western New York**

| | |
|---|---|
| Member | 1999-2000 |

**Prevention Focus:**

| | |
|---|---|
| Member, Board of Directors | 1995-1998 |

**Native American Leadership Council on Disability:**

| | |
|---|---|
| Member | 1994-1996 |

**Latah County Human Rights Task Force:** (Idaho)

| | |
|---|---|
| Member | 1988-1993 |

**Pregnancy Counseling Services:** (Idaho)

| | |
|---|---|
| Member, Board of Directors | 1989-1990 |
| Secretary, Board of Directors | 1989-1990 |

**Alternatives to Violence of the Palouse:** (Washington & Idaho)

| | |
|---|---|
| Member, Board of Directors | 1989-1990 |
| Chair, Board of Directors | 1990 |

Exhibit 5 - 155

**EDITORIAL AND REVIEWER EXPERIENCE:**

Consulting Editor, *Affilia*                                         2004-Present

Consulting Editor, *Journal of Social Work* Education 2006-Present

External Reviewer, *Children and Youth Services Review*   2007-Present

Reviewer, University of Wisconsin, Stevens Point          2005
    Application to initiate a BSW program

Member, Editorial Board, *Affilia*                          2001-2004

Member, Editorial Board, *Social Work*                      2000-2003

Guest Editor,  *Journal of Sociology and Social Welfare* 2000-2002

Consulting Editor,  *Social Work*                           1998-2001

Reviewer,       *Native American Bibliography*            2000
    Council on Social Work Education

Reviewer,       *Journal of Rural Health*                  2000

Reviewer,       *Journal of Progressive Human Services*  1997-1998

Guest Editor,  *Journal of Human Behavior in the Social*  1996-1999
    *Environment. Voices of First Nations*
    *People: Human Service Considerations*
    (Released as both a journal and book)

Guest Editor,  *Journal of Health and Social Policy*       1996-1999

Reviewer,       *Families in Society: The Journal of*      1996
    *Contemporary Human Services*

Book Reviewer, *Families in Society: The Journal of*      1992-1995
    *Contemporary Human Services*


**PRESENTATIONS**

**Named lectures and plenaries:**
   1. Keynote speaker, 3rd North American conference on Spirituality
     and Social Work. "Spirituality in cross-cultural contexts:

Exhibit 5 - 156

Implications for practice and research." Fredricton, New Brunswick, Canada. 2008.

2. Keynote speaker, Clinical Supervision conference. "Diversity issues in the context of the supervisory relationship". Buffalo, NY. 2008.

3. Keynote speaker, 16th National Conference on Child Abuse and Neglect. "Drawing on cultural strengths to move toward a more child-centered, family friendly society". Portland, OR. 2007.

4. Keynote speaker, Building Bridges Cultural Competence conference. "Striving for cultural competence: Meeting the needs of First Nations Peoples". Fort Frances, Ontario. 2006.

5. Graduation banquet speaker; Genessee Community College, Native American Student Association. Batavia, NY. 2005.

6. Keynote speaker, Michigan Indian Day, "Continuity and resilience: Drawing on the strengths of indigenous culture for intergenerational healing". Michigan State University, East Lansing, MI. 2004.

7. National Women's History Month speaker, Niagara University. "Indigenous women: At the center of the circle". Niagara Falls, NY. 2003.

8. National Social Work Month speaker, Niagara University. "Indigenous people and the helping professions: Overcoming a legacy of mistrust and striving for cultural competence". Niagara Falls, NY. 2003.

9. National Leaders Forum speaker, 35th annual New York State Social Work Education conference. "Addressing current challenges in the profession". Buffalo, NY. 2002.

10.    Keynote speaker, 5th annual Child Welfare and American Indian Projects conference. "Cultural competence in child welfare". University of Minnesota, Duluth and Fond du Lac Tribal and Community College. Cloquet, MN. 2002.

11.    Keynote speaker, Alaska Native Social Work Association banquet, University of Alaska. "Native people and the social work profession: Where have we been; where are we going". Fairbanks, AK. 2001.

12.    Commencement speaker, Arizona State University School of Social Work, Native student graduation. "Indigenous social work students and the transformation of the profession". Fort McDowell reservation, AZ. 2000.

7

Exhibit 5 - 157

13.     Opening lecture, 25th anniversary celebration, Siena College School of Social Work: "Effective social work practice with Native Americans: Identifying the elements of cultural competence". Albany, NY. 1999.

14.     Closing plenary, Annual Leadership Meeting, National Association of Social Workers: "A dialogue on race". Panel presentation. Crystal City, VA. 1999.

15.     Helen Winifred Guthrie Memorial Lecture: "Culturally competent social work and Native Americans: What is it? How do we do it? How do we teach it?". Nazareth College, Rochester, NY. 1999.

16.     George Warren Brown School of Social Work Fall Lecture Series: "Indigenous people in a diverse society: Strategies for survival and progress". St. Louis, MO. 1998.

17.     Chaplains Enrichment Day plenary: "Beliefs and practices of Native Americans". East Aurora, NY. 1998

18.     Parallel Plenary Panel: Multiculturalism- Implications for Social Work Practice and Education: "Cultural safety and education for the helping professions: Examining the experiences of Maori and Native American helpers". Joint World Congress of the International Federation of Social Workers and the International Association of Schools of Social Work, Jerusalem, Israel, 1998.

19.     Hazel Augustine Lecture Series: "Social work and American Indian people: Issues, challenges, and strategies for effective helping". Smith College, Northampton, MA. 1997.

20.     Plenary panel: "Multicultural leadership: A seat at the table". E Pluribus Unum II: Continuing the Diversity Dialogue. State University of New York at Buffalo, Buffalo, NY, 1997.

21.     Lena Seitz Memorial Social Work Lecture: "Culturally competent social work: Helping Native people while avoiding biases inherent in many social work models, theories, and interventions". 23rd Annual Symposium on the American Indian, "American Indian Reflections: A Changing Profile". Northeastern Oklahoma State University, Tahlequah, OK, 1995.

**Invited presentations (conferences):**

1.     "Indigenous Perspectives on Social Work Education: Who's Talking? Who's Listening? Why Care?". Council on Social Work Education Annual Program meeting. Philadelphia, PA. 2008.

Exhibit 5 - 158

2.  "Social issues for indigenous peoples: Reflections on three generations". Indigenous Voices in Social Work: Not Lost in Translation conference. Waianae, HI. 2007.

1. "Overcoming mental health stigma: Responding to troubled youth". 5th Annual Race and Reconciliation Conference. Buffalo, NY. 2007.

2. "Indigenous Social Work in the United States: Reflections on Indian Tacos, Trojan Horses, and Canoes filled with Indigenous Revolutionaries". Indigenous Social Work Around the World. Fredrickton, New Brunswick, Canada. 2006.

3. "Traditions of helping: Blending indigenous values with contemporary helping practices". Bringing it Back conference. Native American Community Services and University at Buffalo's Council on Ongwehonwe Graduate Students. Buffalo, NY. 2004.

4. "Women of color in the academy: Reflections of an indigenous woman in social work education". Council on Social Work Education Annual Program meeting. Anaheim, CA. 2004.

5. "Putting it all together: Resources to enhance your teaching". Panel presentation with the CSWE Publications and Media Commission. Council on Social Work Education Annual Program meeting. Anaheim, CA. 2004.

6. "Health disparities and Native Americans". Access Health: Collaborative Solutions for Health Care Disparities, A SUNY Conversation in the Disciplines. Buffalo, NY. 2003.

7. "Putting it all together: Resources to enhance your teaching". Panel presentation with the CSWE Publications and Media Commission. Council on Social Work Education Annual Program meeting. Atlanta, GA. 2003.

8. "Surviving the tenure process". New York State Social Work Education conference. Buffalo, NY. 2002.

9. "Putting it together: Resources to enhance your teaching". Panel presentation with the CSWE Publications and Media Commission. Council on Social Work Education Annual Program meeting. Nashville, TN. 2002.

10.    "Social justice and indigenous issues: Striving for culturally competent activism". Panel presentation with Myrna Gooden, Michael Jacobsen, and Warren Skye, Jr. Council on Social Work Education Annual Program meeting. Nashville, TN. 2002.

11.    "Visions for the future". American Indian Social Work

Exhibit 5 - 159

Educators' Association annual meeting. Nashville, TN. 2002.

12.     "The art and science of cultural competence". National
        Association of Social Workers, Western New York region,
        Buffalo, NY, 2001.

13.     "Getting indigenous content on the mainstream agenda:
        Strategies for getting abstracts accepted for conferences and
        publishing manuscripts". American Indian Social Work Educators'
        Association annual meeting. Dallas, TX. 2001.

14.     "From the Word processor to the Journal: Paradoxes and
        Choices". Council on Social Work Education annual program
        meeting. Dallas, TX. 2001.

15.     "Contemporary Issues for Native Americans in Social Work:
        A Report from the American Indian Caucus of the National
        Association of Social Workers". Townhall meeting. NASW meeting
        of the profession. Baltimore, MD. 2000.

16.     "Welfare and Social Reform Across the Twentieth Century".
        Panel discussant. Graduate Student Symposium on Gender.
        Buffalo, NY. 2000.

17.     "Iyeska: Indigenous people as cultural translators". Panel
        presentation. Borders of the Americas conference. Buffalo, NY.
        2000.

18.     "Demystifying tenure: Recently tenured women discuss
        approaches and survival techniques and share materials". Panel
        presentation. Council on Social Work Education annual program
        meeting. New York, NY. 2000.

19.     "Indigenous people in the helping professions: Experiences
        with Western higher education". Native Voices: Symposia on
        Contemporary Native American Issues. Brockport, NY. 1999.

20.     "Issues impacting the education and life chances of
        American Indians/Native Americans in the land of the brave and
        the home of the free; past and present. Black Experience
        Workshop. Chapel Hill, NC. 1999.

21.     "Demystifying tenure: Recently tenured women discuss
        approaches and survival techniques and share materials". Panel
        presentation. Council on Social Work Education annual program
        meeting. San Francisco, CA. 1999.

22.     "Advocacy and American Indian issues: Roles for social
        workers". National Association of Social Workers, annual
        meeting of the profession. Baltimore, MD. 1997.

10

Exhibit 5 - 160

23.     "The family life cycle in the 21st century". Panel presentation. National Association of Social Workers, annual meeting of the profession. Baltimore, MD. 1997.

24.     "Recognizing and understanding diversity as a means to ending family violence: Naming the problem". Panel presentation. Erie County Coalition Against Family Violence. Buffalo, NY, 1997.

25.     "Identity factors for American Indians: Sorting through measurement and political issues". American Indian Social Work Educators' conference. Chicago, IL, 1997.

26.     "Surviving in social work academia: Issues for American Indian women". Panel presentation. Council on Social Work Education, annual program meeting. Chicago IL, 1997.

27.     "Dr. Martin Luther King's legacy and challenge". Panel presentation. St. Paul's Cathedral, Buffalo, NY, 1997.

28.     "Identity issues with Native Americans: Implications for mental health" with G. Michael Jacobsen. National Association of Social Workers, annual meeting of the profession. Cleveland OH., 1996.

29.     "The Native American family circle: Roots of resiliency" with Barry J. White. National Association of Social Workers, annual meeting of the profession. Cleveland OH, 1996.

30.     "Aspects of cultural identity for Indian people: Strengths, vulnerabilities, and implications for healing". Native American Council on Substance Abuse annual conference. Buffalo, NY, 1996.

31.     "Cultural identity and Native people: Exploring implications for physical and mental well-being". Native American Council on Substance Abuse, Visions of Native Healing conference, Batavia, NY, 1995.

32.     "The Native American family circle: Roots of resiliency" with Barry J. White. National Association of Social Workers annual meeting of the profession, Philadelphia, PA, 1995.

33.     "Identity issues with Native people: Implications for mental health" with G. Michael Jacobsen and Maria Brave Heart-Jordan. National Association of Social Workers annual meeting of the profession, Philadelphia, PA, 1995.

34.     "Facets of Native identity: Contributing factors and their implications for who we are". 23rd Annual Symposium on the American Indian, "American Indian Reflections: A Changing

Exhibit 5 - 161

Profile", Tahlequah, OK, 1995.

35.    "Has social work failed the Indian community?" with G. Michael Jacobsen. Council on Social Work Education, Annual Program Meeting, San Diego, CA, 1995.

36.    "Training culturally competent social workers: What students should know about Native American people". Association of Baccalaureate Social Work Program Directors, 12th annual conference, San Francisco, CA, 1994.

37.    "Careers in human services: Opportunities for Native people". Panel presentation. Onkwehonwe: An Educational and Career Opportunities Conference, Buffalo, NY, 1994.

38.    "Native American issues in social work education" Diversity Initiative Panel, Council on Social Work Education, Annual Program Meeting, Atlanta, GA, 1994.

39.    "Occupational social work: An overview". North Branch, Idaho Chapter, National Association of Social Workers, Moscow, ID, 1992.

**<u>Invited presentations (universities and organizations):</u>**
1. "Native Americans and social work". American Indian Day. University at Buffalo, Buffalo, NY. 2008.
2. "Multigenerational Perspectives among Indigenous people in a changing world: Native American perspectives" with Iris Hill. United Nations Permanent Seventh Forum on Indigenous Issues. New York, NY. 2008.
3. "Health and wellness for Native Americans". Niagara University, Niagara, NY. 2008.
4. "Native Americans and social work". Native American Heritage Day. University at Buffalo, Buffalo, NY. 2007.
5. "Native communities and HIV: Understanding our contemporary realities". Welcome to Summer Celebration. Native American Community Services of Erie and Niagara Counties. Buffalo, NY. 2007.
6. "Cultural differences or pathology? The challenges of differential diagnosis" Monsignor Carr Institute. Buffalo, NY. 2007.
7. "Healthy living in two worlds". UB School of Social Work Research Colloquium. Buffalo, NY. 2007
8. "Healthy living in two worlds: Project update". National Cancer Institute. Bethesda, MD. 2007.
9. "Cultural Competence in clinical settings". Monsignor Carr Institute. Buffalo, NY. 2006.

12

Exhibit 5 - 162

10. "An introduction to Native Americans and social work services" Daemon College. Buffalo, NY. 2006.
11. "Indigenous peoples in a landscape of risk: Responses of the social work community" Forth Permanent Forum on Indigenous Peoples, United Nations, New York, NY 2005.
12. "An introduction to contemporary Native Americans". Public School 45. Buffalo, NY. 2004.
13. "Centering our nations: Native American women, past, present, and future". Gender Matters 3. Institute for Research and Education on Women and Gender, State University of New York at Buffalo. Buffalo, NY. 2004.
14. "Promoting wellness in Native American communities: Finding a balance of mind, body, spirit, and heart". Welcome to Summer Celebration. Native American Community Services of Erie and Niagara Counties. Buffalo, NY. 2004.
15. "Haudenosaunee: The people of the Longhouse". Public School 45. Buffalo, NY. 2003.
16. "Contemporary Native American issues". Intercultural communication class. State University of New York at Buffalo, Buffalo, NY. 2003.
17. "An introduction to Native Americans". Intensive Language Institute. State University of New York at Buffalo, Buffalo, NY. 2002.
18. "The NASW Code of Ethics and Native American values". Native American Community Services of Erie and Niagara Counties. Buffalo, NY. 2001.
19. "An introduction to Native Americans". Intensive Language Institute. State University of New York at Buffalo, Buffalo, NY. 2001.
20. "Culturally competent social work practice with Native clients". Practice and Human Behavior in the Social Environment classes, University of Alaska, Fairbanks, AK. 2001.
21. "An introduction to Native Americans". Intensive Language Institute. State University of New York at Buffalo, Buffalo, NY. 2000.
22. "Commentary on the books *Voices of First Nations People: Human Service Considerations*, and *Health and the American Indian*". American Studies Dept. State University of New York at Buffalo, Buffalo, NY. 2000.
23. "An introduction to Native Americans". Intensive Language Institute. State University of New York at Buffalo, Buffalo, NY. 1999.
24. "The Indian Child Welfare Act: Issues for indigenous women". American Studies Dept. State University of New York at Buffalo, Buffalo, NY. 1999.
25. "Social work and indigenous people: An overview". D'Youville College, Buffalo, NY. 1999.
26. "An introduction to Native Americans". Intensive Language Institute. State University of New York at Buffalo, Buffalo, NY. 1998.

Exhibit 5 - 163

27. "Indigenous people in a multicultural society: Unique issues for human services". Corning campus, State University of New York at Buffalo, Corning, NY. 1998.
28. "Culturally competent helping: Considerations for social workers working with Native Americans". State University of New York at Brockport, Brockport, NY. 1998.
29. "Activism in indigenous communities: Considerations for social workers". University of Kansas, Lawrence, KS. 1998.
30. "Humility: An important characteristic of culturally competent social work services with Native Americans". University of Kansas, Lawrence, KS. 1998.
31. "Culturally competent helping: Considerations for psychologists working with Native Americans". Guest presentation in Multicultural Counseling. State University of New York at Buffalo, Buffalo, NY. 1998.
32. "Exploring educational and career options: Choices for Native American students". Native American Student Day, State University of New York at Buffalo. Buffalo, NY. 1997.
33. "The Indian Child Welfare Act: Background, content, and applications". Guest presentation in Legal Aspects of Child Custody, Foster Care, Adoption, and Child Abuse, State University of New York at Buffalo. Buffalo, NY. 1997.
34. "The Journey from education to career path for Native American people: A personal example". Erie Community College. Buffalo, NY 1997.
35. "Marginalized people: Qualitative Research Around the Disciplines" Panel presentation. Baldy Center lecture series. Buffalo, NY 1997.
36. "Cultural dynamics in the helping process". Veterans Administration Medical Center. Buffalo, NY, 1996.
37. "Native American issues in social work". Native American Heritage Celebration, Buffalo State College. Buffalo, NY, 1996.
38. "Supportive services in the workplace: A growing trend" interview on National Public Radio, Weekend Edition/Morning Edition, WBFO, Buffalo, NY, 1994.
39. "Serving the needs of women and minorities: Has social work been responsive?" University of Idaho Women's Center, Moscow, ID, 1993.
40. "Interracial marriages: Perspectives of a grown child". University of Idaho, Diversity Week, Moscow, ID, 1992.
41. "Working with the homeless of New York City: An overview". Psi Chi, Psychology Honor Society, University of Idaho, Moscow, ID, 1989.
42. "Social work: A diverse and challenging profession". KUOI, Radio interview and call-in show, Moscow, ID, 1989.


**Juried presentations:**
1. "Research with Native Americans: Examining the Healthy Living

14

Exhibit 5 - 164

in Two Worlds Project" Council on Social Work Education Annual Program meeting. Philadelphia, PA. 2008.
2. "Wellness promotion for indigenous youth: The Healthy Living in Two Worlds Program" 19th World Conference for Social Service. Salvador da Bahia, Brazil. 2008.
3. "Research with Native American communities: Issues of ethics, funding, and cultural competence". Council on Social Work Education Annual Program meeting. San Francisco, CA. 2007.
4. "Healthy living in two worlds: Promoting wellness among urban indigenous youth". Indigenous Voices in Social Work: Not Lost in Translation conference. Waianae, HI. 2007.
5. "Land- An essential resource for Indigenous Peoples: A tale of loss and recovery". 6th annual Permanent Forum on Indigenous Issues. United Nations, New York, NY. 2007.
6. "Indigenous Peoples: The Past and Present Struggle for Human Rights" with Elaine Congress. International Federation of Social Workers 50th Year Jubilee Conference. Munich, Germany. 2006.
7. "Indigenous children and families in a landscape of risk: Challenges and solutions in realizing the Millennium Development Goals" 5th annual Permanent Forum on Indigenous Issues. United Nations, New York, NY. 2006.
8. "Indigenous people in a landscape of risk: Socially just social work responses" with Elaine Congress. Council on Social Work Education Annual Program meeting. Chicago, IL. 2006.
9. "Augmenting multicultural classroom content: Development of a virtual Diversity Resource Center" with Janine Hunt-Jackson, David Kolker & Kelly Jackson. . Council on Social Work Education Annual Program meeting. Chicago, IL. 2006.
10.     "Integrating diversity within a school of social work" with Kelly Jackson and David Kolker. New York State Social Work Education Association conference. Saratoga Springs, NY. 2005
11.     "Developing an MSW program with a Native American focus" with Ken Nakamura and Shaunna McCovey. American Indian Alaska Native Social Work Educators' Association. New York, NY. 2005.
12.     "From stereotypes to activism: Incorporating Native American content in the classroom". Council on Social Work Education Annual Program meeting. New York, NY. 2005.
13.     "Navigating two worlds: Honoring tradition while living as urban Native American youth". Council on Social Work Education Annual Program meeting. Atlanta, GA. 2003.
14.     "Techniques for integrating Native American content throughout the social work curriculum". Council on Social Work Education Annual Program meeting. Nashville, TN. 2002.
15.     "Elements of Cultural Competence: Key Issues for Native American Clients". National Association of Social Workers conference. Baltimore, MD. 2000.
16.     "Working with Native Americans: Promoting equitable societies through cultural competence". International Federation of Social Workers conference. Montreal, Quebec, Canada. 2000.

Exhibit 5 - 165

17.     "Achieving social justice through cultural competence: Education and Native American helping professionals". Council on Social Work Education annual program meeting. New York, NY. 2000.

18.     "Training culturally competent and safe helping professionals: A Native American example". Council on Social Work Education annual program meeting. San Francisco, CA. 1999.

19.     "From the four directions: Indian Child Welfare training and preservation of the Native family" with Barry J. White. National Staff Development and Training Association conference. New Orleans, LA. 1998.

20.     "Culturally competent social work and Native Americans: What is it? How do we do it? How do we teach for it?". New York State Social Work Education Association annual conference. Buffalo, NY. 1998.

21.     "Indigenous scholars in the helping professions". Association of American Indian and Alaska Native Professors annual conference. Haskell Indian Nations University, Lawrence, KS. 1998.

22.     "Training culturally competent and safe helping professionals: A Maori example". Council on Social Work Education, annual program meeting. Orlando, FL, 1998.

23.     "Education for the helping professions: The experiences of indigenous people". American Indian Social Work Educators' Association annual conference. Orlando, FL, 1998.

24.     "Activism and American Indian issues: Opportunities for action and respecting boundaries". Bertha Capen Reynolds Society National Conference. St. Louis, MO, 1997.

25.     "Addressing the needs of Native American communities: A Northeastern example". Council on Social Work Education, annual program meeting. Chicago IL, 1997.

26.     "Native Americans, Maori, and the helping professions: Issues of cultural competence and cultural safety". National Association of Social Workers, annual meeting of the profession. Cleveland OH, 1996.

27.     "Relatives across the Bering Strait: American Indian identity issues" with Maria Yellow Horse Brave Heart. Association of Asian American Studies Joint Regional Conference. Honolulu, HI, 1996.

28.     "Jewish content and the multi-cultural curriculum" with Howard Doueck and Marvin Bloom. Annual Program Meeting, Council on Social Work Education. Washington, D.C., 1996.

29.     "The challenges of research in Native communities: Incorporating principles of cultural competence". Annual Program Meeting, Council on Social Work Education. Washington, D.C., 1996.

30.     "Incongruence in definitions of self and identity among American Indians" with Maria Brave Heart-Jordan. Ethnicity and Multiethnicity: Constructing and Deconstructing Identity. Brigham Young University, HI, 1995.

Exhibit 5 - 166

31.     "Models of American Indian identity: Implications for teaching social work practice" with Maria Brave Heart-Jordan. Annual Program Meeting, Council on Social Work Education, San Diego, CA, 1995.
32.     "Bicultural competence: Enhancing the health status of Native American adolescents". National Association of Social Workers annual meeting of the profession, Orlando, FL, 1993.
33.     "Overcoming stereotyping and discrimination: Empowering students to empower communities". Council on Social Work Education, Annual Program Meeting, Kansas City, MO, 1992.


**Workshops:**
1. "Exploring cultural dynamics: Issues with clients and colleagues". Erie County Medical Center. Buffalo, NY 2008.

2. "Providing culturally competent services". Erie County Department of Social Services. Buffalo, NY. 2008.

3. "Striving for Culturally Competent Services: Steps for Transforming your Services and your Organization". UB School of Social Work Continuing Education. Buffalo, NY 2007

4. "Incorporating diversity issues in the classroom". UB School of Social Work training for adjuncts. Buffalo, NY June 2007.

5. "Developing a diversity self-awareness: Supervisory issues of culture, race, class, gender, and sexual orientation". Erie County Department of Social Services. Buffalo, NY, Jan. 2007.

6. "Providing culturally competent services". Erie County Department of Social Services. Buffalo, NY, June 2006.

7. "Developing a Diversity Self-awareness: Supervisory issues of culture, race, class, gender, and sexual orientation". Erie County Department of Social Services. Buffalo, NY, March 2006.

8. "Providing culturally competent services". Erie County Department of Social Services. Buffalo, NY, Aug. 2005.

9. "Cultural Competence with Elders" National Association of Social Workers. Buffalo, NY, May, 2005.

10.     "Providing culturally competent services". Chautauqua County Department of Social Services. Dunkirk, NY, Sept. 2004.

11.     "Providing culturally competent services". Chautauqua County Department of Social Services. Jamestown, NY, Sept. 2004.

17

Exhibit 5 - 167

12.     "Indigenous people in a multicultural society: Unique issues for human services". National Association of Social Workers, Alaska chapter, Fairbanks, AK, April, 2001.

13.     "The dynamics of ethnicity". Continuing Education Workshop, State University of New York at Buffalo, Buffalo, NY, August 2000

14.     "Integrating cultural issues into the helping process". Transitional Services staff training. Buffalo, NY, October 1999.

15.     "Integrating cultural issues into the helping process". Transitional Services staff training. Buffalo, NY, October 1999.

16.     "The dynamics of ethnicity". Continuing Education Workshop, State University of New York at Buffalo, Buffalo, NY, August 1999

17.     "The dynamics of ethnicity". Continuing Education Workshop, State University of New York at Buffalo, Buffalo, NY, July 1999

18.     "The dynamics of ethnicity". Continuing Education Workshop, State University of New York at Buffalo, Buffalo, NY, June 1997

19.     "The dynamics of ethnicity". Continuing Education Workshop, State University of New York at Buffalo, Buffalo, NY, September 1997

20.     "The dynamics of ethnicity". Continuing Education Workshop, State University of New York at Buffalo, Buffalo, NY, June 1997

21.     "The dynamics of ethnicity". Continuing Education Workshop, State University of New York at Buffalo, Buffalo, NY, May 1997

22.     "Integrating Native American content into the curriculum: Preparing students for culturally competent practice". Faculty Development Institute, Annual Program Meeting, Council on Social Work Education. Washington, D.C., 1996.

23.     "Cultural diversity in the social work curriculum: An American Indian example" with G. Michael Jacobsen. Faculty Development Institute, Annual Program Meeting, Council on Social Work Education, San Diego, CA, 1995.

24.     "Crossing boundaries: Culturally competent human services

18

Exhibit 5 - 168

for Native people". Continuing Education Workshop, State University of New York at Buffalo, Buffalo, NY, 1994.

### TEACHING

**Courses taught, University at Buffalo School of Social Work:**
Interventions I, Interventions skill lab, Interventions II, Multicultural Issues in Social Work, Social Work with Native Americans, Cross Cultural Social Work: Interventions with Native Americans and New Immigrants, and Diversity and Oppression, Responding to refugees and immigrants. (All masters level).

**Courses taught, George Warren Brown School of Social Work:**
Health and wellness in Native American communities (masters level).

**Courses co-taught, University of Waikato Psychology Department:**
Culture, Ethnicity, and Self Development (undergraduate), Maori Development and Psychology (undergraduate), and Maori Development and Psychology (masters level).

**Courses taught, Univ. of Idaho Dept. of Sociology & Anthropology**
Introduction to Social Services, Social Welfare Policy, Human Behavior in the Social Environment, Child Welfare, Social Group Work, Cross Cultural Factors in Social Work, Social Work Methods, Field Seminar and Alternatives to Violence. (All undergraduate level).

**Dissertation & graduate student advising:**

| | | |
|---|---|---|
| Member, | Dissertation Committee, Diane McEachern Educational Studies, Lesley University | 2008-Present |
| Chair, | Dissertation Committee, Warren Skye (School of Social Work; SUNY, Buffalo) | 2000-Present |
| Advisor, | Council on Onkwehonwe Graduate Students (SUNY, Buffalo) | 2003-Present |
| Chair, | Dissertation Committee, Barb General | |

Exhibit 5 - 169

```
                    (School of Social Work; SUNY, Buffalo)        2007-Present

Member,     Dissertation Committee, Michael Hart               2007
            (School of Social Work, University of Manitoba)PhD 2007

Chair,      Dissertation Committee, Kelly Jackson            2003-2007
            (School of Social Work; SUNY, Buffalo)           PhD 2007

Chair,      Dissertation Committee, Rodney Haring            2003-2007
            (School of Social Work; SUNY, Buffalo)           PhD 2007

Chair,      Dissertation Committee, Janine Hunt-Jackson      2001-2007
            (School of Social Work; SUNY, Buffalo)           PhD 2007

Member,     Dissertation Committee, Barb General

            (School of Social Work; SUNY, Buffalo)           2006-2007

Member,     Dissertation Committee, John Whyte               2004-2005
            (School of Social Work, University of Melbourne) PhD 2005

Member,     Dissertation Committee, Peter Renkin                 2005-
2006
            (School of Social Work, University of Melbourne) PhD 2006

Chair,      Dissertation Committee, Linda Schlichting-Ray 2000-2005
            (School of Social Work; SUNY, Buffalo)           PhD 2005

Advisor,    Barbara General                                  2004

Advisor,    Rodney Haring
            (School of Social Work; SUNY, Buffalo)           2002

Advisor,    Steven Osterstrom
            (School of Social Work; SUNY, Buffalo)           2000-2003

Member,     Dissertation Committee, Kristina Ackley         1999-2000
            (American Studies; SUNY, Buffalo)                  PhD 2005

Advisor,    Janine Hunt
            (School of Social Work; SUNY, Buffalo)           1998-2001

Member,     Dissertation Committee, Linda Schlichting-Ray
            (School of Social Work; SUNY, Buffalo)           1998-2000

Member,     Dissertation Committee, Maryann Diebel Brown
            (School of Social Work; SUNY, Buffalo)           1998-2000

Member,     Dissertation Committee, Pat Merle               1999-2000
            (School of Social Work; Columbia University)     PhD 2000
```

Exhibit 5 - 170

```
Key informant, Cheryl Stampley
            (School of Social Work; Loyola University)     1998-1999

Chair,     Dissertation Committee, Roselle Scaggs
            (School of Social Work; SUNY, Buffalo)         1997-1999

Advisor,   Marsha Zornick
            (School of Social Work; SUNY, Buffalo)         1997-1999

Member,    Dissertation Committee, Kevin Blair               1994-
1995
            (School of Education; SUNY, Buffalo)           PhD
1995

Member,    Thesis Committee "Disintegration and           1989-1992
            Renewal in the Native American Novel"         MA 1992
            (School of Education; University of Idaho)
```

### GRANTS/FELLOWSHIP SUPPORT

**Funded:**
Institute for Research and Education on Women and Gender. $700. 2006.
D. Elze, L. Bay-Cheng & H. Weaver Investigators (in alphabetical order).
"Out of the Mouths of Babes"

National Cancer Institute. $157,000.                      2005-2007
Principle Investigator.
"Healthy Living in Two Worlds: Strengthening cultural connections for wellness in urban Native American youth".

Institute for Research and Education on Women and Gender. $800.2005
Principle Investigator.
Presentation for Gender Week at UB: "Social Work a male dominated, female majority profession.

National Association of Social Workers, New York State Chapter. $1000.                                                    2005
Principle Investigator.
"Strengthening Latino Content in the Social Work Curriculum"

Wendt Foundation. $10,000.                                1999
Principle Investigator.
"Assessing trauma, torture, and mental health sequelae in Sri Lankan refugees".

Center for Development of Human Services. $1500.          1999

21

Exhibit 5 - 171

Principle Investigator
"Cultural competency steering committee".

Baldy Center for Law and Social Policy. $3050.            1999
Principle Investigator.
"Refugees seeking legal status: Factors associated with successful
asylum claims".

University at Buffalo, Center Chapter, Professional Development
Quality of Life Committee. $1000.                         1998
Principle Investigator.
"Professional development through conference participation and
travel in the Middle East".

Center for Development of Human Services. $1500.          1998
Principle Investigator.
"Integrating diversity content into human services curricula".

Baldy Center for Law and Social Policy. $2400.            1998
Principle Investigator.
"Refugees and legal status: The importance of telling their
stories".

Baldy Center for Law and Social Policy. $500.             1997
Principle Investigator.
"Cultural safety and the helping professions".

Center for Development of Human Services. $1500.          1997
Principle Investigator.
"Integrating diversity content into human services curricula".

Center for Development of Human Services. $1500.          1996.
Principle Investigator.
"Indigenous people in a multicultural society: Unique issues for
human services".

**Under review:**
National Cancer Institute
Principle Investigator.
"Healthy living in two worlds: A prevention initiative for urban
Native youth"  $275,000 (direct costs).

**PUBLICATIONS:**

**Articles in refereed journals:**

1. Weaver, H.N. & Congress, E.P. (In press). Indigenous people in
a landscape of risk: Socially just social work responses.
*Journal of Ethnic and Cultural Diversity.*

Exhibit 5 - 172

*2.* Weaver, H.N. (In press). The colonial context of violence: Reflections on violence in the lives of Native American women. *Journal of Interpersonal Violence, 24*(9).

*3.* Weaver, H.N.(In press). Native Americans and cancer risks: Moving toward multifaceted solutions. *Journal of Health and Social Policy.*

*4.* Weaver, H.N. (In press). Culturally competent counseling: Providing effective services for Native American clients. *Journal of Cultural Diversity: An Interdisciplinary Journal.*

5. Weaver, H.N. (2008). A boiling pot of animosity or an alliance of kindred spirits? Exploring connections between Native and African Americans. *Journal of Sociology and Social Welfare, 35*(4), 115-132.

6. Weaver, H.N. (2005). Re-examining what we think we know: A lesson learned from Tamil refugees. *Affilia*, 20, 238-245.

7. Weaver, H.N. (2004). The elements of cultural competence: Applications with Native American clients. *Journal of Ethnic and Cultural Diversity in Social Work, 13*(1), 19-35.

8. Weaver, H.N., Hunt-Jackson, J., & Burns, B.J. (2003). Asylum-seekers along the U.S.-Canada Border: Challenges of a Vulnerable Population. *Journal of Immigrant and Refugee Services, 1*(3/4), 81-98.

9. Weaver, H.N. (2002). Perspectives on Wellness: Journeys on the Red Road. *Journal of Sociology and Social Welfare, 29*(1), 5-15.

10.     Weaver, H.N. (2001). Indigenous identity: What is it and who *really* has it?. *American Indian Quarterly, 25*(2), 240-255.

11.     Weaver, H.N. (2001). Indigenous nurses and professional education: Friends or foes? *Journal of Nursing Education, 40*(6), 1-7.

12.     Weaver, H.N. & Burns, B.J. (2001). "I shout with fear at night": Understanding the traumatic experiences of refugees. *Journal of Social Work, 1*(2), 147-164.

13.     Weaver, H.N. (2000). The professional training of Native American psychologists: A comfortable fit or more cultural loss? *Transformations*, *11*(1), 17-29.

14.     Weaver, H.N. (2000). Balancing culture and professional education: American Indians/Alaska Natives and the helping

Exhibit 5 - 173

professions. *Journal of American Indian Education, 39*(3), 1-18.

15.     Weaver, H.N. (2000). Culture and professional education: The experiences of Native American social workers. *Journal of Social Work Education, 36*(3), 415-428.

16.     Weaver, H.N. (2000). Activism and American Indian issues: Opportunities and roles for social workers. *Journal of Progressive Human Services, 11*(1), 3-22.

17.     Weaver, H.N. (1999). Transcultural nursing with Native Americans: Critical knowledge, skills, and attitudes. *Journal of Transcultural Nursing, 10*(3), 197-202.

18.     Weaver, H.N. (1999). Assessing the needs of Native American communities: A Northeastern example. *Evaluation and Program Planning: An International Journal, 22*(2), 155-161.

19.     Weaver, H.N. & White, B.J. (1999). Protecting the future of indigenous children and nations: An examination of the Indian Child Welfare Act. *Journal of Health and Social Policy. 10*(4), 35-50.

20.     Weaver, H.N. (1999). Indigenous people and the social work profession: Defining culturally competent services. *Social Work, 44*(3), 217-225.

21.     Weaver, H.N. (1999). Through indigenous eyes: A Native American perspective on the HIV epidemic. *Health and Social Work 24*(1), 27-34.

22.     Weaver, H.N. (1999). Voices of First Nations people: An introduction. *Journal of Human Behavior in the Social Environment, 2*(1/2), 1-3.

23.     Weaver, H.N. & Yellow Horse Brave Heart, M. (1999). Examining two facets of American Indian identity: Exposure to other cultures and the influence of historical trauma. *Journal of Human Behavior in the Social Environment, 2*(1/2), 19-33.

24.     Weaver, H.N. (1999). Health concerns for Native American youth: A culturally grounded approach to health promotion. *Journal of Human Behavior in the Social Environment, 2*(1/2), 127-143.

25.     Weaver, H.N. (1998). Teaching cultural competence: Application of experiential learning techniques. *Journal of Teaching in Social Work, 17*(1/2), 65-79.

26.     Weaver, H.N. (1998). Indigenous people in a multicultural society: Unique issues for human services. *Social Work, 43*(3),

Exhibit 5 - 174

203–211.

27.     Weaver, H.N. (1997). Which canoe are you in? A view from a First Nations person. *Reflections: Narratives of Professional Helping. 4*(3), 12–17.

28.     Weaver, H.N. (1997). The challenges of research in Native American communities: Incorporating principles of cultural competence. *Journal of Social Service Research, 23*(2), 1–15.

29.     Weaver, H.N. (1997). Training culturally competent social workers: What students should know about Native people. *Journal of Teaching in Social Work, 15*(1/2), 97–112.

30.     Weaver, H.N. & White, B.J. (1997). The Native American family circle: Roots of resiliency. *Journal of Family Social Work, 2*(1), 67–79.

31.     Weaver, H.N. (1996). Social work with American Indian youth using the orthogonal model of cultural identification. *Families in Society: The Journal of Contemporary Human Services. 77*(2), 98–107.

32.     Weaver, H.N. & Wodarski, J.S. (1995). Cultural issues in crisis intervention: Guidelines for culturally competent practice. *Family Therapy, 22*(3), 213–223.

33.     Weaver, H.N. (1992). African Americans and social work: An overview of the Antebellum through Progressive eras. *Journal of Multicultural Social Work, 2*(4), 91–102.

**Articles in referred journals (under review):**
Weaver, H.N. (Under review). The Healthy Living in Two Worlds project: An inclusive model of curriculum development.

Weaver, H.N. & Jackson, K.F. (Under review). Cancer Risks and Native Americans: The Healthy Living in Two Worlds Study.

Weaver, H.N. & Jackson, K.F. (Under review). Healthy Living in Two Worlds: Testing a Wellness Curriculum for Urban Native Youth.

Weaver, H. N. (Under review). Between a rock and a hard place: Documenting the traumatic experiences of Tamil refugees.

Weaver, H.N. (Under review). Serving multicultural elders: Recommendations for helping professionals.

Weaver, H.N. (Under review). From stereotypes to activism: Incorporating Native American content in the classroom.

Exhibit 5 - 175

Weaver, H.N. (Under review). Developing a culturally appropriate assessment tool: Reflections on process considerations.

Weaver, H.N. (Under review). In the world but not of it: An indigenous woman's journey through Anglo educational processes.

## Books

Weaver, H.N. (2005). *Explorations in Cultural Competence: Journeys to the Four Directions*. Brooks-Cole Publishing. 306 pages.

Weaver, H.N. (ed.) (1999). *Voices of First Nations People: Human Services Considerations*. New York: Haworth Press. (Published simultaneously as *Journal of Human Behavior in the Social Environment, 2*(1/2)). 188 pages.

Day, P. & Weaver H.N. (ed.) (1999). *Health and the American Indian*. New York: Haworth Press. (Published simultaneously as *Journal of Health and Social Policy, 10*(4). 88 pages.

## Book chapters

1. Weaver, H.N., (In press). Evidenced-based Social Work Practice with Native Americans. In D.F. Harrison, J.S. Wodarski, & B.A. Thyer, (eds*.). Human Diversity and Social Work Practice: An Evidence-based Approach*. Springfield. IL: Charles C. Thomas, publisher.

2. Weaver, H.N., (In press). Evidenced-based Social Work Practice with Latinos. In D.F. Harrison, J.S. Wodarski, & B.A. Thyer, (eds.). *Human Diversity and Social Work Practice: An Evidence-based Approach*. Springfield. IL: Charles C. Thomas, publisher.

3. Weaver, H.N. (2008). Striving for cultural competence: Moving beyond potential and transforming the helping professions. In R.H. Dana & J.R. Allen (Eds.). *International and Cultural Psychology: Cultural Competency Training in a Global Society*. Springer. 139-162

4. Weaver, H.N. (2008). "Indigenous Social Work in the United States: Reflections on Indian Tacos, Trojan Horses, and Canoes filled with Indigenous Revolutionaries". In J. Coates (ed.) *Indigenous Social Work Practice.*

5. Weaver, H.N. (2008). Native Americans: Overview. In T. Mizrahi & L. Davis, (Eds.). *Encyclopedia of Social Work, 20th Edition*,

Exhibit 5 - 176

295-299.

6.  Weaver, H.N. (2007). Seeking a balance: Perspectives of a
    Lakota woman in social work academia. In H. F.O. Vakalahi,
    S.H. Starks, & C.O. Hendricks (eds.), *Women of Color as Social
    Work Educators: Strengths and Survival*. Council on Social Work
    Education Press.

7.  Weaver, H.N. (2006). Cultural competence with First Nations
    peoples. In D. Lum (ed.) *Culturally Competent Practice: A
    Framework for Understanding Diverse Groups and Justice Issues,
    3rd edition*. Pacific Grove, CA: Brooks/Cole. (Update of 2003
    chapter). 254-275.

8.  Weaver, H.N. (2006). "Social work through an indigenous lens:
    Reflections on the state of our profession". In N. Hall (ed.)
    *Social Work: Making a World of Difference: Social Work Around
    the World IV in the year of IFSW's 50th Jubilee.* Berne,
    Switzerland: International Federation of Social Workers and
    Fafo. 37-51.

9.  Weaver, H.N. (2005). First Nations Peoples. In K.L. Guadalupe
    and D. Lum (eds.), *Multidimensional Contextual Practice:
    Diversity and Transcendence*. Belmont, CA: Brooks/Cole
    Publishing. 287-307.

10. Weaver, H.N. (2003). Family Preservation with American Indian
    Children and Families. In E. Gonzalez-Santin & T. Perry,
    *Understanding the Cultural Context: Working with American
    Indian Children and Families*. Arizona State University Office
    of American Indian Projects.

11. Weaver, H.N. (2003). Cultural competence with First Nations
    peoples. In D. Lum (ed.) *Culturally Competent Practice: A
    Framework for Understanding Diverse Groups and Justice Issues*.
    Pacific Grove, CA: Brooks/Cole, 197-216.

12. Weaver, H.N. (2001). Native Americans and substance abuse. In
    S.L.A. Straussner (ed.), *Ethnocultural Factors in Substance
    Abuse Treatment*. New York: Guilford Press. 77-96.

13. Weaver, H.N. (2001). Organization and community assessment
    skills with First Nations people. In R. Fong & S. Furuto
    (eds*.), Culturally Competent Practice: Skills, Interventions,
    and Evaluations*. Boston: Allyn and Bacon. 178-195.

14. Weaver, H.N. &  White, B.J. (1999). Protecting the future of
    indigenous children and nations: An examination of the Indian
    Child Welfare Act. In P.A. Day & H.N. Weaver (eds.). *Health
    and the American Indian*. New York: Haworth Press. (Published
    simultaneously as  *Journal of Health and Social Policy. 10*(4),

Exhibit 5 - 177

35-50).

15. Weaver, H.N. (1999). Indigenous people in a multicultural society: Unique issues for human services. In P.L. Ewalt, E.M. Freeman, A.E. Fortune, D.L. Poole, & S.L. Witkin (eds.). *Multicultural Issues in Social Work*. Washington, D.C.: NASW Press. 85-95. (Reprinted from *Social Work, 43*(3), 203-211.

16. Weaver, H.N. (1999). Voices of First Nations people: An introduction. In *Voices of First Nations People: Human Services Considerations*. H.N. Weaver, (ed.). New York: Haworth Press. 1-3. (Published simultaneously as an introduction to *Journal of Human Behavior in the Social Environment, 2*(1/2).

17. Weaver, H.N. & Yellow Horse Brave Heart, M. (1999). Examining two facets of American Indian identity: Exposure to other cultures and the influence of historical trauma. In *Voices of First Nations People: Human Services Considerations*. H.N. Weaver, (ed.). New York: Haworth Press. 19-33. (Published simultaneously as an article in *Journal of Human Behavior in the Social Environment, 2*(1/2)).

18. Weaver, H.N. (1999). Health concerns for Native American youth: A culturally grounded approach to health promotion. In *Voices of First Nations People: Human Services Considerations*. H.N. Weaver, (ed.). New York: Haworth Press. 127-143. (Published simultaneously as an article in *Journal of Human Behavior in the Social Environment, 2*(1/2)).

19. Weaver, H.N. & White, B.J. (1997). The Native American family circle: Roots of resiliency. In *Cross-Cultural Practice with Couples and Families*. P.M. Brown & J.S. Shalett, (eds.). New York: Haworth Press. 67-79. (Published simultaneously as an article in *Journal of Family Social Work, 2*(1)).

20. Weaver, H.N. & Wodarski, J.S. (1996). Social work practice with Latinos. In *Cultural Diversity and Social Work Practice*. D.F. Harrison, J.S. Wodarski, & B.A. Thyer, (eds.). Springfield. IL: Charles C. Thomas, publisher. 52-86.

## Book chapters (under review):

Weaver, H.N. & Congress, E. (Under review). The On-going Impact of Colonization: Manmade Trauma and Native Americans. In *International Handbook of Emotional Healing.*

Weaver, H.N. (Under review). Native Americans: Overview. In *Oxford Bibliography Online: Social Work.*

Weaver, H.N. (Under review). A cruel and surreal result: Restrictions on indigenous spirituality in the land of the free. In

Exhibit 5 - 178

J. Schiele (ed.), *Social Welfare Policy: Regulation and Resistance among People of Color.*

Weaver, H.N. (Under review). Diversity and social change: Race, gender, ethnicity, and class. In F. Rivera & J. Erlich (eds.), *The Helping Profession: Social Work and Social Welfare*.

**Conference Proceedings:**
Weaver, H.N. (2008). Spirituality in cross-cultural contexts: Implications for practice and research. 3rd North American conference on Spirituality and Social Work. Fredricton, New Brunswick, Canada.

Weaver, H.N. (2003). Mitakuye oyasin: Perspectives from the American Indian/Alaska Native Social Work Educators' Association. R.W. Rodenhiser (ed.). 34th and 35th annual conference of the New York State Social Work Education Association.

Weaver, H.N. (in press). Multigenerational perspectives among Indigenous Peoples in a changing world: Native American Perspectives (with Iris Hill).United Nations NGO Committee on Aging.

**Reports/Curricula:**
Weaver, H.N. (2001). Declaration in a Habeas Corpus petition. California Supreme Court.

Weaver, H.N. (2000). Critical settings in American Indian communities: Community. Haskell Indian Nations University and the Bureau of Indian Affairs.

Weaver, H.N. (1997*) Assessing the Needs of the Urban Native American Community: Erie and Niagara Counties, NY*. Buffalo NY: Native American Community Services of Erie and Niagara Counties.

**Book reviews**
Weaver, H.N. (2006*). Culturally Competent Public Child Welfare*. In *Children and Youth Services Review*, *28*(1), 103-104.

Weaver, H.N. (1995). *Bread and Spirit: Therapy with the New Poor; Diversity of Race, Culture, and Values*. In *Families in Society: The Journal of Contemporary Human Services*. 76(9), 579-580.

Weaver, H.N. (1995). *Work and Well-being: The Occupational Social Work Advantage*. In *Families in Society: The Journal of Contemporary Human Services, 76*(4), 260-262.

Weaver, H.N. (1993). *Developing Cross Cultural Competence: A Guide for Working with Young Children and their Families*. In *Families in*

29

Exhibit 5 - 179

*Society: The Journal of Contemporary Human Services,* 74(5), 317-318.

Exhibit 5 - 180

# EXHIBIT B

Exhibit 5 - 181

*U.S. v. Lezmond Mitchell*

**DOCUMENT INDEX FOR HILARY WEAVER, D.S.W.**

1.    Family Tree (prepared by FPD-LA)

**LEZMOND MITCHELL – CLIENT**

2.    **Vital Records**

    a.    Birth Certificate, 9/17/1981

    b.    Tribal Affiliation-1/4 Navajo Indian Blood, 3/23/1984

3.    **Medical Records**

    a.    Auto Accident, 10/9/1999

    b.    Edward Fields, Ph.D., 1998-1999

    c.    Red Mesa High School

4.    **School Records**

    a.    Sanders Elementary School, Sanders, Arizona (Grades K-2)

    b.    Thomas McCarthy Catholic School, Hanford, CA (Grades 1-2)

    c.    Avenal Elementary School, Avenal, California (Grades 2)

    d.    Round Rock Elementary School, Teec Nos Pos, Arizona (Grades 3-5)

    e.    Red Mesa Jr. High School, Teec Nos Pos, Arizona (Grades 7-8)

    f.    Red Mesa High School, Teec Nos Pos, Arizona (Grades 9-11)

    g.    Rough Rock High School, Rough Rock, Arizona (Grade 11)

    h.    Rough Rock Community School, Chinle, Arizona (Grade 12)

    i.    Disciplinary and Absentee Records

5.    **Employment Records**

    a.    Levy Restaurants (Bank One Ballpark, Phoenix, AZ), 7/2001-8/2001

1

Exhibit 5 - 182

6. **Court Records**

    a.    Trial Court Judgment, Chinle, Arizona, 11/7/2001

    b.    Arrest Warrant, Phoenix, AZ, 11/23/2001

    c.    Superseding Indictment, U.S. v. Mitchell, CR 01-1062-PCT-MHM, D. Ariz., 7/2/2002

7. **Miscellaneous**

    a.    **Photographs**

**SHERRY LANE MITCHELL – CLIENT'S BIRTH MOTHER**

8. **Vital Records**

    a.    Birth Certificate, 5/27/1958

    b.    Dept. of Interior/BIA and Tribal Enrollment Records

9. **School Records**

    a.    Cherokee High School, Cherokee, NC,1971-76

    b.    Dine Community College, Tsaile, AZ, 1978-1981

    c.    Northern Arizona University, Flagstaff, AZ, 1978-1983

    d.    Northland Pioneer College, Holbrook, AZ, 1978-79; 1984; 1987

10. **Medical Records**

    a.    Birth Records of Lezmond Mitchell, Tsaile, AZ, 9/1981

    b.    Tuba City Indian Medical Center, Tuba City, AZ, 1964; 1977

    c.    R.M. Christian Hospital, Gallup, NM, 6/2000; 2/2009

    d.    Flagstaff Medical Center, Flagstaff, AZ, 2/2009

2

Exhibit 5 - 183

11.   **Court Records**

    a.   Mitchell v. Hemil, Orange Co. Superior Court Case No. 40-21-32, Child Support Records (Orange County, California), 1984

    b.   Guardianship Records re Lezmond Mitchell, 12/1987; 9/1998

12.   **Miscellaneous**

    a.   Photographs

**FOSTER LEZMOND HEMIL – CLIENT'S BIRTH FATHER**

13.   **Vital Records**

    a.   Death Certificate, 12/1/2002

    b.   Medical Records-Armer Ishoda Memorial Hospital, Marshall Islands, 1985-2002

14.   **School Records**

    a.   Dine College, Tsaile, AZ, 1979-1980

    b.   Marshall Islands High School, 1974-1979

15.   **Employment Records**

    a.   Verification letter re employment, Majuro, Marshall Islands, MH, 4/21/2009

16.   **Court Records**

    a.   Child Support, 1984 (see child support records under Sherry Mitchell)

    b.   Sexual Battery Case, CA v. Hemil, Orange Co. Superior Court Case No. C51741, 1983

    c.   DWI (Administrative Record Only), CA v. Hemil, Orange Co. Superior Court Case No. 84CS03093, 1984

3

Exhibit 5 - 184

17. **Penalty Phase Testimony, U.S. v. Mitchell, CR 01-1062-PCT-MHM, D. Ariz.**

    a.    Bobbi Jo Mitchell, 5/9/2003 Deposition

    b.    Robert Roessel, 5/14/2003 (RT 3788-3819)

    c.    Ruth Roessel, 5/14/2003 (RT 3820-30)

    d.    Auska Mitchell, 5/15/2003 (RT 3887-3900)

    e.    Marty Conrad, 5/15/2003 (RT 3900-08)

    f.    John Fontes, 5/15/2003 (RT 3909-22)

    g.    Lorenzo Reed, 5/15/2003 (RT 3926-35)

    h.    Sonja Halsey, 5/15/2003 (RT 3936-48)

    i.    Tammy Sebahe, 5/15/2003 (RT 3950-57)

## GEORGE MITCHELL - CLIENT'S MATERNAL GRANDFATHER

18. **Vital Records**

    a.    Affidavit of Birth, 3/2/1923

    b.    Marriage Certificate, 12/9/1956

    c.    Death Certificate, 1/3/2004

    d.    Affidavit of Birth, George's Mother, 1883

    e.    Census and Navajo Profile, 9/3/1973

19. **Miscellaneous**

    a.    Guardianship Records re Lezmond

    b.    George Mitchell Memorial Tribute & Obituary, 6/11/2005

4

Exhibit 5 - 185

**BOBBI JO MITCHELL - CLIENT'S MATERNAL GRANDMOTHER**

20. **Vital Records**

   a. Birth Certificate, 1/5/1942

   b. Marriage Certificate, 12/9/1956

   c. Death Certificate, 5/20/2005

   d. Census & Navajo Profile, 9/3/1973

   e. Death Certificate of Jessie Erwin (Bobbi Jo's Father), 4/6/1957

21. **Medical Records**

   a. Lovelace Health Systems, Albuquerque, NM, 1975-1985

   b. Mission St. Joseph's, Asheville, NC, 1976

   c. High Desert Medical, Lancaster, CA, 2000-2001

22. **Employment Records**

   a. Dos Palos, Dos Palos, CA, School District, 1996-1998

   b. Curriculum Vitae of Bobbi Jo Mitchell, 1971-1998

23. **Court Records**

   a. Report of Theft, L.A. Co. Sheriff's Dept., 6/26/2001

   b. Parents' Divorce Records, Mary D. Erwin v. Jessie Carl Erwin, Cowley Co. KS, Case No. 26992 ,4/25/1948

24. **Miscellaneous**

   a. Photographs

   b. Guardianship Records re Lezmond Mitchell, 1987, 1998

   c. Memorial Tribute from "The Bagpiper," the Erwin Family newsletter

5

Exhibit 5 - 186

**AUSKA MITCHELL - CLIENT'S MATERNAL UNCLE**

25. **Vital Records**

    a.    Census and Navajo Profile, 9/3/1971

26. **School Records**

    a.    Monument Valley High School, Kayenta, AZ, 1981-85

27. **Medical Records**

    a.    Tuba City Indian Medical Center, Tuba City, AZ, 1985-1995

    b.    Chinle Health Care Facility, Chinle, AZ, 1986-1994

    c.    Northern Navajo Medical Center, Shiprock, NM, 8/2003

28. **Miscellaneous**

    a.    Photographs

**THE HEMILS - CLIENT'S PATERNAL FAMILY**

29. a.    Foster Hemil's Marshall Island Children

**THE ERWINS - CLIENT'S MATERNAL GRANDMOTHER'S FAMILY**

30. **Billy Don Erwin - Client's Great-Uncle**

    a.    Birth Certificate, 10/5/1931

    b.    Death Certificate, 5/17/2002

31. **Jimmy Dean Erwin - Client's Great-Uncle**

    a.    Birth Certificate, 6/2/1938

    b.    Military Form DD214, 6/8/1968

32. **Julia Olive Erwin - Client's Great-Aunt**

    a.    Birth Certificate, 9/7/1944

6

Exhibit 5 - 187

33. **Erwin Family**

    a.   Family History

    b.   Sir William de Irwyn

    c.   Photographs

34. **Trading Post Robbery**

    a.   Shiprock Dist. Police Dept. Crime Report, 10-31-2001

    b.   FBI Report, 1-10-2002

**UNITED STATES v. LEZMOND MITCHELL, No. CR-01-1062-PCT-MHM**

35. **Murder Book**

    a.   Excerpt from Ninth Circuit Opinion-U.S. v. Mitchell,
No. 03-99010 (2007)

    b.   Co-Defendant/Conviction and Sentence Chart

36. **Privileged and/or Work Prodcut From Trial Counsel's Files: Filed Under Seal**

    a.   Fields, Edward - Interview 04-16-2006

    b.   Morenz, Dr. Barry - Report 03-03-2003

    c.   Ockenfels, Vera - Social History 11-2-2003

**OTHER MISCELLANEOUS FAMILY RECORDS**

37. a.   Shirlene Moses - Navajo Nation Court Records

    b.   Foster Hemil, Jr. Death Certificate

7

Exhibit 5 - 188

**DECLARATIONS AND REPORTS RE LEZMOND MITCHELL**

38.     **Lay, Family and Witness Declarations**

      a.      Clah, Sherwin, 10-24-2009

      b.      Clinton, Kevin Eugene,  05-14-2009

      c.      Comb, Randall, 08-14-2009

      d.      Coronado, Mary, 05-15-2009

      e.      DeLuca, Eric, 06-04-2009

      f.      Dunn, Karin,  05-14-2009

      g.      Escalante, Rene,  05-15-2009

      h.      Fontes, John, 06-05-2009

      i.      George, Padrian, 05-20-2009

      j.      Halsey, Sonja, 06-06-2009

      k.      Haskan, Carlisle, 08-15-2009

      l.      Hemil, Lezmond, 05-2009

      m.      Lameman, Ferdinand, 08-15-2009

      n.      Leal, Dennie, 05-31-2009

      o.      Loughridge, Lisa, 05-15-2009

      p.      Mitchell, Alex, 10-22-2009

      q.      Mitchell, Auska, 06-04-2009

      r.      Mitchell, Sherry Lane, 05-07-2009

      s.      Nakai, Daisy,  05-20-2009

      t.      Nakai, Gregory, 05-15-2009

      u.      Nakai, Jakegory, 10-06-2009

      v.      Nakai, Jimmy Jr., 09-29-2009

      x.      Orsinger, Johnny, 06-02-2009

8

Exhibit 5 - 189

y.      Reed, Freda, 05-29-2009

z.      Reed, Lorenzo Jr., 05-30-2009

aa.     Reed, Randy, 05-29-2009

bb.     Reed-Dayzie, Tara  05-21-2009

cc.     Roessel, Ruth, 05-31-2009

dd.     Sebahe, Tammy Rose, 05-30-2009

ee.     Sowell, Donnarae,  05-16-2009

ff.     Tsosie, Cheryl, 06-01-2009

gg.     Tsosie, Herman, 06-01-2009

hh.     Wilson, Celestial,  05-14-2009

**39.  Expert Declarations**

a.      Ockenfels, Vera - Declaration 09-22-2009

b.      Stewart, Pablo - Declaration 10-28-2009

9

Exhibit 5 - 190

SUPPLEMENTAL DECLARATION
OF HILARY N. WEAVER, D.S.W.

1. My name is Hilary N. Weaver; I am a Doctor of Social Welfare. I am a professor of social work with expertise in cultural issues in the counseling process, with a particular emphasis on Native Americans.

2. I previously submitted a declaration on behalf of Lezmond Mitchell, identified as Exhibit 143 in his case, No. CV 09-8089. A copy of my curriculum vitae is attached to my first declaration as Attachment A; my education, publications and professional experience have not substantially changed since I submitted my first declaration in November of 2009.

3. In reaching my professional opinion, I have reviewed additional evidence to that which I reviewed prior to my first declaration. A true and correct copy of the listed materials I reviewed is attached as Exhibit A to this declaration.

4. Additional information pertinent to Lezmond Mitchell's social history has been discovered since the filing of my first declaration. As noted in that declaration, Lezmond Mitchell's maternal grandfather, George Mitchell was one of three people with strong shaping influences on Lezmond's life. The suspicions of child molestation noted in my first declaration have been validated by newly obtained information.

1

Exhibit 5 - 191

5. Bobbi Jo Mitchell is George Mitchell's wife, thus, she is Lezmond's grandmother. Floyd Graham, Bobbi Jo's younger half-brother, lived with George, Bobbi Jo and Sherry Mitchell, Lezmond's mother, when Floyd was a teenager; Sherry was a child during this time. In 1964, while Floyd was living with the Mitchell household, he regularly provided child care for a three year old neighbor girl [not Sherry]. One evening Floyd left the neighbor girl in George's care, in order to attend his high school prom. The day following the prom, Bobbi Jo Mitchell was extremely upset with Floyd. She blamed Floyd for giving George the opportunity to sexually molest the three year old child. "Bobbi Jo said that if I hadn't gone to the prom, the little girl and George wouldn't have ended up together alone. Bobbi Jo let me know that George did something sexual to the little girl. I could not understand why Bobbi Jo could hold me responsible for something her husband did to a little girl." [Exhibit 155, ¶10.] Floyd recalls that, after this incident, George was transferred to teach at another school district the next school year. [Exhibit 155, ¶10.]

6. Perhaps most telling about this exchange between Bobbi Jo and Floyd Graham, is Bobbi Jo's statement reflecting her knowledge that George was a sexual predator who could not be trusted when small children were left alone with him.

2

Exhibit 5 - 192

7.  George Mitchell molested other children as well.  Floyd Graham's sister, Mary Lee Alice Reed, was also molested by George.  Floyd Graham recalls that, "[t]he incident in Tuba City [with the three year old neighbor girl] came to mind when years later my sister, Mary Lee, said that George Mitchell molested her when she was eight or nine years old."  Floyd realized George molested his sister at about the same time her behavior changed radically, "...as though the light just left her."  The change in Mary Lee following the molestation was so drastic that her family remarked on the difference.  [Exhibit 155, ¶11.]

8.  Mary Lee confirmed that she sometimes stayed with her half-sister, Bobbi Jo Mitchell, and Bobbi Jo's husband, George.  Before their daughter, Sherry, was born Mary Lee visited Bobbi Jo and George in Chilocco.  Mary Lee stated, "I recall feeling very uncomfortable with George, who kept looking at me." [Exhibit 160, ¶7.]

9.  Mary Lee points out Bobbi Jo's questionable judgment; on at least one occasion, Bobbi Jo left her ten year old brother, Billy, in charge of Bobbi Jo's baby daughter, Sherry.  Sherry was just two or three weeks old at the time.  Billy wanted to play outside and passed the care of the young infant to six year old Mary Lee.  It is another instance when the behavior of the adults in the Mitchell household put children at risk.  [Exhibit 160, ¶6.]

3

Exhibit 5 - 193

10. When Mary Lee was nine years old, she stayed with Bobbi Jo, George and Sherry Mitchell in their apartment in Arkansas City. A bed was made up on the couch for Mary Lee. Mary Lee went to sleep, but woke up when she felt someone touching her. "It was George, who was rubbing my vagina. I felt him insert his finger in me all the while whispering to me, 'Doesn't it feel good?' When George went back to his bedroom, I went into the bathroom and took the hottest bath I could stand. The water was so hot it scalded my skin. I stayed in the bathroom for a long time, I couldn't stop crying. While I was in the tub, George knocked on the door and asked me if I was okay. I told him to go away." [Exhibit 160, ¶9.]

11. Due to the small size of the Mitchell's apartment and because Mary Lee could see Bobbi Jo in her bedroom while George molested her, Mary Lee believes Bobbi Jo knew of the molestation as it happened, and did nothing in response. [Exhibit 160, ¶10.]

12. The next day, three year old Sherry, sat with nine year old Mary Lee and tried to comfort her by patting her leg and telling her "it's okay, it's okay." Later, Sherry screamed at her parents at the top of her lungs, "I hate you! I hate you!" George and Bobbi Jo ignored her, while tossing a ball back and forth as though nothing had happened. [Exhibit 160, ¶ 13] This attempt on a three year old's part

4

Exhibit 5 - 194

to provide solace to Mary Lee, strongly suggests that Sherry understood that something terrible had happened to Mary Lee. It seems that at least Bobbi Jo knew George molested Mary Lee. [Exhibit 160, ¶13.] Like so many survivors of sexual assault, Mary Lee carried feelings of shame, guilt and dirtiness for years.[1]  These feelings washed over her unpredictably, triggered by seemingly normal events, such as sitting as a white couch which prompted Mary Lee to worry about staining the fabric. [Exhibit 160, ¶12.]

13.  Johnny Grey, Jr. has lived his entire life in Chilchinbeto, Arizona. He attended Chilchinbeto Community School through elementary and junior high school, when George Mitchell was the principal there. In 1986, Johnny attended high school in Rough Rock while still living in Chilchinbeto. During that school year, Johnny remembers hearing from his mother, one of his teachers, and others in the community that George Mitchell was fired from his position as school principal because he had molested a student. [Exhibit 156, ¶¶2-4.]

14.  George's behavior came to the attention of people outside his immediate family. Willie Nez, past-president of the Chilchinbeto School Board, recalls complaints filed in the mid-1980s against George by parents of school children.

---

[1] Parsons, Erwin R., Bannon, Luerena K. (2004); Stress Responses in Sexual Trauma Victims and in Others Experiencing Overwhelming Events. *Incidents of Sexual Abuse*, 3-4).

5

Exhibit 5 - 195

(This was apparently before George was fired, as noted by Mr. Grey.)  Mr. Nez does not recall the substance of the complaints of thirty years ago against George. He does remember that George left the school district shortly after the complaints were filed.  [Exhibit 159, ¶¶2-3.]

15.  James Laughter, a life-long resident of the Navajo reservation and the Vice President of the Chapter House at Chilchinbeto also recalls that in 1985 or 1986, two community members brought complaints against George to the Chapter House Board members.  Similarly, James Laughter no longer recalls the specifics of those complaints, but does recall that the charges were serious.  Mr. Laughter reports that the Chapter House and Chilchinbeto School Board removed George from his position as school principal.  George's contract was paid off and he was asked to leave the community.  [Declaration of James Laughter, Exhibit 158, ¶¶2-3.]

16.  Neither Mr. Nez nor Mr. Laughter, now elderly men, were able to detail the charges against George Mitchell.  However the charges were serious enough to terminate George's employment contract and for the leaders of the Chapter House to ask him to leave the community.  The recollections about the charges from varied and multiple sources, coupled with the earlier instances of child molestation and George's continued involvement with children, suggest that George's sexual

6

Exhibit 5 - 196

misconduct continued.

17. As I discussed in my previous declaration, during Lezmond's childhood he was often left to live with George Mitchell. There are multiple indicators that George had an ongoing pattern of molesting young children; indeed, it is known that child molesters are recidivists, even those who do receive incarceration or treatment for their criminal behavior. Child molestation is terrifying and traumatic for the victim, usually leaving life long scars. Lezmond lived under the care of a man that molested multiple children over the course of at least several years. Throughout her childhood, Lezmond's mother, Sherry, was subjected to sexually suggestive behavior by her father and likely molested by him. George was not only sexually assaulting children outside his family, he was sexually inappropriate within his immediate family. George was a man who indulged himself sexually, without regard for boundaries, biology or the age of his victims.

18. While Lezmond moved frequently during his lifetime, being Navajo was his identity. As an enrolled member of the Navajo Nation, Lezmond's blood quantum is documented as one-quarter Navajo. This in itself can be somewhat misleading as blood quantum and cultural identity are not synonymous. Identity is largely shaped by the social environment of the individual and the perceptions of others. Lezmond is one-half Marshallese through his father's bloodline, yet

7

Exhibit 5 - 197

Lezmond knows nothing of the Marshall Islands and indeed, has never met anyone from that side of his family. He has had no exposure to the Marshallese culture, therefore it had no shaping influence on Lezmond's identity.

19. Lezmond is also one-quarter White through his grandmother Bobbi Jo's lineage. It appears she adapted as much as possible to a Native American cultural context and later even claimed some vague connection to a Native American bloodline as well. While Lezmond spent some time living outside the Navajo reservation in predominantly non-Native contexts, he does not appear to have assimilated into a mainstream White environment. Accounts of his time in California suggest that Lezmond felt he did not fit in there because he was neither White nor Hispanic. Phenotypically, Lezmond clearly does not present as White. The only aspect of his identity left for Lezmond to connect with is being Navajo.

20. As a Navajo, Lezmond experienced painful alienation because he was not fluent in the language and did not grow up immersed in the culture. (This aspect is peculiar since George, who became and remained Lezmond's primary caretaker, taught Navajo culture at the school.) Nevertheless, though out his life Lezmond participated in Navajo traditional ceremonies both attending with family members as a child and on his own in later years. The Native American Church belief system has always been and remains significant to Lezmond. Likewise, he

8

Exhibit 5 - 198

espouses a clear and unwavering belief in witchcraft as it is defined within the Navajo belief system.

21. I have previously discussed the enormous influence the various Mitchell family conflicts had on Lezmond. He had a childhood of instability, with a combination of physical moves and a nearly constantly changing constellation of care givers. Lezmond was the target of adult behavior intended to shame, humiliate and isolate him. The adults around Lezmond put themselves and their personal needs first, to his detriment throughout his life. Finally, Lezmond's mother and grandmother knowingly gave up his care for extended periods of time to his grandfather, a man whom they knew sexually preyed on children.

22. George Mitchell sexually assaulted children over a period of many years. His behavior was known in the communities in which he lived, brought to the Chapter House board's attention in at least one community, resulting in George losing his job and his family being asked to leave the area. His behavior was known by his wife, Bobbi Jo, who did nothing to protect the children around him, but chose to blame others for allowing George "access" to these children. It appears she allowed George to molest children in her home, and did nothing to protect her own daughter, Sherry, from George's assaults. In that environment Lezmond had not a single family member he could count on, no one who took his

9

Exhibit 5 - 199

personal safety and well-being as their responsibility.

23. Lezmond lived many of his formative years in a community that experienced a high rate of violence, substance abuse and trauma. Lezmond had a near death experience when he was in high school and survived a car accident that killed the driver, Jeremy Gorman [Exhibit 162]. Drug and alcohol use were rampant in a community that outlawed alcohol sales within its borders. Lezmond's own drug use escalated following his graduation from high school, primarily as a means of escape from the chaos that permeated his life.

24. Lezmond's behaviors in the instance offense are anathema to traditional Navajo beliefs about balance, harmony, and how life should be lived. Nonetheless, Lezmond's life still fits well within the Navajo explanatory framework. As stated in the Resolution of the Dineh Medicine Association, "Death is employed by those beings who dissociate, who become detached, unlinked from the teaching of relatedness, respect and responsibility." [Exhibit      Lezmond's fragmented and trauma-filled life was indeed disconnected in this way.

25. The Navajo Nation is a nation with a rich cultural heritage, and yet Lezmond was never given the tools to fully draw from it both strength and identity. George was a full-blooded Navajo, fluent in the language, who could have passed the richness and grounding of his culture to Lezmond and did not. Whether it was

10

Exhibit 5 - 200

George's lack of interest in helping shape Lezmond, or George's own self

indulgence that kept him from teaching Lezmond about their culture, isn't clear.

What is clear is that while Lezmond identifies as Navajo, he was given little help in

preparing to live as a functioning adult in any context, including within his own

Navajo cultural context.

I declare under the penalty of perjury the foregoing is true and correct.

Signed this ___30___ day of October, 2010.

Hilary N. Weaver

11

Exhibit 5 - 201

Documents Reviewed by Hilary N. Weaver for the Supplemental Declaration:

Exhibit 155.  Declaration of Floyd Dale Graham, 5/15/2010

Exhibit 156.  Declaration of Johnny Grey, 4/29/2010

Exhibit 158.  Declaration of James Laughter, 4/29/2010

Exhibit 159.  Declaration of Willie Nez, 4/29/2010

Exhibit 160.  Declaration of Mary Lee Alice Reed, 5/6/2010

Exhibit 162.  Declaration of Bryant Wilson, 3/12/2010

Exhibit        Resolution of Dineh Medicine Association.

Exhibit 5 - 202

# ATTACHMENT G

Exhibit 5 - 203

August 20, 2019

To Whom It May Concern:

That I, Alex Mitchell and I'm in
support the declaration that I wrote
on October 22, 2009. I have met with
an investigator from the Office of the
Federal Public Defender on August
20, 2019.

I knew Lesmond Mitchell as a young
boy, he was very bright kid. He would
bring his cartoon movies, games and
ride his bicycle. He spoke english
and later he began to learn the Navajo
language. I enjoyed being around
Lesmond and he was kind and respectful.

For these reasons, I ask you
spear spare his life. The Navajo
Nation is against the death penalty.
It is against our tradition and values,
as it is my. I am a Tribal Member
of the Navajo Nation.

Signed in Tsaile, AZ

Alex Mitchell

Alex Mitchell
August 20, 2019

Exhibit 5 - 204

August 19, 2019

To Who this may concern:

I, Bryant Wilson, am writing this in regards to Lezmond Mitchell's current sentence, which is death.

In my personal opinion and belief the death sentence is to extreme for a good, caring person who had hardship turmoil through his upbringing.

Yes, I knew as I am sure he, Lezmond Mitchell, understands and is greatly remorseful for the crimes he committed by taking the lives of others. There is no excuse for those actions. We have all made mistakes in our lives I am sure he accepts responsibility and has lived with the pain, guilt and among all the heartache and sorrow he inflicted on the victims loved ones he also is carrying that burden within his heart and soul. He will live, suffering with that burden the rest of his days.

Exhibit 5 - 205

The reason I knew this is true
since being the Legmond Mitchell
I knew was not a violent
person who would ever take
a life. What he DID that day
was a shock to me as I'm
sure it was to all who were close
and knew Legmond, being that
what I said about him a good,
caring person, is true.
Despite the abuse, emotionally
and physically, that Legmond
suffered as a child and into
adulthood and yet he still
managed to be class president,
made outstanding grades and
graduated from high school. He
was selected to give the graduation
speech speech because of his high
school accomplishment.
His punishment should last the
rest of his days in custody as
opposed to being put to death by
the government. As Native Americans,
we do not support the death penalty.
Death should remain the decision of
the creator.

Exhibit 5 - 206

I am begging and pleading that
you spare Lezmond Mitchell's life.
Let him serve out the rest of his
life in prison, where he suffers for
the crimes he committed that day.

This letter supports the declaration
I signed on March 12, 2010.

I met with an investigator from
the office of the Federal Public
Defender, from Los Angeles, on
August 19, 2019.

BRYANT Wilson    BW
          Signed in Chinle, AZ, 8/19/19

Exhibit 5 - 207

August 19, 2019

To Who this may concern:

I, Bryant Wilson, am writing this in regards to Lezmond Mitchell's current sentence, which is death.

In my personal opinion and belief the death sentence is to extreme for a good, caring person who had hardship turmoil through his up bringing.

Yes, I knew as I am sure he, Lezmond Mitchell, understands and is greatly remorseful for the crimes he committed by taking the lives of others. There is no excuse for those actions. We have all made mistakes in our lives I am sure he accepts responsibility and has lived with the pain, guilt and among all the heartache and sorrow he inflicted on the victims loved ones he also is carrying that burden within his heart and soul. He will live, suffering with that burden the rest of his days.

Exhibit 5 - 208

The reason I knew this is true
since being the Legmond Mitchell
I knew was not a violent
person who would ever take
a life. What he DID that day
was a shock to me as I'm
sure it was to all who were close
and knew Legmond, being that
what I said about him a good,
caring person, is true.
Despite the abuse, emotionally
and physically, that Legmond
suffered as a child and into
adulthood and yet he still
managed to be class president,
made outstanding grades and
graduated from high school. He
was selected to give the graduation
speech speech because of his high
school accomplishments.
His punishment should last the
rest of his days in custody as
opposed to being put to death by
the government. As Native Americans,
we do not support the death penalty.
Death should remain the decision of
the creator.

Exhibit 5 - 209

I am begging and pleading that
you spare Lezmond Mitchell's life
Let him serve out the rest of his
life in prison, where he suffers for
the crimes he committed that day

This letter supports the declaration
I signed on March 12, 2010.

I met with an investigator from
the Office of the Federal Public
Defender, from Los Angeles, on
August 19, 2019.

BRYANT Wilson   BW
      Signed in Chinle, AZ, 8/19/19

Exhibit 5 - 210

11:20 ⌁



+1 (928) 277-7835 ›

Text Message
Friday 5:22 PM

Cynthia, Im just texting you my statement hopefully your able to print it. I did what I can.

Charlotte Yazzie
P.O. Box 149
Red Valley, AZ 86544

RE: Lezmond Mitchell

As you should all know this was a very sensitive tough decision to make. However, when this issue was addressed to me it had reminded the tragic terrifying incident

Exhibit 5 - 211







+1 (928) 277-7835 ›

However, when this issue was addressed to me it had reminded the tragic terrifying incident that occurred to me an it affected my family.  I thought i had put this to a closure and forgotten. Apparently this tragic was brought back to my attention.

Im thankful that I'm alive and got to see my children grow up.  At the time of the incident my children were still babies.

My heart goes out to the family that loss the

Exhibit 5 - 212





+1 (928) 277-7835 ›

My heart goes out to the family that loss the grandma and the 9 year little girl.  However, I want a complete closure to this incident therefore; out of my own will I decided for Lezmond Mitchell to spend the rest of his life incarcerated. I don't want him to be put to death because it would be the easy way out for him.

Respectfully submitted by:

Charlotte Yazzie

Exhibit 5 - 213

TO: Rosalind Sargent-Burns, Acting Pardon Attorney

Dear Ms. Sargent-Burns:

Attached is my letter in support of Lezmond Mitchell's application for executive clemency and a pardon. I am respectfully requesting Lezmond Mitchell's death sentence and life sentences be commuted, and that he be permitted to return to his home: the Navajo Nation.

Thank you for your consideration.

*Chungtt*

Date: *9/17/19*

Exhibit 5 - 214

August 21, 2019

To whom it may concern:

I believe that Lezmond Mitchell does not deserve the death penalty. I believe that is The Lord's decision. It is not up to man to decide who should live or die. Even though Lezmond has taken two lives, two wrongs do not make a right. Our God is a forgivng God and Lezmond should serve out the rest of his life in prison.

As a full-bloodied Navajo, I know that our tribe is against the death penalty and that it is wrong to kill another human being. It is against our beliefs and culture.

I have known Lezmond since I was 11 years old. I am now 36 years old. Lezmond was a very polite, respectful and kind person. He had a fun sense of humor. As I grew up, I learned how smart Lezmond was. I know when he was in high school, he was the class president and valedictorian. He graduated with honors and was a strong, positive leader for other students. I know they looked up to him.

I do not know what happened to Lezmond that he was involved in taking the lives of others. I know that he did not have any parental support, of any kind. He did not have financial or emotional support. It was sad because his mother was a principal of another high school on the same reservation. His parents were not involved in his life. They did not attend his high school graduation and did not hear him give the graduation speech.

For all of these reasons, I ask that his life be spared. He is deserving of clemency.

This letter supports my past declaration that I signed in 2009. I have met with an investigation from the office of the Federal Public Defender on August 21, 2019.

*Chuyffn*

Cheryl Tsosie-Hoswoot

Signed in Chinle, Arizona

PO Box 3027, Chinle, Arizona 86503

928-349-0102

Date: 8/21/17

Exhibit 5 - 215

TO: Rosalind Sargent-Burns, Acting Pardon Attorney

Dear Ms. Sargent-Burns:

Attached is my letter in support of Lezmond Mitchell's application for executive clemency and a pardon. I am respectfully requesting Lezmond Mitchell's death sentence and life sentences be commuted, and that he be permitted to return to his home: the Navajo Nation.

Thank you for your consideration.

Date: 09/17/19

Exhibit 5 - 216

August 21, 2019

To whom it may concern,

I Clifford Hoswoot am spouse to Cheryl L. Hoswoot. I am writing this letter on behalf of

Lezmond Mitchell. I am full blooded Navajo and I'm aware of the tribe's position on the death

penalty. I believe that to take a life is wrong. That it is not up to man to determine this

dispensation of life. I believe that God is a forgiving God and that all your sins are forgiven

through the blood of Jesus Christ. So therefore, Lezmond should serve out his sentence for his

wrong doings. Based on everything I know about Lezmond, I believe his life should be spared.

He can still make a contribution in the prison setting as he did in high school.

I met with an investigator from the office of the Federal Public Defender on August 21,

2019.

Clifford Hoswoot

Signed in Chinle, Arizona

PO Box 3027, Chinle, Arizona 86503

928-349-3514

Date: Aug, 21 2019

Exhibit 5 - 217

Rosalind Sargent-Burns
Acting Pardon Attorney
U.S. Department of Justice
Office of the Pardon Attorney
950 Pennsylvania Avenue
RFK Main Justice Building
Washington, DC 20530

August 29, 2019

Dear Ms. Sargent-Burns

God Bless You and greetings,

My name is Michael Brian Slim. I am forty-two years old. I am Native American ('Dine' - Navajo) born in Fort Defiance, AZ currently living in Phoenix, AZ.

In 2001 our family was affected by the double murder of my grandmother Alyce R Slim and my cousin Tiffany Lee. During this time our family was hurt and devastated by the double loss.

We went through the process of searching for our family members, for what seemed like day and night. Having the police and FBI finally take the missing persons case seriously and assist us. Locating my grandma's burned vehicle. To the police/FBI finally coming back to the family telling us they were dead.

This time in my life seemed to last forever.  I felt so much pain and heartache that I just wanted to sleep. Because when you wake up, you have to deal with the pain and hurt all over again until you cry yourself back to sleep.

The most painful part for me was watching my aunt Marlene. She lost her daughter and her mother. Seeing the hurt she went through as well as her son Brian.  Our family still deals with the hurt. Mostly my family doesn't want to talk about it. I deeply LOVE my family and don't intend to cause more hurt but only Growth.

In 2003, it was very hard going to the trial and having to hear how the crime was done. There were times at this point in my life when I felt Lezmond Mitchell was getting what he deserved. I even gave testimony giving my input on this. During this time in my life I thought this was the right thing to do. As a form of revenge, thinking he should die for killing my family members.

I LOVED my grandma Alyce and Tiffany a lot at that time. I would say I LOVE them more now. Over the past 16 years since the trial, I have discovered the real meaning of LOVE. God's Love.

*"We love, because he first loved us."  1 John 4:19*

My faith has taken me to a new way of seeing and experiencing Life to Discover the real meaning of being 'Born Again'.

On Thursday July 25, 2019, I was contacted by a NPR radio reporter. Telling me for the first time about this execution date. To my knowledge the United States didn't inform us that this was going to happen or even ask how we felt now. They just spoke for the families and assumed that their decision was

1

Exhibit 5 - 218

correct by stating this in the press release: "and we owe it to the victims and their families to carry forward the sentence imposed by our justice system."

After this happened I was contacted by a defense victim outreach specialist for Mr. Lezmond Mitchell's defense team. I told her of my interest in helping them get Lezmond Mitchell off death row. I want to clarify, I'm not trying to get Lezmond Mitchell out of jail. That's not my journey.  But to take another person's life because he made a mistake is not Forgiving. It is revenge. I Forgive Lezmond Mitchell for the double murder that affected my family. We are not God to make the decision on when he should be killed.

Yes, Lezmond Mitchell made a mistake. I have made mistakes. You have made mistakes. When you ask God for Forgiveness and you mean it, it's Done. I recently went to the hearing for Lezmond Mitchell where I was verbally attacked by one of the prosecutors. This was because my death penalty stance is different than hers, and I caught her in a lie. This happened in front of her co-counsel and the defense team. I had to remind her that I was the one who lost my family members. Then she wanted to call security on me, because I caught her in a lie. The lie was telling family members not to talk to anyone. I had proof of her lie also.

> *"And he said unto him, Thou shalt love the Lord thy God with all thy heart, and with all thy soul, and with all thy mind. This is the great and first commandment. And a second like unto it is this, Thou shalt love thy neighbor as thyself."  Matthew 22:37-39*

I help Lezmond Mitchell as a sign of Forgiveness and LOVE. Attached is a letter I wrote Lezmond on Thursday, August 15, 2019. I am his supporter and soon to be his friend.

I am not speaking for our entire family. This is one member of the Slim family who was traumatized by our loss but with the help of God healed. I am strong enough to fight for Lezmond's life. With LOVE, Forgiveness and Peace.

This is an extension of an olive branch of LOVE to Lezmond and his family. We do not need another murder (execution of Lezmond Mitchell) for our family to heal or feel better. Having his family suffer is not the right thing to do.

> *"The heavens declare the glory of God; And the firmament showeth his handiwork." Psalms 19:1*

God Bless Humanity and the United States of America.

With sincere LOVE,

Michael B Slim
1225 N 40th Street #2060
Phoenix, AZ 85008
602-465-8813

Exhibit 5 - 219

*Duplicate of letter given to Lezmond Mitchell's defense team on 8/15/19, copy given to the prosecution*

Thursday, August 15, 2019

Greetings and hello Mr. Lezmond Mitchell,

My name is Michael Brian Slim. I want to say hi to you and tell you that you have a friend. At times we feel alone and like the world is against us. We forget that God is always with us. He is our biggest supporter and he LOVES us.

This letter is written to you with LOVE and Forgiveness.  This letter is NOT to make you feel guilty, hurt or bring up any resentment toward you.

This is how I see it. You made a mistake. But it's not up to me or humanity to take your life. That's something only God should do.

Recently I started to pray for you.  Also, others in my church and my friends. You will be getting off death row. If you are really sorry talk to God about it. He will help you. I promise you.


There are things you can do to really being God into your life quicker and stronger.

1. ***Give your heart to Jesus***. Accept him as your lord and savior.

- ***fear God*** (when you fear God you show him respect. You show him that you are his child and that you make mistakes)

Also

***1 - Pray every day***. That's your connection with God. Prayer you are asking God for help and growth. The more you pray the more he will talk to you. Its hearing his voice.

***2 - Read the Bible***. I have a Bible with this letter. (This Bible is yellow; this is your color - like the number 3 is your number. God told me to tell you that) If you need to have God talk to you. Just open the Bible to any page and start reading. He will give you answers and clarity for your questions.

1

Exhibit 5 - 220

*Duplicate of letter given to Lezmond Mitchell's defense team on 8/15/19, copy given to the prosecution*

**3 - *Don't lie***. When you lie you give into negativity. Tell the truth. (In your case tell your lawyers. What's bothering you and what happen if you choose. MOST OF ALL TELL GOD IN YOUR PRAYERS. This will release a lot of negativity you are holding on to. Remember the lawyers can't tell what you say to anyone. That's Good enough for God and your healing.

I want to tell you that I will continue to pray for you. And I ask you to pray for me and my family for healing and growth. Also, forgiveness. If we both pray for each other this will be a lot easier and quicker for us to get through. I forgive you and I LOVE YOU.  I want to be your friend. I will be your cheerleader. Like God is OUR cheerleader.

You're free to call me or write to me if you choose. This is the first step in this journey. I will meet in person. I will Pray with you in person and I will be your friend.

Michael B Slim
1225 N 40th Street #2060
Phoenix, AZ 85008
602-465-8813

I've also enclosed some money for you to use. I pass on and spread my Blessings on to you.   Remember nothing is impossible for God. Trust God. Most of all LOVE GOD with all your heart.

God Bless You and your family.

 Your friend. Your Navajo brother.



Michael B Slim

2

Exhibit 5 - 221

TO: Rosalind Sargent-Burns, Acting Pardon Attorney

Dear Ms. Sargent-Burns:

Attached is my letter in support of Lezmond Mitchell's application for executive clemency and a pardon.  I am respectfully requesting Lezmond Mitchell's death sentence and life sentences be commuted, and that he be permitted to return to his home: the Navajo Nation.

Thank you for your consideration.

Avska K Mitchell sa

Date:   9-11-19

Exhibit 5 - 222

## DECLARATION OF AUSKA KEE CHARLES MITCHELL

I, Auska Kee Charles Mitchell, hereby declare as follows:

1.    My name is Auska Kee Charles Mitchell. I am Lezmond Mitchell's uncle. His mother, Sherry Lane Mitchell, is my older sister. Our parents were George Mitchell, a full-blooded Navajo, and Bobbi Jo Erwin, whose family was of Scottish ancestry. Our parents raised Lezmond for much of his life.

2.    After I graduated from Monument Valley High School, I enlisted in the Army. I spent four and a half years in the Army. I was called back for Desert Storm, and I'm a Desert Storm veteran.

3.    After I left the military, I worked for Aramark Service Master as a director of facilities and did custodial service for different schools on and off the reservation.

4.    As a child, I grew up mostly on the reservation. There was a lot of emotional and physical abuse in our house growing up. There was constant fighting between my parents and between my mother and Sherry. I once saw my father threaten to kill my mother with a bow and arrow. My father was physically abusive to my mother and to me. My mother was extremely manipulative and emotionally abusive to all of us. She and my father used to beat me with a belt. She demeaned and degraded all of us. I felt so much pressure growing up in that house.

5.    I couldn't wait to graduate from high school and move away. One time when I was still at home, my parents and I were outside, and they were fighting. I had an outburst and told my parents to just go ahead and kill me—I was

A.L.C.M

Exhibit 5 - 223

so upset, I couldn't stand my parents' constant fighting any more. My mother told me to stand behind her truck. She then got into the truck, put it in reverse, and hit the gas. She actually tried to kill me. I managed to jump out of the way and avoided being hit before my mother slammed into the side of the barn.

6.     My mother wasn't much of a parent to me. When I was a kid, Sherry acted more like a maternal figure than my own mother. But she suffered from my mother's ways too.

7.     I've been in Lezmond's life since he was first born. I used to help take care of him before I joined the Army. After I returned to the reservation, I would see Lezmond on a pretty regular basis. Lezmond spent the greater part of his childhood with my parents, either both of them together or with each separately. I don't know why Sherry felt like she couldn't take care of Lezmond herself. He would come and stay with me and my family for the weekend about once a month. Lezmond used to play with my children and help me and my wife around the house. In my experience, he was a respectful and loving child and teenager.

8.     In all the years that I knew him, there was only one occasion where I feel like Lezmond disrespected me and my family. One weekend that he was staying with us, I walked into the kids' room where he had his bags and I could smell marijuana. I searched his bags and found a pot pipe. I was upset, because I didn't want drugs in my house. I confronted him and he immediately apologized. He broke down in tears because he was upset that he had upset me.

9.     I wanted Lezmond to come live with me and my family. I didn't want him to grow up exposed to the violence and emotional abuse that Sherry and I lived with from our parents. He was a good kid and I wanted him to stay on the

A.L.C.M

Exhibit 5 - 224

right path. But my mother and sister believed it was better for Lezmond to live with his grandfather (my father), and I deferred to them.

10. Lezmond always seemed like a follower to me. He was raised in traumatic circumstances, and he never got the support he needed from his parents. His father was never around, and Sherry was gone a lot—though when she was around, she never attended school activities or met with his teachers, even though she was a principal at another high school. She even missed his graduation. Lezmond was class president and he gave the graduation speech. I'm not aware of any activities Sherry attended to support her son.

11. I would go to Lezmond's high school as part of my job, and I would check in on him, and ask his teachers and the staff how Lezmond was doing. They would all say what a great kid he was. Lezmond protected younger students and kids from being bullied. I think if Lezmond had more support growing up, more guidance and caring from his family, he could have accomplished a lot in life.

12. Lezmond is a caring soul. I truly believe that he found himself in a situation with Johnny Orsinger, who had a violent past, and those others involved that he couldn't get out of the situation. I believe Lezmond is worthy of mercy and forgiveness. Lezmond deserves the same sentence that Johnny Orsinger received.

13. I follow the Navajo tradition. Our tribe is against the death penalty, as we believe it is wrong to kill another human being as punishment. Two wrongs never make a right. I am against the death penalty as a Navajo, and I am against it personally for Lezmond. If Lezmond is executed, it will be a devastating loss for me, my family and for our community.

14. I met with an investigator from the Office of the Federal Public Defender on August 22, 2019. I previously signed a declaration in this case on

A.L.C.M

Exhibit 5 - 225

June 4, 2009. This declaration is an addendum to the previous declaration, which I continue to stand by. I'm providing this declaration now in support of Lezmond's petition for clemency.

I declare under the penalty of perjury and the laws of the United States of America, that the foregoing is true and correct. Signed this 28th day of August, 2019, in Goodyear, Arizona.

AUSKA KEE CHARLES MITCHELL, Sr.

A.L.C.M

Exhibit 5 - 226

TO: Rosalind Sargent-Burns, Acting Pardon Attorney

Dear Ms. Sargent-Burns:

Attached is my declaration in support of Lezmond
Mitchell's application for executive clemency and a
pardon. I am respectfully requesting Lezmond
Mitchell's death sentence and life sentences be
commuted, and that he be permitted to return to his
home: the Navajo Nation.

Thank you for your consideration.

ate: 9/17/19

HERMAN TSOSIE

D

Exhibit 5 - 227

Herman Tsosie        (928) 781-2282
Bx 115
Round Rock, AZ
        86547

To: Justice Dept

American Indians are by law
not to be excuted.

The current Attorney General
Bar has Clearly shown, abuse
of Power, under Trump admistraten

credibility of Justice are at
odds with the rest of the
Country, the appointed AG doesn't
Abide by the law, he has detour
the whole Congress and senate

The inadequate AG needs to
reminded of the law set forth
for the Native American.

Herman Tsosie

Exhibit 5 - 228

TO: Rosalind Sargent-Burns, Acting Pardon Attorney

Dear Ms. Sargent-Burns:

Attached is my declaration in support of Lezmond Mitchell's application for
executive clemency and a pardon. I am respectfully requesting Lezmond
Mitchell's death sentence and life sentences be commuted, and that he be permitted
to return to his home: the Navajo Nation.

Thank you for your consideration.

_John Pontes_

JOHN PONTES

Date: 9-17-2019

Exhibit 5 - 229

**DECLARATION OF JOHN FONTES**

I, John Fontes, hereby declare as follows:

1. My name is John Fontes. Since 2004, I have been employed at Northern Light, Charles A. Dean Hospital located at 364 Pritham Avenue, Greenville, ME 04442. My position is Clinical Laboratory Scientist. As such, I perform patient diagnostic testing in the hospital laboratory.

2. I first met Lezmond Mitchell at Rough Rock Community High School ("RRCHS) located in Chinle, Arizona. Chinle is part of the Navajo Reservation.

3. I was RRCHS's vocational director and assistant principal during Lezmond's junior and senior years. I recall Lezmond adapting well and acquiring abilities to actively involve himself in programs that could potentially benefit other students.

4. Lezmond was involved in extra-curricular activities. He was president of the student council during his senior year. Lezmond was also part of the school's varsity football team.

5. At the time, Lezmond lived with the family of his friend and fellow student at RRCHS, Lorenzo Reed, in Round Rock, Arizona. I recall Lezmond had no communication with his mother, and my impression was that she wanted nothing to do with him or the teachers at the school.

1



J.F.

Exhibit 5 - 230

6.      In my opinion as an educator, Lezmond excelled in all his studies and extra-curricular activities while at RRCHS.    I have no memory of Lezmond having problems at school such as getting into fights or assaulting other students or faculty. He did however, express discontent with different issues including the school's lack of textbooks and library materials but he would express his frustrations in a calm and collected manner.    Lezmond had the ability to offer solutions to problems. For example, Lezmond was part of a group of students who started a tutoring program to help students struggling with learning difficulties.

7.      The most significant memory I have of Lezmond is his participation in a school landscaping project as the senior class president.    The project was led by me, as the vocational director, and in coordination with the school principal, other academic staff, and the students involved in this project led by Lezmond,    As the student leader in this project, Lezmond encouraged other students in finding significance in building something they could not only enjoy themselves, but also for the enjoyment of other future students in years to come.    This project was referred to as an "enclosed outdoor recreational garden" and was designed with the intention of converting the entrance of an enclosed three wall desert sand only desolate area into an "oasis" filled with plants, flowers, trees, flagstone patio, and picnic tables and benches.

8.      The oasis was designed and built by students with faculty supervision. Dr. Paul Kadota, a professor from Northern Arizona University ("NAU"), marveled at the project as he stood looking at the oasis in disbelief at what the students had created.    In fact, Dr. Kadota often brought some of his NAU graduate students to tour the RRCHS project which was like green oasis in the desert.

2

J.F.

Exhibit 5 - 231

9.     Lezmond basically spent the entire spring during his senior year working on this project almost on a daily basis.     He also helped with the design of the senior tables and benches located in the east corner of the garden area. Lezmond and Jaworski Castillo were the lead students working on this project, mostly during study hall time.     The students also designed an octagon shaped table with a capacity to seat a total of eight students.     The oasis/landscaping project brought an incredible sense of pride to everyone at RRCHS, especially for the students and faculty involved in the project.

10.     I previously signed a declaration regarding this case on June 5, 2009. This declaration is an addendum to the previous declaration, which I continue to stand by.     I am now providing this declaration in support of Lezmond's Clemency Petition.

11.     I strongly believe that Lezmond's life should be spared.     Lezmond has demonstrated a sincere desire to learn and study history, medical science, and technology, throughout the 16 years he has been housed at FBP Terre Haute. Furthermore, Lezmond has selflessly shared his knowledge with me and has contributed in making me a better clinical laboratory scientist.     Lezmond has also been instrumental when drafting proposals I have submitted in support of certain grants allowing for future funding for vocational school projects within the Navajo Reservation.

/ / /

/ / /

3

J.F.

Exhibit 5 - 232

12.    In essence, Lezmond and I have become more than a simple social visit, we have become intellectual friends.    I strongly believe that Lezmond is capable of contributing to create positive change in others and to make our country a better place for everyone, especially for Native Americans.

I declare under the penalty of perjury and the laws of the United States of America, that the foregoing is true and correct.    Signed this 27 day of August, 2019, in Greenville, Maine.


_____
JOHN FONTES


4


J.F.


Exhibit 5 - 233

09/18/2019  16:28    5056328905          TAFT CONSTRUCTION              PAGE  02/02
     09/17/2019  14:36    9512766368          FPD:RIVERSID                  PAGE  02/03

TO: Rosalind Sargent-Burns, Acting Pardon Attorney

Dear Ms. Sargent-Burns:

Attached is my declaration in support of Lezmond Mitchell's application for
executive clemency and a pardon.  I am respectfully requesting Lezmond
Mitchell's death sentence and life sentences be commuted, and that he be permitted
to return to his home: the Navajo Nation.

Thank you for your consideration.


LORENZO REED                                      Date: _9-18-19_

Exhibit 5 - 234

## DECLARATION OF LORENZO REED, JR.

I, Lorenzo Reed, Jr. hereby declare as follows:

1.      My name is Lorenzo Reed, Jr.   I live in Round Rock, Arizona, with my mother, Freda Reed.   My brother, Randy Reed, and my sister, Tara Reed, also live with my mother in Round Rock, Arizona.   Currently, I travel to Colorado and other states to work on construction contracts.   Sometimes I am gone weeks at a time but I always return home to Round Rock, Arizona, after I'm done.

2.      I met Lezmond Mitchell when we were both in elementary school in Round Rock, Arizona.   Round Rock is part of the Navajo Reservation.

3.      By the time Lezmond was a senior in high school, we were more than best friends; we were brothers.   In fact, Lezmond moved in with us during his senior year.   My mother grew very fond of Lezmond throughout the years, especially during the time he lived with us.   My sister, Tara, and my brother, Randy, also saw Lezmond as a new member of the family.

4.      I never saw Lezmond as happy as when he lived with us.   It was nice seeing him transition from a shy and quiet kid to a talkative and funny kid.   I never got to know Lezmond's mother or grandparents because they were not

1

L.R.

Exhibit 5 - 235

friendly people.   When Lezmond talked about his life at home with his
grandparents, he seemed like he didn't feel loved.   Lezmond told me that his
grandfather had once told him that he (Lezmond) had been a product of a rape.   I
also remember Lezmond telling about the day his grandmother asked him to clean
the oven.   He told me that after he had cleaned the oven, his grandmother
inspected his work and was not satisfied and therefore shoved his head inside the
oven hitting him on the head.

5.    During the time Lezmond lived with us, he never complained about
doing chores around the house.   Lezmond was tremendously helpful to my mother
and my grandmother, Betty.   Lezmond helped clean the house, he would chop
wood, promptly put the groceries away when my mother came back from the
supermarket, and he also rounded up the sheep for my grandmother.

6.    I knew Lezmond as a very good person and a true gentleman.   He
was polite with everyone, not only with my family.   He babysat my niece,
Kadeda, who was a toddler back when Lezmond lived with us.   My grandmother,
Betty, also loved Lezmond like a grandson.   Up to Grandma Betty's death a
couple of years ago, she recalled Lezmond with affection and only wished the best

2

L.R.

Exhibit 5 - 236

for him.   If she were alive now and knew of his impending execution date, she would have been devastated, just as we all are.   Lezmond was the adopted son to everyone in my family.

7.      In regards to my feelings about Lezmond, I can say that he is the reason I made it through school.   Lezmond made me realize that school is important.   Before meeting Lezmond, I did not care for school.   In fact, I was retained one year because of my lack of cooperation and excessive absences. Lezmond was my mentor, my tutor, my counselor, and the best brother I could ever ask for.

8.      I am proud to be a Navajo, and as such, execution is contrary to my beliefs.   Navajos do not hate and kill via execution.   We learn to forgive and leave punishment to a higher power.

9.      Should the government proceed with Lezmond's execution, I will be devastated and heartbroken.   Part of me as I know it will be lost forever.

10.     I previously signed a declaration regarding this case and my experiences with Lezmond on May 30, 2009.   This declaration is an addendum to the previous declaration, which I continue to stand by.

3

L.R.

Exhibit 5 - 237

I declare under penalty of perjury and the laws of the United States of America, that the foregoing is true and correct.   Signed this $25$ day of August, 2019, in Greeley, Colorado.


_____
Lorenzo Reed

4

_____
L.R.

Exhibit 5 - 238

TO:  Rosalind Sargent-Buns, Acting Pardon Attorney

Dear Ms. Sargent-Burns,

Attached is my letter in support of Lezmond Mitchell's application for executive clemency and a pardon.
I am respectfully requesting Lezmond Mitchell's death sentence and life sentences be commuted, and
that he be permitted to return to his home: the Navajo Nation.

Thank you for your consideration,

Marty Conrad
Date:  9/16/19

Exhibit 5 - 239

To: Rosalind Sargent-Burns Acting Pardon Attorney

From: Marty Conrad – Teacher/Academic Coach

Subject: Lezmond Mitchell

My name is Marty Conrad. I've been a teacher/coach for 45 years. I came to know Lezmond Mitchell as a student at Rough Rock Community School in Rough Rock, Arizona in the late nineties. I coached him for two years. Lezmond was the student body president his senior year, honor roll student, outstanding athlete, and helped with organizing student activities and events.

Lezmond was well respected by his peers and the teaching staff because of his leadership ability and concern for others. He had a positive outlook on life and looked forward to a prosperous future despite the total lack of family and parental support. I never saw his parents, including his mother, who was a principal at a nearby community school on the Navajo reservation, at Rough Rock High School.

Lezmond overcame his parent's neglect to continue his high school education and did so successfully. He maintained a positive attitude in spite of zero support from his mother. I never knew anything about his father. I never saw his mother at any school event or at teacher's conferences even though I knew she had been contacted and asked to attend and support her son. It was beyond my understanding how an educator could be so disinterested in her son. The teaching staff provided Lezmond with new shoes, which his mother did not purchase. Lezmond went home every day after school to a cold dormitory, not a family home.

Lezmond told me he did not want to go to his grandfather's home on the weekends but would stay with friends until Monday morning. I personally saw Lezmond walking home, after school in the dark and I contacted security to make sure he got home safely. I'm certain that happened more than once. Lezmond didn't have anyone except his friends and the staff to depend on.

Regarding football, Lezmond was an all-conference player and was one of the most intelligent linemen I have ever coached. He was a dedicated and disciplined player. He quickly learned the offensive blocking schemes and would instruct the other linemen, who respected him. Lezmond was a leader on and off the field. He conducted class assemblies which no other student had ever done. His graduation speech was delivered powerfully with maturity and encouragement inspiring his fellow students and the community members who attended. Rough Rock High School graduation has always been one of the most important events in the Rough Rock community.

Exhibit 5 - 240

Lezmond had everything it took to continue his higher education and to continue to make his community proud of him. I was proud of him. I've often thought that if only I had adopted him he would have had the opportunities he deserved. I regret that I did not. I considered him like one of my sons.

When I heard about his charges and the crimes he committed, I was shocked and could not believe what had happened to one of my most promising students. Lezmond Mitchell was a potential college academic and an athletic star. If only he had parents who had cared about him and guided him. Lezmond was a loner among his family. Without family support you are alone in your heart. To see that young man, on graduation day and up on that stage, telling his fellow students how great their lives could be while he was up there alone with no one was painful to witness.

Given Lezmond's background and neglect, I never saw or knew of him being in fights, arguments or disruptive behavior. What I saw was just the opposite. Lezmond was a kind and gentle young man. He was humble which reflected the Navajo culture and traditions.

Because of our Navajo values, we are against the death penalty. It is against our moral code. It is wrong to take another's life, even give what Lezmond did, I overwhelming support clemency. It is against my own tribal believes for anyone to kill another human being, including the US Government.

I am asking you to spare Lezmond Mitchell's life.

Sincerely,

Marty Conrad

PO Box 650, Window Rock, AZ  86515

Exhibit 5 - 241

To:  Rosalind Sargent-Burns, Acting Pardon Attorney

Attached is my letter in support of Lezmond C. Mitchell's application for executive
clemency and a pardon.  I am respectfully requesting that Lezmond C. Mitchell's death
sentence and life sentences be commuted, and that he be permitted to return to his home,
the Navajo Nation.

Thank you for your consideration.

*Sonja Halsey* , September 17, 2019
Sonja Halsey

Exhibit 5 - 242

## SUPPLEMENTAL DECLARATION OF SONJA HALSEY

I, Sonja Halsey, declare:

1.     I graduated from the University of Bridgeport, Connecticut with a Bachelor of Science degree in 1971. I attained a Master of Arts in Secondary Multicultural Education with an emphasis on Native American Studies from the University of New Mexico in 1994. I went on to graduate from Northern Arizona University in 2001 with a Master of Education in Counseling with Distinction.

2.     I was Lezmond Mitchell's English teacher at Rough Rock Community School on the Navajo Reservation in Rough Rock, Arizona. Lezmond entered my sophomore English class (English II) as a transfer student at the beginning of the spring semester in 1999. During the 1999-2000 school year, he completed both English III and English IV in my classes. This was possible because our school was on a block schedule during that time, which meant that our class periods were two hours long and that teachers were required to cover a year's curriculum in a semester. It also meant that I had Lezmond Mitchell in class for two hours a day both of those semesters. Since I was the only one teaching both of those required classes that year, it could have been a difficult situation for both of us. It was not; for me it was the most rewarding experience I had as a teacher both on and off the reservation because of Lezmond's unquenchable thirst for knowledge. Lezmond Mitchell, as a student, as a young man at that time, was remarkable in ways which I will describe below.

3.     My sophomore English class was composed entirely of Navajo students, most of whom were bilingual. Although these students had little trouble speaking English, they

*sH*

Exhibit 5 - 243

struggled with reading. Assigning a piece of literature for homework and giving a quiz the next day did not work. One of the social studies teachers who had his students read the material aloud in class suggested I try that. I resisted, afraid the students would find it humiliating. He assured me that it would be fine, that they genuinely wanted to learn and would discreetly help each other with the reading. I gave it a try and remarkably, found he was correct. However, it was not the solution I sought. While it gave the students practice reading, and helped me assess their skills, it was not going to teach them to love reading or to understand a piece of literature. They lost the story line in the struggle with the words. To compensate for this, I had gradually started reading longer and longer sections to them as well as adding short plot summaries and explanations of various literary devices along the way. In my experience, you don't get excited about reading until you want to know what happens. You need the story. This is where we were when Lezmond Mitchell entered my English II class mid-year. Here was a student who did not speak Navajo or look Navajo. I observed a young man conflicted about transitioning to his new school. I was shortly to discover that Lezmond was light years ahead of his classmates intellectually and academically.

4.      I had made it a practice not to know the backstory of any of my students; everyone came into my class with a clean slate. Lezmond had sat through a few days of listening to his classmates struggling with their reading before I called on him. He read a long passage quickly, perfectly, but with no expression in his voice other than utter boredom. His attitude was more exasperation with his classmates than a need to show off. I felt both amazed and dismayed. The other students were looking down at their desks. I asked him to help us understand what he had read. He was sharp; he knew exactly what I

2

Exhibit 5 - 244

was asking, and to my surprise he complied. He read it again, slowly and with expression.

5.      I gradually increased the amount of reading I asked Lezmond to do. By the following year he was helping me read aloud complicated pieces of literature that I would not have attempted otherwise. In another setting, his classmates might have resented this, but instead they loved it.

6.      Although Lezmond Mitchell was at our school for a relatively short time, he quickly became a leader, one who made academic achievement an important goal. He became the Student Council President and was active in that role. He was on Rough Rock's first football team. He had a significant part in planning the landscaping, but also did a lot of the actual construction on the garden project at the entrance to the school dedicated to his graduating class of 2000. In one of the papers I required of my seniors, Lezmond wrote about his desire to become a Vocational Education Coordinator. It has been almost twenty years since I read that paper, but I remember it well.

7.      One of the most significant things about his paper, especially in light of events that followed, was that Lezmond did not know how he was going to accomplish his goal. His counselor, Gib Rogers, had played a significant role in Lezmond's success at our school. The reason why Lezmond was unsure of how to take the next step to college was that his school counselor, Gib Rogers, the only counselor at our school, had resigned at the end of the first semester. The loss of Gib Rogers support was critical for Lezmond.

8.      During this period in his life, I observed Lezmond developing positive relationships with staff members and classmates.   He was, in fact, living with the family

3

Exhibit 5 - 245

of one of his classmates, Lorenzo Reed. Noticeable by their absence was Lezmond's family, including his mother who was a principal at a school on the reservation. I am aware that all efforts to involve his mother in his life and education were met with refusal. His mother made it clear to our staff that she was not to be bothered with her son.

9.     Neither Lezmond's mother nor father ever attended any of his football games, parent/ teacher conferences, or even his high school graduation. They missed the speech their son gave to his graduating classmates about the importance of education and taking responsibility for your actions. He followed up this advice by continuing to encourage two of his friends, Herman Tsosie and Ferdinand Layman to stay in school and then attended their graduation the following year.

10.     Lezmond Mitchell has already had an impact on my life. I saw a brilliant student left at loose ends by the loss of the guidance he needed to make the transition to college. I contacted Northern Arizona University that summer and started a master's program in school counseling. It was too late to help Lezmond, but I have helped others. I have kept in touch with Lezmond during the years of his incarceration. I had the opportunity to speak to Lezmond on the phone on one occasion a few years ago. I have been amazed at his continued love of learning and the scope of his interests. I will be devastated if he is executed.

11,     I previously signed a declaration regarding this case on June 6, 2009. This declaration is an addendum to the previous declaration, which I continue to stand by.

4

$8 9 7 1$

Exhibit 5 - 246

12.   I met with an investigator from the office of the Federal Public Defender on August 10, 2019 and August 12, 2019.

I have read and reviewed this five page supplemental declaration.

I declare under penalty of perjury, under the laws of the United States of America, the foregoing is true and correct.   Signed this _12th_ day of August 2019, in _Rio Rancho_, New Mexico.

Sonja Halsey

Sonja Halsey

5

Exhibit 5 - 247

TO: Rosalind Sargent-Burns, Acting Pardon Attorney

Dear Ms. Sargent-Burns:

Attached is my declaration in support of Lezmond Mitchell's application for
executive clemency and a pardon. I am respectfully requesting Lezmond
Mitchell's death sentence and life sentences be commuted, and that he be permitted
to return to his home: the Navajo Nation.

Thank you for your consideration.

TAMMY ROSE SEBAHE

Date: 09.17.2019

Exhibit 5 - 248

## DECLARATION OF TAMMY ROSE SEBAHE

I, Tammy Rose Sebahe, declare as follows:

1.      My name is Tammy Rose Sebahe.   Randy, Lorenzo and Tara Reed are my cousins-brothers.   Our mothers, Rose Sebahe and Freda Reed, are sisters.

2.      I met Lezmond Mitchell several months before he started living at my Aunt Freda's house.   Aunt Freda's house is a few hundred feet from my mother's house and Grandma Betty's house was another few hundred feet east of my mother's house.   I remember seeing Lezmond and Lorenzo coming in and out in the mornings when they left to school and in the afternoons after school.   They both attended Rough Rock High School.

3.  I know Lorenzo dropped out of high school during his junior or senior year and I also know that it was because of Lezmond's help and encouragement that Lorenzo was able to go back to school and graduate.

4.      During the months that Lezmond lived with Aunt Freda, Lezmond would often times stay at my Grandma Betty's house alone with her.   Many a times, we would all leave to run errands and Lezmond would stay behind to keep an eye on Grandma Betty.   My mother and aunt Freda appreciated having Lezmond around because he was trustworthy and they knew that he would take good care of Grandma Betty should an emergency arise and Grandma Betty knew

1


T. R. S.

Exhibit 5 - 249

she could count on Lezmond to round up the sheep and chop firewood for her during cold days.

5.      Lezmond told me that he preferred staying with Lorenzo, rather than at his house, because they were both trying to finish school, and they encouraged each other.   Lezmond also said he liked that he and Lorenzo took the bus to school together.   I once overheard Lezmond telling Lorenzo that he felt as though his mother did not care for him because she wasn't even part of his life.

6.      I considered Lezmond a cousin-brother, just like Lorenzo.   Lezmond encouraged all of us teenagers to stay in school.   Lezmond was very intelligent and generous with his knowledge   He was always reading and sharing facts with us.   It was convenient for us kids to have someone around whom we could ask questions about our homework.   I remember Lezmond telling Tara and I to stay away from boys and to focus on our education instead.   I felt protected by Lezmond as if he were my older brother.

7.      I felt comfortable being around Lezmond because he was such a nice and respectful kid.   Lezmond actually respected everyone.   He was the type of kid who opened doors for a lady.   During dinner, Lezmond would wait until everyone else had been served before serving himself.   Lezmond felt comfortable around all of us.   He would engage in conversation and participate in activities   He was

2



T.R.S.

Exhibit 5 - 250

funny and talkative, especially when it came to sports such as football.   He was smart and interesting to talk to.

8.      While living with Aunt Freda, Lezmond helped with chores without complaining.   In fact, he volunteered and seemed happy to help in any way he could.   Lezmond enjoyed cooking.   I remember he knew how to cook spaghetti and other potato dishes.   He babysat my cousin's (Tara) two younger kids.   I can still see him running to help unload grocery bags when Aunt Freda or Grandma Betty came home from grocery shopping.   I never saw Lezmond smoke or drink, and this includes the time Lezmond and Lorenzo lived with my brother Randy in Phoenix, Arizona.

9.      I consider Lezmond as part of my family and just like other Navajos who have committed serious crimes within the reservation and have not been sentenced to death, Lezmond's life should also be spared.   It is against Navajo traditions and values to take someone else's life via capital punishment.   We believe that life is sacred and that only God has the right to punish or forgive.   We believe that people deserve a chance to redeem themselves and repent.   I will always remember Lezmond as I described him in this declaration.   I cannot fathom Lezmond hurting another human being.

10.      I will be devastated if the government proceeds with Lezmond's execution and I know everyone who knows him will feel the same way.


T.R.S.

Exhibit 5 - 251

11.     I previously signed a declaration regarding this case on May 31, 2009.

This declaration is an addendum to the previous declaration, which I continue to stand by.

I declare under the penalty of perjury and the laws of the United States of

America, that the foregoing is true and correct.   Signed this 28th day of August,

2019, in Phoenix, Arizona.


TAMMY ROSE SEBAHE

Exhibit 5 - 252

# ATTACHMENT H

Exhibit 5 - 253

Mr Mlene Slim Statement-
Daughter to Alyce Slim
+ mother to Tiffany
Lee

December 28, 2001

Marlene S. Slim
P.O. Box 2247
Window Rock, Arizona 86515

U. S Department of Justice
United States Attorney
District of Arizona

RE:    UNITED STATES VS. LEZMOND MITHCELL
       Court Number: CR-01-1062-PCT-MHM

This is regarding the questionnaire for punishment for the conviction of Carjacking First Degree
Murder. Below are my thoughts and concerns regarding the Lezmond Mitchell.

1)    What sentence do you feel each defendant should receive? Please explain below.

My daughter was only nine years old, with her whole life ahead of her. I certainly will miss
the mother-daughter relationship watching her grow up. And my mother was about to retire
after 30 years of devotion to the Window Rock Unified School District #8 as a Bus Driver.

My daughter and mother's lives and future were taken from them in a instant. This horrific
action effected many lives, including our family, and many other families, adults and kids
alike. For our family, there is a significant void that is evident on an everyday basis. It is a
extremely difficult situation, one in which we will never get over and shattering our lives.

Therefore, due to the savageness and unhuman murders of my daughter, Tiffany N. Lee and
my mother, Alyce R. Slim, who posed no threat what-so-ever to anyone, the sentence called
for would be his natural life in prison, with no chance of parole. A sentence that is harsh
enough to send a message that such offenses will not be tolerated by society. These organized
band of beast, who's whole sole purpose was to get what they wanted through the hurting of
others with no remorse, what-so-ever.

My mother's truck, which was stolen and later used in a armed robbery in Red Valley, AZ,
was driven around in which to gloat their bad deeds. I can only imagine these perpetuators
enjoyed themselves while joy riding and thinking they wouldn't get caught. Lezmond
Mitchell as indicated in my father's statement, knew right from wrong, including the other
suspect, Jason Kinlicheenie for Carjacking and he also should be responsible and indicted,
because he was as much involved for being there, and knowing right from wrong. All of

Exhibit 5 - 254

them should be accounted, due to their knowledge as to what happen and commited. This organized band of gangs should all be given the maximum penalty of life imprisonment and therefore, suffer the consequences of their actions.

2) Other comments or information you would like the Assistant U.S. Attorney to know:

Though, I am not familiar with the laws of crimes within the Arizona State and the Navajo Nation Criminal laws, however, I am learning day by day.

As my father indicated, I filed a report on them missing on Tuesday, October 30, 2001. It seem that the Navajo Police Department did not really do anything as in looking for them. Other than people are missing all the time. And that whole week, we searched and looked for them, even the School Bus Drivers, friends and relatives, posting their pictures and where they might have last been seen. It wasn't until one of the Ranger's or Resource Enforcement Officers found my mother's vehicle in the Wheatfields area, that the Navajo Police and Criminal Investigators finally responded and became involved, when before, they were sitting at idle.

Their responsibility in taking the situation over, their attitude was they didn't really care, perhaps because it wasn't any of their relatives nor anybody they knew. There main objective is to serve and protect, and our family never saw that. When the FBI's showed up and became involved. They handled the situation very professionally and expeditiously in apprehending the suspects, in which they traumatize are family greatly. Through this, my family and I are very thankful to the FBI, in regards to this tragic ordeal in which effected us tremendously, and would like to see that justice is done, so that our lives may be put at ease, however, never the same with our losses.

This will conclude my thoughts and concerns regarding the above matter. If any other questions or concerns, please contact me at my address or telephone number. Thank you.

Respectfully Submitted

Marlene S. Slim

Exhibit 5 - 255

# ATTACHMENT I

Exhibit 5 - 256

TRANSCRIPT OF VIDEOTAPED INTERVIEW OF SHERRY MITCHELL
Interview Conducted on November 21, 2016
Video Transcribed by Edith Prado, Office of the Federal Public Defender, on August 27, 2019

SHERRY MITCHELL:  I was going to college at, um, Navajo Community College before they called it Diné College. And, at that time, um, I realized that I was expecting my son, Lezmond, and, um, so I was really happy because, at that time, I had nothing to do with my parents or this home site or anything because it, um, was very turbulent, um, the way my parents were and everything and it was a very dysfunctional family and I just had to get away. So, I was very happy when I knew I was expecting, um, my son, Lezmond. And I chose to be a single parent and I chose that from the beginning. So there wasn't an issue that I thought later on that, you know, the father would come back and want to be part of the life or get married or anything like that. It wasn't like that. I was by myself and I was doing a lot of things. I was either working, you know, I think I was working before I walked back into school and everything to get my degree. And, I just chose to be-to do that and I didn't tell my parents about, um, anything--that I was expecting my child--or anything like that because I didn't want him to be part of the dysfunction that was going on with this family and I just, I-I really hated being raised by my mom and dad. They could not, especially my mom, her total existence was functioning in chaos all the time. Could not do anything unless chaos was going on. Could not do anything unless there was a problem to solve. And it was getting to that point where I just told her, I said, "You know, I can't live like this. Life cannot be a total chaos all the time." So, when my mom passed, I got to look at the marriage license, the birth certificates, and all this stuff, because those are things they were not sharing. So she was thirteen years old when she married my dad. She was fifteen when she had me. She was a child raising a child. And I had to live with that all my life. I had to live with stuff like that. Out in California, even before I had my son, when she was addicted to Vicodin and stuff like that, on drugs, seeing a psychologist, everything. And it's like, you don't live life like this. Life shouldn't be like this. It shouldn't be this hard, shouldn't be this tough. So, when I was old enough to be able to work on my own to get out on my own, that's what I started doing. So I started working two jobs to establish my own home so that I could put myself through college. And that's what I did. My last year of college, they begrudged me, asking-I asked them to take care of Lezmond 'cause I wanted to take more than twelve hours to finish up and to graduate.

When all this happened, he was with people that were using hard drugs and drinking and everything.

He usually calls on the phone, um, he mostly calls to check on me to make sure I'm doing okay and stuff like that. We do a lot of talking, and, um, he gets quite involved with my job, so I'll talk with him about stuff and we'll talk about this-and-that. I mean, even when I took the job at Rough Rock, I had three jobs to choose from that day, and Rough Rock was one of them, and my son says, "mom, please go to Rough Rock. Make it better, the high school there, for those kids, they need you. You're not there for a paycheck. You're there for the kids and an education." He said, "please go to Rough Rock" so, I did. I went to Rough Rock. I don't have anything to do with anyone else.

My son is very much loved and missed by me. And I hope you will take under consideration what he's asking because I do miss him very much. I have to be here for him to make sure he's okay. And that's what it's always been. And I got up every morning and I prayed for him.

Prepared August 27, 2019/ep

Exhibit 5 - 258

# ATTACHMENT J

Exhibit 5 - 259

March 24, 2020

The Honorable Donald J. Trump
President of the United States of America
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

Re: *United States of America v. Lezmond Charles Mitchell*

Dear Mr. President,

On behalf of _____, I strongly urge you to consider granting Lezmond Charles Mitchell's petition for executive clemency and a full pardon. Mr. Mitchell is a member of the Navajo Nation, and was convicted in the United States District Court for the District of Arizona of several intra-Indian crimes which took place in Indian country. Despite the Navajo Nation's opposition, the Department of Justice elected to pursue a death sentence against Mr. Mitchell in contravention of principles of tribal sovereignty and U.S. Congressional intent barring federal capital prosecutions, absent tribal consent, of intra-Indian crimes committed in Indian country. Mr. Mitchell is the only American Indian on federal death row.

This case is also deeply concerning to the native peoples due to the manner in which the FBI abused Indian tribal courts to deprive Mr. Mitchell of his federal due process guarantees. Specifically, Mr. Mitchell was held in a tribal jail for 25 days while the FBI continually interrogated him. It was only after they allegedly obtained a full confession that Mr. Mitchell was brought to federal court, presented to a magistrate, and appointed counsel. In keeping with FBI protocol, however, Mr. Mitchell's alleged confession is neither tape-recorded nor did he write a statement. In fact, in Mr. Mitchell's only recorded statement, he fervently denies having a direct role in the capital offenses.

Federal criminal prosecutions of intra-Indian crimes occurring within the borders of Indian country bring up long-standing issues of tribal sovereignty. In order to maintain tribal rights, as well as individual tribal member's due process rights, we support Mr. Mitchell's position and urge you to strongly consider granting Mr. Mitchell's petition for executive clemency and a pardon.

Thank you for your continued support of American Indians and Alaska Natives across the nation.

Sincerely,

Lynn Williams
Kaw Nation Chair
Kaw City, OK

Exhibit 5 - 260



GAKONA VILLAGE COUNCIL

March 26, 2020

The Honorable Donald J. Trump
President of the United States of America
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20500

Re: United States of America v. Lezmond Charles Mitchell

Dear Mr. President,

On behalf of the Native Village of Gakona, I strongly urge you to consider granting Lesmond Charles Mitchell's petition for executive clemency and a full pardon. Mr. Mitchell is a member of the Navajo Nation, and was convicted in the United States District Court for the District of Arizona of several intra-Indian crimes which took place in Indian Country. Despite the Navajo Nations opposition, the Department of Justice elected pursue a death sentence against Mr. Mitchell in contravention of principles of tribal sovereignty and U.S. Congressional intent barring federal capital prosecutions, absent tribal consent, of intra-Indian crimes committed in Indian country. Mr. Mitchell is the only American Indian on federal death row.

This case is also deeply concerning to the native peoples due to the manner in which the FBI abused Indian tribal courts to deprive Mr. Mitchell of his federal due process guarantees.

Federal criminal prosecutions of intra-Indian crimes occurring within the borders of Indian country bring up long-standing issues of tribal sovereignty. In order to maintain tribal rights, as well as individual tribal member's due process rights, we support Mr. Mitchell's position and urge you to strongly consider granting Mr. Mitchell' petition for executive clemency and a pardon.

Thank you for your continued support of American Indians and Alaska Natives across the nation.

Sincerely,

Darin Gene,  Council President

Exhibit 5 - 261

April 10          , 2020

The Honorable Donald J. Trump
President of the United States of America
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

      Re: *United States of America v. Lezmond Charles Mitchell*

Dear Mr. President,

    On behalf of ___Organized Village of Kwethluk___ , I strongly
urge you to consider granting Lezmond Charles Mitchell's petition for executive clemency and a full
pardon. Mr. Mitchell is a member of the Navajo Nation, and was convicted in the United States
District Court for the District of Arizona of several intra-Indian crimes which took place in Indian
country. Despite the Navajo Nation's opposition, the Department of Justice elected to pursue a death
sentence against Mr. Mitchell in contravention of principles of tribal sovereignty and U.S.
Congressional intent barring federal capital prosecutions, absent tribal consent, of intra-Indian crimes
committed in Indian country. Mr. Mitchell is the only American Indian on federal death row.

    This case is also deeply concerning to the native peoples due to the manner in which the FBI
abused Indian tribal courts to deprive Mr. Mitchell of his federal due process guarantees. Specifically,
Mr. Mitchell was held in a tribal jail for 25 days while the FBI continually interrogated him. It was
only after they allegedly obtained a full confession that Mr. Mitchell was brought to federal court,
presented to a magistrate, and appointed counsel. In keeping with FBI protocol, however, Mr.
Mitchell's alleged confession is neither tape-recorded nor did he write a statement. In fact, in Mr.
Mitchell's only recorded statement, he fervently denies having a direct role in the capital offenses.

    Federal criminal prosecutions of intra-Indian crimes occurring within the borders of Indian
country bring up long-standing issues of tribal sovereignty. In order to maintain tribal rights, as well
as individual tribal member's due process rights, we support Mr. Mitchell's position and urge you to
strongly consider granting Mr. Mitchell's petition for executive clemency and a pardon.

    Thank you for your continued support of American Indians and Alaska Natives across the
nation.

                Sincerely,

                Even Priedai

                Organized village of Kwethluk
                PO Box 130
                Kwethluk, AK   99621

                phone   907-757-6714
                Fax     907-757-6328
                email: cou1ovk@gmail.com
                      (cont)
                    kwethlukira@gmail.com

Organized Village of Kwethluk (IRA)

Exhibit 5 - 262

May 1, 2020

The Honorable Donald J. Trump
President of the United States of America
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

Re: *United States of America v. Lezmond Charles Mitchell*

Dear Mr. President,

On behalf of Arctic Village Council , I strongly urge you to consider granting Lezmond Charles Mitchell's petition for executive clemency and a full pardon. Mr. Mitchell is a member of the Navajo Nation, and was convicted in the United States District Court for the District of Arizona of several intra-Indian crimes which took place in Indian country. Despite the Navajo Nation's opposition, the Department of Justice elected to pursue a death sentence against Mr. Mitchell in contravention of principles of tribal sovereignty and U.S. Congressional intent barring federal capital prosecutions, absent tribal consent, of intra-Indian crimes committed in Indian country. Mr. Mitchell is the only American Indian on federal death row.

This case is also deeply concerning to the native peoples due to the manner in which the FBI abused Indian tribal courts to deprive Mr. Mitchell of his federal due process guarantees. Specifically, Mr. Mitchell was held in a tribal jail for 25 days while the FBI continually interrogated him. It was only after they allegedly obtained a full confession that Mr. Mitchell was brought to federal court, presented to a magistrate, and appointed counsel. In keeping with FBI protocol, however, Mr. Mitchell's alleged confession is neither tape-recorded nor did he write a statement. In fact, in Mr. Mitchell's only recorded statement, he fervently denies having a direct role in the capital offenses.

Federal criminal prosecutions of intra-Indian crimes occurring within the borders of Indian country bring up long-standing issues of tribal sovereignty. In order to maintain tribal rights, as well as individual tribal member's due process rights, we support Mr. Mitchell's position and urge you to strongly consider granting Mr. Mitchell's petition for executive clemency and a pardon.

Thank you for your continued support of American Indians and Alaska Natives across the nation.

Sincerely,

Galen Gilbert 1st Chief
Galen Yeullt
POBox 22069
Arctic Village AK
99722

Arctic Village

Exhibit 5 - 263



**ASA'CARSARMIUT TRIBAL COUNCIL**
P.O. Box 32249
Mountain Village, AK 99632-0107
Telephone: (907) 591-2814
Facsimile: (907) 591-2811

The Honorable Donald J. Trump                                          May 08, 2020

President of the United States of America

The White House

1600 Pennsylvania Avenue NW

Washington, DC

Re: *United States of America v. Lezmond Charles Mitchell*

Dear Mr. President,

On behalf of Asa'carsarmiut Tribal Council, I strongly urge you to consider granting Lezmond Charles Mitchell's petition for executive clemency and a full pardon. Mr. Mitchell is a member of the Navajo Nation, and was convicted in the United States District Court of the District of Arizona of several intra-Indian crimes which took place in Indian country. Despite the Navajo Nation's opposition, the Department of Justice elected to pursue a death sentence against Mr. Mitchell in contravention of principles of tribal sovereignty and U.S. Congressional intent barring federal capital prosecutions, absent tribal consent, of intra-Indian crimes committed in Indian country. Mr. Mitchell is the only American Indian on federal death row.

This case is also deeply concerning to the native peoples due to the manner in which the FBI abused Indian tribal courts to deprive Mr. Mitchell of his federal due process guarantees. Specifically, Mr Mitchell was held in tribal jail for 25 days while the FBI continually interrogated him. It was only after they allegedly obtained a full confession that Mr. Mitchell was brought to federal court, presented to a magistrate, and appointed council. In keeping with FBI protocol, however, Mr. Mitchell's alleged confession is neither tape-recorded nor did he write a statement. In fact, in Mr. Mitchell's only recorded statement, he fervently denies having a direct role in the capital offenses.

Exhibit 5 - 264

Federal criminal prosecutions of intra-Indian crimes occurring within the borders of Indian country bring up long-standing issues of tribal sovereignty. In order to maintain tribal rights, as well as individual tribal member's due process rights, we support Mr. Mitchell's position and urge you to strongly consider granting Mr. Mitchell's petition for executive clemency and a pardon.

Thank you for your continued support of American Indians and Alaska Natives across the nation.

Sincerely,

James C. Landlord, First Chief

Exhibit 5 - 265



PAMUNKEY TRIBAL GOVERNMENT
1054 POCAHONTAS TRAIL
PAMUNKEY INDIAN RESERVATION
KING WILLIAM, VA 23086-2133

July 16, 2020

The Honorable Donald J. Trump
President of the United States of America
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

Re: *United States of America v. Lezmond Charles Mitchell*

Dear Mr. President,

On behalf of the Pamunkey Indian Tribe, I strongly urge you to consider granting Lezmond Charles Mitchell's petition for executive clemency and a full pardon. Mr. Mitchell is a member of the Navajo Nation, and was convicted in the United States District Court for the District of Arizona of several intra-Indian crimes which took place in Indian country. Despite the Navajo Nation's opposition, the Department of Justice elected to pursue a death sentence against Mr. Mitchell in contravention of principles of tribal sovereignty and U.S. Congressional intent barring federal capital prosecutions, absent tribal consent, of intra-Indian crimes committed in Indian country. Mr. Mitchell is the only American Indian on federal death row.

This case is also deeply concerning to the native peoples due to the manner in which the FBI abused Indian tribal courts to deprive Mr. Mitchell of his federal due process guarantees. Specifically, Mr. Mitchell was held in a tribal jail for 25 days while the FBI continually interrogated him. It was only after they allegedly obtained a full confession that Mr. Mitchell was brought to federal court, presented to a magistrate, and appointed counsel. In keeping with FBI protocol, however, Mr. Mitchell's alleged confession is neither tape-recorded nor did he write a statement. In fact, in Mr. Mitchell's only recorded statement, he fervently denies having a direct role in the capital offenses.

Federal criminal prosecutions of intra-Indian crimes occurring within the borders of Indian country bring up long-standing issues of tribal sovereignty. In order to maintain tribal rights, as well as individual tribal member's due process rights, we support Mr. Mitchell's position and urge you to strongly consider granting Mr. Mitchell's petition for executive clemency and a pardon.

Thank you for your continued support of American Indians and Alaska Natives across the nation.

Sincerely,

Robert Gray
Chief, Pamunkey Indian Tribe

Exhibit 5 - 266

# RED LAKE BAND
## of CHIPPEWA INDIANS

*RED LAKE NATION HEADQUARTERS*



OFFICERS:
DARRELL G. SEKI, SR., Chairman
SAMUEL R. STRONG, Secretary
ANNETTE JOHNSON, Treasurer

DISTRICT REPRESENTATIVES:
GARY NELSON
GLENDA J. MARTIN
JULIUS "TOADY" THUNDER
ALLEN PEMBERTON
ROBERT "BOB" SMITH
DONALD GOOD, SR.
ADRIAN BEAULIEU
MICHELLE (BARRETT) COBENAIS

ADVISORY COUNCIL:
7 HEREDITARY CHIEFS

PO Box 550, Red Lake, MN 56671          Phone 218-679-3341 · Fax 218-679-3378

July 20, 2020

The Honorable Donald J. Trump
President of the United States of America
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

RE: *United States of America v. Lezmond Charles Mitchell*

Dear Mr. President:

On behalf of the Red Lake Band of Chippewa Indians, I strongly urge you to consider Lezmond Charles Mitchell's petition for executive clemency and a full pardon. Mr. Mitchell is a member of the Navajo Nation, and was convicted in the United States District Court for the District of Arizona of several intra-Indian crimes which took place in Indian country. Despite the Navajo Nation's opposition, the Department of Justice elected to pursue a death sentence against Mr. Mitchell in contravention of principles of tribal sovereignty and U.S. Congressional intent barring federal capital prosecutions, absent tribal consent, of intra-Indian crimes committed in Indian country. Mr. Mitchell is the only American Indian on federal death row.

This case is also deeply concerning to Native people due to the manner in which the FBI abused the Navajo Nation Tribal Court to deprive Mr. Mitchell of his federal due process guarantees. Specifically, Mr. Mitchell was held in a tribal jail for 25 days while the FBI continually interrogated him. It was only after the FBI allegedly obtained a full confession that Mr. Mitchell was brought to federal court, presented to a magistrate, and appointed counsel. In keeping with FBI protocol, however, Mr. Mitchell's alleged confession was neither tape recorded nor did he write a statement. In fact, in Mr. Mitchell's only recorded statement, he strenuously denies having a direct role in the capital offenses.

Federal criminal prosecutions of intra-Indian crimes occurring within the borders of Indian country invoke long-standing issues of tribal sovereignty. In order to maintain tribal rights, as well as individual tribal members' due process rights, we support Mr. Mitchell's position and urge you to strongly consider granting Mr. Mitchell's petition for executive clemency and a pardon.

TRIBAL COUNCIL   Organized April 18, 1918   (Revised Constitution & By-Laws, January 6, 1959)
CHIEF COUNCIL OF 1889:  May-dway-gwa-no-nind, Nah-gaun-e-gwon-abe, Mays-co-co-caw-ay, Ahnah-me-ay-ge-shig, Naw-ay-tah-wowb; Nah-wah-quay-ge-shig

Exhibit 5 - 267

We appreciate your continued support of American Indians and Alaska Natives across the United States.

Sincerely,

Darrell G. Seki, Sr.
Tribal Council Chairman

Exhibit 5 - 268



**SAN PASQUAL BAND OF MISSION INDIANS**

**SAN PASQUAL RESERVATION**

**TRIBAL COUNCIL**

Stephen W. Cope
Chairman

Justin Quis Quis
Vice Chairman

Tilda M. Green
Secretary-Treasurer

David L. Toler
Councilman

Joe Chavez
Councilman

July 27, 2020

The Honorable Donald J. Trump
President of the United States of America
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

Re: *United States of America v. Lezmond Charles Mitchell*

Dear Mr. President,

On behalf of the San Pasqual Band of Mission Indians, I strongly urge you to consider granting Lezmond Charles Mitchell's petition for executive clemency and a full pardon. Mr. Mitchell is a member of the Navajo Nation and was convicted in the United States District Court for the District of Arizona of several intra-Indian crimes which took place in Indian country. Despite the Navajo Nation's opposition, the Department of Justice elected to pursue a death sentence against Mr. Mitchell in contravention of principles of tribal sovereignty and U.S. Congressional intent barring federal capital prosecutions, absent tribal consent, of intra-Indian crimes committed in Indian country. Mr. Mitchell is the only American Indian on federal death row.

This case is also deeply concerning to the native peoples due to the manner in which the FBI abused Indian tribal courts to deprive Mr. Mitchell of his federal due process guarantees. Specifically, Mr. Mitchell was held in a tribal jail for 25 days while the FBI continually interrogated him. It was only after they allegedly obtained a full confession that Mr. Mitchell was brought to federal court, presented to a magistrate, and appointed counsel. In keeping with FBI protocol, however, Mr. Mitchell's alleged confession is neither tape-recorded nor did he write a statement. In fact, in Mr. Mitchell's only recorded statement, he fervently denies having a direct role in the capital offenses.

Federal criminal prosecutions of intra-Indian crimes occurring within the borders of Indian country bring up long-standing issues of tribal sovereignty. In order to maintain tribal rights, as well as individual tribal member's due process rights, we support Mr. Mitchell's position and urge you to strongly consider granting Mr. Mitchell's petition for executive clemency and a pardon.

Thank you for your continued support of American Indians and Alaska Natives across the nation.

Sincerely,

Stephen W. Cope
Chairman

P.O. BOX 365   16400 KUMEYAAY WAY, VALLEY CENTER, CA 92082
PHONE 760-749-3200 · FAX 760-749-3876 · WWW.SANPASQUALBANDOFMISSIONINDIANS.ORG

Exhibit 5 - 269

07/30/2020    13:08 COHARIE INTRA TRIBAL COUNCIL                    (FAX)                        P.002/002

# Coharie Intra-Tribal Council, Inc.

7351 North U.S. 421 Hwy.
Clinton, N.C. 28328



Phone (910) 564-4906
(910) 564-6909
Fax (910) 564-2701

July 28 , 2020

The Honorable Donald J. Trump
President of the United States of America
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

Re: *United States of America v. Lezmond Charles Mitchell*

Dear Mr. President,

On behalf of Coharie Intra-Tribal Council, I strongly urge you to consider granting Lezmond Charles Mitchell's petition for executive clemency and a full pardon. Mr. Mitchell is a member of the Navajo Nation, and was convicted in the United States District Court for the District of Arizona of several intra-Indian crimes which took place in Indian country. Despite the Navajo Nation's opposition, the Department of Justice elected to pursue a death sentence against Mr. Mitchell in contravention of principles of tribal sovereignty and U.S. Congressional intent barring federal capital prosecutions, absent tribal consent, of intra-Indian crimes committed in Indian country. Mr. Mitchell is the only American Indian on federal death row.

This case is also deeply concerning to the native peoples due to the manner in which the FBI abused Indian tribal courts to deprive Mr. Mitchell of his federal due process guarantees. Specifically, Mr. Mitchell was held in a tribal jail for 25 days while the FBI continually interrogated him. It was only after they allegedly obtained a full confession that Mr. Mitchell was brought to federal court, presented to a magistrate, and appointed counsel. In keeping with FBI protocol, however, Mr. Mitchell's alleged confession is neither tape-recorded nor did he write a statement. In fact, in Mr. Mitchell's only recorded statement, he fervently denies having a direct role in the capital offenses.

Federal criminal prosecutions of intra-Indian crimes occurring within the borders of Indian country bring up long-standing issues of tribal sovereignty. In order to maintain tribal rights, as well as individual tribal member's due process rights, we support Mr. Mitchell's position and urge you to strongly consider granting Mr. Mitchell's petition for executive clemency and a pardon.

Thank you for your continued support of American Indians and Alaska Natives across the nation.

Sincerely, Freddie Lee Carter Jr.

Freddie Carter Jr.
CITC Chairman

Coharie Tribe of Sampson & Harnett Counties

Exhibit 5 - 270

# ATTACHMENT K

Exhibit 5 - 271

# First Step Act

To assess the programming needs of
each inmate under the First Step Act,
inmates will receive an assessment on
TRULINCS on or about
December 4, 2019.

When you receive this assessment,
please complete it promptly.

Based on your responses, programs
that would be most beneficial for you
will be identified.

The initial assessment will close January 1, 2020.

MITCHELL, LEZMOND  48685008

Exhibit 5 - 272

DATE REVIEWED: 11/8/19

INSTITUTION: FccTMP     UNIT: SCU

INMATE NAME: Mitchell     REG NO: 48685-008

FIRST STEP ACT (Circle One):     ELIGIBLE / (INELIGIBLE)

RECIDIVISM RISK LEVEL (Circle One):     MINIMUM (LOW) MEDIUM    HIGH

Exhibit 5 - 273

# EXHIBIT 6

| | |
|---|---|
| **From:** | US Pardon Attorney (imailagent) |
| **To:** | Celeste Bacchi |
| **Cc:** | Jonathan Aminoff |
| **Subject:** | Lezmond Charles Mitchell, Reg. No. 48685-008, Death Penalty Case No. C291338 (Intranet Quorum IMA00832845) |
| **Date:** | Monday, August 3, 2020 10:01:47 AM |
| **Attachments:** | Death Penalty Regulations.pdf |
| | IQFormatFile.txt |

August 3, 2020

Ms. Celeste Bacchi
Jonathan Aminoff
Office of the Federal Public Defender
Central District of California
321 East Second Street
Los Angeles, CA 90012-4202

Death Penalty Case No. C291338

Dear Ms. Bacchi and Mr. Aminoff:

This is to advise you that we have received the petition for commutation of sentence you submitted on Lezmond Charles Mitchell's behalf as well as a written and signed authorization permitting you to submit the request. I must advise you of a few things, however, before we may consider the application.

Per our regulations, any substantive materials which you wish to be included in the clemency application, must be received within 15 days of August 1, 2020. We cannot guarantee that any submission will be considered in the clemency application if it is received more than 15 days from August 1. *See* 28 C.F.R. § 1.10(b).

Additionally, only one clemency request for commutation of a death sentence will be processed to completion absent a clear showing of exceptional circumstances. 28 C.F.R. § 1.10(e). Moreover, because clemency is generally considered an option of last resort, a petitioner should exhaust his or her readily available remedies prior to applying for clemency. Should the date of execution be suspended or stayed by the court for any reason other than to allow additional time for processing a clemency application, the petition may also be withdrawn without penalty, or may be suspended by this office to allow for the resolution of judicial proceedings. *See* 28 C.F.R. § 1.10(d).

The submission of your client's petition includes a request to make an oral presentation, as permitted by our regulations. 28 C.F.R. § 1.10(c). The regulations permit an oral presentation of reasonable duration to the Office. Though the exact parameters of the presentation will be determined by the Office of the Pardon Attorney (PARDON) after review of the application, you may reasonably anticipate being permitted to make a presentation of approximately one hour to a panel of representatives involved in the clemency analysis. We would anticipate that no more than 2 to 3 individuals will be permitted to speak on Lezmond Charles Mitchells' behalf during that presentation. Due to the current COVID-19 pandemic, the hearing will take place remotely. We will be in contact with you shortly regarding the instructions for the logistics of attending the remote hearing. We assume that you have access to several common teleconference platforms, such as Microsoft Teams, Skype, and/or WebEx; I believe the government is unable to utilize Zoom applications. Given the time-sensitive nature of this process, we will need to schedule the hearing as soon as possible. Please let us know by close of business on August 4, 2020, which of the following dates and times you would prefer:

Friday, August 7, 2020 at 10:00am EST
Monday, August 10, 2020 at 10:00am EST
Monday, August 10, 2020 at 1:00pm EST

Exhibit 6 - 274

We could perhaps schedule a later hearing to accommodate the fact that you are all based on the West Coast, but we cannot schedule any hearing that will end after 4 pm EST. We also need to know as soon as possible who will be attending the meeting so that we can provide your information to the transcription services.

Please be aware that this office may request comments and recommendations from the United States Attorney in the district of conviction, other Department of Justice officials, as well as the sentencing judge. Moreover, we will obtain relevant documentation of the crime, to include the presentence report and judgment, as well as documentation of Mr. Mitchell's prison conduct from the Bureau of Prisons.

Please advise your client that we have received the application you have submitted. Please also ensure that your client is aware of information that is publicly available about the identities of executive clemency applicants. If the President grants clemency, a public notice is released stating the recipient's name, city and state of residence, offense, sentence, and date and district of conviction for the offense for which clemency was granted. The Office of the Pardon Attorney (PARDON) will also proactively disclose an electronic copy of the clemency warrant on our website. Moreover, pursuant to long-standing policy, this office would, if asked, confirm that a specific individual has applied for or was granted or denied clemency. Finally, PARDON is obligated pursuant to the Freedom of Information Act to release existing lists of the names of persons who have been denied executive clemency by the President to anyone who requests such records.

To ensure your correspondence receives immediate attention, please always be sure to reference Death Penalty Case No. C288750 in any future correspondence with this office. We have attached a copy of our sentence of death regulations to this email. These regulations are also available for review on our website at https://www.justice.gov/pardon/legal-authority-governing-executive-clemency. You may address any questions about your case to Acting Pardon Attorney Rosalind Sargent-Burns at USPardon.Attorney@usdoj.gov or leave us a voicemail at (202) 616-6070 and we will be sure to respond to you in a timely manner based on time constraints in your client's case. Please note that the nature of the clemency review process limits the information we will be able to provide to you and your client, but we will attempt to be as responsive as possible.

Sincerely,
Office of the Pardon Attorney

--------------------------- Original Email ---------------------------
From:Celeste Bacchi [Celeste_Bacchi@fd.org]
Sent:Friday, July 31, 2020 11:55:07 PM
To:USPardon Attorney
CC:Jonathan Aminoff; Dolores Ramos
Subject:Lezmond Mitchell - Petition for Executive Clemency

Dear Ms. Sargent-Burns:

Attached please find the petition for commutation of sentence for Lezmond Mitchell, Reg. No. 48685-008. The attachment to this e-mail includes: a cover letter from counsel; the commutation of sentence form; authorization; and petition in
support of clemency. Due to the size of the attachments to our petition, they needed to be divided in order to ensure delivery. Therefore, Attachments A-E will be in a second email, and Attachments F-K in a third email, for three total emails. We apologize
for any inconvenience this may cause.

The petition and attachments are also being sent to you via FedEx, for delivery on Tuesday, August 4, 2020.

Exhibit 6 - 275

Please do not hesitate to contact me or my co-counsel, Jonathan Aminoff, if you have any questions or need more information.

Thank you,

Celeste Bacchi
Counsel for Lezmond Mitchell

Celeste Bacchi
Deputy Federal Public Defender
Office of the Federal Public Defender
Central District of California
321 E 2ndStreet | Los Angeles, CA 90012 | fpdcdca.org
O:213.894.1887 |
F:213.894.0081

Exhibit 6 - 276

| From: | US Pardon Attorney (imailagent) |
|---|---|
| To: | Jonathan Aminoff |
| Cc: | Celeste Bacchi |
| Subject: | Lezmond Charles Mitchell, Reg. No. 48685-008, Death Penalty Case No. C291338 (Intranet Quorum IMA00832845) |
| Date: | Wednesday, August 5, 2020 8:19:33 AM |
| Attachments: | IQFormatFile.txt |

August 5, 2020

Mr. Jonathan C. Aminoff
Ms. Celeste Bacchi
Deputy Federal Public Defender
Office of the Federal Public Defender
Central District of California
321 East Second Street
Los Angeles, CA 90012-4202

Re: Death Penalty Case No. C291338

Dear Mr. Aminoff and Ms. Bacchi:

We appreciate your prompt response to our request for oral presentation availability. Unfortunately, we are unable to accommodate your request for Monday, August 10, 2020 at 2:00 pm EST, and we have now unfortunately passed the time when we can arrange transcription for Friday or for Monday morning. However, in response to your request for an afternoon oral presentation, our Office has made additional availability on the following dates and times:

Tuesday, August 11, 2020 at 1:00 or 2:00 pm EST
Wednesday, August 12, 2020 at 1:00 or 2:00 pm EST

Given the time-sensitive nature of this process, please let us know your preference by close of business today. Additionally, no later than 1:00 pm EST on Monday, August 10, please provide the full name of each individual who will be attending the presentation so that we can provide that information to the transcription service.

Please reference Death Penalty Case No. C291338 in any future correspondence with this office.

Sincerely,
Office of the Pardon Attorney

--------------------------- Original Email ---------------------------
From:Jonathan Aminoff [Jonathan_Aminoff@fd.org]
Sent:Tuesday, August 4, 2020 1:10:17 PM
To:USPardon Attorney; Celeste Bacchi
Subject:RE: Lezmond Charles Mitchell, Reg. No. 48685-008, Death Penalty Case No. C291338 (Intranet Quorum IMA00832845)

Dear Office of the Pardon Attorney:

Thank you for this email. We appreciate your offer to accommodate us regarding the time for this presentation. Would it be possible to schedule the presentation for:Monday, August 10, 2020 at 2:00pm EST?

Thank you

Exhibit 6 - 277

Jonathan C. Aminoff

Deputy Federal Public Defender

Office of the Federal Public Defender

Central District of California

321 East Second Street

Los Angeles, CA 90012

Direct: 213 894 5374

Fax: 213 894 0310

CONFIDENTIALITY NOTICE

This email, and any attachments accompanying this e-mail, contain information from the Federal Public Defender for the California Central District of which is confidential or privileged. The information is intended only for the use of the individual(s) or entity(s) named in this e-mail. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this e-mail in error, please notify us immediately by reply e-mail.

From:US Pardon Attorney (imailagent) <uspardon.attorney@usdoj.gov>

Sent:Monday, August 3, 2020 10:01 AM

To:Celeste Bacchi <Celeste_Bacchi@fd.org>

Cc:Jonathan Aminoff <Jonathan_Aminoff@fd.org>

Subject:Lezmond Charles Mitchell, Reg. No. 48685-008, Death Penalty Case No. C291338 (Intranet Quorum IMA00832845)

August 3, 2020

Ms. Celeste Bacchi
Jonathan Aminoff

Office of the Federal Public Defender

Central District of California

321 East Second Street

Los Angeles, CA 90012-4202

Exhibit 6 - 278

Death Penalty Case No. C291338

Dear Ms. Bacchi and Mr. Aminoff:

This is to advise you that we have received the petition for commutation of sentence you submitted on Lezmond Charles Mitchell's behalf as well as a written and signed authorization permitting you to submit the request. I must advise you of a few things, however, before we may consider the application.

Per our regulations, any substantive materials which you wish to be included in the clemency application, must be received within 15 days of August 1, 2020. We cannot guarantee that any submission will be considered in the clemency application if it is received more than 15 days from August 1.See28 C.F.R. § 1.10(b).

Additionally, only one clemency request for commutation of a death sentence will be processed to completion absent a clear showing of exceptional circumstances. 28 C.F.R. § 1.10(e). Moreover, because clemency is generally considered an option of last resort, a petitioner should exhaust his or her readily available remedies prior to applying for clemency. Should the date of execution be suspended or stayed by the court for any reason other than to allow additional time for processing a clemency application, the petition may also be withdrawn without penalty, or may be suspended by this office to allow for the resolution of judicial proceedings.See28 C.F.R. § 1.10(d).

The submission of your client's petition includes a request to make an oral presentation, as permitted by our regulations. 28 C.F.R. § 1.10(c). The regulations permit an oral presentation of reasonable duration to the Office. Though the exact parameters of the presentation will be determined by the Office of the Pardon Attorney (PARDON) after review of the application, you may reasonably anticipate being permitted to make a presentation of approximately one hour to a panel of representatives involved in the clemency analysis. We would anticipate that no more than 2 to 3 individuals will be permitted to speak on Lezmond Charles Mitchells' behalf during that presentation. Due to the current COVID-19 pandemic, the hearing will take place remotely. We will be in contact with you shortly regarding the instructions for the logistics of attending the remote hearing. We assume that you have access to several common teleconference platforms, such as Microsoft Teams, Skype, and/or WebEx; I believe the government is unable to utilize Zoom applications. Given the time-sensitive nature of this process, we will need to schedule the hearing as soon as possible. Please let us know by close of business on August 4, 2020, which of the following dates and times you would prefer:

Friday, August 7, 2020 at 10:00am EST

Monday, August 10, 2020 at 10:00am EST

Monday, August 10, 2020 at 1:00pm EST

We could perhaps schedule a later hearing to accommodate the fact that you are all based on the West Coast, but we cannot schedule any hearing that will end after 4 pm EST. We also need to know as soon as possible who will be attending the meeting so that we can provide your information to the transcription services.

Exhibit 6 - 279

Please be aware that this office may request comments and recommendations from the United States Attorney in the district of conviction, other Department of Justice officials, as well as the sentencing judge. Moreover, we will obtain relevant documentation of the crime, to include the presentence report and judgment, as well as documentation of Mr. Mitchellâ€™s prison conduct from the Bureau of Prisons.

Please advise your client that we have received the application you have submitted. Please also ensure that your client is aware of information that is publicly available about the identities of executive clemency applicants. If the President grants clemency, a public notice is released stating the recipient's name, city and state of residence, offense, sentence, and date and district of conviction for the offense for which clemency was granted. The Office of the Pardon Attorney (PARDON) will also proactively disclose an electronic copy of the clemency warrant on our website. Moreover, pursuant to long-standing policy, this office would, if asked, confirm that a specific individual has applied for or was granted or denied clemency. Finally, PARDON is obligated pursuant to the Freedom of Information Act to release existing lists of the names of persons who have been denied executive clemency by the President to anyone who requests such records.

To ensure your correspondence receives immediate attention, please always be sure to reference Death Penalty Case No. C288750 in any future correspondence with this office. We have attached a copy of our sentence of death regulations to this email. These regulations are also available for review on our website athttps://www.justice.gov/pardon/legal-authority-governing-executive-clemency. **You may address any questions about your case to Acting Pardon Attorney Rosalind Sargent-Burns atUSPardon.Attorney@usdoj.govor leave us a voicemail at (202) 616-6070 and we will be sure to respond to you in a timely manner based on time constraints in your clientâ€™s case. Please note that the nature of the clemency review process limits the information we will be able to provide to you and your client, but we will attempt to be as responsive as possible.**

**Sincerely,**

**Office of the Pardon Attorney**

**--------------------------- Original Email ---------------------------**

**From:Celeste Bacchi [Celeste_Bacchi@fd.org]**

**Sent:Friday, July 31, 2020 11:55:07 PM**

**To:USPardon Attorney**

**CC:Jonathan Aminoff; Dolores Ramos**

**Subject:Lezmond Mitchell - Petition for Executive Clemency**

**Dear Ms. Sargent-Burns:**

**Attached please find the petition for commutation of sentence for Lezmond Mitchell,**

Exhibit 6 - 280

Reg. No. 48685-008. The attachment to this e-mail includes: a cover letter from counsel; the commutation of sentence form; authorization; and petition in

support of clemency. Due to the size of the attachments to our petition, they needed to be divided in order to ensure delivery. Therefore, Attachments A-E will be in a second email, and Attachments F-K in a third email, for three total emails. We apologize

for any inconvenience this may cause.

The petition and attachments are also being sent to you via FedEx, for delivery on Tuesday, August 4, 2020.

Please do not hesitate to contact me or my co-counsel, Jonathan Aminoff, if you have any questions or need more information.

Thank you,

Celeste Bacchi

Counsel for Lezmond Mitchell

Celeste Bacchi

Deputy Federal Public Defender

Office of the Federal Public Defender

Central District of California

321 E 2ndStreet | Los Angeles, CA 90012 | fpdcdca.org

O:213.894.1887 |

F:213.894.0081

Exhibit 6 - 281

| | |
|---|---|
| **From:** | US Pardon Attorney (imailagent) |
| **To:** | Jonathan Aminoff |
| **Cc:** | Celeste Bacchi |
| **Subject:** | Your correspondence re: Lezmond Charles Mitchell (Intranet Quorum IMA00832845) |
| **Date:** | Thursday, August 6, 2020 9:23:25 AM |
| **Attachments:** | IQFormatFile.txt |

August 6, 2020

Mr. Jonathan C. Aminoff
Ms. Celeste Bacchi
Deputy Federal Public Defender
Office of the Federal Public Defender
Central District of California
321 East Second Street
Los Angeles, CA 90012-4202

Re: Case Number C291338

Dear Aminoff and Ms. Bacchi:

Thank you for your response. You are confirmed to present on Tuesday, August 11, 2020 at 2:00 pm EST. We have noted that Jonathan Aminoff, Celeste Bacchi, and Jonathan Nez will be presenting on behalf of Lezmond Mitchell.

The remote hearing will be held using Skype. You will receive a follow up email with instructions for attending. If you have any questions, please let us know.

Please reference case number C291338 in any future correspondence with this office.

Sincerely,
Office of the Pardon Attorney

Exhibit 6 - 282

# EXHIBIT 7

# THE NAVAJO NATION



JONATHAN NEZ | PRESIDENT    MYRON LIZER | VICE PRESIDENT

July 31, 2020

The Honorable Donald J. Trump
President of the United States of America
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

**Re: *United States of America v. Lezmond Charles Mitchell***

Dear Mr. President:

On behalf of the Navajo Nation, we strongly encourage you to consider leniency for Lezmond Charles Mitchell, a citizen of the Navajo Nation, who is facing execution on August 26, 2020. Mr. Mitchell is the only Native American on federal death row; sentenced for several crimes committed on the Navajo Nation in 2001. The United States Department of Justice sought the death penalty against Mr. Mitchell despite the Navajo Nation's public opposition, against the express wishes of the victim's family, and ostensibly against the recommendation of the U.S. Attorney for the District of Arizona. The Navajo Nation is respectfully requesting a commutation of the death sentence and the imposition of a life sentence for Mr. Mitchell. This request honors our religious and traditional beliefs, the Navajo Nation's long-standing position on the death penalty for Native Americans, and our respect for the decision of the victim's family.

In 2001, Lezmond Mitchell was involved in the kidnapping and murder of two Navajo victims, a grandmother and her granddaughter. This crime took place on the Navajo Nation. Mr. Mitchell was arrested and charged with murder and other associated crimes. His trial and subsequent conviction occurred in federal court in Arizona. The Major Crimes Act is a federal statute that brings a Native American defendant before a federal court for certain crimes involving a Native American offender and a Native American victim if the crime took place on an Indian reservation. Murder is one such crime in the Major Crimes Act and the primary criminal charge for Mr. Mitchell's prosecution in federal court.

During the federal prosecution process, the United States Attorney for Arizona asked the Navajo Nation for its position on the death penalty. The Federal Death Penalty Act affords the Navajo Nation the ability to opt-in to the death penalty and thereby permit the federal government to seek the death penalty for federal crimes that take place on the Navajo Reservation. If the Navajo Nation opted-in, which it has not, the federal government could ask for the death penalty for a crime under the Major Crimes Act; such as murder. The United States' decision to seek the death penalty against Mr. Mitchell ignored the intent of the tribal opt-in provisions of the Federal Death Penalty Act. Instead the United States included carjacking resulting in death with the crimes charged against Mr. Mitchell. Carjacking resulting in death is a non-Major Crimes Act crime, but which carries the death penalty sentence. Mr. Mitchell is now on death row as a result of a crime that is

NAVAJO NATION OFFICE OF THE PRESIDENT AND VICE PRESIDENT
POST OFFICE BOX 7440 · WINDOW ROCK, AZ 86515 · PHONE: (928) 871-7000 · FAX: (928) 871-4025

Exhibit 7 - 283

not included in the crimes associated with Indian Country under the Major Crimes Act, and in complete disregard to the Navajo Nation's deliberate decision not to opt-in to the death penalty under the Federal Death Penalty Act.

On a number of occasions, since 2002, the Navajo Nation Attorneys General, the Navajo Nation Council Standing Committee, and the Navajo Nation Chief Justice informed the U.S. Attorney for the District of Arizona of the Navajo Nation's opposition to the death penalty in Mr. Mitchell's case citing Navajo cultural teachings that stress the sanctity of life and instruct against the taking of human life for vengeance. This respect for life was weighed against the heinous crimes committed by Mr. Mitchell that resulted in the death of a grandmother and her granddaughter. Most important, we understand the daughter and mother of both victims attested and strongly opposed the death penalty in Mr. Mitchell's case and specifically requested the U.S. Attorney's Office not to seek it. The Navajo Nation and the family of the victims have not changed their position; the Navajo Nation has not opted-in for the death penalty and we strongly hold to our cultural, traditional, and religious beliefs that life is sacred.

The Navajo Nation works continuously to improve the government-to-government relationship with our federal partners. We know this relationship works in addressing criminal matters in both tribal and federal cases; however, there are times when this relationship gets misaligned for any number of reasons. This; however, is a time when we can work together to bring our working relationship back into alignment in protecting our citizens from bad actors. We do not know the details of the decision by the U.S. Department of Justice and the U.S. Attorney's Office to seek the death penalty in Mr. Mitchell's case. What we do know is the sovereignty of the Navajo Nation and our decision, while clearly explained, was marginalized. We need to address this issue to move forward in our trust of our federal partners and to continue to work on the importance of protecting our People.

Mr. President, for these reasons, we believe a grant of Executive Clemency with a commutation of the death penalty sentence, replaced with life imprisonment, for Lezmond Mitchell is appropriate to begin to restore harmony and balance to the affected families and to the inherent sovereignty of the Navajo Nation. We thank you for your consideration of this exigent request.

Sincerely,

Jonathan Nez, *President*
**THE NAVAJO NATION**

Myron Lizer, *Vice President*
**THE NAVAJO NATION**

NAVAJO NATION OFFICE OF THE PRESIDENT AND VICE PRESIDENT
POST OFFICE BOX 7440 · WINDOW ROCK, AZ 86515 · PHONE: (928) 871-7000 · FAX: (928) 871-4025

Exhibit 7 - 284



# 24TH NAVAJO NATION COUNCIL
## OFFICE OF THE SPEAKER

## HONORABLE SETH DAMON
*Speaker*, 24th Navajo Nation Council

August 16, 2020

The Honorable Donald J. Trump
President of the United States of America
The White House
1600 Pennsylvania Avenue, NW
Washington, DC  20500

Re:  *United States of America v. Lezmond Charles Mitchell*

Dear Mr. President:

On behalf of the Navajo Nation Council, the legislative branch of the Navajo Nation, I write to join the July 31, 2020, letter of Navajo Nation President Jonathan Nez in asking you to exercise the awesome power committed to you as President of the United States to commute the sentence of Lezmond Mitchell, a Navajo citizen, from the death penalty to life imprisonment without the possibility of parole.  Time is of the essence, as the execution of our member is scheduled for August 26.  Mr. President, you have demonstrated your mercy and compassion in exercising your powers of leniency.  We ask that you do so in this case, so that the Navajo Nation's position is accorded full respect and comity, and consistently with the wishes of the victims' family, who are also Navajo citizens.

We are a people who, since time immemorial, have had the means to exercise justice when disruptions occurred between our people on our lands.  Our justice system is based on life – *Iiná* – that is sacred and must be protected.  We therefore condemn murder and abhor the crimes committed in this case.  But our belief system requires us to seek harmony and restore not only the victim, but also to restore the broken relations between families and communities so we all may heal.  This foundation is taught by our elders and spiritual leaders and woven into our way of life.  They teach that the decision to take a life is not ours to make.  Vengeance or retribution are western ways that conflict with Navajo principles of harmony, balance and restoring the whole.

The Navajo Nation Council in prior years held hearings to hear from our people and received an extensive report by the then Public Safety Committee, all of which corroborated the Navajo Nation's position against capital punishment for crimes committed on Navajo lands.  We also have taken account of the wishes of the Navajo member whose mother and daughter were killed in this specific case, who asked that Mr. Mitchell be sentenced to life in prison and not given

LEGISLATIVE BRANCH
Office of the Speaker • Post Office Box 3390 • Window Rock, Arizona 86515 • Ph: (928) 871-7160 • Fax: (928) 871-7255

Exhibit 7 - 285

the death penalty.  As the elected leaders of the Navajo People, we reiterate to you our opposition to the death penalty and its application to Lezmond Mitchell.

The Federal Death Penalty Act recognizes the sovereign-to-sovereign relationship of Indian tribes and the Federal Government.  This law recognizes a tribe's *sovereign choice* in guiding the U.S. government whether to seek the death penalty in the sentencing of American Indians for crimes between Indians in Indian country arising under the Major Crimes Act. President Nez expressed in great detail the circumstances of this case and how that law was circumvented.  In essence, the decision to seek the death penalty abused the system twice; it disregarded the Navajo Nation's position against the death penalty, and it disregarded the letter of the law that recognizes a tribe's *sovereign choice and decision* in the application of that law.

Mr. President, we implore you to take into consideration these extenuating circumstances and exercise mercy for our tribal member, Lezmond Mitchell, and grant executive clemency by commuting the death penalty sentence to life in prison without the possibility of parole.  With your intervention, our people will be able to start toward a path of healing.



Respectfully,

Seth Damon, *Speaker*
**24TH NAVAJO NATION COUNCIL**

LEGISLATIVE BRANCH
Office of the Speaker • Post Office Box 3390 • Window Rock, Arizona 86515 • Ph: (928) 871-7160 • Fax: (928) 871-7255

Exhibit 7 - 286



**NATIONAL CONGRESS OF AMERICAN INDIANS**

**EXECUTIVE COMMITTEE**

PRESIDENT
**Fawn R. Sharp**
*Quinault Indian Nation*

1ST VICE PRESIDENT
**Aaron Payment**
*Sault Ste. Marie Tribe of Chippewa Indians*

RECORDING SECRETARY
**Juana Majel-Dixon**
*Pauma Band of Luiseño Indians*

TREASURER
**Clinton Lageson**
*Kenaitze Indian Tribe*

**REGIONAL VICE PRESIDENTS**

ALASKA
**Rob Sanderson, Jr.**
*Tlingit & Haida Indian Tribes of Alaska*

EASTERN OKLAHOMA
**Norman Hildebrand**
*Wyandotte Nation*

GREAT PLAINS
**Larry Wright, Jr.**
*Ponca Tribe of Nebraska*

MIDWEST
**Shannon Holsey**
*Stockbridge-Munsee Band of Mohican Indians*

NORTHEAST
**Tina Abrams**
*Seneca Nation of Indians*

NORTHWEST
**Leonard Forsman**
*Suquamish Tribe*

PACIFIC
**Erica Rae Macias**
*Cahuilla Band of Indians*

ROCKY MOUNTAIN
**Mark Pollock**
*Blackfeet Nation*

SOUTHEAST
**Nancy Carnley**
*Ma-Chis Lower Creek Indian Tribe of Alabama*

SOUTHERN PLAINS
**Robert Tippeconnie**
*Comanche Nation*

SOUTHWEST
Vacant

WESTERN
Vacant

CHIEF EXECUTIVE OFFICER
**Kevin Allis**
*FOREST COUNTY POTAWATOMI COMMUNITY*

**NCAI HEADQUARTERS**
1516 P Street, N.W.
Washington, DC  20005
202.466.7767
202.466.7797 fax
www.ncai.org

August 18, 2020

Honorable Donald J. Trump
President of the United States of America
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

Re: Clemency for Lezmond Mitchell

Dear Mr. President:

On behalf of the National Congress of American Indians (NCAI), the oldest and largest organization comprised of American Indian and Alaska Native tribal nations and their citizens, I write to respectfully urge you to grant clemency to Lezmond Mitchell, a citizen of the Navajo Nation, and commute his death sentence to life without the possibility of release. Mr. Mitchell's execution is currently scheduled for August 26, 2020, and he is the only tribal citizen on federal death row.

Mr. Mitchell's death sentence was imposed for a crime that occurred against Navajo citizens on Navajo lands, and the Navajo Nation has opposed the death sentence in this case. The Federal Death Penalty Act of 1994 generally gives tribal nations the authority to opt in to the federal death penalty for crimes committed on tribal lands, including murder under the Major Crimes Act. 18 U.S.C. § 3598. This provision appropriately requires that the federal government defer to tribal nations on whether to seek capital sentences—specifically where the federal government is prosecuting serious crimes committed by Indians against other persons within an Indian reservation.

In this case however, the United States charged Mr. Mitchell with carjacking resulting in death, under a federal statute of general applicability, rather than charging Mr. Mitchell with murder under the Major Crimes Act, in order to avoid this provision and obtain a death sentence despite the Navajo Nation's objections. The Nation has never opted in to the federal death penalty and has consistently opposed capital punishment on cultural and religious grounds.

The Nation's opposition has been consistent since 2002, when the Nation formally requested that the Department of Justice not seek the death penalty against Mr. Mitchell. Letter from Levon Henry, Attorney General of the Navajo Nation, to Paul Charlton, United States Attorney (Jan. 22, 2002). In doing so, the Nation explained:

> Our culture and tradition teach us to value life and instruct against the taking of human life for vengeance. . . . Committing a crime not only disrupts the harmony between the victim and the perpetrator but it also disrupts the harmony of the community. The capital punishment sentence removes . . . any possibility of restoring the harmony in a society.

Exhibit 7 - 287

Id. at 2. The U.S. government's decision to pursue a death sentence in Mr. Mitchell's case contravenes both the Navajo Nation's sovereign prerogatives, as recognized by Congress, and the federal policy of tribal self-determination in general. If his execution is allowed to proceed, it will set a dangerous precedent.

Consistent with the position of the Navajo Nation, and with your Administration's stated position of respect for tribal self-determination, we urge you to commute Mr. Mitchell's death sentence. Thank you for your consideration.

Sincerely,



Fawn Sharp,
NCAI President

Cc:     William Barr, Attorney General, Department of Justice
        David Bernhardt, Secretary, Department of the Interior
        Tara Sweeney, Assistant Secretary-Indian Affairs, Department of the Interior
        Tracy Toulou, Director, Office of Tribal Justice, Department of Justice

2

Exhibit 7 - 288

# NATIVE AMERICAN RIGHTS FUND

1506 Broadway, Boulder, Colorado 80302-6296
(303) 447-8760 FAX (303) 443-7776
www.narf.org

**EXECUTIVE DIRECTOR**
John E Echohawk

**LITIGATION MANAGEMENT COMMITTEE**
David L Gover
Matthew L Campbell
Erin C Dougherty Lynch

**ATTORNEYS**
Matthew L Campbell
Jacqueline De León
K Jerome Gottschalk
David L Gover
Melody L McCoy
Steven C Moore
Susan Y Noe
Brett Lee Shelton
Joe M Tenorio

**CHIEF FINANCIAL OFFICER**
Michael Kennedy

**DIRECTOR OF DEVELOPMENT**
Donald M Ragona

**CORPORATE SECRETARY**
Ronald P Mack

**WASHINGTON OFFICE**
1514 P Street, NW (Rear)
Suite D
Washington, D C  20005-1910

Ph (202) 785-4166
FAX (202) 822-0068

**ATTORNEYS**
Joel W Williams
Daniel D Lewerenz
Samantha B Kelty

**ANCHORAGE OFFICE**
745 W 4th Avenue, Ste  502
Anchorage, AK 99501-1736

Ph (907) 276-0680
FAX (907) 276-2466

**ATTORNEYS**
Natalie A Landreth
Erin C Dougherty Lynch
Matthew N Newman
Wesley J Furlong
Megan Condon

August 20, 2020

The Honorable Donald J. Trump
President of the United States
The White House
1600 Pennsylvania Avenue, NW
Washington, DC  20500

  Re:  *United States of America v. Lezmond Charles Mitchell*

Dear Mr. President,

On behalf of the Native American Rights Fund and our allied organizations signing below, we strongly urge you to commute the sentence of Lezmond Mitchell, a member of the Navajo Nation, from the death penalty to life in prison without the possibility of parole.  Our request is even more urgent since Mr. Mitchell's date of execution is August 26, 2020, just one week away.  Mr. Mitchell is the only tribal citizen on federal death row.  His death sentence was imposed for a crime that occurred against Navajo Nation citizens on Navajo Nation reservation lands, and the Navajo Nation has consistently opposed the death sentence in this case.

The Federal Death Penalty Act of 1994 generally requires the Tribal Nations to "opt in" to the federal death penalty for major crimes committed on Indian country, including murder under the Major Crimes Act.  18 U.S.C. § 3598.  This provision appropriately requires that the federal government defer to Tribal

Exhibit 7 - 289

Nations on whether to seek capital sentences.  Congress's intent in § 3598 was to respect the sovereign wishes of Indian nations regarding the imposition of the death penalty on a tribal member for crimes committed by Indians against Indians in Indian country.  Thus, when certain major crimes, such as murder, are committed in Indian country between Indians, the death penalty can only apply when the Tribal Nation whose land the crime occurred on has chosen to "opt-in" to have the death penalty apply.

The Navajo Nation has never "opted in" to the federal death penalty and has consistently opposed capital punishment on cultural and religious grounds.  In this case, the United States charged Mr. Mitchell with carjacking resulting in death, under a federal statute of general applicability, rather than charging Mr. Mitchell with murder under the Major Crimes Act, in order to avoid § 3598 and obtain a death sentence despite the Navajo Nation's objections.

Our organizations are firmly committed to the rule of law.  Section 3598 of the Federal Death Penalty Act underscores the sovereign-to-sovereign relationship between Tribal Nations and the federal government.  Yet in this instance, the law was circumvented, and the Navajo Nation's sovereign and statutorily designated rights were ignored.  The U.S. government's decision to pursue a death sentence in Mr. Mitchell's case contravenes both the Navajo Nation's sovereign prerogatives—as recognized by Congress in § 3598—and the federal policy of tribal self-determination in general.

The Navajo Nation has consistently voiced its opposition to the death penalty in Mr. Mitchell's case from 2002 to the present, most recently in letters to you from Navajo Nation President Jonathan Nez (dated July 31, 2020) and Navajo Nation Speaker Seth Damon (dated August 16, 2020).  It is highly irregular and unjust that Mr. Mitchell now faces the ultimate penalty of death when his Tribe, the Navajo Nation, has persistently and emphatically stated its opposition to capital punishment.  We urge you to give deference to the Navajo Nation—one sovereign to another.

Mr. President, only you in this late hour has the authority to intercede and afford full respect and comity to the Navajo Nation's request for Executive Clemency for Mr. Mitchell with a commutation of the death penalty sentence replaced with life imprisonment, a position supported by the victim's family. We urge you to commute Mr. Mitchell's death sentence.  Thank you for your consideration.

Exhibit 7 - 290

Signed,

John E. Echohawk
Executive Director
Native American Rights Fund

Cassandra Stubbs
Director, Capital Punishment Project
American Civil Liberties Union

Norman L. Reimer
Executive Director
National Association of Criminal
  Defense Lawyers

Gary Mitchell
President
ACLU of New Mexico

3

Exhibit 7 - 291

# EXHIBIT 8

## THE DEPARTMENT OF JUSTICE.      21

The following table shows the number of days devoted to business by the employés
of the division of appointments and disbursements:

### 1884.

| | January. | February. | March. | April. | May. | June. | July. | August. | September. | October. | November. | December. | Total. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days .............. | 31 | 29 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 365 |
| Sundays........... | 4 | 4 | 5 | 4 | 4 | 5 | 4 | 5 | 4 | 4 | 5 | 4 | 52 |
| Holidays ......... | 1 | 1 | .... | .... | 1 | .... | 1 | .... | .... | .... | 1 | 1 | 6 |
| Working days..... | 26 | 24 | 26 | 26 | 26 | 25 | 26 | 26 | 26 | 27 | 24 | 26 | 308 |
| (32) class four .... | 26 | 24 | 26 | 26 | 26 | 25 | 26 | 21 | 26 | 27 | 24 | 26 | 303 |
| (44) class one . .... | 26 | 24 | 26 | 26 | 26 | 22 | 24 | 26 | 24 | 25 | 8 | 21 | 278 |

### 1885.

| | January. | February. | March. | April. | May. | June. | July. | August. | September. | October. | November. | December. | Total. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days ............. | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 365 |
| Sundays........... | 4 | 4 | 5 | 4 | 5 | 4 | 4 | 5 | 4 | 4 | 5 | 4 | 52 |
| Holidays ......... | 1 | 1 | .... | .... | 1 | 2 | .... | .... | .... | .... | 2 | 1 | 8 |
| Working days..... | 26 | 23 | 26 | 26 | 25 | 26 | 25 | 26 | 26 | 27 | 23 | 26 | 305 |
| (32) class four..... | 26 | 23 | 26 | 26 | 25 | 26 | 25 | 22 | 26 | 27 | 23 | 26 | 301 |
| (44) class one ..... | 26 | 23 | 26 | 26 | 24 | 25 | 22½ | 26 | 26 | 7 | 23 | 25 | 279½ |
| (52) copyist* ..... | .... | .... | .... | .... | .... | .... | 17 | 26 | 26 | 27 | 23 | 25 | 144 |

*\* Appointed July 9, 1886.*

### 1886.

| | January. | February. | March. | April. | May. | June. | July. | August. | September. | October. | November. | December. | Total. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days .............. | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 565 |
| Sundays........... | 5 | 4 | 4 | 4 | 5 | 4 | 4 | 5 | 4 | 5 | 4 | 4 | 52 |
| Holidays ......... | 1 | 1 | .... | .... | 1 | .... | 1 | ....... | .... | .... | 2 | 1. | 7 |
| Working days..... | 25 | 23 | 27 | 26 | 25 | 26 | 26 | 26 | 26 | 26 | 24 | 26 | 306 |
| (34) class four..... | 25 | 23 | 27 | 26 | 25 | 26 | 26 | 26 | 26 | 26 | 24 | 26 | 306 |
| (44) class one ..... | 24 | 23 | 27 | 26 | 25 | 23 | 24 | 19 | 25 | 8 | 24 | 26 | 274 |
| (62) copyist. ...... | 25 | 23 | 27 | 26 | 25 | 26 | 25 | 24 | 17 | 24 | 22 | 24 | 288 |

### 1887.

| | January. | February. | March. | April. | May. | June. | July. | August. | September. | October. | November. | December. | Total. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days .............. | 31 | 28 | .... | .... | .... | .... | .... | .... | .... | .... | .... | .... | 59 |
| Sundays........... | 5 | 4 | .... | .... | .... | .... | .... | .... | .... | .... | .... | .... | 9 |
| Holidays ......... | 1 | 1 | .... | .... | .... | .... | .... | .... | .... | .... | .... | .... | 2 |
| Working days..... | 25 | 23 | .... | .... | .... | .... | .... | .... | .... | .... | .... | .... | 48 |
| (32) class four..... | 25 | 23 | .... | .... | .... | .... | .... | .... | .... | .... | .... | .... | 48 |
| (44) class one ..... | 24 | 21 | .... | .... | .... | .... | .... | .... | .... | .... | .... | .... | 45 |
| (52) copyist ....... | 25 | 23 | .... | .... | .... | .... | .... | .... | .... | .... | .... | .... | 48 |

## PARDON BUREAU.

DEPARTMENT OF JUSTICE,
*Washington, April* —, 1887.

SIR: The following statement of the method of transacting the business of the Pardon Bureau of this Department is respectfully submitted, in compliance with your request, for the information of the Select Committee of the Senate appointed in pursuance of a resolution adopted March 3, 1887, "to inquire into and examine the methods of business and work in the Executive Departments of the Government," &c.

Every application for pardon addressed to the President is referred to the Attorney-General, and by him to the clerk of pardons for his prompt and appropriate attention. Whereupon, in order to a proper consideration of the case, it becomes necessary for he clerk of pardons to inclose the application to the United States district attorney of the district in which the case occurred, for the purpose of obtaining a statement of the facts in the case and an expression of his opinion, and likewise, if practicable, that of the judge of the district upon the question of the exercise of Executive clem-

Exhibit 8 - 292

**22**                    THE DEPARTMENT OF JUSTICE.

ency in the premises, the following being the form of the circular letter in which the application is transmitted to the district attorney:

"DEPARTMENT OF JUSTICE,
"*Washington*, ——, 188-.

"SIR: The President has consulted the Attorney-General upon the application of —— —— for Executive clemency.

"The petition and other papers are herewith inclosed for your examination.

"You are directed to report as to the facts of the case; and also to express your opinion upon the expediency and justice of clemency in the premises. You will communicate, if practicable, with the judge who presided at the trial with a view of obtaining such expression of his opinion in the matter as he may be disposed to make, and transmit such opinion, if any is expressed, with your report.

"And please furnish an abstract of the docket entries, stating the precise offense, sentence, date of sentence, and court by which imposed.

"By direction of the Attorney-General,

"—— ——,
"*Clerk of Pardons.*

"—— inclosures, which please return.
"—— ——,
   "*United States Attorney,*
      "—— *District of* ——."

It is also usual to submit the case to the head of the Executive Department under whose jurisdiction it occurred, which is done not only in deference to the courtesy existing between the co-ordinate departments of the Government, but also for the purpose of eliciting such further facts and expression of official opinion as may thereby be obtained concerning the character of the case and the propriety of recommending the offender's pardon.

For example, if the case under consideration is a violation of the postal laws, a letter is prepared by the clerk of pardons for the Attorney-General to sign, which is sent to the Postmaster-General, and which is in the form following:

"DEPARTMENT OF JUSTICE,
"*Washington*, ——, 188-.

"SIR: You will please find inclosed certain papers relating to an application for the pardon of — ——, who was convicted of a violation of the postal laws in the State of ——.

"I have the honor to request an expression of your opinion upon the propriety of granting his pardon.

"Very respectfully,

"—— ——,
"*Attorney-General.*

"The POSTMASTER-GENERAL."

When the necessary information has been obtained to enable the clerk of pardons to make up a proper presentation of the case he prepares his report upon it for submission to the Attorney-General. In doing this he mentions all the material facts to show the character of the offense and the circumstances connected with its commission, being careful at the same time to accord to the convict all that he may be fairly entitled to have said in his favor, so that the Attorney-General will have an impartial representation of the case in making up his mind as to the merits of the application. After the Attorney-General has done this, and indorsed the report with his recommendation for pardon or otherwise, it is sent to the President for his action upon it in the exercise of his constitutional prerogative. If it be the pleasure of the President to grant the pardon asked for, he signifies the same by an autographic memorandum upon the report and returns it to the Department of Justice, whereupon the clerk of pardons prepares for the Attorney-General to sign a requisition upon the Secretary of State for a warrant for pardon, giving the recital to be transcribed therein, the requisition being substantially after the following form:

"DEPARTMENT OF JUSTICE,
"*Washington*, ——, 188-.

"SIR: I am directed by the President to request you to issue a warrant for the pardon of —— ——, with the following recital:

"Whereas at the —— term, 188-, of the United States district court for the —— district of ——, —— —— was convicted on a charge of ——, and sentenced to —— years imprisonment in the penitentiary at ——;

Exhibit 8 - 293

"And whereas it appears that the said ——— ———, previous to the crime of which he was convicted, maintained a good character;

"And whereas it further appears that since his incarceration his health has become so impaired that the attending physician of the prison has certified that longer confinement will cost him his life;

"And whereas the United States district attorney and judge who officiated at his trial have recommend his pardon, which is asked for also by many respectable citizens: Now, therefore, &c.

"Very respectfully,

"———— ————,
"*Attorney-General.*

"The SECRETARY OF STATE."

The warrant for pardon having been prepared at the Department of State, is signed by the President, countersigned by the Secretary of State, and sent to the Department of Justice, when the clerk of pardons transmits it to its proper destination.

At every stage of these proceedings, in the progress of an application for pardon through the Department of Justice, a record is made in a book kept for that purpose, showing, in proper sequence, the name of the convict; the State and district where the case occurred; the nature of the crime; the sentence, and when imposed; the date when application for pardon was filed; when the case was referred to the district attorney; when district attorney's report was received; what the report was, favorable or unfavorable; when the case was reported to the Attorney-General; what his action was; when pardon was granted; when requisition was made on the Secretary of State; when the pardon was transmitted, and to whom.

Similar memoranda are also made on the jackets in which the papers in the case are filed for safe-keeping and future reference.

When the President declines to pardon, the parties are so informed, and the papers in that case filed away in the Department of Justice.

The time required for an application for pardon to get through the Department of Justice depends upon so many contingencies that it is difficult to state it with any degree of certainty. While, for instance, a district attorney to whom a case is referred may be able to report upon it within a week, because of his proximity to the seat of Government, &c., there are cases, sometimes, when the district attorney's residence is thousands of miles away; so that, by reason of that fact, or for mail interruptions, or because of his absence in attendance at court in a distant part of his district, and from other causes, he cannot be heard from for months. Consequently, action on said cases must be, in the mean time, suspended.

Then, too, it occasionally happens that the district attorney knows nothing of the case referred to him, because of its having occurred before the beginning of his term of service, and of the records not being immediately accessible to him.

While pardon cases are pending in the Department of Justice there is more or less correspondence concerning them, which, with personal interviews with regard to them, necessarily occupies much of the time of the clerk of pardons. Members of Congress who write or call to inquire as to the status of cases in which their constituents are interested; lawyers engaged as counsel in such cases; personal friends of the prisoners, and members of their immediate families, constitute the most of these correspondents and visitors. And when it is remembered that all of the duties of the bureau, as detailed in the foregoing statement, devolve upon a single person, it will readily be seen that some clerical assistance is required to aid him in their prompt performance, especially as applications for pardon are constantly increasing, notwithstanding the fact that during the last fiscal year fewer pardons were granted than during those immediately preceding it.

Respectfully submitted.

ALEX. R. BOTELER,
*Clerk of Pardons.*

The ATTORNEY-GENERAL.

---

## MISCELLANEOUS CASES DIVISION.

DEPARTMENT OF JUSTICE,
*Washington, D. C., March 25, 1887.*

SIR: In response to the circular of Hon. F. M. Cockrell, chairman Select Committee United States Senate, dated the 18th instant, a copy of which has been referred to me for consideration and report, I have the honor to call attention to the follow-

Exhibit 8 - 294

# EXHIBIT 9



COPY

# EXECUTIVE ORDER

I hereby direct that all warrants of pardon and commutation of sentences, heretofore prepared at the Department of State on the requisition of the Attorney-General, be prepared and recorded in the Department of Justice under the seal of that Department and countersigned by the Attorney-General.

[Signed]  GROVER CLEVELAND.

Executive Mansion,
Washington, D. C., June 16, 1893.

Executive Mansion,
April 13, 1893.

Respectfully forwarded to the Secretary of State with a request that he furnish a copy of the within amendments to the Civil Service Rules to the Civil Service Commission.

By direction of the President

Henry T. Thurber
Private Secretary

Exhibit 9 - 295

# EXHIBIT 10

### **DECLARATION OF ELIZABETH LUCK**

I, Elizabeth Luck declare:

1.    I am an attorney with the Federal Capital Habeas Project based in the Office of the Federal Public Defender for the District of Maryland. The Federal Capital Habeas Project was appointed as counsel for Daniel Lewis Lee in 2014 for his remaining capital post-conviction and executive clemency proceedings. I was one of the attorneys assigned to represent Mr. Lee.

2.    On July 25, 2019, Mr. Lee received a letter from T.J. Watson, the Complex Warden at the Federal Correctional Complex at Terre Haute, notifying him that his execution would take place on December 9, 2019. That letter further notified Mr. Lee that if he wished to pursue a commutation of his sentence or a reprieve from the President, he would need to submit a petition for commutation of sentence to the Office of the Pardon Attorney ("OPA") within 30 days of the date of the notice.

3.    I, along with my co-counsel, Ruth E. Friedman and Morris H. Moon, timely submitted a petition for commutation of sentence with the OPA on August 30, 2019.[1]  Clemency Case Number C288749. OPA confirmed receipt, and later granted our request to make an oral presentation in support of our petition to the OPA on October 23, 2019.

4.    On that date, I, along with Ms. Friedman and Mr. Moon, made an oral

---

[1] The petition was timely. The July 25, 2019 notification letter contained significant errors. The Bureau of Prisons subsequently issued an amended notification on July 31, 2019 which informed Mr. Lee that he had 30 days from that date in which to seek clemency.

1

Exhibit 10 - 296

presentation to the OPA at its office in Washington, D.C. Also present were
Acting Pardon Attorney Rosalind Sargent-Burns; Senior Attorneys Kira Gillespie
and Christina Smith; and other OPA staff.

5.      On December 6, 2019, the United States Supreme Court denied the
Department of Justice's request to vacate an injunction barring Mr. Lee's
execution. As a result, Mr. Lee was not executed on December 9, 2019. Having
not received a final decision from the OPA on Mr. Lee's clemency application, on
December 13, 2019, my co-counsel and I withdrew Mr. Lee's clemency
application then pending before the Office of the Pardon Attorney, in light of 28
C.F.R. § 1.10 (e), which states: "Only one request for commutation of a death
sentence will be processed to completion, absent a clear showing of exceptional
circumstances." Withdrawing a petition in this posture is not uncommon, and is
done so that a new or revised submission can be made should the Department set
another execution date for the client. OPA acknowledged the action.

6.      On June 15, 2020, the Government rescheduled Mr. Lee's execution
for July 13, 2020.

7.      On December 2, 2019, Mr. Lee filed a Complaint in the district court
for the District of Columbia, alleging violations of his Fifth Amendment right to
due process and the First Amendment rights of correctional officers who wished to
provide critical information in support of his clemency application but were barred
from doing so by the Defendants in that action. *See Lee v. Barr*, *et. al.*, 1:19-cv-
03611 (D. D.C.) Dkt. 1. On February 12, 2020, Mr. Lee filed an Amended
Complaint. *Id.* at Dkt. 17.

8.      On June 22, 2020, Mr. Lee moved for a preliminary injunction,
enjoining Defendants from deliberately interfering with and obstructing Mr. Lee's
ability to obtain and present favorable, material evidence in the executive

2

Exhibit 10 - 297

clemency process for individuals under a death sentence, and enjoining Defendants from carrying out his scheduled execution until he had an opportunity to obtain and present evidence. *Id.* at Dkt. 24. The district court did not rule on this motion.

9.      On July 10, 2020, my co-counsel and I submitted a renewed clemency application for Mr. Lee to the OPA, in compliance with the procedures set forth in 28 C.F.R. § 1.10. I received an email acknowledgement from the OPA confirming that they had received Mr. Lee's clemency petition. Clemency Case Number C291125.

10.      Mr. Lee never received a decision from the OPA regarding either his 2019 clemency application or his 2020 clemency application, or any other application.

11.      The government executed Mr. Lee on July 14, 2020. The OPA "administratively closed" Mr. Lee's application on July 14, 2020.


I declare under penalty of perjury that the foregoing is true and correct. Executed in Chapel Hill, North Carolina on August 7, 2020.

EBluek

ELIZABETH LUCK

3

Exhibit 10 - 298

# EXHIBIT 11

TOM UDALL
NEW MEXICO

531 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-6621
(202) 228-3261 FAX
http://tomudall.senate.gov

### United States Senate
WASHINGTON, DC 20510

COMMITTEES:
APPROPRIATIONS
COMMERCE, SCIENCE, AND TRANSPORTATION
FOREIGN RELATIONS
INDIAN AFFAIRS
RULES AND ADMINISTRATION

August 19, 2020

*SENT VIA ELECTRONIC SUBMISSION*

The Honorable Donald J. Trump
President of the United States of America
The White House
1600 Pennsylvania Avenue NW
Washington, D.C. 20500

**Re:** *United States of America v. Lezmond Charles Mitchell*

Dear Mr. President:

I am writing to recommend your urgent and serious consideration of the Navajo Nation's request for Executive Clemency to commute the death sentence for Lezmond Charles Mitchell to life imprisonment. Mr. Mitchell, an enrolled member  of the Navajo Nation and the only Native American on federal death row, is facing execution on August 26, 2020.  The President and Vice President of the Navajo Nation both wrote to you on July 31, 2020 outlining the Nation's consistent opposition to the Department of Justice's decision to seek capital punishment in this case and requesting commutation.

Under the "opt-in" principle for capital punishment pursuant to the Federal Death Penalty Act, federally recognized Tribes may permit the federal government to seek the death penalty for major crimes, including murder, involving Tribal members that take place on reservation lands.  The Navajo Nation has long objected to the option because its traditional and religious beliefs teaches against taking human life for vengeance.  In Mr. Mitchell's case, rather than a charge of murder, the Department of Justice charged Mr. Mitchell with carjacking resulting in death – a crime for which the death penalty is not subject to Tribal consent -- and sought the death penalty on that charge over the Nation's objections.  This decision not only disrespected the Nation's traditional and religious beliefs, but also disregarded its sovereign decision not to opt in to capital punishment.

This request fully recognizes the gravity of Mr. Mitchell's heinous actions for which he was duly convicted. I have the deepest sympathies for the victims and their families, who have suffered a horrific loss to a grandmother and her granddaughter.  It is my understanding that the victims' immediate family do not support imposing capital punishment on Mr. Mitchell for his crimes.  I also share the concerns expressed by two judges who presided over Mr. Mitchell's case on appeal to the Ninth Circuit: for the first time in the modern history of the death penalty, the federal government has decided to execute a Native American for a crime committed entirely on Tribal lands and against fellow Tribe members—and it is doing so against the Tribe's longstanding objections.

Mr. President, as a former U.S. Attorney charged with upholding justice in Indian Country and as a United States Senator representing the Navajo Nation in New Mexico, I support President Nez and Vice President Lizer's request for a grant of Executive Clemency with a commutation of the death penalty sentence, replaced with life imprisonment, for Lezmond Mitchell.  I appreciate your urgent and serious consideration of their

STATE OFFICES:

ALBUQUERQUE:
400 GOLD AVENUE SW
SUITE 300
ALBUQUERQUE, NM 87102
505-346-6791

LAS CRUCES:
201 N. CHURCH STREET
SUITE 201B
LAS CRUCES, NM 88001
575-526-5475

PORTALES:
100 SOUTH AVENUE A
SUITE 113
PORTALES, NM 88130
575-356-6811

SANTA FE:
120 SOUTH FEDERAL PLACE
SUITE 302
SANTA FE, NM 87501
505-988-6511

Exhibit 11 - 299

**TOM UDALL**
NEW MEXICO

531 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-6621
(202) 228-3261 FAX
http://tomudall.senate.gov



**United States Senate**

WASHINGTON, DC 20510

COMMITTEES:
APPROPRIATIONS
COMMERCE, SCIENCE, AND TRANSPORTATION
FOREIGN RELATIONS
INDIAN AFFAIRS
RULES AND ADMINISTRATION

request and believe the commutation is the correct way to ensure justice for the victims and respect the sovereignty of the Navajo Nation.

Sincerely,

Tom Udall
U.S. Senator

STATE OFFICES:

ALBUQUERQUE:
400 GOLD AVENUE SW
SUITE 300
ALBUQUERQUE, NM 87102
505-346-6791

LAS CRUCES:
201 N. CHURCH STREET
SUITE 201B
LAS CRUCES, NM 88001
575-526-5475

PORTALES:
100 SOUTH AVENUE A
SUITE 113
PORTALES, NM 88130
575-356-6811

SANTA FE:
120 SOUTH FEDERAL PLACE
SUITE 302
SANTA FE, NM 87501
505-988-6511

Exhibit 11 - 300

# EXHIBIT 12



Native American Bar Association of Arizona
c/o Verrin Kewenvoyouma, President
PO Box 1732
Phoenix, Arizona 85001

The Honorable Donald J. Trump, President of the United States of America
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

Re: Executive Clemency for Lezmond Charles Mitchell, Execution set for August 26, 2020

Dear Mr. President:

On behalf of the Native American Bar Association of Arizona, we respectfully urge you to
grant clemency to Lezmond Charles Mitchell, a Navajo man, and commute his death sentence
to life without the possibility of release. Mr. Mitchell's death sentence deeply offends the
tribal sovereignty of the Navajo Nation as well as the values of many Native American
people. He should not be executed, and you alone have the power to show him mercy and
spare his life.

Mr. Mitchell is the only Native American on federal death row. Since 2001, when the crime
occurred against Navajo people on Navajo tribal land, the Navajo Nation has steadfastly
opposed a death sentence for Mr. Mitchell. The government used a legal loophole to obtain a
death sentence against Mr. Mitchell over tribal opposition, the only case in which it has ever
done so.

Mr. Mitchell's case is troubling for other reasons as well. The FBI abused Indian tribal courts
to deprive Mr. Mitchell of his federal due process rights. There are also disturbing, unresolved
issues about whether anti-Indian bias infected the nearly all-white jury that sentenced Mr.
Mitchell to death.

Further, Mr. Mitchell was just twenty years old at the time of the crime that sent him to death
row, and he had no history of violence or prior criminal convictions. The crime was terrible,
and he has expressed great remorse about his involvement. Yet his more culpable co-

Exhibit 12 - 301

Honorable Donald J. Trump
Re: Mitchell Clemency
August 21, 2020
Page 2 of 2

defendant, who was the primary aggressor, did not face a death sentence because of his young age.

Mr. Mitchell has now been given an execution date in the midst of a worldwide pandemic, which is already causing great pain and suffering in Indian communities.

Mr. Mitchell has spent nearly two decades in solitary confinement on federal death row and accepts that he must pay a heavy price for his crime. A commutation of his sentence to life without the possibility of release is a severe punishment. But he should not be executed.

For all these reasons, we urge you to commute Mr. Mitchell's death sentence. Thank you for your consideration.

Respectfully,

NATIVE AMERICAN BAR ASSOCIATION OF ARIZONA

Verrin Kewenvoyouma, President

Exhibit 12 - 302

# EXHIBIT 13

### DECLARATION OF JONATHAN C. AMINOFF

I, Jonathan C. Aminoff, hereby state and declare as follows:

1.       I am a Deputy Federal Public Defender at the Office of the Federal Public Defender in Los Angeles, California. I am licensed to practice law in the State of California and I am admitted to practice in this Court. I, along with Celeste Bacchi, represent Plaintiff Lezmond Mitchell in this action.

2.       In the course of my office's representation of Mitchell, we submitted an application for executive clemency to the Office of the Pardon Attorney ("OPA") seeking commutation of his death sentence. As part of that application, we were granted an opportunity to make an oral presentation to the OPA on August 11, 2020.

3.       On that date, I, along with Celeste Bacchi, made our oral presentation to OPA via videoconference. Also present were Acting Pardon Attorney Rosalind Sargent-Burns, Senior Attorneys Kira Gillespie and Christina White-Smith, and other OPA staff.

4.       At the oral presentation, Ms. Bacchi and I inquired about the review process and whether Mitchell would receive a decision about a grant or a denial of clemency before the execution date. Kira Gillespie, Senior Attorney Advisor at OPA, said that she could not tell us whether Mitchell's clemency petition would be decided, and a decision would be announced, before Mitchell's scheduled execution date. She told us that OPA are not the ultimate decision makers in the process and that there was no guarantee that we would receive a decision.

5.       Ms. Gillespie stated that she could not say when the OPA's recommendation would be sent to the Deputy Attorney General or any members of upper management at the Department of Justice, or when the recommendation might go to President Trump or his staff at the White House.

6.       When Mitchell's counsel asked if there was a procedure to expedite a reprieve request, to ensure a decision one way or the other before the execution day, Ms. Gillespie did not

Exhibit 13 - 303

provide an answer, but confirmed that a reprieve is a type of clemency that is within the President's prerogative.

7.      On August 20, 2020, Ms. Bacchi and I contacted Ms. Gillespie to inquire about the possibility of a reprieve before initiating this lawsuit. Ms. Gillespie again stated that she was not permitted to provide any details about where the clemency application was in the process, or whether there would be a decision before the execution on August 26, 2020.

8.      On August 24, 2020, Ms. Bacchi emailed myself and Assistant United States Attorney Krissa Lanham, of the United States Attorney's Office for the District of Arizona, who represents the Government in the criminal and post-conviction proceedings concerning Mr. Mitchell's criminal convictions and sentences.  Ms. Bacchi informed Ms. Lanham of the nature of this lawsuit, inquired as to who would be representing the Government in this matter, and to schedule a meet and confer concerning the motion for a temporary restraining order and injunction. Ms. Lanham indicated that she and Assistant United Sates Attorney Alan Burch would be counsel for the Government in this matter. Ms. Lanham further indicated, in a later email, that she would prefer to meet and confer by telephone.  Ms. Lanham and I spoke at approximately 4:15 p.m. E.S.T., and at that time she read a prepared statement as follows: "Having received both written and oral submissions from Mr. Mitchell, the Office of the Pardon Attorney has completed its investigation and the department has made its recommendation to the President.  *See* 28 CFR 1.6 and 1.10. Accordingly, no additional time is needed to complete the executive clemency process."  She further stated that the Government opposes a temporary restraining order or preliminary injunction.

Exhibit 13 - 304

I declare under penalty of perjury that the foregoing is true and correct. Executed in Terre Haute, Indiana on August 24, 2020.

_____
JONATHAN C. AMINOFF

Exhibit 13 - 305

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2020, in addition to filing via ECF, I caused true and correct copies of Plaintiff's Complaint, Civil Cover Sheet, Motion for Temporary Restraining Order and Preliminary Injunction, Motion for Expedited Hearing, and all supporting papers to be delivered (1) via email to counsel for the defendants Krissa Lanham (email: Krissa.Lanham@usdoj.gov), Sharon Sexton (email: Sharon.Sexton@usdoj.gov), William G. Voit (email: William.Voit@usdoj.gov), and Alan Burch (email: Alan.Burch@usdoj.gov) and (2) by overnight delivery, to the Defendants in the above-captioned action, at the following addresses:

WILLIAM P. BARR, et al.
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

JEFFREY A. ROSEN
Deputy Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

ROSALIND SARGENT-BURNS
Acting Pardon Attorney
Office of the Pardon Attorney
950 Pennsylvania Avenue, NW
Washington, DC 20530

MICHAEL CARVAJAL
Director
Federal Bureau of Prisons
U.S. Department of Justice
320 First Street, NW
Washington, DC 20534

JEFFREY E. KRUEGER
Regional Director
Federal Bureau of Prisons
North Central Region
U.S. Department of Justice
400 State Avenue, Suite 800
Kansas City, KS 66101

T.J. WATSON
Complex Warden
U.S. Penitentiary Terre Haute
4700 Bureau Road South
Terre Haute, IN 47802

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC 20530

Federal Bureau of Prisons
U.S. Department of Justice
320 First Street, NW
Washington, DC 20534

Office of the Pardon Attorney
950 Pennsylvania Avenue, NW
Washington, DC 20530

DATED:  August 24, 2020

_/s/ Jonathan C. Aminoff_
JONATHAN C. AMINOFF
Deputy Federal Public Defender

Counsel for Lezmond Charles Mitchell